**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| WILLIAM LOWREY,<br><br>Plaintiff,<br><br>v.<br><br>TWILIO INC., OPENAI, L.L.C., and FRESH START GROUP LLC,<br><br>Defendants. | Civil Action No. 6:25-cv-116-MFU |

**BRIEF IN SUPPORT OF OAI INTERNATIONAL, INC.'S (F/K/A OPENAI, LLC) MOTION TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. OpenAI Offers A Generative-AI Service To The Public .......... 3

B. Lowrey Alleges Fresh Start Group Ran A Robocalling Campaign. .......... 5

STANDARD OF REVIEW .......... 6

ARGUMENT .......... 6

I. Plaintiff Does Not Plausibly Allege OpenAI Violated The TCPA .......... 6

A. Plaintiff Does Not Plausibly Allege OpenAI "Initiated" Any Calls. .......... 6

B. Plaintiff Does Not Plausibly Allege That He Is A "Residential Telephone Subscriber." .......... 19

C. Plaintiff Does Not Plausibly Allege A "Telephone Solicitation." .......... 26

II. Plaintiff Does Not Plausibly Allege OpenAI Violated The VTPPA. .......... 28

A. The Court Should Decline Supplemental Jurisdiction Over Plaintiff's State-Law Claims. .......... 29

B. Plaintiff Does Not Plausibly Allege OpenAI "Made," "Initiated," Or "Caused To Be Initiated" Any Calls. .......... 29

C. Plaintiff Does Not Plausibly Allege A "Telephone Solicitation." .......... 31

D. Plaintiff's Failure-To-Identify Claim Fails Because He Does Not Allege OpenAI "Made Contact" With Him. .......... 31

III. OpenAI Cannot Be Held Liable Under Either The TCPA or the VTPPA Because Its Terms Of Service Prevent Unlawful Solicitations. .......... 33

CONCLUSION .......... 34

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA International v. FCC*,
885 F.3d 687 (D.C. Cir. 2018) ....................12

*Aderhold v. car2go N.A. LLC*,
668 F. App'x 795 (9th Cir. 2016) ....................27

*Advocate Christ Medical Center v. Kennedy*,
605 U.S. 1 (2025) ....................22

*Alvarez Ronquillo v. Bondi*,
151 F.4th 522 (4th Cir. 2025) ....................7, 20

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) ....................33

*Andersen v. Nexa Mortgage, LLC*,
2024 WL 3762098 (C.D. Cal. Aug. 12, 2024) ....................27

*Bank of America Corp. v. City of Miami*,
581 U.S. 189 (2017) ....................11

*Bank v. Vivint Solar, Inc.*,
2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019) ....................16

*Barr v. American Ass'n of Political Consultants, Inc.*,
591 U.S. 610 (2020) ....................21

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................13

*Bell v. Hawx Services, LLC*,
2025 WL 2533371 (E.D. Cal. Sep. 3, 2025) ....................28

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) ....................7

*Bryant v. Byron Udell & Associates Inc.*,
2023 WL 5180351 (E.D. Va. Aug. 11, 2023) ....................14, 15, 30

*Callier v. GreenSky, Inc.*,
2021 WL 2688622 (W.D. Tex. May 10, 2021) ....................23

*Cancian v. Hannabass & Rowe, Ltd.*,
2018 WL 6515148 (W.D. Va. Dec. 11, 2018) ....................................................32

*Cavey v. MarketPro Homebuyers, LLC*,
542 F. Supp. 3d 418 (E.D. Va. 2021) ....................................................31

*Cellcontrol, Inc. v. Mill Mountain Capital, LLC*,
2022 WL 598752 (W.D. Va. Feb. 28, 2022) ....................................................32

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ....................................................16

*Chennette v. Porch.com, Inc.*,
50 F.4th 1217 (9th Cir. 2022) ....................................................20, 21, 26

*Clemens v. Consumer Solution Center*,
2025 WL 2427685 (E.D. Va. Aug. 22, 2025) ....................................................30

*Cunningham v. McDonald*,
2018 WL 6737418 (M.D. Tenn. Nov. 5, 2018) ....................................................24

*Cunningham v. Politi*,
2019 WL 2519702 (E.D. Tex. Apr. 26, 2019) ....................................................24

*Cunningham v. Rapid Capital Funding, LLC/RCF*,
2017 WL 3574451 (M.D. Tenn. July 27, 2017) ....................................................24

*Cunningham v. Rapid Response Monitoring Services, Inc.*,
251 F. Supp. 3d 1187 (M.D. Tenn. 2017) ....................................................24

*Cunningham v. Sunshine Consulting Group, LLC*,
2018 WL 3496538 (M.D. Tenn. July 20, 2018) ....................................................23

*Dahdah v. Rocket Mortgage, LLC*,
2023 WL 5941730 (E.D. Mich. Sept. 12, 2023) ....................................................28

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) ....................................................23

*Feliciano v. Department of Transportation*,
605 U.S. 38 (2025) ....................................................21

*Gaker v. Q3M Insurance Solutions*,
2023 WL 2472649 (W.D.N.C. Feb. 8, 2023) ....................................................20, 23

*Garnett v. Remedi Seniorcare of Virginia, LLC*,
892 F.3d 140 (4th Cir. 2018) ....................................................15

*Godon v. North Carolina Crime Control*,
141 F.3d 1158 (4th Cir. 1998) ....................14

*Google LLC v. Oracle America, Inc.*,
593 U.S. 1 (2021)....................4

*Henderson v. Harmon*,
102 F.4th 242 (4th Cir. 2024) ....................29

*Hicks v. Alarm.com Inc.*,
2020 WL 9261758 (E.D. Va. Aug. 6, 2020)....................14, 30

*Hodgin v. UTC Fire & Security Americas Corp.*,
885 F.3d 243 (4th Cir. 2018) ....................16

*Horton v. Molina Healthcare of Texas, Inc.*,
2026 WL 490216 (N.D. Tex. Feb. 6, 2026)....................27

*Howard v. RNC*,
164 F.4th 1119 (9th Cir. 2026) ....................30

*Hulce v. Zipongo Inc.*,
132 F.4th 493 (7th Cir. 2025) ....................27

*Hurley v. Messer*,
2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018) ....................9, 10, 13

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ....................3, 6

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021)....................3

*Kisor v. Wilkie*,
588 U.S. 558 (2019)....................7

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) ....................7

*Laccinole v. Cova Home Realty LLC*,
2026 WL 617312 (E.D. Va. Feb. 11, 2026)....................32

*Lee v. Loandepot.com, LLC*,
2016 WL 4382786 (D. Kan. Aug. 17, 2016) ....................24

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................11

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....7, 22

*Matthews v. Senior Life Insurance Co.*,
2025 WL 1181789 (E.D. Va. Apr. 22, 2025) ....14, 15

*McLaughlin Chiropractic Associates., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025)....22, 23

*Megaro v. McCollum*,
66 F.4th 151 (4th Cir. 2023) ....34

*Melito v. American Eagle Outfitters, Inc.*,
2015 WL 7736547 (S.D.N.Y. Nov. 30, 2015)....13

*Morris v. Lincare, Inc.*,
2023 WL 5336780 (M.D. Fla. Aug. 18, 2023) ....21

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*,
130 F.4th 91 (4th Cir. 2025) ....13

*Murphy v. DCI Biologicals Orlando, LLC*,
2013 WL 6865772 (M.D. Fla. Dec. 31, 2013)....27

*Nickson v. Advanced Marketing & Processing, Inc.*,
2023 WL 4932879 (D. Md. Aug. 2, 2023) ....28

*Payne v. Sieva Networks, Inc.*,
347 F.R.D. 224 (N.D. Cal. 2024)....24

*Perrong v. CMI Marketing Research Inc.*,
2023 WL 6277299 (E.D. Pa. Sept. 26, 2023) ....27

*Salomon & Ludwin, LLC v. Winters*,
150 F.4th 268 (4th Cir. 2025) ....25

*Santos-Zacaria v. Garland*,
598 U.S. 411 (2023)....11

*Schmitendorf v. Juicy's Vapor Lounge, Inc.*,
2025 WL 2966205 (D. Kan. Oct. 21, 2025) ....25, 26

*Schulz v. Infogroup, Inc.*,
2020 WL 4201636 (N.D. Tex. July 21, 2020)....28

*Scruggs v. CHW Group*,
2020 WL 9348208 (E.D. Va. Nov. 12, 2020)....15, 29

*Shelton v. Fast Advance Funding, LLC*,
378 F. Supp. 3d 356 (E.D. Pa. 2019) ....................23

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................12

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025)....................17, 18, 19

*Southern Environmental Law Center v. Council on Environmental Quality*,
446 F. Supp. 3d 107 (W.D. Va. 2020) ....................8

*Stevens-Bratton v. TruGreen, Inc.*,
437 F. Supp. 3d 648 (W.D. Tenn. 2020)....................24, 25

*Strange v. ABC Co.*,
2021 WL 798870 (W.D. La. Mar. 1, 2021) ....................24, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................4

*Tharpe v. Lawidjaja*,
8 F. Supp. 3d 743 (W.D. Va. 2014) ....................8

*Turizo v. Subway Franchisee Advertising Fund Trust Ltd.*,
603 F. Supp. 3d 1334 (S.D. Fla. 2022) ....................22

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)....................16, 17, 18, 19

*United States v. Boyle*,
469 U.S. 241 (1985)....................26

*United States v. Collazo-Aponte*,
216 F.3d 163 (1st Cir. 2000)....................11

*United States v. Dish Network, LLC*,
75 F. Supp. 3d 942 (C.D. Ill. 2014) ....................25

