**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| WILLIAM LOWREY,<br><br>Plaintiff,<br><br>v.<br><br>TWILIO INC., OPENAI, L.L.C., and FRESH START GROUP LLC,<br><br>Defendants. | Civil Action No. 6:25-cv-116-MFU |

**DEFENDANT TWILIO INC.'S MEMORANDUM OF LAW SUPPORTING ITS MOTION TO DISMISS AND MOTION TO STRIKE CLASS ALLEGATIONS**

Twilio Inc. ("Twilio") respectfully moves, under Rules 12(b)(1), 12(b)(6), and 12(f), to dismiss Counts I through V asserted against it in the Complaint and to strike the facially defective Do-Not-Call class allegations directed at Twilio. In support, Twilio states:

## INTRODUCTION

Plaintiff William Lowrey's ("Plaintiff") claims against Twilio fundamentally mischaracterize Twilio's platform. He attempts to allege that Fresh Start Group LLC ("Fresh Start"), an alleged Twilio customer, initiated repeated unwanted messages and calls to him, transmitting those communications via Twilio's platform. But his class theory targets Twilio alone, even though he does not (and cannot truthfully) allege that Twilio had any role in deciding who was messaged, when the messages were sent, or what those messages said. Because Twilio did not make those decisions, it did not initiate any messages to him and cannot be liable under the

Telephone Consumer Protection Act ("TCPA") or the Virginia Telephone Privacy Protection Act ("VTPPA").

Instead of offering well-pleaded allegations on these essential points, the Complaint attempts to transform Twilio into an active participant in the alleged unwanted messaging by misleadingly citing generic descriptions of optional Twilio features. But the existence of certain optional features does not mean that Fresh Start actually used those features when allegedly messaging him, and Plaintiff offers no well-pleaded allegations that it did. Moreover, review of the materials he cites contradict his theory, showing that even if Fresh Start had opted to use those features, it alone still would have controlled the recipients, content, timing, and/or volume of its messages. His theory as to Twilio therefore fails as a matter of law under both the TCPA and VTPPA.

Second, Plaintiff's TCPA claims against Twilio (Counts I and II) rest on the premises that a text message is a "telephone call" under 47 U.S.C. § 227(c)(5) and that § 227 applies to cellular telephones. The plain language of the statute does not support either of those readings, providing additional independent bases for the Court to dismiss Plaintiff's TCPA claims.

Third, Plaintiff lacks standing under Article III to seek injunctive relief for his TCPA and VTPPA claims, as he does not allege any ongoing or imminent risk of future messages. Prior harm cannot support standing to seek injunctive relief. Accordingly, the Court should dismiss Plaintiff's prayers for injunctive relief under the TCPA and VTPPA.

Finally, Plaintiff's "Twilio TCPA DNC Class" definition, by its terms, includes persons who received only *one* text message within the last four years. The TCPA imposes liability only where a person receives *two or more* messages within a 12-month period while registered on Do

Not Call Registry. Plaintiff's class definition is therefore facially overbroad and should be dismissed or stricken.

## FACTUAL BACKGROUND

### I. Twilio's Business

Twilio is a cloud communications company that specializes in API[1]-based electronic communications tools. Its customers—who are generally consumer-facing businesses—use these tools to send text messages and other communications to current and potential customers.

Twilio provides its customers with a package of services to facilitate these communications. First, Twilio sells its customers rigorously screened phone numbers from which to send their communications. *Phone Numbers*, TWILIO, https://www.twilio.com/docs/phone-numbers.[2] Second, it provides its clients with access to a messaging service platform from which they can launch their communications. The messaging service is an automated process that carries out commands created by each Twilio customer. *Messaging Services*, TWILIO, https://www.twilio.com/docs/messaging/services; Compl. ¶ 21 (citing same). Based upon those customer commands, Twilio's messaging service automatically places the messages in a queue for

[1] An application programming interface (API) is a set of programming codes that queries data and sends instructions between one software platform and another. *Understanding APIs: Definition, Uses, and Examples*, INVESTOPEDIA, https://www.investopedia.com/terms/a/application-programming-interface.asp.

[2] Plaintiff's Complaint makes extensive reference to Twilio's website to support Plaintiff's key factual allegations. *See* Compl. ¶¶ 14–31, 47, 100. Accordingly, the Court may properly consider the website at this stage, as it is "integral to and explicitly relied on in the complaint and . . . the plaintiff[ ] do[es] not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotation marks and citation omitted); *see also Tessler v. Nat'l Broad. Co.*, 364 F. App'x 5, 7 (4th Cir. 2010) (considering website content under incorporation by reference doctrine). Alternatively, the Court may properly take judicial notice of the website. *See Jeandron v. Bd. of Regents of Univ. Sys. of Mary.*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" (quoting Fed. R. Evid. 201(b)).

transmission and then transmits the customer's messages using a phone number in its portfolio containing the same country code (and, if the customer chooses, the same area code) as each recipient. *Id.*; *see also Understanding Twilio Rate Limits and Message Queues*, TWILIO, https://help.twilio.com/articles/115002943027-Understanding-Twilio-Rate-Limits-and-Message-ueues; Compl. ¶¶ 23–24 (citing same).

Twilio is a tool that its customers use according to their own unique needs and goals. Twilio does not decide the content, timing, frequency, or recipients of its customers' communications; rather, that information is supplied by its customers. *Messaging Services*, TWILIO, https://www.twilio.com/docs/messaging/services.