*United States v. Miller*,
604 U.S. 518 (2025)....................11

*United States v. Turkette*,
452 U.S. 576 (1981)....................23

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)....................23

*Valladares v. Ray*,
130 F.4th 74 (4th Cir. 2025) ....................22

*Van Buren v. United States*,
593 U.S. 374 (2021)....................11

*West v. Koskinen*,
141 F. Supp. 3d 498 (E.D. Va. 2015) ....................26

*Zhu v. DISH Network, LLC*,
808 F. Supp. 2d 815 (E.D. Va. 2011) ....................29, 30, 33, 34

**Statutes**

47 U.S.C. § 227....................2, 3, 7, 10, 19, 20, 21, 23, 27, 33

Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394................1, 23

Va. Code § 59.1-510 ....................2, 31

Va. Code § 59.1-512 ....................2, 29, 31

Va. Code § 59.1-514 ....................2, 3, 29, 31, 33

**Regulatory Materials**

47 C.F.R. § 64.1200....................2, 6, 7, 10, 19, 24, 26

*In re Rules & Regulations Implementing the TCPA*,
18 FCC Rcd. 14014 (2003)....................22

*Joint Petition Filed by Dish Network, LLC, et al.*, Declaratory Ruling, 28 FCC
Rcd. 6574 (2013) ....................12

*Rules & Reguls. Implementing the TCPA*, Declaratory Ruling and Order, 30 FCC
Rcd. 7961, (2015) ....................9, 12

**Other Authorities**

*Cellphone*, Collins English Dictionary and Thesaurus (1993) ....................20

*Cellular*, Merriam Webster's Collegiate Dictionary (10th ed. 1994)....................20

*Cellular phone*, The American Century Dictionary (1995)....................20

*Computerized Telephone Sales Calls and 900 Service: Hearings Before the
Senate Comm. on Commerce, Science, and Transp.*, 102nd Cong. 67 (1991) ....................21

Cong. Rsch. Serv., IF12426, *Generative Artificial Intelligence: Overview, Issues, and Considerations for Congress* (Apr. 2, 2025), https://tinyurl.com/54cm2fhe......................3

*Initiate*, American Heritage Dictionary 662 (2d College ed. 1991) ...............................................7

*Initiate*, Merriam-Webster 622 (Ninth New Collegiate 1990).......................................................7

*Make*, American Heritage College Dictionary 818 (3d ed. 2000) ................................................30

*Make contact with someone/something*, Cambridge Dictionary, https://tinyurl.com/m3rxj5vh ..................................................................................32

*Make*, Merriam-Webster's Collegiate Dictionary 702 (10th ed. 1999) ........................................29

OpenAI Services Agreement (May 1, 2025), *available at* https://tinyurl.com/2c7zdeku ..........................................................................33, 34

*Residence*, Black's Law Dictionary (6th ed. 1990) .......................................................................20

*Residence*, Collins English Dictionary and Thesaurus (1993).....................................................20

*Residence*, Merriam Webster's Collegiate Dictionary (10th ed. 1994) ........................................20

S. Rep. No. 102-178 (1991).........................................................................................................21

## INTRODUCTION

Plaintiff William Lowrey brings this suit under the Telephone Consumer Protection Act ("TCPA") and the Virginia Telephone Privacy Protection Act ("VTPPA"). These statutes protect consumers from "nuisance calls to their homes." Pub. L. No. 102-243, § 2(6), 105 Stat. 2394 (1991). Lowrey has sued three parties: an alleged telemarketer (a company called Fresh Start), a dialing platform (a company called Twilio), and OpenAI.[1] He claims to have received unwanted telemarketing calls.

OpenAI does not belong in this case because OpenAI does not make telemarketing calls. Instead, OpenAI provides generative artificial intelligence ("AI") services to hundreds of millions of users across the United States and beyond. To get around the fundamental mismatch between what OpenAI does and what the TCPA and VTPPA prohibit, Lowrey offers an unprecedented—and ultimately, baseless—theory of liability. He claims that OpenAI violated the statutes because Fresh Start tried (unsuccessfully) to use OpenAI's generative-AI technology to talk to him on a phone call.

That theory fundamentally misunderstands the statutes and has no limit. Generative AI is a general-purpose technology that creates text, sounds, and other content at the prompting of users. It can be used any time people need new content, ideas, or data created automatically. It can mark up documents. It can create short stories. It can hold conversations. While these use cases are generally beneficial, they can of course be put to misuse. The document being marked up may be fraudulent. The short story might be in poor taste. The conversation may be held on an illegally placed call. But the same could be said of any general-purpose service—from word processors

[1] The named defendant, OpenAI, L.L.C., converted effective December 31, 2025 from a limited liability company to a corporation named OAI International, Inc.

and Internet service providers to banks and retailers. And nobody could seriously argue that the providers of these general-purpose services are somehow liable any time their services are put to unlawful ends.

The TCPA and VTPPA are no different. They limit liability to those who "initiate" or "make" calls. 47 C.F.R. § 64.1200(c); Va. Code §§ 59.1-514(A), 59.1-512. And Lowrey does not—and could not—plausibly allege that OpenAI itself initiates any calls. That some users allegedly employ OpenAI's technology to generate content *after* a call has been initiated does not result in liability. Beyond that, Lowrey fails to plausibly allege any facts that link OpenAI to the calls at issue in the Complaint. Indeed, the *only* OpenAI-specific allegation Lowrey makes in relation to the calls is that Fresh Start failed to pay for OpenAI's services and thus could not have possibly used those services for the alleged calls. At bottom, Lowrey seeks to hold OpenAI liable for its *user's* misconduct—a form of liability that has been repeatedly rejected by the Supreme Court under even more capacious statutes than the ones here. OpenAI did not "initiate" any unlawful calls and thus cannot be held liable under the TCPA or the VTPPA.

Other deficiencies permeate the Complaint and independently compel dismissal of the claims against OpenAI. For instance, Lowrey alleges he received calls to his *cell phone*, but invokes a cause of action limited to "*residential* telephone subscribers." 47 U.S.C. § 227(c)(1), (5) (emphasis added). Lowrey claims to have received "telephone solicitations," but fails to allege any facts to show that the calls were made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); *see* Va. Code § 59.1-510. And Lowrey incorporates by reference OpenAI contracts that prohibit customers like Fresh Start from using its services to violate the law—a "reasonable practice[ ] and procedure[ ]" that

entitles OpenAI to "an affirmative defense" that compels dismissal. 47 U.S.C. § 227(c)(5); Va. Code § 59.1-514(C).

For each of these reasons, the Court should dismiss with prejudice all claims against OpenAI.

## BACKGROUND[2]

### A. OpenAI Offers A Generative-AI Service To The Public.

OpenAI is an artificial intelligence research and deployment company that "allows its users" to access and employ generative-AI technology. *See* Compl. ¶¶ 43–49. Generative AI "refers to AI models, in particular those that use machine learning (ML) and are trained on large volumes of data, that are able to generate new content … when prompted (often by a user inputting text)." Cong. Rsch. Serv., IF12426, *Generative Artificial Intelligence: Overview, Issues, and Considerations for Congress* 1 (Apr. 2, 2025), https://tinyurl.com/54cm2fhe.[3] OpenAI does not place calls, nor is it a calling platform. Instead, OpenAI's users can employ generative-AI in a variety of different "application areas, such as natural language processing" or "arithmetic and computer programming tasks"—essentially anything that uses context and reasoning to generate "outputs, including text, images, videos, computer, code, or music." *Ibid.*

At issue here, Lowrey alleges that Defendant Fresh Start Group LLC ("Fresh Start") used OpenAI's generative-AI API. *See* Compl. ¶¶ 92–93 (referencing webpages specific to OpenAI's API). An API is an "application programming interface"—a "tool that allows programmers to use

---

[2] OpenAI does not concede the truth of any allegations in the Complaint but merely treats the plausible allegations "as true" for purposes of this motion, as it must on a motion to dismiss. *See Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024).

[3] This Court can "take judicial notice of facts" that "are generally known and can be readily determined from reliable sources, such as the Congressional Research Service." *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

prewritten code to build certain functions into their own programs." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 9 (2021) (quotation marks omitted; alterations accepted). OpenAI's API thus allows third-party users to integrate generative-AI technology into their own programs. For example, the Complaint incorporates a webpage from Defendant Twilio Inc. ("Twilio"), a "cloud communications company," Compl. ¶ 13, that explains how to "implement the functionality to make an outbound call using the Twilio API," and then activate "the OpenAI Realtime API" after someone "answers the phone." *See* Paul Kamp, *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python*, Twilio (Aug. 28, 2025) ("*Twilio Outgoing Calls Page*"), https://www.twilio.com/en-us/blog/outbound-calls-python-openai-realtime-api-voice; *accord* Compl. ¶¶ 47–48 (citing this page).[4]

OpenAI's API acts at the direction of users. And in the calling context, OpenAI's API is engaged *after* a call is initiated. The user has to code in "instructions" to "control[ ] the AI's behavior *during the phone call*" and "control[ ] how the AI will sound." *Twilio Outgoing Calls Page* (emphasis added). In doing so, the user "give[s]" the AI "a prompt … [to] give it its mission, … give it its purpose, give it its persona, and … give it … a conversation flow, like … 'hey, here's how I kind of want the conversation to go' … etcetera, etcetera." Alex Leischow, *How to Build an AI Voice Agent That Cold Calls Leads for You (2025)*, at 2:35–40, 3:53–4:10, YouTube (May 14, 2025), youtube.com/watch?v=yKn0qKakUOk ("*Cold Calls Tutorial Video*"); *accord* Compl. ¶¶ 45–46 (citing this video).

---

[4] "[W]hen ruling on Rule 12(b)(6) motions to dismiss," courts "must consider the complaint in its entirety," which includes, "in particular, documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citing Wright & Miller).

### B. Lowrey Alleges Fresh Start Group Ran A Robocalling Campaign.

Lowrey's Complaint alleges he received unwanted robocalls and texts from Fresh Start via its brand, "Probate CURES." Compl. ¶¶ 71–72. Lowrey says he received 40 text messages "market[ing] services to assist with the probate process in Virginia." *Id.* ¶ 66, 68–70, 73–74, 78, 81–84, 87, 97. And he alleges four phone calls that left "a pre-recorded message … directing [Lowrey] to call … back at [two different numbers] and stating 'I'm reaching out because I noticed you're representing an estate.'" *Id.* ¶¶ 88, 90, 94, 95, 97.