## II. Plaintiff's Allegations

Plaintiff alleges that he received repeated text messages from Fresh Start Group LLC ("Fresh Start") over the course of approximately six weeks in March and April of 2025. Compl. ¶¶ 66–87. Plaintiff alleges that during this six-week period, he requested that Fresh Start stop sending him messages. *Id.* ¶¶ 64, 75, 79, 83, 85. Plaintiff does not allege that he received any unwanted text messages after April 2025. *See generally* Compl.[3]

Plaintiff alleges that the phone numbers from which Fresh Start allegedly sent its text messages were Twilio phone numbers that were used through Twilio. *Id.* ¶ 98. Plaintiff further alleges that such text messages were "initiated by Fresh Start" and sent through Twilio's platform. *Id.* ¶ 101. The Complaint does not allege that Twilio had any input into whether, when, or to whom these text messages were sent. *See generally* Compl.

[3] Plaintiff also alleges that he received four telephone calls from Fresh Start between August and November of 2025, Compl. ¶¶ 88–95, but that these calls were "initiated by Fresh Start and actually made by OpenAI." Compl. ¶ 105. Plaintiff does not allege that Twilio was involved in the alleged voice calls he received. *See* Compl. ¶¶ 101–107.

Plaintiff, purporting to represent several defined classes of individuals, alleges eight counts in this action: (1) Unauthorized Telemarketing Texts and Calls to Phone Numbers on National DNC List in Violation of the TCPA; (2) Continued Telemarketing Texts After Notification to Stop in Violation of the TCPA; (3) Unauthorized Telemarketing Texts to Phone Numbers on National DNC List in Violation of the VTPPA; (4) Continued Telemarketing Texts After Notification to Stop in Violation of the VTPPA; (5) Misleading Caller Identification Information in Texts in Violation of the VTPPA; (6) Misleading Caller Identification Information in Texts in Violation of the VTPPA; (7) Repeated Unwanted Telemarketing Calls in Violation of the TCPA; and (8) Repeated Unwanted Telephone Solicitation Calls in Violation of the VTPPA. *See generally* Compl. Counts I through V are pleaded against Twilio. *Id.*

## STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) where it fails to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court follows a two-step approach: (1) "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," *id.* at 679, and then (2) "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "[L]egal conclusions pleaded as factual allegations, unwarranted inferences, unreasonable conclusions, and naked assertions devoid of further factual enhancement are not entitled to the presumption of truth." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017)

(internal quotation marks and citation omitted). Importantly, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citation omitted).

The Court must dismiss a case if, at any time, it determines that it does not possess subject matter jurisdiction over the claim or action. Fed. R. Civ. P. 12(b)(1). "When a motion is filed pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that subject matter jurisdiction exists." *Prince v. Johnson Health Tech Trading, Inc.*, 653 F. Supp. 3d 307, 311 (W.D. Va. 2023).

A plaintiff fails to establish Article III standing where (1) he has not suffered an "injury-in-fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is not "fairly traceable to the challenged action of the defendant"; and (3) the injury will not likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted). Where a plaintiff seeks injunctive relief, the injury in fact must be "concrete, particularized, and immediately threatening." *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 654 (4th Cir. 2019). Importantly, "plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (internal quotation marks and citations omitted).

Finally, either on a party's motion or on its own, the Court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Such a motion "serves as a pruning device to eliminate objectionable matter from an opponent's pleadings . . . ." *Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 335 (D. Md. 2012) (internal quotation marks and citation omitted). If the challenged allegations are "both immaterial and prejudicial," they should be stricken. *GTSI Corp. v. Wildflower Int'l,*

*Inc.*, 2009 WL 2160451, at *4 (E.D. Va. July 17, 2009). The decision to grant a motion to strike rests within the sound discretion of the trial court. *Id.*; *see also Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548, 566 (E.D. Va. 2023) (striking class allegations where it was "apparent" from the complaint "that the purported class cannot be certified").

## ARGUMENT

### I. Plaintiff's TCPA and VTPPA Claims Fail Because Twilio Did Not "Make" or "Initiate" the Messages at Issue (Counts I through V).

#### A. Under the Plain Meaning of "Make" and "Initiate," Twilio Is Not the Maker or Initiator of Any Message.

The TCPA imposes direct liability only on a party that "makes" or "initiates" the challenged call. 47 U.S.C. § 227(b)(1)(A). Neither term is defined in the statute, and therefore the Court must apply their ordinary meaning. *See Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 439 (4th Cir. 2020). "Under ordinary usage, the words 'make' or 'initiate,' when used with reference to a 'call,' refer to the manner in which a call to a telephone *is begun*." *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1125–26 (9th Cir. 2026) (citing *Make*, Webster's Third New International Dictionary ("Webster's Third") 318, 1383 (1981 ed.) ("to cause to exist, occur, or appear: bring to pass: create, cause"); *Initiate*, *id.* at 1164 ("to begin or set going: make a beginning of: perform or facilitate the first actions, steps, or stages of")) (emphasis added).[4] Under these definitions, a party that merely transmits a communication—without determining its recipients, timing, or content—does not "make" or "initiate" the message.