Lowrey does not allege that OpenAI was involved in sending him text messages. But Lowrey blames OpenAI for the unwanted phone calls. Although he claims the calls were "initiated by Fresh Start," he says they were "actually made by OpenAI." *Id.* ¶ 105. However, OpenAI does not itself make calls, and the Complaint does not allege any facts suggesting otherwise. Again, OpenAI offers to the public generative-AI services—a general-purpose technology that generates content at the direction of users. *See supra* Section A.

Lowrey alleges only one fact that purports to link OpenAI to the calls he received. After he called back one of the numbers that left him a prerecorded message about Fresh Start's services—and upon answering one of the calls—he claims to have heard an error code that referenced a "webpage maintained by OpenAI." Compl. ¶¶ 91–92, 94. That error page explained that the caller had failed to pay its bill and thus could not use OpenAI's services. *Id.* ¶ 92.

Lowrey alleges that OpenAI violated three statutory provisions. In Count One, he alleges that OpenAI "initiated … telephone solicitation[s]" in violation of the TCPA—specifically 47 C.F.R. § 64.1200(c)(2) and 47 U.S.C. § 227(c)(5). Compl. ¶¶ 138–41. In Count Three, he alleges that OpenAI "initiate[d], or cause[d] to be initiated, a telephone solicitation" in violation of the VTPPA—specifically Va. Code § 59.1-514(B). Compl. ¶¶ 162–64. And in Count Six, he alleges that OpenAI "ma[d]e[ ] a telephone solicitation via telephone call" and, after "making contact,"

did not "identify" itself in violation of the VTPPA—specifically Va. Code § 59.1-512. Compl. ¶¶ 200, 203.

## STANDARD OF REVIEW

The Court should dismiss all claims against OpenAI for failure to state a claim. Under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (alterations accepted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But a court "need not accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Ibid.* And a court "may consider 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Ibid.*

## ARGUMENT

### I. PLAINTIFF DOES NOT PLAUSIBLY ALLEGE OPENAI VIOLATED THE TCPA.

The sole TCPA claim against OpenAI asserts that the company initiated telephone solicitations to a residential telephone subscriber in violation of 47 C.F.R. § 64.1200(c)(2). *See* Compl. ¶¶ 138–41. Lowrey's claim fails for three independent reasons. *First*, OpenAI did not "initiate" any calls. *Second*, Lowrey is not a "residential telephone subscriber," and the allegations otherwise are implausible. *Third*, the alleged calls were not "telephone solicitations." Each of these grounds is dispositive and thus a sufficient basis to dismiss the TCPA claim against OpenAI.

#### A. Plaintiff Does Not Plausibly Allege OpenAI "Initiated" Any Calls.

To state a claim, Lowrey must first plausibly allege that OpenAI "initiate[d]" unlawful calls. 47 C.F.R. § 64.1200(c). Lowrey has failed to plausibly allege that OpenAI initiated calls for three independent reasons. *First*, OpenAI does not initiate calls at all. *Second*, Lowrey has not

pled any factual content that links OpenAI to the calls alleged in this case. *Third*, Lowrey cannot hold OpenAI liable for merely failing to stop an alleged TCPA violator from using its platform.

1. The Complaint Does Not Plausibly Allege That OpenAI Initiates Calls.

a. *OpenAI Does Not "Initiate" Calls Because Its Technology Is Used Only After Call Initiation.*

Start with the meaning of "initiate." The TCPA and its implementing regulations do not define "initiate." *See* 47 U.S.C. § 227(a); 47 C.F.R. § 64.1200(c), (f). Thus, that term must be given its "plain meaning," *Alvarez Ronquillo v. Bondi*, 151 F.4th 522, 526 (4th Cir. 2025) (quotation omitted), and the Court should construe the term as it is used by "an ordinary speaker," *Bondi v. VanDerStok*, 604 U.S. 458, 471 (2025); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *Kisor v. Wilkie*, 588 U.S. 558, 574–75 (2019).

"Initiate" means "[t]o cause to begin," *see Initiate*, Am. Heritage Dictionary 662 (2d College ed. 1991), or "set going," *Initiate*, Merriam-Webster 622 (Ninth New Collegiate 1990); *see Alvarez Ronquillo*, 151 F.4th at 527 (consulting "dictionaries published close in time to when [the statute] was enacted"). Similarly, as the Fourth Circuit has explained, a call is made "by … [an] entity," 47 U.S.C. § 227(c)(5), when it "directly" "place[s]" the call, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659 (4th Cir. 2019).[5] So, in plain terms, one initiates a call when they dial a number and, if necessary, press "call."

OpenAI does not initiate any calls. Rather, OpenAI's role, if any, comes *after* call initiation. A webpage incorporated at paragraphs 47 and 48 of the Complaint shows why. It explains that a "[p]rerequisite[ ]" for a user to initiate calls is the possession of a "Twilio account"

---

[5] The TCPA's private right of action also reaches calls made "on behalf of" an entity, 47 U.S.C. § 227(c)(5), which "contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly," *Krakauer*, 925 F.3d at 659. Lowrey does not allege anyone made calls on behalf of OpenAI and so must show that OpenAI placed calls directly.

and a "Twilio number with Voice capabilities to make an outbound call." *Twilio Outgoing Calls Page*. It then explains how "to make an outbound call *using the Twilio API*." *Ibid.* (emphasis added). It offers instructions to "initialize … the *Twilio client we'll be using to make our outbound call*." *Ibid.* (emphasis added). It makes clear that a caller must "implement the functionality to make an outbound call *using the Twilio API*." *Ibid.* (emphasis added). And it provides code for a "make_call function [that] initiates an outbound call to the specified phone number *using Twilio's Python Helper Library*." *Ibid.* (emphasis added).

The document further explains that *OpenAI*'s API comes into play only *after* someone else has initiated a call. It explains that the system uses "the AI to talk *when the call is picked up*." *Ibid.* (emphasis added). It uses "the OpenAI Realtime API" only *after* someone "*answers the phone*." *Ibid.* (emphasis added). Only "[o]n connect"—i.e., after contact with the recipient—does the program "start proxying audio between OpenAI and Twilio." *Ibid.* There are no instructions on how to use the OpenAI API to place calls. Instead, there are instructions on how to "control[ ] the AI's behavior during the phone call," *ibid.* (emphasis added), and "to get the AI to talk first," *ibid.*—actions that happen only after the call is answered.

Other materials incorporated into the complaint disprove Lowrey's conclusory allegations against OpenAI and reinforce that OpenAI is not involved in any call until after it is initiated. Paragraph 43 references a webpage explaining that outbound-call automation requires using "Twilio for the phone calls" and "OpenAI for the speech to speech AI." HenryObj, *How I automated cold calls with AI*, OpenAI Developer Community (Dec. 23, 2024).[6] Paragraphs 45

[6] This webpage is no longer publicly available. OpenAI thus attaches an archived copy from the "Wayback Machine" as Exhibit A to the motion. *See Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 776 (W.D. Va. 2014) ("The Wayback Machine allows users to view archived webpages and their content as they existed at any given point."); *S. Env't L. Ctr. v. Council on Env't Quality*, 446 F. Supp. 3d 107, 113 n.6 (W.D. Va. 2020) (taking judicial notice of the contents of "WayBack

and 46 reference an instructional video that similarly explains that, when it comes to "actually calling phone numbers," the outbound-calling system must use a dialing platform—in the video, the platform used is called "make.com." *Cold Calls Tutorial Video* at 17:40–52. Again, the AI technology does not come into play until after the user places the call using that calling platform. *See also* Compl. ¶¶ 92, 94 (alleging Lowrey heard an error message when caller allegedly attempted to use OpenAI's services after initiating the call).

Thus, the factual matter and materials incorporated in the Complaint allege that the technology works like this: (i) a caller (here, allegedly Fresh Start) chooses to initiate calls, (ii) a calling platform like make.com takes the causal steps to place the calls at the entity's direction, and (iii) in some cases, the caller uses an AI platform like OpenAI's API to hold a conversation *after* the call is initiated.[7]

The bottom line is that OpenAI did not "initiate" any call in violation of 47 C.F.R. § 64.1200(c). Indeed, courts facing analogous circumstances have reached the same conclusion. In *Hurley v. Messer*, 2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018), a plaintiff sued an individual caller, calling platforms, and a technology intermediary called Fiverr. *Id.* at *1. Fiverr allegedly connected the individual caller to "voice actors" who "read [a] prepared script" for prerecorded calls that violated the TCPA. *Id.* at *3. Although the court found it plausible that the individual and/or the platforms initiated the calls, it dismissed the claims against Fiverr. It reasoned that there

---

Machine evidence"). As that exhibit shows, the post on OpenAI's Developer Community page was made by a third-party developer named HenryObj, who claims to be affiliated with an organization called "SPAR" and does not claim any affiliation with OpenAI. *Contra* Compl. ¶ 43.

[7] None of this is to suggest that calling platforms initiate any calls or texts. To the contrary, the FCC has found that a dialing platform that merely "allows its users to send" communications "does not make or initiate a call." *See Rules & Reguls. Implementing the TCPA*, Declaratory Ruling and Order, 30 FCC Rcd. 7961, ¶¶ 31–32 (2015). But OpenAI is even further removed than even non-initiator dialing platforms because it is not involved in placing calls *at all*.

were "no facts suggesting that Defendant Fiverr physically placed the telephone calls at issue." *Id.* at *3. And it rejected the contention that the provision of voice actors for unlawful calls meant Fiverr "could be deemed to have initiated them." *Ibid.* "[P]roviding an actor to read the content of an illegal message," the court explained, "is not the equivalent of being 'so involved in *the placing* of a specific telephone call as to be deemed *to have initiated it*.'" *Id.* at *4 (emphasis in original).