The Complaint and the very Twilio webpages it incorporates confirm that Twilio did not decide whether to send the messages, to whom to send them, when to send them, or what they

[4] The 1986 edition of Webster's Third—the latest edition prior to the enactment of the TCPA—contains identical definitions for "make" and "initiate." *See* Webster's Third New International Dictionary (1986 ed.), at 1164, 1363.

should say. *See Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 683 (D. Md. 2001) ("When the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail" (citing *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)); *Veney*, 293 F.3d at 730. Instead, Twilio provides a neutral, reactive transmission platform that executes customer instructions that are compliant with its compliance guardrails. According to the terms' ordinary meaning, Twilio is therefore not a "maker" or "initiator" within the context of the TCPA.

As Plaintiff alleges, Twilio did not "make" any of the subject text messages. Instead, allegedly Fresh Start created the message content, selected the recipients, and determined when and how the messages would be transmitted. *See* Compl. ¶ 101 ("The aforementioned texts that were sent to Mr. Lowrey were initiated by Fresh Start and sent by Twilio through its SMS platform."). Twilio therefore did not "cause" any message "to exist, occur, or appear." Webster's Third, at 1383. It did not compose the message, load it into the system, or determine the timing. At most, Twilio acted as a message-delivery conduit, passively transmitting what allegedly Fresh Start had already fully created.

Likewise, Twilio did not "initiate" the messages at issue. As explained, to "initiate" a message, the defendant must take the "first actions" that "begin" or "set[s] going" the messages. *Id.* at 1164. Twilio did none of that. Again, allegedly Fresh Start drafted the messages, orchestrated the messaging campaign, and pressed the button that set the messages in motion. Compl. ¶ 101. Like a switchboard operator placing a line, Twilio merely carried out the mechanical transmission of communications that allegedly Fresh Start had already begun and caused to be sent. Because Twilio did not "perform or facilitate the first actions, steps, or stages of" sending the messages, it is not an "initiator" within the meaning of the TCPA. Therefore, under the plain meanings of

"make" and "initiate," Twilio is not liable under § 227 and Counts I and II should be dismissed. *See Selou v. Integrity Sol. Servs. Inc.*, 2016 WL 612756, at *4 (E.D. Mich. Feb. 16, 2016) (dismissing TCPA claims against platform provider defendant who the complaint alleged was "directly liable for enabling the Defendants' collection calls to plaintiff" and whose "technology made the calls" and holding provider "is not considered the maker or initiator of the calls under the TCPA"); *Frank v. Cannabis & Glass, LLC*, 2019 WL 4855378, at *3 (E.D. Wash. Oct. 1, 2019) (granting dismissal under Rule 12(b)(6) where the complaint did not plausibly allege that defendant, a software platform provider, "controlled the recipients, timing or content" of the communications that were sent using its platform).

### B. FCC Guidance Shows that Twilio Did Not "Make" or "Initiate" Messages.

Although no longer entitled to deference, *see McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 145 S.Ct. 2006, 2015 (2025), FCC guidance provides a useful framework for this issue. The FCC has explained that "'initiate' suggests some 'direct connection between a person or entity and the making of a call.'" *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991* ("2015 FCC Order"), 30 F.C.C. Rcd. 7961, 7980 ¶ 29 (2015) (quoting *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6583 ¶ 26 (2013)). A "direct connection" exists where an entity "tak[es] the steps necessary to physically place a telephone call" or is "'so involved in the placing of a specific telephone call' as to be deemed to have initiated it." *Id.* at 7980 ¶ 30 (quoting *Dish Network*, 28 F.C.C. Rcd. at 6583 ¶¶ 26–27).

The FCC has emphasized that adjudicators should consider the following factors in determining whether one "makes" or "initiates" a "call," including:

1) The extent to which the defendant controls the call's message;

2) The extent to which the defendant controls the timing or initiation of the call;



#534453954_v6

3) The extent to which the defendant controls who receives the call;

4) Whether the service is "reactive in nature," meaning that it places calls in a manner that is arranged by the customer rather than the defendant;

5) The extent to which the defendant "willfully enables fraudulent spoofing of telephone numbers" by offering that functionality to clients;

6) The extent to which the defendant "assists telemarketers in blocking Caller ID" by offering that functionality to clients; and

7) Whether a defendant "who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes."

*Cunningham v. Montes*, 378 F. Supp. 3d 741, 747–48 (W.D. Wis. 2019) (quoting 2015 FCC Order, at 7980–84 ¶¶ 30–37). As addressed below, Plaintiff's Complaint does not allege any facts showing that Twilio "makes" or "initiates" a "call" pursuant to these factors.

The FCC has further explained that a software platform provider "does not make or initiate a text when [its customer] merely uses the [software]" to initiate text messages that the customer or user controls. 2015 FCC Order, at 7978 ¶ 25. Nor is such a provider an "initiator" where "app user determines whether to send the . . . text messages," *id.* at 7981 at ¶ 31, or the provider "does not control the recipients, timing, or content" of the messages. *Id.* at 7982 ¶ 33; *see also id.* ¶ 32 (no TCPA liability exists where a provider "exercises no discernible involvement in deciding whether, when, or to whom [a message] is sent, or what [the message] says").