The same reasoning applies here. The Complaint shows that OpenAI did not "physically place[ ] the telephone calls." *Id.* at *3. And the Complaint's allegation that OpenAI's platform "generates the audio, and interacts with individuals who answer such calls," Compl. ¶ 49, at the direction of users who code in "instructions" to "control[ ] the AI's behavior during the phone call," *Twilio Outgoing Calls Page*; *Cold Calls Tutorial Video* at 3:53–4:10, shows that here, OpenAI simply offered the AI version of Fiverr's provision of voice actors. "[P]roviding an [API]" that third parties use to generate "the content of an illegal message is not the equivalent of being 'so involved in *the placing* of a specific telephone call as to be deemed *to have initiated it*.'" *Hurley*, 2018 WL 4854082 at *4 (emphasis in original).

b. *The Structure And Purpose Of The TCPA's Regulatory Scheme Reinforce That OpenAI Does Not "Initiate" Calls.*

Reading "initiate" to reach OpenAI's provision of a generative-AI API would not only flout the plain meaning of that term, but it would also make a mess of the TCPA's regulatory scheme.

Start with the structural implications. Lowrey's theory would render OpenAI liable based on which number is called, *see* 47 C.F.R. § 64.1200(c)(2), the relationship between the calling party and recipient, *see id.* § 64.1200(c)(2)(ii)–(iii), and the purpose for the call, *see* 47 U.S.C. § 227(a)(4). But OpenAI is neither a telemarketer nor a dialing platform. Thus, it does not choose

which number to call, it has no way of knowing the caller's relationship with the recipient, and it does not decide the purpose for the call. Thus, Lowrey's reading would hold OpenAI liable for decisions completely outside of its control.

That reading is nonsensical. It would "render the statutory scheme incoherent" by imposing on a non-caller "obligation[s] … incompatible with the rest of the statute's design." *Santos-Zacaria v. Garland*, 598 U.S. 411, 428 (2023). That "flouts a fundamental canon of statutory construction … that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Miller*, 604 U.S. 518, 533 (2025) (quotations omitted). And by eschewing any need for "some direct relation between the injury asserted and the injurious conduct alleged," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202–03 (2017), that reading is inconsistent with principles of "proximate causation," presumptively incorporated into "statutory cause[s] of action," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). Worse still, it would raise serious constitutional questions by holding a party liable for choices it did not make. *See, e.g.*, *United States v. Collazo-Aponte*, 216 F.3d 163, 196 (1st Cir. 2000) (explaining "due process constrains" liability "where the relationship between [a party] and the substantive offense is slight"), *vacated on other grounds*, 532 U.S. 1036 (2001).

The "breathtaking" scope of Lowrey's reading further "underscores the implausibility of [his] interpretation." *Van Buren v. United States*, 593 U.S. 374, 393–94 (2021). If offering a legitimate, general-purpose service is sufficient to render a company liable under the TCPA when its users employ that service in furtherance of allegedly unlawful calls, there would be no end to the statute's reach. Proofreading and related features in word-processing software such as Apple Pages commonly suggest spelling, grammar, and other changes to documents. If the document

happens to be a cold-calling script, does that render the software company liable for calls made using that script? Similarly, telemarketers and others commonly store telephone numbers in spreadsheet programs such as Google Sheets. If employees place calls using the spreadsheet program, *see, e.g.*, *Cold Calls Tutorial Video* at 21:18–21:40, is the distributor of the spreadsheet software liable? Of course not. Reading "initiate" to reach providers of general-purpose technology—in particular, technology that has nothing to do with phone calls—would give the statute "an eye-popping sweep" that would render countless companies "TCPA-violator[s]-in-waiting" for conduct entirely beyond their control. *ACA Int'l v. FCC*, 885 F.3d 687, 697–98 (D.C. Cir. 2018) (rejecting expansive reading of the TCPA that would reach every smartphone).

These issues are exactly why the FCC has rejected a reading of "initiate" that would sweep in "a host of activities which have only a tenuous connection with the making of a telephone call." *Joint Petition Filed by Dish Network, LLC, et al.*, Declaratory Ruling, 28 FCC Rcd. 6574, ¶ 26 (2013) ("*2013 FCC Ruling*"); *accord Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The agency has "conclude[d] that a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities … that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." *2013 FCC Ruling* ¶ 26. Thus, a company "does not make or initiate a call" when it offers a service that is "reactive in nature" and "allows its users to" make communications. *Rules & Reguls. Implementing the TCPA*, Declaratory Ruling and Order, 30 FCC Rcd. 7961, ¶¶ 31–32 (2015) ("*2015 FCC Ruling*"). And even that guidance is specifically about the liability of dialing platforms that "facilitate[ ] calling, or host[ ] a calling service"—entities that, unlike OpenAI, are at least "involved in the placing of … telephone call[s]." *Id.* ¶¶ 28, 30, 31 (analyzing "YouMail" app offering "service to send an automatic text message"), 35 (analyzing app that

"sends invitational text messages"), 36 (analyzing "TextMe app and service" that "provides access to text message and voice call services"). Lowrey alleges a violation of the FCC's rules, Compl. ¶ 140, but the agency has *never* suggested that general-service platforms like OpenAI—that are not involved in placing calls at all—can somehow be deemed call initiators. *See, e.g.*, *Hurley*, 2018 WL 4854082, at *4 ("read[ing] the content of an illegal message is not the equivalent of being … involved in *the placing* of a" call (quoting *2015 FCC Ruling* ¶ 30) (emphasis in original)).

For these reasons, Lowrey has failed to plausibly allege that OpenAI "initiated" any calls—much less the calls to his phone number.

2. <u>Plaintiff Has Not Plausibly Alleged Any Facts Showing That OpenAI Initiated The At-Issue Calls.</u>

Even if the Court were to find that OpenAI's API "initiates" some telemarketing calls (it does not), Lowrey's TCPA claim still fails for an independent reason: he fails to plausibly allege that OpenAI initiated the telemarketing calls at issue in this case.

Lowrey alleges in wholly conclusory fashion that "OpenAI made, initiated, and/or caused to be initiated multiple telemarketing calls to Plaintiff within the meaning of the TCPA and the VTPPA." Compl. ¶¶ 54, 105. That allegation, standing alone, is a textbook failure to state a claim. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to survive a motion to dismiss." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 112 (4th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied sub nom.*, 146 S. Ct. 821 (2025). Yet here, Lowrey offers nothing more than a "naked assertion of" wrongdoing. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Indeed, courts regularly reject as "a legal conclusion devoid of further factual enhancement" plaintiffs' "conclusory assertions that [a defendant] sent or caused … to be sent" communications in violation of the TCPA. *Melito v. Am. Eagle Outfitters, Inc.*, 2015 WL

7736547, at *4 (S.D.N.Y. Nov. 30, 2015); *Matthews v. Senior Life Ins. Co.*, 2025 WL 1181789, at *3 (E.D. Va. Apr. 22, 2025) (rejecting plaintiff's conclusory assertion that defendant initiated calls without "plead[ing] any facts to substantiate that claim"); *Bryant v. Byron Udell & Assocs. Inc.*, 2023 WL 5180351, at *5 (E.D. Va. Aug. 11, 2023) (rejecting "broad, conclusory and ambiguous allegations about [defendant's] involvement" in calls); *Hicks v. Alarm.com Inc.*, 2020 WL 9261758, at *4 (E.D. Va. Aug. 6, 2020) (dismissing complaint where "connection between the[ ] communications and the named Defendant is factually flimsy").

Yet here, Lowrey alleges virtually no factual matter about OpenAI's supposed involvement with the alleged calls. Indeed, the *only* factual allegation about OpenAI affirmatively undermines Lowrey's bare legal conclusion. Lowrey claims that he received a "call from Defendants in which they left a voicemail" with a "callback number," and that when he "called th[e] number back," he heard a "recorded message" purporting to be from Fresh Start, followed by another message that said: "All three attempts failed. 429: you've exceeded your current quota. Please check your plan and billing detail. For more information on this error, read the docs. https://platform.openai.com/docs/guides/error-codes/api-errors." Compl. ¶¶ 90–91; *see also id.* ¶ 94. "The link provided in this message is to an actual webpage maintained by OpenAI," which provides that the "OpenAI customer[ ] … ha[s] run out of credits or hit their maximum 'monthly spend.'" *Id.* ¶ 92. In other words, Lowrey alleges that Fresh Start could not use OpenAI's services because it had not paid its bill. *See id.*; *accord Error Codes*, OpenAI, https://tinyurl.com/3ek7kvxh (explaining that "[s]olution" to error is to "[b]uy more credits or learn how to increase your limits").

That allegation cuts sharply against Lowrey. Accepting as true that Fresh Start was unable to use OpenAI's services "does not support—and indeed undermines—[Lowrey's] claim," *Godon*

*v. N. Carolina Crime Control*, 141 F.3d 1158, at *3 (4th Cir. 1998) (per curiam), that the calls were "made by OpenAI" after being "initiated by Fresh Start," Compl. ¶ 105. Put simply, if Fresh Start had not paid its bill to use OpenAI's services, then it could not have used OpenAI's services for *any* purpose, much less to "make" the alleged calls (functionality that OpenAI's API does not even support, *see Twilio Outgoing Calls Page*). And, of course, the mere fact that an error message mentioned OpenAI when Lowrey "called th[e] number back," Compl ¶ 91, does not plausibly suggest that OpenAI had anything to do with initiating a call to Lowrey. That theory is akin to conflating the existence of a telephone answering machine with actually placing a telephone call.