In accordance with FCC guidance, federal district courts have held that passive carriers do not "make" or "initiate" messages if they transmit messages on behalf of users without determining the content of messages or whether, when, or to whom to send messages. *See, e.g.*, *Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1048 (S.D. Cal. 2015) (holding carrier was not liable under TCPA where it "required its users to take affirmative steps to determine whether, when, and to whom they would send text messages" and did not draft content of messages); *Rinky Dink, Inc. v. Elec. Merch. Sys.*, 2015 WL 778065, at *7 (W.D. Wash. Feb. 24, 2015) ("CallFire is a common

carrier, was not involved in EMS's message transmission to a 'high degree,' and did not have actual knowledge of the EMS calls. As such, CallFire does not fall within the scope of the TCPA.").

Plaintiff's own allegations and incorporated sources show that Twilio played no role in determining the content of the challenged messages. *See Hosack v. Utopian Wireless Corp.*, 2011 WL 1743297, at *5 (D. Md. May 6, 2011) ("[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim."). As a threshold matter, Plaintiff's allegations contradict themselves: while reciting the bare conclusion—unsupported by any well-pled facts—that Twilio determines the content of messages, Plaintiff also asserts that the subject messages "were *initiated by Fresh Start* and sent by Twilio through its SMS platform." Compl. ¶ 101 (emphasis added). Plaintiff also makes the bare conclusion that Twilio "construct[s] and finalize[s]" message content through templates and "'CustomerAI Technology' and AI Assistants," Compl. ¶¶ 27–30, but the materials cited in support demonstrate that Twilio merely supplies tools that assist users in drafting their own messages. Twilio's templates require user-authored text, and AI-assistance responds to user prompts. *See Send templates created with the Content Template Builder*, Twilio, https://www.twilio.com/docs/content/send-templates-created-with-the-content-template-builder (describing how customers can "create [their] content template" and "configure required fields in [their] API request"); Compl. ¶ 27 (citing same); *How to use generative AI to write SMS copy in seconds*, Twilio, https://www.twilio.com/en-us/blog/n'is'ights/ai/use-g;enerative-ai-to-write-sms-coay (explaining how customers can use third-party and Twilio AI tools to help draft marketing messages); Compl. ¶ 30 (citing same); *Introducing Twilio AI Assistants: a platform to build customer-aware autonomous assistants*, Twilio, https://www.twilio.com/en-us/blog/introducing-twilio-ai-assistants (explaining how

customers can construct and use AI assistants to automate certain tasks); Compl. ¶ 30 (citing same); *Twilio To Deliver Customer-Aware Generative AI Through New OpenAI Integration*, Twilio, https://www.twilio.coin/en-us/press/releases/twilio-to-deliver-customeraware-generative-ai-through-new-opena (describing partnership between OpenAI and Twilio); Compl. ¶ 30 (citing same). Under the ordinary meanings of "make" and "initiate," as well as the FCC's explicit treatment of content control as a core factor, a platform that does not decide what a message says cannot be the maker or initiator of that message. *See* 2015 FCC Order, at 7982 ¶¶ 32, 33.

More fundamentally, while these tools exist, the Complaint does not even allege that Fresh Start *used* these tools to craft or transmit the specific messages at issue to Plaintiff. *See generally* Compl. Instead, Plaintiff improperly "assum[es] that [the AI and template] features of [Twilio's] products are being enabled [by Fresh Start], based simply on the fact that those features happen to be described in [Twilio's] generic product descriptions." *See Doe I v. Google LLC*, 741 F. Supp. 3d 828, 840 (N.D. Cal. 2024) (dismissing privacy claims based on Google product descriptions explaining how its services were "capable of operating generally" where complaint lacked well-pleaded allegations about how the relevant providers were "actually using Google's products"). As in *Doe*, the Complaint identifies Twilio capabilities that may exist but does not connect them with well-pleaded allegations either to Plaintiff or the specific messages at issue here. Instead, Plaintiff asks the Court to assume that these features were used by Plaintiff. But there are no well-pleaded allegations to support this assumption, which is fatal to his TCPA claims.

Furthermore, Twilio's customers decide the timing of any message, not Twilio. Plaintiff incorrectly alleges, without factual support, that Twilio "controls when text messages are sent, through its message queue and throughput features." Compl. ¶ 23. But the Twilio webpages Plaintiff relies upon explain unequivocally that customers decide when to send messages, and

Twilio merely queues their requests "in the order we receive them" and processes them at throughput rates determined by technical and carrier constraints. *Understanding Twilio Rate Limits and Message Queues*, Twilio, https://help.twilio.com/articles/115002943027-Understanding-Twilio-Rate-Limits-and-Messageueues; Compl. ¶¶ 23–24 (citing same); *Message throughput (MPS) and Trust Scores for A2P IODLC in the US*, Twilio, https://help.twilio.com/articles/1260803225669-Message-throughput-MPSand-Trust-Scores-for-A2P-l0DLC-in-the-US; Compl. ¶¶ 23–24 (citing same). The speed at which the messages leave the queue depends on network capacity, not Twilio's discretion. *Id.* These reactive, technical processes cannot constitute the "first steps" or "beginning" of a call or text. *See Howard*, 164 F.4th at 1125–26. Nor do these allegations demonstrate that Twilio has any true control over the timing of the messages sent. *Cf.* 2015 FCC Order, at 7982 ¶¶ 32, 34.