But even if the Court were to credit that an error code mentioned OpenAI—disregarding the context of that mention—that factual allegation would still be insufficient to support an inference that OpenAI initiated the calls. That is because even if a plaintiff alleges "the caller identified himself as associated with" the defendant, that "solitary fact" does not clear the plausibility bar for initiation. *Scruggs v. CHW Grp.*, 2020 WL 9348208, at *6–*7, *9–*10 (E.D. Va. Nov. 12, 2020); *id.* at *10 ("That lone link to the defendant is insufficient under the *Iqbal* pleading standards."); *Bryant*, 2023 WL 5180351, at *4 ("In *Scruggs*, the unwanted telemarketer actually identified himself as associated with the defendant. Nevertheless, the court still dismissed the case after determining that there was no factual basis to trace the calls to the defendant and that 'the alleged conduct could have been attributed to an unrelated third party.'" (citations omitted)); *Matthews*, 2025 WL 1181789, at *3 (holding that receiving "questions regarding" the defendant's service on the call "is not sufficient to identify [defendant] as the caller").

At bottom, Lowrey does not plead "a scintilla of factual support" that would plausibly "connect" OpenAI to the calls, and thus his "complaint fails the basic test … that 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Garnett v. Remedi Seniorcare*

*of Virginia, LLC*, 892 F.3d 140, 146 (4th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679); *accord Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 253 (4th Cir. 2018) (rejecting argument that party was responsible for calls where only purported "connection between [defendant's actions] and the purported TCPA violations [wa]s so attenuated" that it "amount[ed] to mere speculation"). That alone dooms Lowrey's TCPA claim against OpenAI.

3. Plaintiff Does Not Plausibly Allege Any Facts That Would Support Holding OpenAI Liable For Its Users' Alleged Misdeeds.

Finally, even if the Court finds plausible that OpenAI "initiates" calls at all (it does not) and was in some abstract way connected to the initiation of the calls alleged in the Complaint (it was not), Lowrey still cannot show that OpenAI "initiated" the at-issue calls for a third independent reason: he has articulated no facts that would support holding OpenAI liable for its users' actions.

Lowrey, at bottom, seeks to hold OpenAI liable for aiding and abetting Fresh Start's alleged calls. But the TCPA does not authorize aiding-and-abetting liability. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (explaining civil statutes do not provide for secondary liability absent express language); *accord Bank v. Vivint Solar, Inc.*, 2019 WL 1306064, at *5 n.4 (E.D.N.Y. Mar. 22, 2019) ("no court has found that the TCPA provides for aiding and abetting liability"). And a pair of recent Supreme Court cases shows that Lowrey would not be able to satisfy even that more relaxed liability standard—only crystallizing that he falls far short of plausibly alleging the *direct* liability required by the TCPA.

First, in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court unanimously declined to hold social-media companies liable where a terrorist group allegedly used the companies' online "platforms to recruit new terrorists and to raise funds for terrorism." *Id.* at 478. To impose liability for assisting in another's wrong, the Court explained, a plaintiff must allege "conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493. The

plaintiffs fell short in *Twitter* because the defendants' "mere creation of" social-media "platforms … [wa]s not culpable" simply because "bad actors … [we]re able to use [such] platforms … for illegal … ends." *Id.* at 499. Similarly, in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), the Supreme Court unanimously refused to hold gun manufacturers liable for allegedly "supply[ing] firearms to retail dealers whom they know illegally sell to Mexican gun traffickers." *Id.* at 288. Again, the Court recognized that "routine and general activity that happens on occasion to assist a [wrong]—in essence, incidentally—is unlikely to count as aiding and abetting." *Id.* at 292 (quotations omitted).

The principles in these cases are plainly instructive: both were decided on motions to dismiss, and both sought to hold a company liable because customers allegedly used the company's services to commit a wrong. But, as explained, the statutes at issue in *Twitter* and *Smith & Wesson* were far easier to satisfy than the TCPA because they each authorize aiding-and-abetting liability. *See Twitter*, 598 U.S. at 478 ("any person who aids and abets, by knowingly providing substantial assistance"); *Smith & Wesson*, 605 U.S. at 286 (similar). If there was no liability under statutes that authorized aiding-and-abetting liability, a fortiori there can be no direct liability here.

Lowrey fails even the more forgiving aiding-and-abetting standard articulated in *Twitter* and *Smith & Wesson*. Just like the Defendants in those cases, OpenAI offers a service to the public: a general-purpose, generative-AI API that can engage in real-time voice and text generation. By its very nature, this service can be—and is—used for many different activities. That includes phone calls. But it also could include uses such as acting as a virtual personal assistant, offering a customer-support chat window on a website, or even voicing characters in a movie or video game.

So, at most, Lowrey alleges that OpenAI offers a general "service[ ] to the public writ large" and "fail[ed] to stop" a TCPA violator "from using [OpenAI's] platform[ ]." *Twitter*, 598 U.S. at 499–500. Just like in *Twitter* and *Smith & Wesson*, OpenAI allegedly engaged in "routine and general activity that happen[ed] on occasion to assist in a" TCPA violation. *Smith & Wesson*, 605 U.S. at 292. And just like in those cases, such allegations, without more, fail to establish liability for "mere passive nonfeasance." *Twitter*, 598 U.S. at 500; *Smith & Wesson*, 605 U.S. at 292, 297.

By that same token, "[n]one of [Lowrey's] allegations suggest that" OpenAI "culpably associated [itself] with" Fresh Start's TCPA violation, "participated in it as something [OpenAI] wished to bring about," or sought "to make it succeed." *Twitter*, 599 U.S. at 498 (quotations omitted). There is no allegation OpenAI gave Fresh Start "any special treatment or words of encouragement." *Ibid.* Indeed, in serving "millions … of people" with "vast quantities of information on a daily basis," there "are no allegations that [OpenAI] treated [Fresh Start Group] any differently from anyone else." *Id.* at 500. And Lowrey has not offered "any reason to think that [OpenAI] w[as] consciously trying to help or otherwise participate in" Fresh Start's alleged TCPA violation. *Ibid.* (quotations omitted).

Indeed, consider what little the Complaint says about OpenAI. Lowrey's central allegation is that "OpenAI *allows its users* to fully automate calls," Compl. ¶ 49 (emphasis added), that OpenAI's *users* "control[ ] the AI's behavior during the phone call," *Twilio Outgoing Calls Page*; *Cold Calls Tutorial Video* at 2:35–40, 3:53–4:10, and that *Fresh Start* unsuccessfully tried to use OpenAI's API, *id.* ¶¶ 91–92. Lowrey thus alleges that once the API was "up and running, [OpenAI] at most allegedly stood back and watched; [it was] not alleged to have taken any further action with respect to" Fresh Start. *Twitter*, 598 U.S. at 499. Such "failures, omissions, or

inactions … rarely support aiding-and-abetting liability," much less *direct* liability. *Smith & Wesson*, 605 U.S. at 292 (cleaned up). Lowrey also alleges that third parties discussed how to use OpenAI's technology to generate content on phone calls. Compl. ¶¶ 43–48. But such calls are not inherently illegal. *See, e.g.*, 47 C.F.R. § 64.1200(c)(2)(i); 47 U.S.C. § 227(a)(4)(A)–(C). And even if OpenAI "kn[ew] that in some fraction of cases misuse will occur," it would still not "become liable" for any "misuse of" its service by customers. *Smith & Wesson*, 605 U.S. at 292 (cleaned).

At bottom, even under aiding-and-abetting liability, a plaintiff cannot hold a service provider "liable for any sort of wrongdoing merely for knowing that [some] wrongdoers [a]re" potentially "using its services and failing to stop them." *Twitter*, 598 U.S. at 503. Plainly then, Lowrey cannot prevail on that same theory under a *direct*-liability regime.

### B. Plaintiff Does Not Plausibly Allege That He Is A "Residential Telephone Subscriber."

Lowrey's TCPA claim fails for additional, independent reasons. Lowrey alleges he received unwanted telephone calls to "his cellular phone number ending in 4102" after registering it "on the National Do Not Call Registry." Compl. ¶ 64. That allegation fails to state a claim as a matter of law because the TCPA authorizes do-not-call suits only by *residential* telephone subscribers, not *cellular* telephone subscribers. Even if the Court disagrees, Lowrey has not alleged sufficient factual content to show that his cellular telephone was a residential telephone.

#### 1. <u>Cellular Telephones Are Not Residential Telephones.</u>

Lowrey invokes the TCPA private right codified at 47 U.S.C. § 227(c)(5). Compl. ¶¶ 141, 144, 145. That right authorizes suits for telephone calls made "in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). "[T]his subsection" refers to subsection

227(c), which authorizes the FCC to issue do-not-call regulations "to protect *residential* telephone subscribers' privacy rights." 47 U.S.C. § 227(c)(1) (emphasis added).

"The Fourth Circuit has not addressed whether cell phone owners are considered 'residential telephone subscribers.'" *Gaker v. Q3M Ins. Sols.*, 2023 WL 2472649, at *2 (W.D.N.C. Feb. 8, 2023). The statute's "plain meaning" shows they are not. *See Alvarez Ronquillo*, 151 F.4th at 527. When Congress enacted the TCPA, a "residence" was "a building used as a home." *Residence*, Merriam Webster's Collegiate Dictionary 996 (10th ed. 1994). The term "residential" meant "relating to [a] residence or residences." *Ibid.*; *see also*; *Residence*, Black's Law Dictionary (6th ed. 1990) (a "residence" is a "[p]lace where one actually lives or has his home; a person's dwelling place or place of habitation; an abode"); *Residence*, Collins English Dictionary and Thesaurus 981 (1993) ("the place in which one resides; abode or home"). The term "residential telephone," therefore, meant a traditional landline telephone connected to a residence. The term could not refer to a cellular telephone because a cellular telephone was necessarily a wireless telephone unconnected with any particular residence. *See Cellular*, Merriam Webster's Collegiate Dictionary 184 (10th ed. 1994) ("a radiotelephone system in which a geographical area (as a city) is divided into small sections each served by a transmitter of limited range"); *Cellphone*, Collins English Dictionary and Thesaurus 175 (1993) ("a portable telephone operated by cellular radio"); *Cellular phone*, The American Century Dictionary 93 (1995) ("mobile radio-telephone that can operate over a wide region via a network of local transmitters, each serving a local area (cell)").