The same is true of Twilio's routing functions, which Plaintiff attempts to cast as initiation. Compl. ¶ 21. He baldly concludes that Twilio "automatically chooses the 'optimal' phone number" from which a text is sent. *Id.* But nothing about selecting a sender ID[5] for display—whether based on geographic match or continuity of experience—affects the key determinative factors under the TCPA: whether a message is sent, to whom it is sent, when it is sent, or what it says.

Nor does Twilio's ability to deliver messages at scale transform it into the party that "makes" or "initiates" them. *See* Compl. ¶¶ 24–26. Plaintiff's contention that "[i]t is not physically possible for a human" to send messages at Twilio's speed is irrelevant. *Id.* ¶ 26. Twilio's high-volume capabilities reflect the automated nature of its services and the customer's chosen scale of outreach, not Twilio's independent decision to send anything at all.

[5] A "sender ID" is a phone number that displays a customer's company name or brand for one-way messaging. *Alphanumeric Sender ID*, Twilio, https://www.twilio.com/docs/glossary/what-alphanumeric-sender-id.



#534453954_v6

Plaintiff's attempt to reframe Twilio's compliance guardrails as indicators of control is equally misguided. Compl. ¶¶ 18–20. The portions of Twilio's website that Plaintiff cites show that Twilio does the opposite of what Plaintiff alleges. First, on its webpage "*What is the Telephone Consumer Protection Act (TCPA)?*," Twilio warns its customers about legal requirements under the TCPA and instructs them: "You should consult with your legal counsel to ensure that your opt-out process is compliant with applicable law and consistent with industry standards." Twilio, https://www.twilio.com/docs/glossary/what-is-telephone-consumer-protection-act-tcpa; Compl. ¶ 18 (citing same). Second, the same webpage explains that Twilio provides *default opt-out handling* and supplies optional advanced opt-out configurations. *Id.*; *see also Twilio Support for Opt-out Keywords (SMS STOP Filtering)*, Twilio, https://help.twilio.com/hc/en-us/articles/223134027-Twilio-support-for-STOP-BLOCK-and-CANCEL-SMS-STOP-filtering-; Compl. ¶ 20 (citing same). This is not a case where a platform knows of illegal use of its service and does nothing about it. *Cf. Kauffman,* 141 F. Supp. 3d at 1049–50.

The FCC's factors also ask whether the provider engages in spoofing, caller-ID blocking, or knowingly facilitates unlawful conduct to determine whether one "makes" or "initiates" messages. Plaintiff alleges none of these. *See generally* Compl. Plaintiff likewise does not allege that Twilio determines *who* will receive messages. *See generally id.* Accordingly, Plaintiff has not adequately alleged that Twilio "makes" or "initiates" text messages and therefore Plaintiff's TCPA claims fail as a matter of law. Counts I and II of the Complaint should be dismissed on this basis alone.

### C. Plaintiff's VTPPA Claims Fail Because Twilio Is Not a "Telephone Solicitor" (Counts III through V).

Similar to the TCPA, the VTPPA imposes liability only on a "telephone solicitor," and Twilio does not fall within that definition. Each of the three Virginia counts asserted against

Twilio—Count III (§ 59.1-514(B)), Count IV (§§ 59.1-513(A), 59.1-514(A)), and Count V (§ 59.1-513(B))—applies exclusively to "telephone solicitors." Va. Code Ann. §§ 59.1-513, -514. A "telephone solicitor" is defined as:

> [A]ny person *who makes or initiates, or causes another person to make or initiate*, a telephone solicitation call on its own behalf or for its own benefit or on behalf of or for the benefit of a seller.

Va. Code Ann. § 59.1-510 (emphasis added). Accordingly, the VTPPA imposes liability only where the defendant is the party making, initiating, or causing the message to be sent—not merely the provider of a communications platform or conduit.

As explained above, the Complaint does not adequately allege that Twilio made or initiated any text message for its own benefit or on behalf of any seller, including Fresh Start, as Twilio does not decide whether, when, or to whom to send any text message, nor the content of such message. *See supra* § I.A & I.B. A passive technology provider does not "make" or "initiate" a communication. *See, e.g.*, *Kauffman*, 141 F. Supp. 3d at 1048; *see also Zhu v. DISH Network, LLC*, 808 F. Supp. 2d 815, 818 (E.D. Va. 2011) (rejecting VTPPA § 59.1-513(A) claim against defendant for communications sent by third parties and reasoning that imposing such liability would improperly create a "strict liability" regime found nowhere in the statute). As in *Zhu*, Plaintiff's theory would essentially render Twilio strictly liable for every communication sent by any customer using Twilio's tools, even though Twilio engages in no telemarketing and makes no decisions about any solicitation activity. That is not the law.

Because Twilio is not a "telephone solicitor" as defined by § 59.1-510 and did not make, initiate, or cause to be initiated any telephone solicitation for its own benefit or on behalf of a seller, the VTPPA claims in Counts III–V fail as a matter of law and should be dismissed.

## II. Plaintiff's TCPA Claims Fail Because a Text Message Is Not a "Telephone Call" (Counts I and II).

As explained above, in Counts I and II, Plaintiff asserts claims under § 227(c)(5) of the TCPA. Count I alleges "Unauthorized Telemarketing Texts and Calls to Phone Numbers on the National DNC List," and Count II alleges "Continued Telemarketing Texts After Notification to Stop." For Count I, Plaintiff asserts that Twilio "sent or caused to be sent repeated telemarketing *texts*" to Plaintiff and putative class members whose numbers were on the National Do Not Call Registry. Compl. ¶ 134 (emphasis added). For Count II, Plaintiff similarly alleges that Twilio "repeatedly made telemarketing *texts*" to Plaintiff and putative class members after they asked Twilio to stop. Compl. ¶ 149 (emphasis added).