Common usage from the time agrees with the dictionary definitions. For example, statements "made in connection with Congress's consideration of the TCPA" differentiated "calls to the home" from "calls to ... cellular telephones." *Chennette v. Porch.com, Inc.*, 50 F.4th 1217,

1234 (9th Cir. 2022) (Ikuta, J., dissenting) (collecting examples).[8] An analysis from the Congressional Budget Office similarly distinguished "cellular" and "residential" subscribers, S. Rep. No. 102-178, at 7 (1991) (reprinting CBO letter), as did a legislative summary prepared by the relevant U.S Senate Committee, *see Computerized Telephone Sales Calls and 900 Service: Hearings Before the Senate Comm. on Commerce, Science, and Transp.*, 102nd Cong. 67 (1991) (appendix summary distinguishing TCPA provisions relating to cellular phones from those relating to home phones); *accord Feliciano v. Dep't of Transp.*, 605 U.S. 38, 48 (2025) (citing CBO report as "evidence of how an ordinary reader might have understood the statutory language … around the time of the … statute's adoption"). Outside of Congress, telephone equipment "[i]nstallation guides at the time assumed residential telephones were wired telephones." *Chennette*, 50 F.4th at 1233 n.1 (Ikuta, J.) (collecting examples).

The TCPA's structure reinforces its clear text. Subsection 227(c) addresses "residential telephones" but says nothing about "cellular telephones." Subsection 227(b), by contrast, contains separate prohibitions for robocalls to a "cellular telephone," § 227(b)(1)(A)(iii), and robocalls to a "residential telephone," § 227(b)(1)(B). The Supreme Court has held these terms in subsection 227(b) are not interchangeable. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 617, 617 n.3 (2020) (explaining "residential telephone" in subsection 227(b) means "home phones" not "cellular phones"); *accord Morris v. Lincare, Inc.*, 2023 WL 5336780, at *4 (M.D. Fla. Aug. 18, 2023) ("'home phone[s]' and 'residential telephone[s]' … are distinct from cell

---

[8] The *Chennette* majority expressed no disagreement with Judge Ikuta's statutory analysis but, in that *Chevron*-era decision, considered itself bound by "the FCC's" conclusion "that a cell phone is presumptively residential." 50 F.4th at 1225; *see also id.* at 1226 (Bress, J., concurring) (rejecting the dissent's position because "the FCC has ruled that cell phones can be regarded as residential telephones under the TCPA"). As explained in subsection I.B.2, *infra*, the Supreme Court has since made clear that the FCC's interpretation of the TCPA cannot bind a court.

phones" (citing *Barr*, 591 U.S. at 617 n.3)). "Considering Congress knew of cellular telephones—and in fact referenced cellular telephones as distinct from residential telephones throughout the TCPA—a proper interpretation of the statute would conclude that Congress intentionally omitted any reference to cellular telephones in section 227(c)." *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1340 (S.D. Fla. 2022); *see also, e.g.*, *Valladares v. Ray*, 130 F.4th 74, 83 (4th Cir. 2025) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation and quotation omitted)).

2. <u>The FCC's Contrary Interpretation Fails.</u>

Resisting the plain meaning of the text Congress actually enacted, the FCC in 2003 announced a "presumption" that "wireless subscribers who ask to be put on the national do-not-call list [are] 'residential subscribers.'" *In re Rules & Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14039 (2003) ("*2003 FCC Order*"). But that mistaken agency "interpretation" cannot bind this Court and should not persuade it either.

The Supreme Court's teaching is clear: "courts decide legal questions by applying their own judgment." *Loper Bright*, 603 U.S. at 392. Accordingly, a district court "is not bound by the FCC's interpretation of the TCPA" but "must independently determine for itself whether the agency's interpretation of [the] statute is correct." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155, 168 (2025).

The FCC's interpretation is wrong. It relied not on the text but instead on what it perceived as "the overall intent of the TCPA." *2003 FCC Order*, 18 FCC Rcd. at 14039. But "no statute pursues a single policy at all costs," *Advoc. Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 19 (2025) (cleaned up), and the FCC cannot "rewrite" the TCPA "to suit its own sense of how the statute

should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also McLaughlin*, 606 U.S. at 166; *Facebook, Inc. v. Duguid*, 592 U.S. 395, 409 (2021). While the text here is dispositive, *see supra* Section I.B.1, the purpose is in accord. Congress identified the TCPA's purpose as "the need to protect *residential* telephone subscribers." 47 U.S.C. § 227(c)(1) (emphasis added); *see also United States v. Turkette*, 452 U.S. 576, 593 (1981) ("The language of the statute ... [is] the most reliable evidence of its intent"). And Congress's enacted findings likewise focus on "[t]he use of the telephone to market goods and services *to the home* and other businesses"—with no mention of cellular phones. Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(1), 105 Stat. 2394, 2394 (codified at 47 U.S.C. § 227 note) (emphasis added); *see id.* §§ 2(6), 2(12).

Because subsection 227(c) authorizes suits only by *residential* telephone subscribers and Lowrey concedes that he is a *cellular* telephone subscriber, the Court should dismiss. *Gaker*, 2023 WL 2472649, at *4 (dismissing do-not-call claims because "[t]he structure and language of the TCPA controvert coverage of cell phones").[9]

3. Lowrey Has Not Plausibly Alleged His Cell Phone Was "Residential."

Courts that have wrongly indulged the FCC's mistaken presumption have still required the plaintiff to plausibly allege that his or her particular "cellular number is used for residential

[9] *See, e.g.*, *Callier v. GreenSky, Inc.*, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021) ("Plaintiff does not cite—and the Court is not aware of—any authority that has found § 64.1200(d)(1) applicable to cellphones. Accordingly, the Court finds that this claim fails as a matter of law."); *Cunningham v. Sunshine Consulting Grp., LLC*, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018) ("The private right of action created by 47 U.S.C. § 227(c)(5) provides for redress of violations of the regulations that concern residential telephone subscribers. Plaintiff alleges only calls to his cellular phone." (citation omitted)), *report and recommendation adopted*, 2018 WL 5728534 (M.D. Tenn. Aug. 7, 2018); *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 363 n.7 (E.D. Pa. 2019) ("The Court…is not convinced that Congress and the FCC, through the TCPA and its regulations, intended to protect 'cellular telephone subscribers' along with 'residential telephone subscribers.'").

purposes." *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1201 (M.D. Tenn. 2017); *see also ibid.* ("It may be that, in some cases, an individual who relies on a cellular phone may nevertheless fall within the definition of a 'residential telephone subscriber' under the Act. Cunningham, however, has pled no facts sufficient for this Court to draw that conclusion here." (citation omitted)).[10]

Here, Lowrey has not pled facts creating a plausible inference that his cellular telephone is "residential." The Complaint principally alleges that Lowrey "registered his cellular phone number … on the National Do Not Call Registry." Compl. ¶ 64. That allegation alone clearly cannot satisfy the pleading requirement: the FCC regulation Lowrey seeks to enforce makes clear that the complainant must "register[ ] his or her telephone number on the national do-not-call registry" *and* must be a "residential telephone subscriber." 47 C.F.R. § 64.1200(c). "If establishing the National Do-Not-Call Registry element necessarily established the residential-telephone-subscriber element, the regulatory language requiring the latter would be superfluous." *Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 658 n.4 (W.D. Tenn. 2020). "Allowing proof of registration on the National Do-Not-Call Registry to satisfy the 'residential telephone

---

[10] *See also, e.g.*, *Strange v. ABC Co.*, 2021 WL 798870, at *4 (W.D. La. Mar. 1, 2021) ("Plaintiff's pleadings allege only that calls were made to his cellular phone and he has pled no facts or offered evidence sufficient for the court to draw the conclusion that he has stated a cause of action under subsection (c)(5)"); *Cunningham v. McDonald*, 2018 WL 6737418, at *2 (M.D. Tenn. Nov. 5, 2018) (same); *Cunningham v. Rapid Cap. Funding, LLC/RCF*, 2017 WL 3574451, at *3 (M.D. Tenn. July 27, 2017) ("As Plaintiff has not alleged facts showing his cell phones are used for residential purposes, he fails to state a claim under 47 U.S.C. § 227(c)"), *report and recommendation adopted* 2017 WL 3776165 (M.D. Tenn. Aug. 31, 2017); *Cunningham v. Politi*, 2019 WL 2519702, at *4 (E.D. Tex. Apr. 26, 2019) (recommending dismissal because "§ 227(c)(5) does not encompass Plaintiff's cellular phones"), *report and recommendation adopted*, 2019 WL 2526536 (E.D. Tex. June 19, 2019); *cf. Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 228 (N.D. Cal. 2024) ("the burden to show the residential status is on [the plaintiff]"); *Lee v. Loandepot.com, LLC*, 2016 WL 4382786, at *6 (D. Kan. Aug. 17, 2016) (similar).

subscriber' element would violate the interpretive canon against surplusage." *Ibid.*; *see also Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 275 (4th Cir. 2025) ("[E]very word and every provision is to be given effect .... None should be ignored." (citation omitted)); *Strange v. ABC Co.*, 2021 WL 798870, at *4 (W.D. La. Mar. 1, 2021) ("plaintiffs, like Strange, who register their cell phones with do-not-call registries are presumed to be residential subscribers. However, the Court finds that Strange is still required to put forth evidence supporting this presumption, as he is seeking enforcement"); *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1024 (C.D. Ill. 2014) ("The FCC created an administrative presumption that would allow wireless phone users to register on the Registry, but the complaining registrant would still need to show that the phone was used for residential purposes."), *vacated in part on other grounds*, 80 F. Supp. 3d 917 (C.D. Ill. 2015).