Both counts rest on the flawed premise that § 227(c)(5) applies to text messages. The statute's plain language contains no reference to text messages, and traditional tools of statutory interpretation confirm that the statute applies only to telephone calls, not sending a text. Nowhere in either count does Plaintiff allege that Twilio ever initiated, participated in, or caused a *telephone call* to Plaintiff.

### A. The Plain Language of 47 U.S.C. § 227(c)(5) Does Not Reference "Text Messages."

The Supreme Court recently eliminated judicial deference to agencies' statutory interpretation and instead instructed that district courts "must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *McLaughlin*, 145 S.Ct. at 2015 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024)).[6] When interpreting a statute, the Court must "start with its text," giving the

[6] While Plaintiff alleges that Twilio violated 47 C.F.R. § 64.1200(d), this agency regulation, which the Court need not defer to, is not dispositive of liability under § 227(c)(5).

statutory language its "ordinary, contemporary, common meaning" and enforcing it "according to its terms." *Harrell*, 976 F.3d at 439 (internal quotation marks and citations omitted).

Section 227(c)(5) authorizes a private right of action only for persons who receive "more than one *telephone call* within any 12-month period." (emphasis added). The TCPA does not define "telephone call," so the Court must determine its meaning as of 1991, when Congress enacted the statute. *See Loper Bright*, 603 U.S. at 400 ("[E]very statute's meaning is fixed at the time of enactment." (quoting *Wis. Cent. Ltd. v. U.S.*, 585 U.S. 274, 284 (2018)) (emphasis omitted)).

As courts have recently recognized, "[t]ext messaging was not an available technology in 1991, and thus 'telephone call' would not have included text messages or SMS messages." *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 899 (C.D. Ill. 2025) (citations omitted). Ordinary usage today confirms the same point: "no ordinary person would think of a text message as a '*telephone* call.'" *Davis v. CVS Pharmacy, Inc.*, 97 F. Supp. 3d 1272, 1273 (N.D. Fla. 2025); *see also Jones*, 792 F. Supp. 3d at 899 ("[I]n today's American parlance, 'telephone call' means something entirely different from 'text message.'"). Contemporary dictionaries at the time of enactment reinforce that understanding. In 1990, Webster's Dictionary defined the noun "call" as "the act of calling on the telephone" and "telephone" as "an instrument for reproducing sounds at a distance . . . one in which sound is converted into electrical impulses for transmission by wire." Merriam-Webster New Collegiate Dictionary (9th ed. 1990). Text messages do not reproduce sounds and therefore fall outside of this authoritative definition. Because the text of § 227(c)(5) unambiguously excludes text messages, the Court's inquiry ends there. *See Shaiban v. Jaddou*, 97 F.4th 263, 265 (4th Cir. 2024).



#534453954_v6

Also telling, however, is the broader statutory structure of § 227. In § 227(a)(4), Congress defined "telephone solicitation" as "the initiation of a telephone call *or message*." (emphasis added). Congress's deliberate use of "telephone call or message" in that definition, but only "telephone call" in § 227(c)(5), triggers the presumption that different words in a statute carry different meanings. *See U.S. v. Bethea*, 841 Fed. Appx. 544, 555 (4th Cir. 2021) (explaining presumption that "must presume Congress intends different meaning when it uses different language across a statute"); *Stanley v. City of Sanford, Florida*, 606 U.S. 46, 53 (2025) (same). Congress easily could have amended § 227(c)(5) to include the term "message" but chose not to. "That Congress used different language in these two provisions strongly suggests that it meant for them to work differently." *Stanley*, 606 U.S. at 53; *see also Sayed v. Naturopathica Holistic Health, Inc.*, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025) ("[T]he term 'text message' appears elsewhere in the TCPA and related amendments, an appearance that confirms Congress understood the pertinent distinction and legislated mindful of the distinction.").

Subsequent amendments to the TCPA reinforce this distinction. In 2018, Congress amended § 227(e)(8), which prohibits the transmittal of a misleading phone number, by replacing the reference to "a call made using a telecommunications service or IP-enabled voice service" with "a call made using a voice service *or a text message* sent using a text messaging service." *See* Pub. L. No. 115-141 (codified at 47 U.S.C. § 227(e)) (emphasis added). Congress did not make any corresponding change to § 227(c)(5). When "Congress has shown that it knows how to adopt the omitted language," it is "particularly inappropriate" for a court to rewrite the statute to include the missing language. *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

Consistent with these fundamental principles of statutory interpretation, a substantial number of courts applying *McLaughlin* and *Loper Bright* have held that § 227(c)(5) does not

support a cause of action where a plaintiff alleges only the receipt of text messages. *See, e.g.*, *Jones*, 792 F. Supp. 3d at 899; *Davis*, 97 F. Supp. 3d at 1273; *Sayed*, 2025 WL 2997759, at *2; *Stockdale v. Skymount Prop. Grp.*, 2026 WL 591842, at *2–*4 (N.D. Ohio Mar. 3, 2026); *Radvansky v. 1-800-FLOWERS.COM, INC.*, 2026 WL 456919, at *5 (N.D. Ga. Feb. 17, 2026) ("The statutory text here is clear that only telephone calls are actionable under § 227(c)(5), not text messages.").[7] This Court should similarly hold that the term "telephone calls" in § 227(c)(5) does not include text messages and dismiss Counts I and II against Twilio.