The only other fact that Lowrey alleges to support his claimed residential use is that "[h]is home has no landline telephone." Compl. ¶ 65. Again, that is not enough. Courts have held similar facts insufficient to show residential use. *See, e.g.*, *Stevens-Bratton*, 437 F. Supp. 3d at 656 ("In her declaration, she states: 'I affirm that I have used my cellular phone, (501) 802-XXXX, as both my residential line and mobile line since May 2005. I have not [had] a dedicated landline since May 2005.' That is not enough to establish that she uses her telephone for residential purposes." (citation omitted)).

Lowrey has also failed to allege any facts showing he uses his cellphone exclusively for residential purposes. In *Schmitendorf v. Juicy's Vapor Lounge, Inc.*, 2025 WL 2966205 (D. Kan. Oct. 21, 2025), a plaintiff survived judgment on the pleadings because he alleged that personal use was exclusive—i.e., "he alleged that he used his cell phone *only* in personal contexts." *Id.* at *8 (emphasis added). But that same plaintiff lost at summary judgment because discovery showed

he "also uses his cell phone for business purposes," including "to apply for jobs, communicate with his boss, and swap shifts with his co-workers." *Ibid.*; *see also Chennette*, 50 F.4th at 1225 (majority opinion) (explaining courts consider, *inter alia*, "whether plaintiffs have held out to the public or advertised their phone numbers for business purposes," "whether, and the extent to which, plaintiffs use their phones for business transactions or employment," and "other factors bearing on how a reasonable observer would view the phone line"). Here, absent factual allegations to show that Lowrey's cellular telephone use was exclusively personal, the bare assertion that Lowrey lacks a home landline telephone, without more, cannot plausibly suggest that his cellular telephone is "residential."

Furthermore, Lowrey's other allegations suggest a business purpose. Lowrey says he received telephone calls about "services to assist with the probate process in Virginia." Compl. ¶ 66; *see also* Compl. ¶ 68 ("'Emma, from ProbateCURES' was 'reaching out because I noticed you're representing an estate'") ¶ 88 ("I'm reaching out because I noticed you're representing an estate") ¶ 90 (same), ¶ 95 (same). But serving as an executor is typically regarded as a business function. *See, e.g.*, *West v. Koskinen*, 141 F. Supp. 3d 498, 499, 503 (E.D. Va. 2015) ("executors of [an] estate" must "exercise[e] ordinary business care and prudence"); *United States v. Boyle*, 469 U.S. 241, 251–52 (1985) (an executor is "a person experienced in business matters"). Beyond alleging that he returned calls about probate services, *see* Compl. ¶¶ 89, 91, Lowrey gives no indication how he uses his cellular telephone. This likewise prevents an inference that Lowrey's cellular telephone is "residential."

**C. Plaintiff Does Not Plausibly Allege A "Telephone Solicitation."**

Lowrey's claim against OpenAI independently fails because he does not plausibly allege that the calls he received were "telephone solicitation[s]." 47 C.F.R. § 64.1200(c). A "telephone solicitation" is a call "for the purpose of encouraging the purchase or rental of, or investment in,

property, goods, or services." 47 U.S.C. § 227(a)(4). "A plaintiff's characterization of a call as a 'solicitation' does not make it so." *Andersen v. Nexa Mortg., LLC*, 2024 WL 3762098, at *3 (C.D. Cal. Aug. 12, 2024). To satisfy this definition, a call must do more than "relat[e] to commerce" or be "profit-seeking." *Hulce v. Zipongo Inc.*, 132 F.4th 493, 499 (7th Cir. 2025). Rather, the call must have been made "for the purpose of persuading or urging someone to pay for a service." *Ibid.*

Lowrey does not allege that anyone encouraged him to purchase, rent, or invest in anything. He instead alleges he received "voicemail[s] with a pre-recorded message … directing Mr. Lowrey to call them back at [a callback number] and stating 'I'm reaching out because I noticed you're representing an estate.'" Compl. ¶¶ 88, 90, 94–95. Lowrey also alleges that when he called back, he heard a "pre-recorded message" purporting to be someone "with FSG"—but, when he "asked to speak to a representative," he heard an error code and was not able to speak to anyone. *See* Compl. ¶¶ 89, 91, 94–95.

Those allegations do not create a plausible inference of a telephone solicitation. For one the calls themselves—the most probative information to assess purpose—did not "encourage[ ] [Lowrey] to purchase, rent, or invest in anything." *Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013) (granting motion to dismiss), *aff'd*, 797 F.3d 1302 (11th Cir. 2015); *see also Aderhold v. car2go N.A. LLC*, 668 F. App'x 795, 796 (9th Cir. 2016) (affirming dismissal where defendant's "message contain[ed] no content encouraging purchase of [its] services"); *Horton v. Molina Healthcare of Texas, Inc.*, 2026 WL 490216, at *9–*10 (N.D. Tex. Feb. 6, 2026) (granting motion to dismiss where there was "no allegation that the[ ] calls requested [plaintiff] to purchase anything at all"); *Perrong v. CMI Mktg. Rsch. Inc.*, 2023 WL 6277299, at *4 (E.D. Pa. Sept. 26, 2023) ("speculat[ion]" that call lacking marketing content was

"pretext for solicitation" was "the sort of thing that could be true, but" lacked "enough plausible facts to get over the Rule 12(b)(6) hurdle").

Further, "when [Lowrey] affirmatively contacted" the callback number, he could not reach anyone and thus obtained no further "context for [the] calls." *Schulz v. Infogroup, Inc.*, 2020 WL 4201636, at *2–*3 (N.D. Tex. July 21, 2020) (granting motion to dismiss); *see also Dahdah v. Rocket Mortg., LLC*, 2023 WL 5941730, at *3 (E.D. Mich. Sept. 12, 2023) ("if no one was on [the] other end [of the call], no inference can be drawn that the calls were made for a solicitation or marketing purpose") [11]; *Nickson v. Advanced Mktg. & Processing, Inc.*, 2023 WL 4932879, at *7 (D. Md. Aug. 2, 2023) (dismissing where "[plaintiff] called the number back," and nobody "encouraged the purchase or rental of, or investment in, property, goods, or services" (alterations accepted)).

Because Lowrey has not alleged facts that would give rise to a plausible inference that he received calls made for the purpose of encouraging a purchase, rental, or investment, he "has not sufficiently pled that he received a telephone solicitation within the meaning of the TCPA." *Bell v. Hawx Servs., LLC*, 2025 WL 2533371, at *4 (E.D. Cal. Sep. 3, 2025).

## II. PLAINTIFF DOES NOT PLAUSIBLY ALLEGE OPENAI VIOLATED THE VTPPA.

The Court should also dismiss Lowrey's VTPPA claims against OpenAI for four independent reasons. *First*, after dismissing the federal TCPA claim against OpenAI, the Court should decline supplemental jurisdiction over the parallel state-law claim against OpenAI. *Second*, Lowrey has failed to plausibly allege that OpenAI "made," "initiated," or "caused to be initiated" calls. *Third*, Lowrey has failed to plausibly allege that he received "telephone solicitations."

---

[11] *Opinion vacated on reconsideration on other grounds*, 2023 WL 11944898 (E.D. Mich. Nov. 17, 2023), *rev'd and remanded on other grounds*, 2026 WL 194455 (6th Cir. Jan. 26, 2026).

*Fourth*, Lowrey's VTPPA failure-to-identify claim fails because he does not allege that a telephone solicitor "made contact" with him.

### A. The Court Should Decline Supplemental Jurisdiction Over Plaintiff's State-Law Claims.

Lowrey urges the Court to take supplemental jurisdiction over his VTTPA claims against OpenAI based on his federal TCPA claims against OpenAI. Compl. ¶ 56 (citing 28 U.S.C. § 1367). For all the reasons explained, *see supra* Section I, the federal TCPA claim against OpenAI must be dismissed. Accordingly, the Court should decline to take supplemental jurisdiction over the VTPPA claims against OpenAI. *See, e.g.*, *Scruggs*, 2020 WL 9348208, at *11–*12 (explaining that court should decline "supplemental jurisdiction" over "VTPPA claim" after dismissing TCPA claim); *accord Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) ("generally, when a district court dismisses all federal claims in the early stages of litigation … it should decline to exercise jurisdiction over any remaining pendent state law claims" (alterations accepted)).

### B. Plaintiff Does Not Plausibly Allege OpenAI "Made," "Initiated," Or "Caused To Be Initiated" Any Calls.

To the extent the Court reaches Lowrey's VTPPA claim, it must be dismissed on the merits.

Foremost, Lowrey fails to plausibly allege that OpenAI "ma[d]e[ ]," Va. Code § 59.1-512, "initiated," or "caused to be initiated," *id.* § 59.1-514(B), calls in violation of the VTPPA. "Initiate" in the VTPPA carries a similar meaning to the TCPA. Looking "to the common dictionary meaning of 'initiate,'" courts have construed the term to mean "to begin or to set going … originate." *Zhu v. DISH Network, LLC*, 808 F. Supp. 2d 815, 819 (E.D. Va. 2011) (citing Webster's Third New International Dictionary of the English Language, Unabridged 1164 (1986)); *accord supra* Section I.A.1. And "make"—as in "make a call"—is synonymous with "initiate." *See Make*, Merriam-Webster's Collegiate Dictionary 702 (10th ed. 1999) ("to cause to exist, occur,

or appear"); *Make*, American Heritage College Dictionary 818 (3d ed. 2000) ("To cause to exist or happen; bring about; create"); *Howard v. RNC*, 164 F.4th 1119, 1125 (9th Cir. 2026) ("Construed in accordance with their ordinary meaning, the words 'make' or 'initiate,' when used with reference to a 'call,' refer to the manner in which a call to a telephone is *begun*." (emphasis in original)); *accord Bryant*, 2023 WL 5180351, at *5 (dismissing claims under both Va. Code § 59.1-512 and Va. Code § 59.1-514(A) absent showing "that the defendant actually, physically initiated the telephone call at issue"). Thus, as with the TCPA, a defendant is not liable if it did not place "the offending calls." *Zhu*, 808 F. Supp. 2d at 819.