### B. The Purpose and Legislative History of the TCPA Supports the Determination a Text Message is Not a Call within the Meaning of § 227(c)(5).

"A court may not disregard the plain language of a statute unless a literal application of the statutory language would lead to absurd results . . . or would thwart the obvious purpose of the statute." *Denny's, Inc. v. Cake*, 364 F.3d 521, 530 (4th Cir. 2004) (internal quotation marks and citations omitted) (ellipses in original). It is well-settled that "Congress enacted the TCPA to protect the interests of telephone users by placing restrictions on unsolicited, automated telephone calls." *Forber v. Management and Tech. Consultants, LLC*, 886 F.3d 789, 792 (9th Cir. 2018) (internal quotation marks and citation omitted); *see also Davis v. Capital One N.A.*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025); S. Rep. No. 1820178, at 1 (1991). The legislative history of the TCPA further demonstrates that the Act was passed in an effort to combat automated calls and not text messages. For example, the legislative history indicates:

[7] The court's analysis in *Radvansky* is instructive. After crediting many of the arguments made here, the *Radvansky* court explained why the reasoning of courts that have held the phrase "telephone call" in § 227(c)(5) includes text messages is "inherently flawed." 2026 WL 456919, at *4. The court explained that those courts had ignored that "text messages did not yet exist when the statute was originally enacted," failed to apply the definition of "call" as of the time of the TCPA's enactment, violated the canon that "Congress must have intended distinct words in a statute to have different meanings." *Id.*

- The purpose of the bill is to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited automated telephone calls to the home . . . .;"

- The bill was passed based on consumer complaints contending there is "no way to prevent these calls;"

- "[I]t is clear that automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons. These automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party, fill an answering machine tape or voice recording service, and do not disconnect the line after the customer hags up the telephone."

S. REP. 102-178 at *2–*6 (1991).

Accordingly, even if the Court determined that the relevant statutory language was somehow unclear, the underlying legislative history establishes the TCPA was passed to prevent automated *calls*, not text messages. Moreover, many of the consumer complaints such as the incessant ringing of a telephone in the home or the inability to stop the phone calls from occurring, would not apply in the context of text messages where many recipients have their phone on silent and have the ability to send a "stop" message or otherwise block a text message.

## III. Plaintiff's TCPA Claims Fail Because Cellular Telephones Are Not "Residential Telephones" (Counts I and II).

Section 227 applies only to "residential telephones," not cellular telephones. *See* 47 U.S.C. § 227(c)(1) (authorizing FCC rulemaking "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object"). Yet, Plaintiff alleges that Twilio sent unsolicited text messages to his "cellular telephone," Compl. ¶¶ 64, 73, while asserting that his "cellular telephone" is a "residential telephone" for purposes of § 227(c). *See, e.g.*, Compl. ¶¶ 134, 138, 149. That theory is incompatible with the TCPA, as the statute clearly establishes that cellular telephones are not residential telephones.

When Congress enacted the TCPA, a "residence" was "a building used as a home." *Residential*, Merriam Webster's Collegiate Dictionary, at 996 (10th ed. 1994). The term "residential" meant "relating to [a] residence or residences." *Id.* A "residential telephone" therefore referred to a traditional landline telephone connected to a home. A cellular telephone, by contrast, is inherently wireless and not tied to any residence. *See Cellular*, Merriam Webster's Collegiate Dictionary, at 184 (10th ed. 1994) ("a radiotelephone system in which a geographical area (as a city) is divided into small sections each served by a transmitter of limited range").

The TCPA's structure confirms the distinction between cellular and residential telephones. Subsection 227(b) separately regulates robocalls to a "cellular telephone," § 227(b)(1)(A)(iii), and to a "residential telephone," § 227(b)(1)(B). The Supreme Court has recognized these terms as distinct. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 617, 617 n.3 (2020) (explaining "residential telephone" in subsection 227(b) means "home phones" not "cellular phones"). "Considering Congress knew of cellular telephones—and in fact referenced cellular telephones as distinct from residential telephones throughout the TCPA—a proper interpretation of the statute would conclude that Congress intentionally omitted any reference to cellular telephones in section 227(c)." *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1340 (S.D. Fla. 2022); *see also Discover Bank v. Vaden*, 396 F.3d 366, 370 (4th Cir. 2005) ("[W]here Congress knows how to say something but chooses not it, its silence is controlling." (internal quotation marks and citations omitted)).

Because Plaintiff alleges only that Twilio sent text messages to his cellular telephone—which is not a residential telephone—he fails to state a claim under § 227(c). Counts I and II should therefore be dismissed.

## IV. Plaintiff's Request for Injunctive Relief Should Be Dismissed for Lack of Standing.

"[W]hen seeking injunctive relief, a plaintiff has standing only when there is a 'real or immediate threat' that the plaintiff will suffer an injury in the future." *Carroll v. Nw. Fed. Credit Union*, 770 Fed. App'x 102, 104 (4th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Accordingly, "a plaintiff seeking prospective injunctive relief may not rely on prior harm to establish Article III standing." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (internal quotation marks and citation omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Instead, a plaintiff seeking such relief "must establish *an ongoing or future injury* in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (emphasis added).