Applied here, "[t]he VTPPA claim[s] must fail at this stage for similar reasons as the parallel TCPA claim." *Hicks*, 2020 WL 9261758, at *5. *First*, Lowrey fails to plausibly allege that OpenAI makes, initiates, or causes to be initiated any calls because OpenAI's involvement (if any) begins *after* a different party makes or initiates a call. *See supra* Section I.A.1; *Clemens v. Consumer Sol. Ctr.*, 2025 WL 2427685, at *4 (E.D. Va. Aug. 22, 2025) (dismissing VTPPA claim where calls were placed by third party, rather than defendants). *Second*, Lowrey fails to allege any facts that would give rise to a plausible inference that OpenAI placed the calls at issue in the Complaint. *See supra* Section I.A.2; *Bryant*, 2023 WL 5180351, at *4–*5 (dismissing VTPPA claim where "Plaintiff … adduced no facts to suggest that [defendant] initiated the telephone call outside of conclusory allegations"); *Hicks*, 2020 WL 9261758, at *5 (similar); *Clemens*, 2025 WL 2427685, at *4 (similar). *Third*, Lowrey fails to allege any culpable conduct that would render OpenAI liable for its users' wrongs under even aiding-and-abetting liability—must less *direct* liability. *See supra* Section I.A.3; *accord Zhu*, 808 F. Supp. 2d at 818–19 (rejecting construction of VTPPA that would render defendants liable for calls placed by third parties).

### C. Plaintiff Does Not Plausibly Allege A "Telephone Solicitation."

Lowrey's VTPPA claims against OpenAI must also be dismissed for the independent reason that he has failed to plausibly allege receipt of a "telephone solicitation." Va. Code §§ 59.1-514(B), 512.

Similar to the TCPA, the VTPPA defines "telephone solicitation" to reach calls made "for the purpose of offering or advertising any property, goods, or services for sale, lease, license, or investment, including offering or advertising an extension of credit or for the purpose of fraudulent activity." Va. Code § 59.1-510. Under the VTPPA, "the purpose of [a call] is determined from the contents of the [call] relative to its recipient." *Cavey v. MarketPro Homebuyers, LLC*, 542 F. Supp. 3d 418, 428 (E.D. Va. 2021).

"Based on that interpretation, Plaintiff has not alleged facts from which to reasonably infer that Defendant violated the VTPPA." *Ibid.* As explained above, *see supra* I.C, the calls at issue "did not offer or advertise any property, goods or services for sale, lease, license or investment." *Cavey*, 542 F. Supp. at 428. "Similarly [the calls] made no mention of any ancillary services that were being offered for sale," and when Lowrey called the number back, he "does not allege" that anyone "attempt[ed] to sell any such service." *Ibid.* Lowrey cannot bridge this gap with a generic allegation "of a larger commercial effort," as, if sufficient, that "construction of the VTPPA would effectively expand its coverage to all [calls]" from companies, rather than the "*sales* calls" Virginia sought to regulate. *Ibid.* (emphasis in original). Thus, Lowrey's VTPPA claims fail.

### D. Plaintiff's Failure-To-Identify Claim Fails Because He Does Not Allege OpenAI "Made Contact" With Him.

For Lowrey to succeed on his failure-to-identify claim, *see* Compl. ¶¶ 200, 203, he must show that OpenAI "ma[d]e a telephone solicitation via telephone call" and failed to "identify [itself] … promptly upon *making contact with the recipient* of such solicitation." Va. Code § 59.1-

512 (emphasis added). "Make contact" means "to *succeed* in communicating with someone or something, especially by speaking or writing to them." *Make contact with someone/something*, Cambridge Dictionary, https://tinyurl.com/m3rxj5vh (emphasis added).

Here, as an initial matter, Lowrey actually alleges that the callers *did* identify themselves—as "Nadine" and as "Emma" "from FSG." *See* Compl. ¶¶ 88–95. Citing only "information and belief," Compl. ¶ 96, Lowrey purports to doubt whether any such persons exist. But, as this Court has rightly recognized, "allegations, supported … only by vague 'information and belief,' are insufficient to allow the court to discern a plausible claim" in most cases. *Cellcontrol, Inc. v. Mill Mountain Cap., LLC*, 2022 WL 598752, at *5 (W.D. Va. Feb. 28, 2022) (Urbanski, J.); *see also Cancian v. Hannabass & Rowe, Ltd.*, 2018 WL 6515148, at *3 (W.D. Va. Dec. 11, 2018) (Urbanski, J.) ("pleadings based upon information and belief … are considered 'tenuous at best'").

Furthermore, the factual matter Lowrey does allege shows that whomever these persons may have been, they have nothing to do with OpenAI—because Lowrey alleges OpenAI never succeeded in communicating with him in the course of a telephone solicitation. He claims to have missed three of the four calls alleged in the Complaint, receiving voicemails with "pre-recorded message[s]" purporting to be from Fresh Start. Compl. ¶¶ 88, 90, 95. And the one call he says he answered again purported to be from Fresh Start, *id.* ¶ 94, and then played an error code explaining that connection to OpenAI API "failed." *Id.* ¶¶ 91–92, 94. Because OpenAI never "ma[d]e[ ] contact with" Lowrey, his failure-to-identify claim under Va. Code § 59.1-512 must be dismissed. *See Laccinole v. Cova Home Realty LLC*, 2026 WL 617312, at *14 (E.D. Va. Feb. 11, 2026) (finding "plaintiff … failed to state a claim" under § 59.1-512 because "plaintiff alleges that he did not speak with" alleged caller), *report and recommendation adopted*, 2026 WL 615862 (E.D. Va. Mar. 4, 2026).

## III. OpenAI Cannot Be Held Liable Under Either The TCPA or the VTPPA Because Its Terms Of Service Prevent Unlawful Solicitations.

Under both the TCPA and the VTPPA, it is "an affirmative defense … that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of" the respective statutes. 47 U.S.C. § 227(c)(5); Va. Code § 59.1-514(C). To the extent OpenAI's provision of a generative-AI service to the general public constitutes having "initiated" or "made" calls (it does not), the pleadings show that OpenAI satisfies this statutory affirmative defense.

OpenAI contractually prohibits its customers from using its API to violate the TCPA. Its Services Agreement—which governs "use of OpenAI's APIs"—provides that users cannot use the API "in a way that violates applicable laws." OpenAI Services Agreement, § 3.3 (May 1, 2025), *available at* https://tinyurl.com/2c7zdeku.[12] And because the Complaint incorporates by reference OpenAI's "standard policies and procedures," Compl. ¶¶ 106, 107, 126, 127, the Court can consider the OpenAI Services Agreement "at the 12(b)(6) stage of the litigation," *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

OpenAI's contractual provision is a reasonable practice and procedure that satisfies the TCPA and VTPPA's affirmative-defense requirement. A decision from a sister court in this Circuit, *Zhu v. DISH Network, LLC*, 808 F. Supp. 2d 815 (E.D. Va. 2011), is instructive. In *Zhu*, the plaintiff received calls from retailers claiming to advertise for DISH Network. *Id.* at 817. The district court held that DISH was entitled to the affirmative defense under the VTPPA because DISH utilized an "independent contractor agreement, which specifically places a du[t]y on

---

[12] Plaintiff alleges unlawful calls between August and November 2025. *See* Compl. ¶¶ 88, 90, 94, 95. The cited Services Agreement was in effect from May 1, 2025 to January 1, 2026, i.e., at all times during the relevant period.

independent contractors to comply with telemarketing laws." *Id.* at 820. "The independent contractor agreement," the court explained, "constitute[d] a reasonable practice and procedure to effectively prevent telephone solicitation calls." *Ibid.* (quotations omitted) (alterations accepted).

This Court should reach the same conclusion here. OpenAI imposes a duty on its API users to comply with "applicable laws," including the TCPA. OpenAI Services Agreement, § 3.3. Indeed, because OpenAI does not itself physically place telephone calls or choose the numbers to be called—like DISH in *Zhu*—it is hard to imagine what more OpenAI could do to facilitate TCPA compliance. Thus, just like in *Zhu*, OpenAI has "properly invoked" the "affirmative defense" present in both the VTPPA and the TCPA by virtue of its "du[t]y on [users] to comply with telemarketing laws." *Zhu*, 808 F. Supp. 2d at 819–20.

Finally, it makes no difference that *Zhu* was decided on summary judgment. "[A]ffirmative defenses can be considered in resolving Rule 12(b)(6) motions when the facts surrounding the defense are clear from the complaint." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023). In *Zhu*, the court held that the contractual duty to comply with telemarketing laws was sufficient to satisfy the affirmative defense. Here, because the relevant contract is referenced by the Complaint—and thus properly considered at this stage of the litigation—the Court can rule for OpenAI without any additional factual development.

## CONCLUSION

For the foregoing reasons, OpenAI respectfully requests that the Court dismiss with prejudice all claims against it.

Dated: March 23, 2026

Respectfully submitted,

*/s/Stephen J. Obermeier*
Stephen J. Obermeier (VSB # 89849)
Michael E. Toner (VSB # 34548)*
Krystal B. Swendsboe (VSB # 89614)
Jeremy J. Broggi (DC Bar # 1029427)*
Boyd Garriott (DC Bar # 1617468)*
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-7000
Fax: (202) 719-7049
sobermeier@wiley.law
mtoner@wiley.law
kswendsboe@wiley.law
jbroggi@wiley.law
bgarriott@wiley.law

*Counsel for OAI International, Inc.*

* *Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

*/s/Stephen J. Obermeier*
Stephen J. Obermeier (VSB # 89849)