While Plaintiff seeks injunctive relief on behalf of himself and a purported class, Plaintiff does not allege an imminent threat of future text messages or even the possibility of such text messages. The Complaint contains no allegations of any recent text messages, with Plaintiff receiving the final subject communication on or around April 16, 2025—more than *eight months* before the filing of the Complaint. Compl. ¶ 83. The Complaint does not allege any other continuing interactions between Plaintiff and Twilio, nor any reasonable likelihood of follow-up messages. Courts routinely dismiss prayers for injunctive relief under the TCPA for lack of Article III standing in similar circumstances. *See, e.g.*, *Barton v. Bright Solar Marketing, LLC*, 2025 WL 2880136, *6 (W.D. Wash. Oct. 9, 2025) (dismissing claim for injunctive relief under the TCPA where plaintiff did not allege ongoing receipt of telemarketing calls, finding "the possibility that Plaintiff may receive additional phone calls in the future is too speculative to establish a real or immediate threat of injury"); *Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 282 (S.D.N.Y. 2024) (dismissing prayer for injunctive relief under the TCPA where plaintiff failed to

plead facts suggesting she would receive further robocalls from defendant, noting that "Article III standing requires a concrete injury even in the context of a statutory violation" (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 34 (2016)); *Bradshaw v. CHW Group, Inc.*, 765 F. Supp. 3d 641, 645 (D.N.J. 2025) (finding that plaintiff lacked standing to seek injunctive relief in TCPA action where plaintiff did not allege that "any of the alleged conduct is ongoing or even potentially ongoing, or that there is reason to think it might start up again"); *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930, at *7 (S.D. Tex. Jan. 26, 2026) (dismissing claim for injunctive relief because "Plaintiff cannot rely on the bare statutory violation to establish the presence of likely future harm").

Based on the foregoing, and the well-settled law that an injunction cannot remedy a "prior harm," *see Abbott*, 900 F.3d at 176, the Court should dismiss Plaintiff's injunctive relief claim given that he has failed to allege Twilio continues to facilitate the sending of such text messages or that he will be harmed in the future in a similar way.

## V. The TCPA Class Allegations Are Facially Overbroad and Should Be Dismissed or Stricken.

Plaintiff defines the "Twilio TCPA DNC Class" as persons who "received a telemarketing text sent from Twilio's platform in the last four years" and whose numbers were on the National DNC. Compl. ¶ 119.[8] That directly conflicts with the TCPA, which allows a private action only upon receiving "more than one telephone call within any 12-month period." 47 U.S.C. § 227(c)(5). Because Plaintiff's class definition fails as a *matter of law*, the Court may strike this definition as overly broad at the pleadings stage. *See Knapp v. Zoetis Inc.*, 2021 WL 1225970, at *10 (E.D. Va. Mar. 31, 2021) (noting a court may "grant a motion to strike class allegations before discovery if

[8] Twilio does not challenge definitions provided for the "Virginia Classes," Compl. ¶ 120, because, unlike the TCPA, the VTPPA does not require multiple calls or text messages to impose liability. *See* Va. Code Ann. § 59.1-514.

the allegations are facially and inherently deficient"); *see also Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 109–10, 116 (4th Cir. 2013) (affirming dismissal of class allegations in complaint).[9]

## CONCLUSION

For the reasons set forth herein, Twilio Inc. requests that the Court enter an order granting its motion, dismissing Plaintiff's case with prejudice, striking the facially defective Do-Not-Call class allegations directed at Twilio and awarding any other relief the Court deems just and proper. Leave to amend is not appropriate, as Plaintiff cannot truthfully, or consistent with Rule 11 obligations, correct the flaws in the Complaint.

Dated: March 23, 2026

Respectfully submitted,

/s/ *Brent Gary*

**HOLLAND & KNIGHT LLP**
Brent R. Gary (VSB # 66592)
1650 Tysons Boulevard, Suite 1700
Tysons, VA 22102
Tel: 703.720.8038
Fax: 703.720.8610
brent.gary@hklaw.com

Travis A. Sabalewski (VSB #47368)
Justin M. Sizemore (VSB #71859)
200 South 10th Street, Suite 1000
Richmond, VA 23219
Tel: 804.799.6591
Fax: 804.500.5353
travis.sabalewski@hklaw.com
justin.sizemore@hklaw.com

Cory W. Eichhorn (FL Bar # 576761)*
Chazz T. Freeman (FL Bar # 1050718)*
701 Brickell Avenue, Suite 3300
Miami, FL 33131

[9] The proposed "Twilio TCPA Stop Contact Class" also fails because it does not specify whether class members received the challenged text messages on a cellular telephone or a residential telephone. Compl. ¶ 119. That omission creates individualized questions about each putative member's telephone type, and the proposed class definition should therefore be stricken.

Phone 305.789.7576
Fax 305.789.7799
cory.eichhorn@hklaw.com
chazz.freeman@hklaw.com

*Counsel for Twilio Inc.*

** Pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2026, this document was filed with and served upon counsel for the parties through the Court's CM/ECF system.

/s/ *Brent Gary*