**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

**WILLIAM LOWREY,** *individually and on*
*behalf of similarly situated individuals,*

        **Plaintiff,**

**v.**                                             **CIVIL ACTION NO. 6:25-cv-116-MFU**

**TWILIO INC., OPENAI, L.L.C., and**
**FRESH START GROUP LLC,**

        **Defendants.**

### FIRST AMENDED CLASS ACTION COMPLAINT

COMES NOW the plaintiff William Lowrey, on behalf of himself and all others similarly situated, by counsel, and for his First Amended Class Action Complaint against Defendants Twilio Inc. ("Twilio"), OpenAI, L.L.C. ("OpenAI"), and Fresh Start Group LLC ("Fresh Start") (collectively "Defendants"), he states as follows:

### I.        INTRODUCTION

1.        In 1991, Congress passed the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq., ("TCPA"), in response to complaints about abusive telemarketing practices.

2.        At the time of the TCPA's passage, the majority of illegal robocalls were made "off-line" using pre-recorded voice messages.

3.        Thereafter, the Federal Communications Commission ("FCC") noted that advertisers seeking to make illegal robocalls increasingly used computer programs to initiate calls as well as SMS text messages, instead of pre-recorded voice messages, to reach cell phone users. *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 88 (2016).

4.      A Pew Research Center study conducted almost 10 years ago found that "[t]ext messaging is the most widely-used smartphone feature," and "is also the most frequently-used." Smith, Aaron, *U.S. Smartphone Use in 2015*, Pew Rsch. Center (Apr. 1, 2025), https://www.pewresearch.org/internet/2015/04/01/us-smartphone-use-in-2015/.

5.      Indeed, last year, Americans sent over 2 trillion individual SMS and MMS messages. *2025 Annual Survey Highlights*, CTIA (Sep. 8, 2025), https://www.ctia.org/news/2025-annual-survey-highlights.

6.      As technology evolved and advertisers adapted to the ways they reached potential customers, the FCC made clear that the TCPA still governed. Specifically, the FCC found that merely moving the process of robo-calling to auto-dialing computer programs, or using automated or pre-recorded text messages instead of a pre-recorded voice, did not place these practices outside the scope of the TCPA. Indeed, the FCC issued a number of declaratory rulings with respect to the TCPA liability of online services that permit the sending of illegal text messages via computer program. *See, e.g.*, *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7978 (2015) ("The TCPA's consent requirement applies to short message service text messages ('SMS' or 'text message') in addition to voice calls.").

7.      Indeed, the TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(13).

8.      Similarly, the Virginia Telephone Privacy Protection (VTPPA), Virginia's state analogue to the TCPA, also prohibits unwanted telemarketing texts. VA. CODE ANN. § 59.1-510 (defining "telephone solicitation call" to include "any text message sent to any wireless telephone").

9.      In order to keep up with changes in technology that impact the robocall industry, the FCC and courts have recognized the need to look at the totality of the circumstances to determine whether a call or text violates the TCPA and who was involved in the making of such call. *See  In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7980 (2015); *League of Women Voters of New Hampshire v. Kramer*, No. 24-CV-73-SM-TSM, 2025 WL 919897, at *12–*13 (D.N.H. Mar. 26, 2025)

**A.  The TCPA applies to common carriers that transmit messages others create**

10.      The TCPA does not define the term "make," but the question of who can be held liable for violations of the TCPA was addressed extensively in 2015. *See* 30 FCC Rcd. at 7980 (2015).

11.      The 2015 FCC Order clarifies that one can violate the TCPA either by "taking the steps necessary to physically place a telephone call," or by "being so involved in the placing of a specific telephone call as to be deemed to have initiated it." *Id.* (citing *Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6583 (2013)).

12.      And in making this determination, the adjudicator must "look to the totality of the facts and circumstances surrounding the placing of a particular call." *Id.*

13.      In 2016, the FCC weighed in on the question of whether text broadcasters could be "senders" of text messages under § 227(b)(1) of the TCPA. *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 88, 91 (2016). It reiterated that they are.

**B.  Twilio's role as leader in the automated texting industry**

14.      Defendant Twilio is a cloud communications company that enables businesses to reach customers around the globe. In doing so, Twilio essentially bridges the gap between web-based applications and the telephone network. In providing this bridge, however, Twilio has been originating illegal robocall traffic.

15.    Twilio boasts of a large client base of "over 335,000 companies." *Communications APIs with AI and data for SMS, Voice, Email | Twilio*, Twilio, https://www.twilio.com/en-us (last visited (Sep. 29, 2025).

16.    Twilio has been named as a "Leader" in the Communication Platform as a Service market. *2025 Gartner Magic Quadrant for CPaaS*, Twilio, https://www.twilio.com/en-us/report/gartner-mq-cpaas-2025 (last visited Sep. 27, 2025).

17.    Twilio serves businesses and provides them with a platform to send marketing messages to consumers. *See Business Text Messaging | Twilio*, Twilio, https://www.twilio.com/en-us/messaging (last visited Apr. 17, 2026) ("Business messaging that scales without slowing you down" and "Build deeper customer relationships at scale with a messaging platform based on trust, quality, and engagement"); *Twilio - About the Cloud Communications Company | Twilio*, Twilio, https://www.twilio.com/en-us/company, (last visited Apr. 17, 2026) ("We're shaping a world where businesses can create amazing experiences for their customers.").

18.    For the second quarter of this year, Twilio reported a total revenue of over $1.2 billion and over 349,000 active customer accounts. *Twilio Announces Second Quarter 2025 Results*, Twilio (Aug. 7, 2025), https://www.twilio.com/en-us/press/releases/q2-2025-earnings.

19.    Twilio boasts that over 130 billion messages are sent and received each year over its Customer Engagement Platform, and that in 2023 it sent 4 billion messages in just one week. *SMS Foundations*, Twilio, https://www.twilio.com/docs/messaging/onboarding/sms-foundations (last visited Sep. 27, 2025); *Mass texting*, Twilio, https://www.twilio.com/en-us/use-cases/mass-texting (last visited Sep. 27, 2025); Shanelle Thadani and Will McKenzie, *Ringing in the holidays with 68 billion messages and emails | Twilio*, Twilio (Nov. 29, 2023), https://www.twilio.com/en-

us/blog/company/news/our-customers-are-ringing-in-the-holidays-with-68-billion-messages-and-emails.

20.     While Twilio recognizes the ban on unsolicited text messages under federal law, Twilio does not incorporate compliance with this ban in its base offerings, but instead offers optional "add-on" products to supposedly ensure compliance. *What is the Telephone Consumer Protection Act (TCPA)?*, Twilio, https://www.twilio.com/docs/glossary/what-is-telephone-consumer-protection-act-tcpa (last visited Sep. 27, 2025); *Marketplace Add-on Listing Tutorial*, Twilio, https://www.twilio.com/docs/marketplace/listings/tutorial (last visited Sep. 27, 2025).

21.     Twilio has the technical capability to restrict all of its users from sending unwanted telemarketing calls and texts yet chooses not to do so.

22.     Twilio represents that through its "SMS Stop Filtering service," Twilio automatically blocks further texts from being sent to a number. *Update to FCC's SMS Opt Out Keywords*, Twilio (Apr. 9, 2025), https://www.twilio.com/en-us/blog/insights/best-practices/update-to-fcc-s-sms-opt-out-keywords; *Twilio support for opt-out keywords (SMS STOP filtering)*, Twilio, https://help.twilio.com/articles/223134027-Twilio-support-for-opt-out-keywords-SMS-STOP-filtering- (last visited Apr. 6, 2026). As borne out by Mr. Lowrey's experience, this is false as he continued to receive texts after he texted stop.

   1.  ***Twilio is extensively involved in and maintains control over messages sent on its platform***

23.     As detailed below, Twilio is deeply involved in how messages are sent on its platform: from what messages can say, to when messages are sent, and to whom messages are sent.

24.     Twilio, through its Messaging Service feature, automatically chooses the phone number that text messages are sent from. *Messaging Services*, Twilio,

https://www.twilio.com/docs/messaging/services (last visited Sep. 27, 2025); *Best Practices for Scaling with Messaging Services*, Twilio, https://www.twilio.com/docs/messaging/guides/best-practices-at-scale (last visited Sep. 27, 2025).

25.     With this feature, users do not choose the phone number the text is sent from, Twilio does.

> i.     *Twilio's control over whether to send messages and what they should say*

26.     Twilio exerts control over the content of messages sent over its platform by determining which messages it will or will not send.

27.     Through its Messaging Service, Twilio also purports to "handle compliance regulations" for messages sent via its platform. *SMS Foundations*, *supra*.

28.     For example, commercial users must submit their proposed text campaigns for approval, during which Twilio performs "a manual vetting process and has a pending status. This process can take between two to three weeks to complete. Twilio will contact you if any additional information is required." *Direct Standard and Low-Volume Standard Registration Guide*, Twilio, https://www.twilio.com/docs/messaging/compliance/a2p-10dlc/direct-standard-onboarding#approval-process-2 (last visited Apr. 6, 2026); *see also Improving Your Chances of A2P 10DLC Registration Approval*, Twilio (Mar. 28, 2025), https://www.twilio.com/en-us/blog/insights/best-practices/improving-your-chances-of-a2p10dlc-registration-approval.

29.     Twilio has also represented it "collects and monitors the content of text messages that are transmitted via Twilio's platform to certain countries in order to detect spam, fraudulent activity, and violations of Twilio's Acceptable Use Policy." (Ex.  A, *Twilio Messaging Policy: SMS, MMS, Conversations, Third-Party Messaging Platforms*, Twilio (Nov. 12, 2024), at 5.)[1]

---

[1] Twilio recently updated this webpage and appears to have removed this language.

30. Twilio further controls the content on its platform as it flat out does not allow certain content, such as content it deems "harmful, unwanted, inappropriate, objectionable . . . even if the content is permissible by law." (*Id.* at 4.)

31. As Twilio admonishes its users:

No one likes SPAM. You should only send SMS messages to recipients who have opted in to your service and are expecting communication from you. Twilio actively monitors for this kind of activity and we may block the phone number or suspend your project if we receive complaints from your subscribers.

*Restricted SMS message types using Twilio*, Twilio, https://help.twilio.com/articles/223181808-Restricted-SMS-message-types-using-Twilio (last visited Apr. 7, 2026).

32. As shown above, Twilio plays an active and intensive role in monitoring what it considers to be acceptable content sent out from its platform and will block certain messages from being sent, as well as freeze accounts that it deems in violation of its policies.

33. Twilio "proactively enforce[s] its own policies independently from [telecommunication] carriers through outreaches and other remediation efforts, including account restrictions or suspension." U.S. Carrier Penalties for Non-Compliant Messaging, Twilio, https://help.twilio.com/articles/4410588996123-U-S-Carrier-Penalties-for-Non-Compliant-Messaging (last visited Apr. 6, 2026).

34. Twilio is also involved with suspension of text campaigns where the campaign violates certain standards, including sending unwanted or unsolicited messages. *Troubleshooting A2P 10DLC Standard/LVS Brands*, Twilio, https://www.twilio.com/docs/messaging/compliance/a2p-10dlc/troubleshooting-a2p-brands/troubleshooting-and-rectifying-a2p-standardlvs-brands (last visited Apr. 6, 2026); *see also Restricted SMS message types using Twilio*, *supra* (noting that users must register for such campaigns before they can send marketing messages using standard 10-digit numbers).

35.     Twilio further exerts control over the content of messages sent on its platform through its Message Filtering. *How Does Message Filtering Work?*, Twilio, https://help.twilio.com/articles/223181848-How-Does-Message-Filtering-Work (last visited Apr. 6, 2026).

36.     Through its filtering program, Twilio will block certain messages and tell its users "you will see your messages with the 'Undelivered' status and Error 30007." *Id.*

37.     Twilio explains that it may block a message one of its users requests to be sent in order "to enforce Twilio's Messaging Policy or Acceptable Use Policy, and/or to comply with regulations and wireless carriers' messaging policies." *Id.*

38.     Twilio clearly states this feature is in place to prevent spam texts from being sent, to "[p]rotect mobile subscribers from unwanted messaging such as spam, fraud, or abuse." *Id.*

     *ii.  Twilio's active involvement in creation of messages sent on its platform*

39.     An industry trade group, the CTIA, has described Twilio's business model as:

> Commercial traffic that resembles [peer-to-peer] traffic in form – sent using ten-digit numbers – but relies on automated systems rather than human beings to generate content.

(Ex. B, Nov. 20, 2015 CTIA Filing with FCC, at 31.)

40.     Through its Content Template Builder, Twilio also will construct and finalize the actual text message that is to be sent, using data points provided by its users. *Send templates created with the Content Template Builder*, Twilio, https://www.twilio.com/docs/content/send-templates-created-with-the-content-template-builder (last visited Sep. 29, 2025).

41.     Twilio also provides a list of message templates that can be sent as marketing texts through its platform. Jesse Sumrak, *31 Promotional Text Message Examples, Templates & Samples*, Twilio (Aug. 2, 2025), https://www.twilio.com/en-us/blog/promotional-text-message-examples.

42.    In fact, Twilio advertises to its customers "Whether you're a developer by trade or don't code at all, Twilio has SMS templates to help you send to your recipients. Powering over 66 billion messages per year, Twilio's SMS API has your back. Sign up today and start building with our text message templates for free!" Jesse Sumrak, *12+ SMS Templates, Examples & Samples for Your Business*, Twilio (Sep. 16, 2025), https://www.twilio.com/en-us/blog/12-sms-templates-examples-to-get-you-started.

43.    Twilio even advises its users how they can make use of AI programs along with Twilio's "CustomerAI technology" and AI Assistants so that users can fully automate the content of the message itself. *How to use generative AI to write SMS copy in seconds*, Twilio, https://www.twilio.com/en-us/blog/insights/ai/use-generative-ai-to-write-sms-copy (last visited Sep. 29, 2025); *Introducing Twilio AI Assistants: a platform to build customer-aware autonomous assistants*, Twilio, https://www.twilio.com/en-us/blog/introducing-twilio-ai-assistants (last visited Sep. 29, 2025); *Twilio To Deliver Customer-Aware Generative AI Through New OpenAI Integratio*n, Twilio, https://www.twilio.com/en-us/press/releases/twilio-to-deliver-customer-aware-generative-ai-through-new-opena (last visited Sep. 29, 2025).

44.    Twilio is further involved in messages sent from its platform through its "Messaging Service features that ensure content is correctly encoded, and provide an ideal end-user experience with sticky senders and media fallback." *How Klaviyo helps retail businesses build deep connections with customers*, Twilio, https://customers.twilio.com/en-us/klaviyo (last visited Oct. 6, 2025).

45.    This is a clear example of how Twilio, not its users, finalizes and formats a text message properly before it is sent.

46.     Twilio also plays an active role in splitting up and reconstituting longer text messages (over 160 characters) sent on its platform:

> When sending concatenated SMS, Twilio will auto-segment long messages with a special header, which mobile carriers can use to reassemble the segments on the destination handset. Thus, concatenated SMS can appear as one single message on the receiving device. Note that special header needs to be appended to handle concatenated messages, so each segment can only contain up to 153 characters. Messages with one or more non-GSM characters have to be sent using UCS-2 encoding and can only contain 67 characters per segment for multi-part messages.

*Does Twilio support concatenated SMS messages or messages over 160 characters?*, Twilio, https://help.twilio.com/articles/223181508-Does-Twilio-support-concatenated-SMS-messages-or-messages-over-160-characters (last visited Apr. 8, 2026); *see also How long can a message be?*, Twilio, https://www.twilio.com/docs/glossary/what-sms-character-limit (last visited Apr. 8, 2026) (describing the header data Twilio creates in longer texts which "contains the instructions for reassembling segments into messages").

47.     Twilio's users do not segment their own messages, nor do they write their own header. Rather, they send raw text to Twilio which Twilio then rearranges into appropriate segments and Twilio writes the necessary headers that come in these messages.

48.     Further, Twilio will also "divide your long message into individual SMS to meet the character limit, and automatically add page information to the beginning of each one, for example (1/2), (2/2)," for "mobile carrier [that do] not support concatenated messages." *Does Twilio support concatenated SMS messages or messages over 160 characters?*, *supra.*

49.     Twilio is further involved in the content of messages through its Smart Encoding feature which "replaces certain non-GSM characters with equivalent GSM characters on your behalf" in order "[t]o assist in reducing messaging costs." *How long can a message be?*, *supra.*

50.     Twilio will also automatically convert MMS messages to SMS messages in certain circumstances:

> When you attempt to send an MMS message, Twilio will check if the recipient phone number number [sic] is registered to one of the carriers we support for MMS. If not, Twilio will attempt a standard SMS instead, and include a shortened URL in the body as a link to your media.

*Why do my messages include a Twilio URL?*, Twilio, https://help.twilio.com/articles/223181228-Why-do-my-messages-include-a-Twilio-URL (last visited Apr. 8, 2026).

### iii.    *Twilio's control over when messages are sent*

51.    Twilio also controls when text messages are sent, through its message queue and throughput features. *Understanding Twilio Rate Limits and Message Queues*, Twilio https://help.twilio.com/articles/115002943027-Understanding-Twilio-Rate-Limits-and-Message-Queues (last visited Sep. 29, 2025); *Message throughput (MPS) and Trust Scores for A2P 10DLC in the US*, Twilio, https://help.twilio.com/articles/1260803225669-Message-throughput-MPS-and-Trust-Scores-for-A2P-10DLC-in-the-US (last visited Sep. 29, 2025).[2]

52.    Twilio uses message queues to keep track of message requests from its customers and determine when such messages are sent based in part on limits of how quickly messages are sent, somewhat akin to people waiting in line. *See Understanding Twilio Rate Limits and Message Queues*, *supra* ("When Twilio receives message requests from your application, these requests are queued for delivery in the order we receive them.")

53.    Message throughput is the rate at which Twilio allows messages to be sent from its platform and is "determined based on the sender's Brand type, Campaign type (use case), and Trust

---

[2] A2P 10DLC are standard 10-digit phone numbers that businesses use to send text messages to people via applications. *What is A2P 10DLC?*, Twilio, https://help.twilio.com/articles/1260800720410-What-is-A2P-10DLC- (last visited Apr. 14, 2026). These are different than short codes, which are between three and seven characters long and intended for marketing and promotion as well as alerts and notifications. *See What's an SMS Short Code?*, Twilio, https://www.twilio.com/docs/glossary/what-is-a-short-code (last visited Apr. 14, 2026).

Score (for Standard Brands)." *See Message throughput (MPS) and Trust Scores for A2P 10DLC in the US*, *supra.*

54.     While a Twilio user may request for a message to be sent, it is ultimately Twilio that determines when the message gets sent.

55.     Twilio further boasts to its users of how messages can be sent "at a rapid rate," in some cases exceeding over 200 messages per second. *Understanding Twilio Rate Limits and Message Queues, supra*; *Message throughput (MPS) and Trust Scores for A2P 10DLC in the US*, *supra.*

56.     Twilio indeed positions itself as a high-volume, rapid text service that provides "marketing messages . . . at a massive scale" and can send "up to 225 messages per second per campaign." *10DLC (10-digit long code numbers)*, Twilio, https://www.twilio.com/en-us/phone-numbers/a2p-10dlc?tab=1_3 (last visited Oct. 6, 2025).

57.     It is not physically possible for a human to send out messages at such high rates, further underscoring that Twilio is ultimately who sends such text messages.

> iv.     *Twilio's control over whom messages are sent to*

58.     Twilio also claims it automatically stops messages being sent to specific phone numbers when the recipient texts back certain keywords such as "STOP." *Twilio Support for Opt-out Keywords (SMS STOP Filtering)*, *supra*.

59.     Through this STOP Filtering, Twilio maintains its own internal do not contact list, as it describes it:

> Any of these STOP keyword replies will prevent a customer from receiving new messages from the Twilio phone number they're responding to. When Twilio receives one of these replies, we will create a "block list" entry on our side, and then pass the message on to your webhook. Once we have a block list entry for a particular recipient phone number, any future attempts to message them will be met with a 400 response from our API, along with Error Code 21610 - Message cannot be sent to the 'To' number because the customer has replied with STOP.

*Id.*

### 2. Prior investigations into Twilio's noncompliance with the TCPA

60.     In 2012, an industry commentator noted:

By Twilio allowing SMS spam to be sent through their SMS platform, they're destroying consumer trust in SMS marketing. The more SMS spam consumers receive, the more unlikely they are to engage with SMS apps in the future. This hurts everyone in the industry, even Twilio.

Twilio needs to admit there's an SMS spam problem on their platform, stop glorifying it, and take the needed steps to fix it. If they don't, we're going to continue to see an increase in SMS spam, and a decrease in consumer trust for SMS apps.

Derek Johnson, *Twilio Continues to Send SMS Spam, Even After Lawsuit*, Tatango (Apr 19, 2012)

(archived version accessed via

https://web.archive.org/web/20120421225250/www.tatango.com/blog/twilio-continues-to-send

sms-spam-even-after-lawsuit).

61.     The CTIA has further opined that

The threat of unwanted or harmful traffic delivered via hybrid business models is real, and Twilio itself has been a conduit for spammers to exploit wireless consumers. Indeed, it is precisely because Twilio and other hybrid providers offer ten digit mass-messaging as an alternative to Short Code program review that they are appealing to bad actors.

(Ex. B, at 5.)

62.     In admonishing Twilio's reckless business model, the CTIA noted:

The company's business model clearly establishes that the higher the volume of traffic Twilio sends, the more profit Twilio generates. With these policies and incentives in place – and no apparent checks against spam – it is no surprise that Twilio has attracted some bad actors in addition to legitimate customers. In February 2014, Cloudmark reported news of "an SMS phishing attack aimed at the customers of several large mobile providers in the US," in which malicious messages were sent through Twilio via traditional P2P mechanisms to "[m]ore than a quarter of a million mobile users." Investigation revealed that more than 90 percent of the numbers involved were provisioned by Twilio. . . .Indeed, one observer asked rhetorically why "spammers love Twilio so much," and then answered: "[I]t's because they use long codes for messaging."

(Ex. B, at 11–12.)

63.     As early as 2017, Twilio has been put on notice that its texting platform is subject to the TCPA and state analogues. *See Wick v. Twilio Inc.*, No. C16-00914RSL, 2017 WL 2964855, at *4 (W.D. Wash. July 12, 2017).

64.     Twilio has further recognized that it "face[s] a risk of litigation" and

> Text messages may subject us to potential risks, including liabilities or claims relating to consumer protection laws. For example, the Telephone Consumer Protection Act of 1991 restricts telemarketing and the use of automatic SMS text messages without proper consent. This has resulted in civil claims against the Company and requests for information through third-party subpoenas. The scope and interpretation of the laws that are or may be applicable to the delivery of text messages are continuously evolving and developing. If we do not comply with these laws or regulations or if we become liable under these laws or regulations due to the failure of our customers to comply with these laws by obtaining proper consent, we could face direct liability.

Twilio Inc., Registration Statement 41 (Form S-1) (Oct. 7, 2016) (available at https://www.sec.gov/Archives/edgar/data/1447669/000119312516733893/d237988ds1.htm).

65.     The Federal Communications Commission ("FCC") investigated Twilio for many months in 2022 and determined that Twilio had been originating illegal robocall traffic on behalf of one or more of its clients. (Ex. C, Jan. 24, 2023 FCC Enforcement Notice Letter.)

66.     When confronted with the investigation's findings, Twilio told the Enforcement Bureau and Industry Traceback Consortium that its client had purportedly obtained the called parties' consent. However, neither Twilio nor its client ever supplied evidence of that consent. (Ex. D, Jan. 24, 2023 FCC Press Release, at 1.)

67.     As a result, the FCC was forced to issue a cease-and-desist letter to Twilio, ordering it to investigate and take steps to address the unlawful traffic. (Ex. C.)

68.     Noting that Twilio was the most prominent and largest provider to receive an Enforcement Bureau cease-and-desist letter, Enforcement Bureau Chief Loyaan A. Egal stated that

"'Know Your Customer' principles should be at the forefront of all communications service providers' business practices. It is concerning to see such a large provider allowing this kind of traffic on its networks. I hope and expect Twilio to immediately cease and desist." (Ex. D, at 1.)

69.     In a public statement, representatives from Twilio swiftly responded: "[The company] takes any concerns related to fraudulent actors on its network extremely seriously and will continue to cooperate fully with the Bureau regarding the allegations in the Bureau's Notice." Russel H. Fox and Jonathan P. Garvin, *Telephone and Texting Compliance News: Regulatory Update — FCC Takes Action Against Repeat Robocaller, Legislators Seek Higher Robocalling Penalties, Twilio Stops Illegal Robocallers* (Feb. 28, 2023),  https://www.mintz.com/insights-center/viewpoints/2023-02-27-telephone-and-texting-compliance-news-regulatory-update-fcc.

### 3.    *Twilio knowingly allows its platform to be used for unlawful purposes.*

70.     As detailed above, Twilio has had clear notice regarding bad actors seeking to make use of its platform. Yet Twilio still allows glaring loopholes for such abuse to occur.

71.     For example, Twilio provides its customers with the ability to completely disable its STOP text filtering described above. *See Twilio Support for Opt-out Keywords (SMS STOP Filtering)*, *supra*.

72.     While Twilio openly recognizes "All of the rules of the TCPA apply even if a call is made by AI," it still seeks to shirk its own responsibility for such compliance and instead tells developers using its platform to "Do your own diligence for compliance."  *See* Paul Kamp, *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python*, Twilio (Apr. 28, 2025), https://www.twilio.com/en-us/blog/outbound-calls-python-openai-realtime-api-voice.

## C.  OpenAI and its GPT Model

73.     OpenAI's flagship product, ChatGPT, as the first of the mainstream LLMs, has indisputably revolutionized how society works and has raised a myriad of thorny ethical questions.

74. ChatGPT is powered by OpenAI's GPT-4o model, which OpenAI describes as "our latest step in pushing the boundaries of deep learning, this time in the direction of practical usability." *Hello GPT-4o*, OpenAI (May 13, 2024), https://openai.com/index/hello-gpt-4o/.

75. Part of what makes this GPT model so revolutionary is its ability to perform its own reasoning, as illustrated in OpenAI's announcement of its deliberative alignment training paradigm that

> directly teaches reasoning LLMs the text of human-written and interpretable safety specifications, and trains them to reason explicitly about these specifications before answering. We used deliberative alignment to align OpenAI's o-series models, enabling them to use chain-of-thought (CoT) reasoning to reflect on user prompts, identify relevant text from OpenAI's internal policies, and draft safer responses.

*Deliberative alignment: reasoning enables safer language models*, OpenAI (Dec. 20, 2024), https://openai.com/index/deliberative-alignment/.

### 1. The Power of the GPT Model

76. ChatGPT's capabilities extend well beyond that of "general service" tools such as a word processor or internet service providers. (*See* Br. Supp. Def. OpenAI's Mtn. Dismiss at 10–11, ECF No. 34.)

77. When OpenAI first launched ChatGPT in 2022, OpenAI's CEO Sam Altman described ChatGPT as "an early demo of what's possible" and that "[s]oon you will be able to have helpful assistants that talk to you, answer questions, and give advice. Later you can have something that goes off and does tasks for you." Samantha Lock, *What is AI chatbot phenomenon ChatGPT and could it replace humans?*, The Guardian (Dec. 5, 2022), https://www.theguardian.com/technology/2022/dec/05/what-is-ai-chatbot-phenomenon-chatgpt-and-could-it-replace-humans.

78. OpenAI billed ChatGPT as "a model . . . which interacts in a conversational way. The dialogue format makes it possible for ChatGPT to answer followup questions, admit its

mistakes, challenge incorrect premises, and reject inappropriate requests." *Introducing ChatGPT*,

OpenAI (Nov. 30, 2022), https://openai.com/index/chatgpt/.

79.    As described by another commentator:

And then, on Nov. 30, a startup called OpenAI released an experimental chatbot dubbed ChatGPT.

Seemingly overnight, the user-friendly generative AI technology enraptured the globe. It wowed the public with its ability to carry human-sounding conversations, draft emails and essays and respond to complex search queries with succinct outputs. In just two months, ChatGPT became the fastest-growing consumer application in history, estimated to have reached 100 million active users by January.

Catherine Thorbecke, *A year after ChatGPT's release, the AI revolution is just beginning*, CNN

(Nov. 30, 2023), https://edition.cnn.com/2023/11/30/tech/chatgpt-openai-revolution-one-year.

80.    Indeed, OpenAI has described ChatGPT as:

The artificial intelligence (AI) tool known as ChatGPT is many things: a revolutionary technology with the potential to augment human capabilities, fostering our own productivity and efficiency; an accelerator for scientific and medical breakthroughs; a mechanism for making existing technologies accessible to more people; an aid to help the visually impaired navigate the world; a creative tool that can write sonnets, limericks, and haikus; and a computational engine that reasonable estimates posit may add trillions of dollars of growth across the global economy.

Mem. Supp. OpenAI Defs.' Mtn. Dismiss at 10 (ECF 52), *New York Times Co. v. Microsoft Corp.*,

No. 1:23-cv-11195-SHS-OTW (S.D.N.Y. Feb. 26, 2024).

81.    OpenAI has undertaken other initiatives to "extend the capabilities of conversational models" and "enable reasoning capable of problem-solving and planning, surpassing merely responding to text," such as through its Project Strawberry. *See* Kristian Hammond, OpenAI's Strawberry: A Step Towards Advanced Reasoning in AI, Center for Advancing Safety of Machine Intelligence (Aug. 12, 2024),

https://casmi.northwestern.edu/news/articles/2024/openais-strawberry-a-step-towards-advanced-reasoning-in-ai.html.

82.     Such extended reasoning skills are applicable to telemarketing sales pitch calls in which the unwilling recipient must be convinced to provide information and to become interested in whatever product or service is being offered.

83.     OpenAI's Operator initiative is another example of the company continuing to extend ChatGPT's advanced reasoning capabilities. OpenAI describes Operator as "transform[ing] AI from a passive tool to an active participant in the digital ecosystem. It will streamline tasks for users and bring the benefits of agents to companies that want innovative customer experiences and **desire higher rates of conversion**." *Introducing Operator*, OpenAI (Jan. 23, 2025), https://openai.com/index/introducing-operator/ (emphasis added).

84.     Conversion rates is a known concept in sales and refers to "the percentage of potential customers who take a desired action after a sales pitch or offer." *See* Candice Gervase , *What Is a Sales Conversion Rate? (Why It Matters and How to Measure)*, Salesforce (Jan. 21, 2025), https://www.salesforce.com/sales/analytics/sales-conversion-rate/#what-is-a-sales-conversion-rate.

85.     OpenAI further explains "simply describe the task you'd like done and Operator can handle the rest" and "Operator is one of our first agents, which are AIs capable of doing work for you independently—you give it a task and it will execute it." *Introducing Operator*, *supra*.

86.     This ability of ChatGPT to autonomously carry out tasks, such as through the Operator initiative, appeals to telephone spammers as they can conduct telemarketing calls without the need for human involvement.

87.     In fact, in October 2024, OpenAI demonstrated its Realtime API making a phone call to order strawberries fully autonomously. Deedy Das (@deedydas), X (Oct. 1, 2024 1:56 pm ET),  https://x.com/deedydas/status/1841175249586622683; *see also* Ryan Morrison, *OpenAI confirms AI agents are coming next year — what it means for you*, Tom's Guide (Oct. 2, 2024) https://www.tomsguide.com/ai/chatgpt/the-agents-are-coming-openai-confirms-ai-will-work-without-humans-in-2025.

88.     As described in the article, "In the Dev Day example we saw a voice bot call a seller (played by a researcher), order 400 chocolate-covered strawberries, give a specific address and say it would pay in cash. It declared its status as an AI assistant but you would struggle to tell it was AI sometimes." *OpenAI confirms AI agents are coming next year — what it means for you*, *supra.*

89.     In the post of the video, the video is described as "OpenAI Realtime API makes a call to order strawberries at Dev Day, which is awesome . . . ." Deedy Das (@deedydas), X (Oct. 1, 2024 1:56 pm ET), https://x.com/deedydas/status/1841175249586622683; *see also* Eze Vidra, *The new Realtime API from OpenAI uses AI voice to call store*, YouTube (Oct 1, 2024), https://www.youtube.com/watch?v=vXu2MZ7fp-I.

90.     This post has been viewed over 66,000 times. Deedy Das (@deedydas), X (Oct. 1, 2024 1:56 pm ET), https://x.com/deedydas/status/1841175249586622683.

91.     This video shows a demonstration in which a human user gives instructions to OpenAI to place a call to order strawberries. *Id*.

92.     The video then shows the AI agent calling an actual phone which rings. *Id.*

93.     When a human answers the phone, the AI agent identifies itself as an AI assistant and carries on a conversation with the human and proceeds to order strawberries. *Id.*

94.     During the conversation, it is clear that OpenAI, not the original human user, is determining what words to say in the conversation. *Id.*

95.     While this demonstration appears to also involve Twilio, it is clear that OpenAI used the demonstration to showcase its Realtime API's ability to make calls to people, as indicated by various descriptions of the video. *See* Deedy Das (@deedydas), X (Oct. 1, 2024 1:56 pm ET), https://x.com/deedydas/status/1841175249586622683; *see also* Eze Vidra, *The new Realtime API from OpenAI uses AI voice to call store*, YouTube (Oct 1, 2024), https://www.youtube.com/watch?v=vXu2MZ7fp-I; Freeplay (@freeplay_ai), X (Oct. 1, 2024 4:50 pm), https://x.com/freeplay_ai/status/1841219079971225618 ("So many big updates from @OpenAI today! . . . . Including a very cool video from @romainhuet of the new Realtime API placing an order for $1,400 worth of chocolate-covered strawberries"); Greg Bauges, *Photos from OpenAI DevDay*, HaiHai Labs - What will we build with AI? (Oct. 4, 2024), https://www.haihai.ai/devday/ ("Romain's Realtime API demo showed off an agent that autonomously called "Ilan's Strawberries" and had a conversation with a human to place an order for 400 people.").

96.     This is a clear example of OpenAI marketing its offerings as a means to make automated outbound calls, creating a tantalizing tool for telemarketing spammers.

### 2. *Open AI's awareness of the dangers and risks of its GPT model*

97.     OpenAI, let alone end users, does not appear to be even in full control of what actions ChatGPT may take, as demonstrated by ChatGPT's secretive Project Giraffe, which appears to concern OpenAI's "efforts to detect and block its models from outputting copyrighted content." *See* Letter at 1 (ECF 1223), *New York Times Co. v. Microsoft Corp.*, No. 1:23-cv-11195-SHS-OTW (S.D.N.Y. Feb. 5, 2026).

98.     Mr. Altman has admitted that the company does not understand precisely how ChatGPT thinks or operates: "We have certainly not solved interpretability." Rachel Curry, *Sam Altman Says OpenAI Doesn't Fully Understand How GPT Works Despite Rapid Progress*, Observer (May 30, 2024 3:57 pm), https://observer.com/2024/05/sam-altman-openai-gpt-ai-for-good-conference/. When asked whether the fact OpenAI does not fully understand its model would be a reason to not release more powerful models, Mr. Altman dismissed such concerns and claimed "these systems [are] generally considered safe and robust." *Id.*

99.     Yet only a year before, Mr. Altman testified before a United States Senate committee and admitted that "[i]f this technology goes wrong, it can go quite wrong." Irinia Ivanova, *Father of ChatGPT: AI could "go quite wrong,"* CBS News (May 16, 2023 4:11 PM ET), https://www.cbsnews.com/news/sam-altman-senate-chatgpt-ai-could-go-quite-wrong/.

100.    OpenAI further admits that "[w]e recognize that GPT-4o's audio modalities present a variety of novel risks." *Hello GPT-4o*, *supra.*

101.    Despite this knowledge of how its platform can be abused and the risks proposed, OpenAI has consciously decided to push its tool further and further, such as through the Operator initiative, Project Strawberry, and other developments.

102.    OpenAI's decision to do so has put profits over safety and the company has suffered of wave of resignations of its safety researchers as a consequence.

103.    As a former top safety researcher at OpenAI has stated: "over the years, safety culture and processes have taken a backseat to shiny products." Jan Leike (@janleike), X (May 17, 2024 11:57 AM), https://x.com/janleike/status/1791498184671605209; *see also* Jason Green-Lowe, *OpenAI Safety Team's Departure is a Fire Alarm*, Center for AI Policy (May 20, 2024), https://www.centeraipolicy.org/work/openai-safety-teams-departure-is-a-fire-alarm;        Kylie

Robinson, *OpenAI researcher resigns, claiming safety has taken 'a backseat to shiny products'*, The Verge (May 17, 2024 2:32 pm ET), https://www.theverge.com/2024/5/17/24159095/openai-jan-leike-superalignment-sam-altman-ai-safety.

104.    As former safety researcher has added: "OpenAI is really excited about building AGI . . .and they are recklessly racing to be the first there." Noor Al-Sibai, *OpenAI Insider Estimates 70 Percent Chance That AI Will Destroy or Catastrophically Harm Humanity*, Futurism (June 4, 2024 3:33 PM EDT), https://futurism.com/the-byte/openai-insider-70-percent-doom.

105.    Other safety researchers have also resigned in protest of OpenAI shirking safety standards in its race to be the top AI company. *See* Beatrice Nolan, *Another OpenAI researcher quits—claims AI labs are taking a 'very risky gamble' with humanity amid the race toward AGI*, Fortune (Jan. 28, 2025, 7:38 AM ET), https://fortune.com/2025/01/28/openai-researcher-steven-adler-quit-ai-labs-taking-risky-gamble-humanity-agi/.

106.    Indeed, OpenAI is facing numerous lawsuits over allegations of inducing psychosis and assisting users in committing murder and suicide. *See* Nikita Ostrovksy, *OpenAI Removed Safeguards Before Teen's Suicide, Amended Lawsuit Claims*, Time (Oct. 23, 2025 11:40 AM ET), https://time.com/7327946/chatgpt-openai-suicide-adam-raine-lawsuit/; Keiran Southern, *Man killed his mother 'after consulting an AI chatbot'*, The Times (Dec. 11, 2025 6:01 pm GMT), https://www.thetimes.com/us/news-today/article/ai-killed-father-chatgpt-stein-erik-soelberg-connecticut-236r5pmc5; John O'Brien, *Murderer's estate blames talks with ChatGPT for his crime*, Legal Newsline (Jan. 2, 2026), https://www.legalnewsline.com/lawsuits/murderer-s-estate-blames-talks-with-chatgpt-for-his-crime/article_04ed0b39-aaf6-4233-b991-3a016a98fdb2.html; Rebecca Bellan and Amanda Silberling, *ChatGPT told them they were special — their families say it led to tragedy*, TechCrunch (Nov. 23, 2025 8:00 AM PST),

https://techcrunch.com/2025/11/23/chatgpt-told-them-they-were-special-their-families-say-it-led-to-tragedy/.

### 3. OpenAI's awareness and control over the content and usage on its platform

107.    Regarding Operator, OpenAI has said "We know bad actors may try to misuse this technology. That's why we've designed Operator to refuse harmful requests and block disallowed content." *Introducing Operator*, OpenAI (Jan. 23, 2025), https://openai.com/index/introducing-operator/.

108.    OpenAI also has a Moderation API which can detect harmful usage of its platform, including "[c]ontent that expresses, incites, or promotes harassing language towards any target" and "[c]ontent that gives advice or instruction on how to commit illicit acts. A phrase like "how to shoplift" would fit this category." *Moderation*, OpenAI Developers, https://developers.openai.com/api/docs/guides/moderation (last accessed Apr. 6, 2026).

109.    OpenAI commends itself on its model's ability to moderate content generated through its platform:

> We present a holistic approach to building a robust and useful natural language classification system for real-world content moderation. The success of such a system relies on a chain of carefully designed and executed steps, including the design of content taxonomies and labeling instructions, data quality control, an active learning pipeline to capture rare events, and a variety of methods to make the model robust and to avoid overfitting. Our moderation system is trained to detect a broad set of categories of undesired content, including sexual content, hateful content, violence, self-harm, and harassment. This approach generalizes to a wide range of different content taxonomies and can be used to create high-quality content classifiers that outperform off-the-shelf models.

*A holistic approach to undesired content detection in the real world*, OpenAI (June 20, 2024), https://openai.com/index/a-holistic-approach-to-undesired-content-detection-in-the-real-world/; *see also* Todor Markov et al., *A Holistic Approach to Undesired Content Detection in the Real World*, arXiv, Feb. 14, 2023 (cited as arXiv:2208.03274).

110.    Tellingly, while OpenAI has the ability to flag such content (which includes flags for violent and self-harm content), OpenAI does not always automatically block such content. Rather, it leaves the choice up to developers: "Use the moderations endpoint to check whether text or images are potentially harmful. If harmful content is identified, you can take corrective action, like filtering content or intervening with user accounts creating offending content." *Moderation*, *supra*.

111.    Such a laissez-faire approach plays into the hands of bad actors such as telemarketing spammers who seek to use OpenAI's platform for illegal ends.

112.    OpenAI also is aware of misuse on its platform as it generates logs of usage on the platform. *See Data controls in the OpenAI platform*, OpenAI, https://developers.openai.com/api/docs/guides/your-data (last visited Apr. 10, 2026).

113.    As OpenAI describes such logs:

Abuse monitoring logs may contain certain customer content, such as prompts and responses, as well as metadata derived from that customer content, such as classifier outputs. By default, abuse monitoring logs are generated for all API feature usage and retained for up to 30 days, unless we are legally required to retain the logs for longer.

*Id.*

114.    Discovery will show OpenAI had logs of the misconduct at issue in this case and allowed it to continue, as evidenced by the multiple calls Mr. Lowrey received as described below.

115.    OpenAI also

leverage[s] automated and human review to monitor for potential abuse and take appropriate action with users who violate our policies. We intend to track the effectiveness of mitigations and refine them over time. We will also continuously leverage discoveries from manual investigations to enhance our automated detection mechanisms and mitigations

*See Operator System Card*, OpenAI (Jan 23, 2025). https://openai.com/index/operator-system-card/.

116. OpenAI has even developed its own internal reasoning models to determine when usage violates its policy. *See Introducing gpt-oss-safeguard*, OpenAI (Oct. 29, 2025), https://openai.com/index/introducing-gpt-oss-safeguard/ (discussing reasoning model that determines if usage violates a particular given policy "which [OpenAI] initially developed for internal use . . .").

117. Yet as evidenced below, OpenAI has not implemented such automated reviews to prevent illegal telemarketing calls to be made with its platform.

118. Interestingly, OpenAI allows customers to pay more money to evade such abuse monitoring. *See Data controls in the OpenAI platform*, *supra.* (noting that customers can "get in touch with our sales team to learn more about these offerings" which includes the option to "have their customer content excluded from abuse monitoring").

119. OpenAI has multiple controls to monitor and block usage it deems unlawful and/or harmful that occurs on its platform.

120. Through its Model Spec, OpenAI describes different levels of control where it automatically blocks certain usage. *See* OpenAI Model Spec, OpenAI (Dec. 18, 2025), https://model-spec.openai.com/2025-12-18.html. For example, OpenAI has implemented a "Root" level of authority, which are "[f]undamental root rules that cannot be overridden by system messages, developers or users. Root-level instructions are mostly prohibitive, requiring models to avoid behaviors that could contribute to catastrophic risks, cause direct physical harm to people, violate laws, or undermine the chain of command." *Id.*

121. One example of a Root Rule that Open AI has established is "Don't provide information hazards" such as "detailed, actionable steps for carrying out activities that are illicit, could harm people or property, or lead to critical or large-scale harm." *Id.* OpenAI gives an

example of the implementation of this rule that prohibits its model from providing a precise recipe for synthesizing methamphetamine. *Id.*

122. In fact, the Model Spec goes into very detailed examples of other types of content that OpenAI's model is prohibited from generating, ranging from building explosives to using exclusive/romantic language with a user.

123. Given the level of specificity of examples of what content such Root Rules prohibit, OpenAI has the ability to create a Root Rule to prohibit its model from making spam telemarketing calls.

124. OpenAI has another level of rules that sit above the Root Rules, called System Rules. *Id.* These rules are also not modifiable by users or developers of the OpenAI's platform. *Id*

125. Based on information and belief, OpenAI does not have any Root nor System Rules to prevent telemarketing spam calls.

126. For other illegal content, OpenAI lauds itself on "deploy[ing] monitoring and enforcement technology to detect and prevent bad actors from attempting to use our tools." *Combating online child sexual exploitation & abuse*, OpenAI (Sep. 29, 2025), https://openai.com/index/combating-online-child-sexual-exploitation-abuse/.

127. Based on information and belief, OpenAI does not employ such features to prevent telemarketing spam on its platform.

128. OpenAI also "invest[s] in technology and teams to identify and disrupt sophisticated threat actors' activities. Our Intelligence and Investigations, Safety, Security, and Integrity teams investigate malicious actors in a variety of ways, including using our models to pursue leads, analyze how adversaries are interacting with our platform, and assess their broader

intentions." *Disrupting malicious uses of AI by state-affiliated threat actors*, OpenAI (Feb. 14, 2024), https://openai.com/index/disrupting-malicious-uses-of-ai-by-state-affiliated-threat-actors/.

129. Again though, Plaintiff expects discovery to show OpenAI makes no similar investment to prevent spammers from using its platform to making illegal telemarketing calls.

130. OpenAI also has the ability to block certain users from accessing its platform to commit illicit activity, including through its API. *See Safety checks*, OpenAI, https://developers.openai.com/api/docs/guides/safety-checks (last visited Apr. 10, 2026) ("If your org engages in suspicious activity that violates our safety policies, we may return an error, limit model access, or even block your account."); *Cybersecurity checks*, OpenAI, https://developers.openai.com/api/docs/guides/safety-checks/cybersecurity (last visited Apr. 10, 2026) ("If a request is classified as potentially suspicious you may receive an API error with the error code cyber_policy. For streaming requests, these errors may be returned in the midst of other streaming events.").

131. OpenAI thus has the ability to block spam calls from being generated on its platform, yet it has failed to implement such measures.

#### 4. OpenAI's involvement in robocalling

132. OpenAI provides "Voice agents" to its developer community and describes such as "Voice agents turn the same agent concepts into spoken, low-latency interactions," including a "Speech-to-speech with live audio sessions" option where "[t]he model handles live audio input and output directly." *Voice agents*, OpenAI, https://developers.openai.com/api/docs/guides/voice-agents (last visited Apr. 9, 2026).

133. OpenAI has allowed developers to openly boast how its system can be used to fully automate marketing calls to individuals, as shown in a community blog post labeled "How I

automated cold calls with AI." (Ex. E, HenryObj, *How I automated cold calls with AI - Community - OpenAI Developer Community*, OpenAI (Dec. 23, 2024 12:33 am).)[3]

134.    In a related video by the same developer, he explains that through OpenAI, he can create a system by which "AI Agents make phone calls on your behalf a bit like having an army of sales development representatives." Henry Obegi, *[DEMO] - Automate Outreach using OpenAI, Twilio, and Google (Sheets/Calendar)*, Vimeo (Dec. 23, 2024 7:13 a.m.), https://vimeo.com/1041701840.

135.    There are similar instructional videos online, including one titled "How to Build an AI Voice Agent That Cold Calls Leads for You" and has over 64,000 views to date. Alex Leischow, *How to Build an AI Voice Agent That Cold Calls Leads for You (2025)*, YouTube (May 14, 2025), https://www.youtube.com/watch?v=yKn0qKakUOk.

136.    The description for this video states that it will "show you how to build an AI Outbound Voice Agent, an automated cold caller that reaches out to leads" using OpenAI. *Id.*

137.    OpenAI's own developer resources also make clear that OpenAI is listening and monitoring the call from the beginning to determine when to respond: "Realtime sessions have voice activity detection (VAD) enabled, which means the API will determine when the user has started or stopped speaking and respond automatically." *Realtime conversations*, OpenAI Developers, https://developers.openai.com/api/docs/guides/realtime-conversations#voice-activity-detection (last visited Apr. 6, 2026).

138.    OpenAI has further marketed its RealTime API's capabilities with phone calls by stating:

> Today we're making the Realtime API generally available with new features that enable developers and enterprises to build reliable, production-ready voice agents. The API now supports remote MCP servers, image inputs, and phone calling

---

[3] This webpage on OpenAI's website has been removed since the filing of this lawsuit.

through Session Initiation Protocol (SIP), making voice agents more capable through access to additional tools and context.

*Introducing gpt-realtime and Realtime API updates for production voice agents*, OpenAI (Aug. 28, 2025), https://openai.com/index/introducing-gpt-realtime/.

### D. Twilio and OpenAI are jointly involved in making telemarketing calls

139. Twilio also markets detailed instructions on how to create an outbound AI voice agent using OpenAI to make such calls. *See, e.g.*, Paul Kamp, *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python, supra.*

140. Glaringly in this tutorial, Twilio admits "[w]orking through exactly who you are allowed to call is beyond the scope of this tutorial." *Id.*

141. Twilio further states in this tutorial:

'Our recommendation is to always disclose the use of AI for outbound or inbound calls.\n'
'Reminder: All of the rules of TCPA apply even if a call is made by AI.\n'
'Check with your counsel for legal and compliance advice.'

*Id.*

142. In another post, Twilio shirks any responsibility, telling its users

Like I warn in the code, making outbound calls requires you comply with the various rules and regulations in your jurisdiction. For example, in the United States, your outbound calls have to comply with the Telephone Consumer Protection Act (or TCPA). We at Twilio ask you to do your own due diligence when determining whether your usage is compliant.

Paul Kamp, *How to Make Outgoing Calls with Twilio Voice and the OpenAI Realtime API and Node.js*, Twilio (Aug. 28, 2025), https://www.twilio.com/en-us/blog/outbound-calls-node-openai-realtime-api-voice.

143. In this tutorial, Twilio in fact has a programming function *isNumberAllowed* that is intended to check if a telephone number is allowed to be called. *Id.* Yet, Twilio then goes on to

say "With your own function, be sure to do your own diligence to be compliant," abdicating any responsibility in preventing spam calls. *Id.*

144.    Indeed, OpenAI and Twilio work together to allow their customers to fully automate outbound calls in which OpenAI initiates the conversation on the call, determines what to say, and interacts with individuals who answer such calls, with zero involvement from OpenAI/Twilio customers on such calls:

> Our friends at OpenAI launched their Realtime API, which exposed the multimodal capabilities of their GPT Realtime model. In another post, we shared how you could build a voice AI assistant in Node.js you could call from your phone.
>
> Since the API's Preview launch last year, we've had many requests to show the opposite scenario – how do you call a phone number using OpenAI's Realtime API and Node.js using Twilio?
>
> In this tutorial, I'll show you some demo code which can dial a phone number using Twilio Voice and Media Streams, and the OpenAI Realtime API. I'll show a function which demonstrates how to check if a phone number you provided is allowed to be called, then begin a phone call. Finally, after a user picks up, we'll trigger the OpenAI Realtime API to have the AI talk first.

 *Id.*

145.    Such calls require both Twilio and OpenAI in order to successfully make a call,

146.    Said another way, the Twilio tutorial referenced above, *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python*, cannot make a successful call without OpenAI's involvement as the active caller participant necessary for a conversation to occur. *See also OpenAI Realtime API with Twilio Quickstart,* Github, https://github.com/openai/openai-realtime-twilio-demo (last visited Apr. 9, 2026) (demonstrating how OpenAI must be "combine[d]" with Twilio "to build an AI calling assistant"); Amanda Lange, *Integrate OpenAI with Twilio Voice Using ConversationRelay*, Twilio (Mar. 20, 2025), https://www.twilio.com/en-us/blog/developers/tutorials/product/integrate-openai-twilio-voice-

using-conversationrelay (noting that Twilio conversation feature requires connection with an AI model in order to "build real-time, human-like voice applications for conversations").

147. Twilio admits that it does not manage the actual conversation on the call, this is left up to others such as OpenAI:

> Twilio handles the things we are good at: Voice channels ( WebRTC, PSTN, SIP), scale, latency, orchestration, and direct relationships with speech-to-text and text-to-speech providers. We leave the important business decisions to the people **building** on our platform: the AI Provider, LLM Interaction, choice of SST and TTS providers, and the overall "agentic" or "conversational" experiences (applications) that you want to build.

*See* Dan Bartlett, Charlie Avila, Ben Johnstone, *Add Voice AI to your website with the Twilio Voice JavaScript SDK and ConversationRelay*, Twilio (July 14, 2025), https://www.twilio.com/en-us/blog/developers/tutorials/product/voice-ai-conversationrelay-twilio-voice-sdk (emphasis in original); *see also* *Text-to-Speech (TTS)*, Twilio, https://www.twilio.com/docs/voice/twiml/say/text-speech (last visited Apr. 13, 2026) ("Although Twilio provides access to these third-party voices, control and updates are managed by the third-party vendors.").

148. Twilio also admits that OpenAI, not Twilio, "power[s] not only the voice interaction, but also mak[es] helpful extensions like tool calling, guardrails, and more possible . . . ." Kelly Robinson, Dominik Kundel, *Build an AI Voice Assistant with Twilio Voice, the OpenAI Realtime Agents SDK, and Node.js*, Twilio (Aug. 28, 2025), https://www.twilio.com/en-us/blog/developers/tutorials/product/speech-assistant-realtime-agents-sdk-node.

149. As detailed above, OpenAI and Twilio offer features that allow their two platforms to be integrated for purposes of making phone calls. These features include OpenAI's Realtime API and Twilio's ConversationRelay.

150.    Through its RealTime API, OpenAI has created an interface that allows other platforms to connect to it in order to allow OpenAI to engage in conversations in real-time through these platforms. *See Realtime conversations*, *supra*.

151.    Within this interface, OpenAI has specific commands for how to accept, hang up, refer, or reject phone calls. *Realtime*, OpenAI, https://developers.openai.com/api/reference/resources/realtime (last visited Apr. 20, 2026); *e.g., Accept call*, OpenAI, https://developers.openai.com/api/reference/resources/realtime/subresources/calls/methods/accept (last visited Apr. 20, 2026).

152.    As detailed above, Twilio has published multiple guides on how to integrate its platform with OpenAI to make phone calls. *See e.g.*, *Integrate OpenAI with Twilio Voice Using ConversationRelay*, *supra*. For such calls to work, both Twilio and OpenAI must be used.

### E.  Impact on Plaintiff

153.    This case arises from Defendants' flagrant violation of federal and state law by repeatedly texting and calling Mr. Lowrey despite his registration on the national Do Not Call (DNC) list and further after he instructed Defendants to not contact him. Here, Defendants' failure to abide by federal and state law caused Mr. Lowrey anxiety, emotional distress, frustration, invasion of privacy, and lost time due to Defendants' ongoing, unwanted solicitation texts.

154.    Both Congress and the Virginia Legislature have taken serious steps toward curbing the unwanted phone calls that plague consumers. Such marketing calls are illegal under either statutory scheme, with Virginia's prohibiting such calls using any method without the called party's consent.

155.    Neither statute permits calling or texting to one whose number is registered on the National Do Not Call List nor who has requested not to receive such communications.

156. Considering the totality of the circumstances, Plaintiff alleges that Twilio made, initiated, and/or caused to be initiated the text messages transmitted to Plaintiff within the meaning of the TCPA and the VTPPA.

157. Those text messages were made on behalf of Defendant Fresh Start, and were marketing messages designed to convince Plaintiff to engage the services of Fresh Start's alter ego, Probate Cures.

158. Further, OpenAI and Twilio made, initiated, and/or caused to be initiated multiple telemarketing calls to Plaintiff within the meaning of the TCPA and the VTPPA.

159. Such calls were made on behalf of Defendant Fresh Start, and were telemarketing calls designed to convince Plaintiff to engage the services of Fresh Start's alter ego, Probate Cures.

160. Other consumers have complained of similar conduct from Fresh Start:

> Lawanda reached out to me unsolicited from Probate Cures asking me whether Probate Cures could help me with estate matters.
>
> WTH? Are you serious?
>
> This is so inappropriate.
>
> You don't reach out to someone asking to help them with personal, financial matters when/if they are grieving. It's a predatory violation of privacy.
>
> I am appalled at the lack of propriety and ethics of some people.

Review, laura (Aug. 9, 2024), *on Probatecures*, Trustpilot,

https://www.trustpilot.com/review/probatecures.com (last visited Apr. 1, 2026).

## II.     JURISDICTION AND VENUE

161. This Court has subject matter jurisdiction over this action pursuant Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227, 28 U.S.C. § 1331, and *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012).

162. Supplemental jurisdiction of the state law claims regarding the same transactions and events is provided under 28 U.S.C. § 1367.

163. Venue is proper in this Court because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Division. Plaintiff is a resident of this District and Division.

### III.    PARTIES

164. Mr. Lowrey is a natural person, Virginia resident, cellular telephone subscriber, and consumer.

165. Defendant Twilio Inc. is a foreign corporation, formed in Delaware. It is registered to do business in Virginia. Twilio's registered agent is listed as Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond Va, 23219. Twilio, either by making or causing others to make, telephone solicitation calls, is a Telephone Solicitor as defined by the Virginia Telephone Consumer Protection Act ("VTPPA"), Va. Code § 59.1-510. It is also governed by the federal Telephone Consumer Protection Act ("TCPA").

166. Defendant OpenAI is a foreign limited liability company, formed in Delaware. It is registered to do business in Virginia. OpenAI's registered agent is listed as 4701 Cox Rd, Ste 285, Glen Allen, VA 23060. OpenAI, either by making or causing others to make, telephone solicitation calls, is a Telephone Solicitor as defined by the Virginia Telephone Consumer Protection Act ("VTPPA"), Va. Code § 59.1-510. It is also governed by the federal Telephone Consumer Protection Act ("TCPA").

167. Defendant Fresh Start Group LLC is a domestic limited liability company. Fresh Start's registered agent is Moe Mathews, 15430 Pouncey Tract Rd, Rockville, VA 23146. Fresh Start, either by making or causing others to make, telephone solicitation calls, is a Telephone

Solicitor as defined by the Virginia Telephone Consumer Protection Act ("VTPPA"), Va. Code § 59.1-510. It is also governed by the federal Telephone Consumer Protection Act ("TCPA").

168.    Fresh Start's principal office is also registered as 15430 Pouncey Tract Rd, Rockville, VA 23146.

169.    Fresh Start owns the property located at 15430 Pouncey Tract Rd, Rockville, VA 23146.

## A.  The Fresh Start Group Enterprise

170.    Neither "ProbateCURES" nor "Probate Cures" is registered with the Virginia State Corporation Commission.

171.    There was a website that was branded as Probate CURES (the "Probate Cures Website") and listed an address of 15430 Pouncey Tract Rd, Rockville, VA 23146 (the "Pouncey Tract Address"). (*Probate CURES*, Way Back Machine, https://web.archive.org/web/20250322031631/https://probatecures.com/ (last visited Apr. 1, 2026, attached as **Exhibit F**.)

172.    This website also included a Probate Cures logo (the "Probate Cures Logo"):



*Id.*

173.    After the filing of the Complaint in this matter, someone deactivated the Probate Cures Website and now its URL is listed as for sale. *See* https://probatecures.com (last visited April 1, 2026) (redirecting to *Probatecures.com*, Dynadot, https://forsale.dynadot.com/probatecures.com).

174.    As of April 1, 2026, the probatecures.com URL is registered to "Dynadot Inc" and the last change to the URL was on March 29, 2026. *WHOIS search results*; GoDaddy, https://www.godaddy.com/whois/results.aspx?itc=dlp_domain_whois&domain=probatecures.com (last visited Apr. 1, 2026).

175.    Based on information and belief, the Probate Cures Website was removed after the filing of this lawsuit and in response to the lawsuit.

176.    The Probate Cures Website listed Cathy Mathews as one of the three individuals involved on the Probate Cures team. (Ex. F, Wayback Machine Probate Cures homepage, at 3.)

177.    A person named Catherine Mathews filed a declaration in this matter in support of Fresh Start's Motion to Dismiss. (*See* Def. Fresh Start's Mtn. Dismiss, Ex. 1, Mathews Dec. ("Mathews Dec."), ECF No. 39-1.)

178.    Cathy Matthews and Catherine Matthews appear to be the same person. Plaintiff has no reason to believe these are different individuals.

179.    Ms. Mathews has submitted other filings on behalf of Fresh Start in this matter. (*See* Fresh Start Letter, ECF No. 22-2.)

180.    The Pouncey Tract Address is associated with Probate Cures through other websites. *See Probate Cures in Rockville, VA – Reviews, Hours, and Contact Details*, Yahoo, https://local.yahoo.com/info-237414595-probate-cures-rockville/ (last visited Apr. 1, 2026); *Probate Cures*, Yelp, https://www.yelp.com/biz/probate-cures-rockville (last visited Apr. 1, 2026).

181.    Defendant Fresh Start owns and manages the Pouncey Tract Address. (Mathews Dec. ¶¶ 2–3, ECF No. 39-1.)

182. There is a Fresh Start branded Instagram page (the "Fresh Start Instagram") that links to the Probate Cures website above. (*Fresh Start Here (@yourfreshstarthere) • Instagram photos and videos*, Instagram, https://www.instagram.com/yourfreshstarthere/ (last visited Apr. 1, 2026), attached as **Exhibit G**.)

183. Fresh Start also maintains a website (the "Fresh Start Website") that markets a variety of business services and represents "[w]e acquire, operate, and advise growth-focused companies. Our brands span real estate, property management, behavioral health, technology, construction, and finance." *Home - Fresh Start Group*, Fresh Start Group, https://freshstart.group/ (last visited Apr. 1, 2026).

184. Another page on the Fresh Start Website advertises a range of other services including "Business Advisory," "M&A," "Growth Strategy," "Real Estate," "Construction," "Lending," "Home Buying," "Home Selling," "Real Estate Investments," and "Partnership and Growth." *Services - Fresh Start Group*, Fresh Start Group, https://freshstart.group/services/ (last visited Apr. 1, 2026).

185. The Fresh Start Website offerings are significantly more than Ms. Mathews' sworn representation that Fresh Start "does not conduct any business other than managing the Property [at the Pouncey Tract Address]." *See* Mathews Dec. ¶ 3, ECF No. 39-1.

186. The Fresh Start Instagram, the Fresh Start Website, and filings Fresh Start has made with this Court all use the same trademark (the "Fresh Start Trademark"):



(*See* ECF No. 22-2; Ex. G, Fresh Start Instagram Page; *Home - Fresh Start Group*, Fresh Start Group, https://freshstart.group/ (last visited Apr. 1, 2026).)

187.    Fresh Start also maintains a Facebook account (the "Fresh Start Facebook") which also uses the Fresh Start Trademark. *Fresh Start Buys Houses*, Facebook, https://www.facebook.com/Freshstartbuyshouses (last visited Apr. 1, 2026.)

188.    "Fresh Start Buys Houses" is not a name registered with the Virginia State Corporation Commission (the "VA SCC").

189.    "Fresh Start Team ("Hanover Co)" was registered with the VA SCC under the entity Fresh Start RVA Homes, LLC. There is no other "Fresh Start Team" that is registered with the VA SCC.

190.    Fresh Start RVA Homes, LLC has been listed as inactive with the VA SCC since August 31, 2023.

191.    "Fresh Start Buys Houses" and "Fresh Start Team" are other names used by Defendant Fresh Start and are not separate legal entities.

192.    Only one week prior to when this lawsuit was filed, Fresh Start posted a video on the Fresh Start Facebook in which it advertised probate services using the name "Probate Cures." Fresh Start Buys Houses, *Probate Made Simple*, Facebook (Dec. 22, 2025), https://www.facebook.com/Freshstartbuyshouses/videos/1174887214752694/.

193.    On this post, Fresh Start stated:

Inheriting a home can feel overwhelming 😟

Probate Cures handles cleanouts, repairs, staging, and sales so you don't have to stress 🏡

We manage title research, repairs, and property prep, keeping you updated every step of the way ✅

See how simple probate can be, visit https://probatecures.com/

*Id.*

194.    The video for this post is branded with the Probate Cures Logo and includes an individual speaking who is wearing a shirt with "FRESHSTART TEAM" printed on it along with the Fresh Start Trademark:





*Id.*

195.    The individual wearing this shirt markets probate services and at one point in the video says that "Our team at Probate Cures brings over 50 years of combined real estate and probate experience." *Id.*

196.    There is also a Probate Cures YouTube channel (the "Probate Cures YouTube") which contains the Probate Cures Logo and has posted many videos that include Fresh Start and the Fresh Start Trademark, including videos from January of this year. A screenshot from this page is below:



*Probate C.U.R.E.S.*, YouTube, https://www.youtube.com/@ProbateCURES/shorts (last visited Apr. 1, 2026.)

197.    In one of these videos, Fresh Start advertises "WE'VE TAKEN INHERITED PROPERTIES OFF THEIR HANDS" as shown through the below screenshot:

 

@ProbateCURES,    *Home    Solutions*,    YouTube    (Nov.    15,    2025),
https://www.youtube.com/shorts/fh_NHaUlqhg.

198.    Fresh Start also maintains a LinkedIn page (the "Fresh Start LinkedIn"), a snapshot of which is below:



*Fresh Start Buys Houses*, LinkedIn, https://www.linkedin.com/showcase/probatecures (last visited

Apr. 1, 2026.)

199.    The FreshStart LinkedIn includes the Fresh Start Trademark and the URL for this

page includes "probatecures." *Id.*

200.    Only a month ago, Fresh Start posted a video on the FreshStart LinkedIn in which it advertised its services in managing properties involved in probate and used the name "Probate Cures:"

 **Fresh Start Buys Houses**
12 followers
1mo · 🌐

+ **Follow**    · · ·

Inheriting a property comes with paperwork, court steps, and tough decisions. Most families don't know where to start with probate.

Probate Cures guides you through the entire process, handling everything from securing the property to managing clean-outs, repairs, and preparing for the final sale. Get updates, not headaches, knowing professionals are handling every detail.

If you've recently inherited a home or are managing an estate in Virginia, visit **probatecures.com** today for a free consultation. **#Probate #Inheritance #EstatePlanning #RealEstate #VirginiaRealEstate #PropertyManagement #EstateSales #ProbateHelp**



Post, *Fresh Start Buys Houses*, LinkedIn, https://www.linkedin.com/posts/probatecures_probate-inheritance-estateplanning-activity-7425212383926644737-sD2H/ (last visited Apr. 1, 2026).

201.    Fresh Start also represents through its Better Business Bureau that it even has a specific team that focuses on probate and estate properties page:

> Fresh Start is a local company that buys houses in Richmond and now anywhere in The USA for cash and close quickly. We buy all types of properties to include, commercial, apartments, condos, townhouses single family homes, multifamily homes, land, and building lots in most areas. Even Inherited Properties, as we have a special team specializing in Probate and Estate Properties!

*Fresh Start | BBB Business Profile | Better Business Bureau*, Better Business Bureau, https://www.bbb.org/us/va/rockville/profile/home-buyers/fresh-start-0603-63396580 (last visited Apr. 1, 2026).

202.    On this same webpage, Fresh Start markets one of its services as "Inherited Real Estate / Probate / Estate Property Services." *Id.*

203.    "Probate Cures" is not a separate legal entity from Defendant Fresh Start.

204.    Rather "Probate Cures" is an alter ego, if not an affiliate or d/b/a, of Defendant Fresh Start.

205.    As shown through the above, Fresh Start markets and offers services to individuals to manage properties involved in inheritance and probate process.

### IV.    FACTS

206.    On or around December 11, 2004, Mr. Lowrey registered his cellular phone number ending in 4102 (the "Phone Number") on the National Do Not Call Registry. He has never changed his cellular phone number, removed it from the list, or relinquished ownership of the number.

207.    Mr. Lowrey has been using the Phone Number for over 20 years for his personal use.

208.    Mr. Lowrey uses the Phone Number for residential purposes. His home has no landline telephone.

209.    The Phone Number is Mr. Lowrey's only phone number.

210.    There is no other phone number that Mr. Lowrey uses for residential purposes.

211.    Mr. Lowrey's cell phone is thus his residential telephone line.

212.    Mr. Lowrey's father passed away in November 2024. On or around December 13, 2024, Mr. Lowrey was appointed executor of his father's estate.

213.    Based on information and belief, Defendant Fresh Start, and/or its agent, obtained details about Mr. Lowrey due to the fact that he had been appointed as executor of his father's estate.

214.    On March 18, 2025, Mr. Lowrey received a text message from Defendants in which they marketed services to assist with the probate process in Virginia.

215.    Mr. Lowrey never consented to receiving communications from any of Defendants.

216.    This message represented that someone named "Emma, from ProbateCURES" was "reaching out because I noticed you're representing an estate."

217.    In this message, Defendants directed Mr. Lowrey to call them at 423-900-2274.

218.    Defendants texted Mr. Lowrey using that phone number 601-552-0000 (the "Telemarketing Number").

219.    On March 24, 2025, Mr. Lowrey received another text from Defendants.

220.    That same day, Mr. Lowrey sent a text back to Defendants telling them to stop texting him.

221.    Defendants texted back stating that they understood Mr. Lowrey's request and would stop texting him.

222.    However, Defendants did not stop texting Mr. Lowrey and in fact sent him another marketing text later that same day.

223.    Over the next several days, Mr. Lowrey received an additional six marketing text messages from Defendants.

224.    On March 29, 2025, Mr. Lowrey again texted Defendants to stop texting him.

225.    Defendants once again responded that they understood Mr. Lowrey's request and would stop texting him.

226.    Despite this assurance, Defendants texted Mr. Lowrey again later that day.

227.    Defendants then sent another seventeen marketing text messages to Mr. Lowrey over the next several weeks.

228.    On April 16, 2025, Mr. Lowrey again texted Defendants to stop contacting him.

229.    Defendants ignored this request and continued to send texts to Mr. Lowrey.

230.    Around April 16, 2025, Mr. Lowrey also called the Telemarketing Number multiple times to reiterate his request for Defendants to stop contacting him, however each time he called, the phone number rang once and then went to a busy signal.

231.    Mr. Lowrey was confused by who was sending him texts as there was no indication who the Telemarketing Number was associated with.

232.    Defendants sent Mr. Lowrey another fifteen text messages over the next two weeks.

233.    On or around August 14, 2025, Mr. Lowrey received a phone call from Defendants in which they left a voicemail in which the caller said her name was "Emma" and directing Mr. Lowrey to call her back at 423-900-2274 and stating "I'm reaching out because I noticed you're representing an estate." This voicemail sounded to Mr. Lowrey like an artificial voice or pre-recorded message.

234.    The 423-900-2274 number is also listed on the Probate Cures Website. (Ex. F, at 4.)

235.    Mr. Lowrey's caller ID showed that this call came from 804-636-1337.

236.    On August 14, 2025, Mr. Lowrey called back the number 423-900-2274 multiple times and each time he heard a pre-recorded female voice on the other end that said "That number is not associated with an inbound agent" followed by three rapid beeps and then the call was disconnected.

237.    On or around October 2, 2025, Mr. Lowrey received another call from Defendants in which they left a voicemail in which the caller said her name was "Emma" and leaving a message similar to the one Mr. Lowrey received on August 14, 2025, including the statement "I'm reaching out because I noticed you're representing an estate" and providing a callback number of 804-636-3337. This voicemail sounded to Mr. Lowrey like an artificial voice or pre-recorded message.

238.    Mr. Lowrey's caller ID showed that this call came from 804-636-1337.

239.    When Mr. Lowrey called this number back within the next few days, he heard a voice state in part "This is Nadine with FSG" and explaining that the company offers in part helping individuals with properties going through probate. When Mr. Lowrey asked to speak to a representative to request not to be contacted, he heard "All three attempts failed. 429: you've exceeded your current quota. Please check your plan and billing detail. For more information on this error, read the docs. https://platform.openai.com/docs/guides/error-codes/api-errors." The voice on this call sounded to Mr. Lowrey like an artificial voice or pre-recorded message.

240.    The link provided in this message is to an actual webpage maintained by OpenAI, and on this page, there is an explanation for the error code 429, that explains to OpenAI customers

they have run out of credits or hit their maximum "monthly spend." Error Codes, OpenAI, https://platform.openai.com/docs/guides/error-codes/api-errors (last visited Oct. 24, 2025).

241.    FSG, as stated in the recorded message, also is the acronym for Fresh Start Group.

242.    On or around October 16, 2025, Mr. Lowrey received a third telemarketing call from Defendants, using the number 804-636-3337. When Mr. Lowrey answered the call, he heard a message very similar to the message he heard when he called this number on October 2, including a voice stating "This is Nadine with FSG" and repeated the same error code message. The voice on this call sounded to Mr. Lowrey like an artificial voice or pre-recorded message.

243.    On or around November 24, 2025, Mr. Lowrey received another call from Defendants in which they left a voicemail in which the caller said her name was "Emma" and leaving a message similar to the messages Mr. Lowrey received on August 14, 2025 and October 2, 2025, including the statement "I'm reaching out because I noticed you're representing an estate" and providing a callback number of 804-636-3337. The voice on this call sounded to Mr. Lowrey like an artificial voice or pre-recorded message.

244.    For each of these calls, Defendants failed to clearly identify who initiated these calls.

245.    For each of these calls, Defendants failed to state the name under which the entity was registered to do business with the Virginia State Corporation Commission.

246.    Indeed, Mr. Lowrey was confused regarding what entity was actually calling him.

247.    Further, Defendants failed to provide a meaningful way for Mr. Lowrey to opt out of receiving such calls as evidenced by his attempts to speak to an actual person and only hearing an error message.

248. Based on information and belief, there is no actual person named either Nadine or Emma who is associated with the aforementioned texts and calls that Mr. Lowrey received.

249. In total, Mr. Lowrey has received approximately 40 unwanted telemarketing text messages from Defendants and at least four unwanted telemarketing phone calls.

250. At least one of aforementioned texts Mr. Lowrey received involved message segmenting for which Twilio formatted and wrote header information in the text. *See Does Twilio support concatenated SMS messages or messages over 160 characters?*, *supra*.

251. The aforementioned texts and calls were sent to Mr. Lowrey to advertise and market Fresh Start's services in handling probate matters.

252. In or around June 2025, Twilio admitted to Mr. Lowrey that both 601-552-0000 and 423-900-2274 are "Twilio number[s]" that were used through Twilio.

253. Twilio was thus aware of Mr. Lowrey's repeated requests to stop receiving text messages, yet Twilio continued to send these messages to Mr. Lowrey.

254. In or around October 2025, Twilio admitted to Mr. Lowrey that 804-636-3337 is a "Twilio number" that was used through Twilio.

255. Twilio made these admissions to Mr. Lowrey when he texted a number provided by Twilio to inquire whether the aforementioned phone numbers belonged to Twilio. *See* Paul Kamp, *Is it Twilio Calling?*, Twilio (Apr. 9, 2019), https://www.twilio.com/en-us/blog/lookup-phone-carrier-records-sms-voice#Text-Twilio-to-1-855-747-7626-1-855-747-ROBO.

256. All three of these numbers are examples of A2P 10DLC phone numbers, as referenced in Twilio's documentation. *See Message throughput (MPS) and Trust Scores for A2P 10DLC in the US*, *supra*.

257.    The aforementioned texts that were sent to Mr. Lowrey were initiated by Fresh Start and sent by Twilio through its SMS platform.

258.    Based on information and belief, these messages were placed in Twilio's queue and Twilio ultimately decided when to send them.

259.    Twilio therefore sent the messages as the agent of Fresh Start.

260.    Based on the trove of information set forth above regarding OpenAI's involvement in the creation and initiation of such messages, discovery will show that OpenAI played a role in initiating or making these messages as well.

261.    Twilio was paid money to send these texts.

262.    Twilio followed its standard policies and procedures in sending the aforementioned texts to Mr. Lowrey.

263.    Twilio follows these same standard policies and procedures in how it sends out all of its text messages.

264.    Similarly, the aforementioned calls Mr. Lowrey received were initiated by Fresh Start and actually made by Twilio and OpenAI.

265.    The calls originated from Twilio's platform as they came from numbers associated with Twilio.

266.    The voices that Mr. Lowrey heard on these calls were not from an actual person but rather were artificially created.

267.    Twilio lacks the ability to have a conversation on its own with someone for such calls and instead relies on third parties like OpenAI to handle the actual interaction on the call.

268.    These calls were nearly identical with one another and thus came from the same source.

269.    When Mr. Lowrey answered one of these calls and tried to speak with someone, he instead heard a message that gave an error code and directed him to go to OpenAI's website.

270.    Based on information and belief, the voices that Mr. Lowrey heard in these calls and resulting voicemail messages were generated by a combination of Twilio and OpenAI.

271.    No actual person from Fresh Start was on any of these calls.

272.    Mr. Lowrey does not have sufficient facts to determine who actually dialed his number to make these calls. However, based on the above pled facts, all Defendants were deeply involved in the making of these calls.

273.    OpenAI determines the content in the call, such as by determining what to say in the voicemail messages as well as when Mr. Lowrey answered his phone.

274.    These calls could not have been made without OpenAI's involvement. Stated another way, there would only be mere silence without OpenAI's involvement on these calls.

275.    These calls did not identify the business that was responsible for initiating the call.

276.    OpenAI and Twilio followed their standard policies and procedures in making the aforementioned calls to Mr. Lowrey.

277.    OpenAI and Twilio follows these same standard policies and procedures in how they makes all outbound calls through their platforms.

278.    These repeated texts and calls caused Mr. Lowrey anxiety and emotional distress.

279.    Mr. Lowrey expended considerable time and energy to determine who was texting and calling him and get the texts and calls to stop.

280.    Mr. Lowrey's efforts included online research and multiple calls to the phone numbers associated with the messages and calls.

281. The repeated texts and calls interrupted Mr. Lowrey's life, harassed him, and caused him to expend time dealing with texts he reasonably expected would stop when he repeatedly instructed Defendants to stop contacting him.

282. Mr. Lowrey remains concerned that he will receive further unwanted telemarketing calls and texts from Defendants.

283. Despite him registering his residential number on the DNC List, Mr. Lowrey believes the only reason he has not received further such solicitations is merely because this lawsuit is pending.

284. Mr. Lowrey believes that unless Defendants are ordered by this Court to stop making such unwanted telemarketing calls and texts, then he will likely receive more in the future.

285. This belief is borne-out by the facts of this case—Mr. Lowrey notified Defendants to stop contacting him, yet they disregarded those instructions.

286. Defendants' violations described above were therefore willful.

287. The TCPA is a long-standing statute, having been enacted in 1991. Defendants have had nearly two decades since each of their beginnings to establish compliant calling procedures.

288. Defendants have access to the publications of the Federal Government, those of other regulators, trade organizations, and decisions of various courts outlining the TCPA's various protections. This information would permit Defendant adequate information to establish compliance procedures.

289. Defendants also have access to attorneys to provide advice and interpretations of the TCPA and permit the development compliant procedures.

290. These same allegations of willful conduct apply to Defendants' failure to abide by the VTPPA in continuing to text and call Plaintiff.

## V.    CLASS ACTION ALLEGATIONS

291.    The Class claims all derive directly from a single course of conduct by the Defendants. Defendants Twilio and Open AI have engaged in uniform conduct toward the Class members. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions among individual Class members. The operative facts on these subjects are the same for all Class members. The same legal standards govern each Claim for Relief asserted by the respective Classes.

292.    Accordingly, Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### A.  The Nationwide Classes

293.    Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a nationwide Class (the "**Twilio TCPA DNC Class**") defined as:

> All persons (1) residing in the United States, (2) whose cell phone number is registered on the National Do Not Call Registry for at least 30 days, and (3) who received at least two telemarketing texts sent from Twilio's platform where at least two such texts were within 12 months of one another and such texts were sent in the last four years from the date of the filing of this lawsuit.

Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a nationwide Class (the "**Twilio TCPA Stop Contact Class**") defined as:

> All persons (1) residing in the United States, (2) who received a telemarketing text sent from Twilio's platform in the last four years from the date of the filing of this

complaint, and (3) prior to receiving such text, such person had sent a text to Twilio to stop contacting them.

Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a nationwide Class (the "**OpenAI TCPA DNC Class**") defined as:

> All persons (1) residing in the United States, (2) whose cell phone number is registered on the National Do Not Call Registry for at least 30 days, and (3) who received at least two telemarketing calls initiated from OpenAI through Twilio's platform where at least two such calls were within 12 months of one another and such calls were made in the last four years from the date of the filing of this lawsuit.

Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a nationwide Class (the "**OpenAI TCPA Artificial Voice Cell Phone Class**") defined as:

> All persons (1) residing in the United States, (2) who received an unsolicited telemarketing call to their cell phone through Twilio's platform (3) in which OpenAI provided the content for what the caller said, and (4) such call was made in the last four years from the date of the filing of this lawsuit.

Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a nationwide Class (the "**OpenAI TCPA Artificial Voice No Opt-Out Cell Phone Class**") defined as:

> All persons (1) residing in the United States, (2) who received an unsolicited telemarketing call to their cell phone through Twilio's platform (3) in which OpenAI provided the content for what the caller said, (4) there was no automated, interactive voice- and/or key press-activated opt-out mechanism, (5) if such a call left a voicemail message, no toll-free number was provided in the message to allow the call to directly access the aforementioned opt-out mechanism, and (6) such call was made in the last four years from the date of the filing of this lawsuit.

### B. The Virginia Classes

294.    Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a state-wide Class (the "**Twilio VTPPA DNC Class**") defined as:

> All persons (1) residing in Virginia and/or who have a cell phone number with a Virginia area code, (2) whose cell phone number is registered on the National Do Not Call Registry, and (3) who received a telemarketing text sent from Twilio's platform in the last two years from the date of the filing of this complaint.

Plaintiff also brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a state-wide Class (the "**OpenAI VTPPA DNC Class**") defined as:

> All persons (1) residing in Virginia and/or who have a cell phone number with a Virginia area code, (2) whose cell phone number is registered on the National Do Not Call Registry, and (3) who received a telemarketing call initiated from OpenAI through Twilio's platform and such calls were made in the last two years from the date of the filing of this complaint.

Plaintiff also brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a state-wide Class (the "**Twilio VTPPA Stop Contact Class**") defined as:

> All persons (1) residing in Virginia and/or who have a cell phone number with a Virginia area code, (2) received a text sent from Twilio's platform in the last two years from the date of the filing of this complaint, and (3) prior to receiving such text, such person had sent a text to Twilio indicating they wanted no further communications from Twilio.

Plaintiff also brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a state-wide Class (the "**Twilio VTPPA Misleading Number Class**") defined as:

> All persons (1) residing in Virginia and/or who have a cell phone number with a Virginia area code, (2) received a text or call sent from Twilio's platform in the last two years from the date of the filing of this complaint, and (3) such number that the text was sent from is not an official contact number for Twilio.

Plaintiff also brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a state-wide Class (the "**OpenAI VTPPA Misleading Name Class**") defined as:

> All persons (1) residing in Virginia and/or who have a cell phone number with a Virginia area code, (2) received a call initiated from OpenAI through Twilio's platform and such calls were made in the last two years from the date of the filing of this complaint, and (3) in such call neither OpenAI nor Twilio identified itself as the entity making the call.

295.    The Twilio TCPA DNC Class, the OpenAI TCPA DNC Class, the Twilio TCPA Stop Contact Class, the OpenAI TCPA Artificial Voice Cell Phone Class, the OpenAI TCPA Artifical Voice No Opt-Out Cell Phone Class, the Twilio VTPPA DNC Class, the OpenAI VTPPA DNC Class, the Twilio VTPPA Stop Contact Class, the Twilio VTPPA Misleading Number Class, and the OpenAI VTPPA Misleading Name Class are collectively referred to as the Classes.

296.    Excluded from the Classes are Defendants, their affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judge who may preside over the case.

297.    This action has been brought and may properly be maintained on behalf of Classes proposed above under Federal Rule of Civil Procedure Rule 23.

298.    **Numerosity**. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Upon information and belief, Defendants Twilio and OpenAI sent or made such illegal telemarketing messages to millions of individuals in the United States and the Commonwealth of Virginia. These individuals are geographically dispersed across the nation and commonwealth, making joinder of all Class members impracticable.

299.    Each of the Classes is ascertainable because its members can be readily identified using phone recipient records and other information kept by Defendants or third parties in the usual course of business and within their custody or control. Plaintiff anticipates providing appropriate

notice to each certified Class in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

300.     **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Classes. The total focus of the litigation will be Defendants Twilio's and OpenAI's uniform conduct, processes and procedures; whether Defendants Twilio and OpenAI sent telemarketing texts and/or calls to numbers on the national DNC list without consent; whether Defendant Twilio sent telemarketing texts after being told not to do so; whether Defendant Twilio sent telemarketing texts from misleading numbers; whether Defendants Twilio and OpenAI sent telemarketing calls using an artificial voice without recipients' consent, whether Defendants Twilio and OpenAI maintain internal Do Not Call Lists; and whether Defendants Twilio and OpenAI willfully took such actions.

301.     **Typicality**. Plaintiff's claims are typical of the other Class Members' claims. As described above, Defendants Twilio and OpenAI use the same standard policies and procedures in how they send out texts and calls, committing the conduct that Plaintiff alleges damaged him and the Classes. Plaintiff is entitled to relief under the same causes of action as the other members of the Classes. Defendants Twilio and OpenAI uniformly breached multiple laws and duties by engaging in the conduct described above, and these violations had the same effect on each member of the Classes.

302.     **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests coincide with, and are not antagonistic to, other Class Members' interests. Additionally, Plaintiff has retained Counsel experienced and competent in complex, commercial,

multi-party, consumer, and class-action litigation. Plaintiff's Counsel has prosecuted complex class actions across the country, including repeatedly in federal court in Virginia.

303.    **Superiority**. Questions of law and fact common to the Classes predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each Class Member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants Twilio's and OpenAI's conduct. It would be virtually impossible for the members of the Class to, individually, effectively redress the class-wide wrongs done to them. Even if the members of the Classes themselves could afford such individual litigation, it would be an unnecessary burden on the courts.

304.    Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants Twilio's and OpenAI's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

305.    There are no known unusual legal or factual issues that would cause management problems not normally and routinely handled in class actions. Because Class Members in each Class that Plaintiff seeks to represent may be unaware that their rights have been violated or, if aware, would be unable to litigate their claims on an individual basis because of their relatively small damages, a class action is the only practical proceeding available. To Plaintiff's knowledge, no other similar actions are pending against Defendants Twilio and OpenAI. This forum is

appropriate for litigation because Defendant Twilio and OpenAI conduct business in this District and the conduct complained-of herein occurred here.

**COUNT ONE:**
**Unauthorized Telemarketing Texts and Calls to Phone Numbers on National DNC**
**List in Violation of the Telephone Consumer Protection Act**
**47 U.S.C. § 227(c)(5)**
**Class Claim Against Defendants Twilio and OpenAI**

306.    Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

307.    Mr. Lowrey brings this Count against Defendant Twilio on behalf of members of the Twilio TCPA DNC Class and against Defendants OpenAI and Twilio on behalf of the OpenAI TCPA DNC Class.

308.    Defendant Twilio sent or caused to be sent repeated telemarketing texts to Mr. Lowrey's residential phone and the phone numbers of members of the Twilio TCPA DNC Class despite Mr. Lowrey and members of the Twilio TCPA DNC Class having registered their numbers on the National Do Not Call List.

309.    Mr. Lowrey received all of the aforementioned texts within a 12-month period.

310.    Twilio did not receive any authorization or consent to send these texts.

311.    These repeated texts were made without Mr. Lowrey's authorization and disregarded Mr. Lowrey's designation of the Phone Number on the National Do Not Call List and were thus a violation of 47 C.F.R. § 64.1200(c)(2).

312.    The violations of these regulations also constituted violations of the TCPA. 47 U.S.C. § 227(c)(5).

313.    Defendants OpenAI and Twilio made or caused to be made repeated telemarketing calls to Mr. Lowrey's residential phone and the phone numbers of members of the OpenAI TCPA

DNC Class despite Mr. Lowrey and members of the OpenAI TCPA DNC Class having registered their numbers on the National Do Not Call List.

314. Mr. Lowrey received all the aforementioned calls within a 12-month period.

315. Neither OpenAI nor Twilio received any authorization or consent to make these calls.

316. These repeated calls were made without Mr. Lowrey's authorization and disregarded Mr. Lowrey's designation of the Phone Number on the National Do Not Call List and were thus a violation of 47 C.F.R. § 64.1200(c)(2).

317. The violations of these regulations also constituted violations of the TCPA. 47 U.S.C. § 227(c)(5).

318. Defendants Twilio and OpenAI willfully and/or knowingly violated these regulations.

319. As a result of repeated unwanted telemarketing texts and calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him. Members of the Twilio TCPA DNC Class and members of the OpenAI TCPA DNC Class suffered similar damages.

320. As a result, Mr. Lowrey, members of the Twilio TCPA DNC Class, and members of the OpenAI TCPA DNC Class are entitled to recover $1,500 in statutory damages for each communication in violation of the TCPA or three times their actual damages, whichever is greater. 47 U.S.C. § 227(c)(5).

321. In the alternative, if such violations are found to not be willful, Mr. Lowrey, members of the Twilio TCPA DNC Class, and members of the OpenAI TCPA DNC Class are

entitled to recover $500 in statutory damages for each communication in violation of the TCPA or their actual damages, whichever is greater. 47 U.S.C. § 227(c)(5).

322.    Mr. Lowrey, on behalf of himself and members of the aforementioned class(es) in this Count, also seeks an injunction against Defendants Twilio and OpenAI for each to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future.

**COUNT TWO:**
**Continued Telemarketing Texts After Notification to Stop**
**in Violation of the Telephone Consumer Protection Act**
**47 U.S.C. § 227(c)(5)**
**Class Claim Against Defendant Twilio**

323.    Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

324.    Mr. Lowrey brings this Count against Defendant Twilio on behalf of members of the Twilio TCPA Stop Contact Class.

325.    Defendant Twilio repeatedly made telemarketing texts to Mr. Lowrey after he informed Defendant Twilio, unequivocally, to stop contacting him on his residential phone. Twilio similarly sent such texts to members of the Twilio TCPA Stop Contact Class after such individuals had already told Twilio to stop sending such texts to them.

326.    Defendant Twilio initiated these repeated texts without instituting procedures to maintain a do not call list in violation of 47 C.F.R. § 64.1200(d).

327.    The violations of these regulations also constituted violations of the TCPA. 47 U.S.C. § 227(c)(5).

328.    Defendant Twilio willfully and/or knowingly violated these regulations.

329. As a result of repeated unwanted telemarketing calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him. Members of the Twilio TCPA Stop Contact Class suffered similar damages.

330. As a result, Mr. Lowrey and members of the Twilio TCPA Stop Contact Class are entitled to recover $1,500 in statutory damages for each communication in violation of the TCPA or three times his actual damages, whichever is greater. 47 U.S.C. § 227(c)(5).

331. In the alternative, if such violations are found to not be willful, Mr. Lowrey members of the Twilio TCPA Stop Contact Class are entitled to recover $500 in statutory damages for each communication in violation of the TCPA or his actual damages, whichever is greater. 47 U.S.C. § 227(c)(5).

332. Mr. Lowrey, on behalf of himself and members of the aforementioned class(es) in this Count, also seeks an injunction against Defendant Twilio to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future.

**COUNT THREE:**
**Unauthorized Telemarketing Solicitations to Phone Numbers on National DNC List**
**in Violation of Virginia Telephone Privacy Protection Act**
**VA. CODE ANN. § 59.1-514(B)**
**Class Claim against Twilio and OpenAI**

333. Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

334. Mr. Lowrey brings this Count against Defendant Twilio on behalf of members of the Twilio VTPPA DNC Class and against Defendants OpenAI and Twilio on behalf of the OpenAI VTPPA DNC Class.

335. Defendant Twilio sent or caused to be sent repeated telemarketing texts to Mr. Lowrey's residential phone and the phone numbers of members of the Twilio VTPPA DNC Class despite Mr. Lowrey and members of the Twilio VTPPA DNC Class having registered their numbers on the National Do Not Call List.

336. Such texts were telephone solicitations calls under the VTPPA. VA. CODE ANN. § 59.1-510.

337. Such texts were in violation of the VTPPA's prohibition on initiating or causing to be initiated telephone solicitation calls to telephone numbers on the National Do Not Call Registry. VA. CODE ANN. § 59.1-514(B).

338. Defendants OpenAI and Twilio sent or caused to be sent repeated telemarketing calls to Mr. Lowrey's residential phone and the phone numbers of members of the OpenAI VTPPA DNC Class despite Mr. Lowrey and members of the OpenAI VTPPA DNC Class having registered their numbers on the National Do Not Call List.

339. Such calls were telephone solicitations calls under the VTPPA. VA. CODE ANN. § 59.1-510.

340. Such calls were in violation of the VTPPA's prohibition on initiating or causing to be initiated telephone solicitation calls to telephone numbers on the National Do Not Call Registry. VA. CODE ANN. § 59.1-514(B).

341. As a result of these repeated unwanted telemarketing calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him. Members of the Twilio VTPPA DNC Class and members of the OpenAI VTPPA DNC Class suffered similar damages.

342.    As a result, Mr. Lowrey, members of the Twilio VTPPA DNC Class, and members of the OpenAI VTPPA DNC Class are each entitled to recover $5,000 in statutory damages for each communication in violation of the VTPPA, as well as reasonable attorney's fees and costs. VA. CODE ANN. § 59.1-515.

343.    In the alternative, if such violations are found to not be willful, Mr. Lowrey, members of the Twilio VTPPA DNC Class, and members of the OpenAI VTPPA DNC Class are each entitled to recover $500 for the first violation, $1,000 for the second violation and $5,000 for each subsequent violation.

344.    Mr. Lowrey, members of the Twilio VTPPA DNC Class, and members of the OpenAI VTPPA DNC Class are also entitled to reasonable attorney fees and court costs. VA. CODE ANN. § 59.1-515(C).

345.    Defendants are jointly and severally liable for violations of the VTPPA in making and/or initiating the aforementioned texts and calls to be sent to Mr. Lowrey's phone. VA. CODE ANN. § 59.1-514.1(A).

346.    Mr. Lowrey, on behalf of himself and members of the aforementioned class(es) in this Count, also seeks an injunction against Defendants Twilio and OpenAI for each to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future.

**COUNT FOUR:**
**Continued Telemarketing Texts After Notification to Stop**
**in Violation of Virginia Telephone Privacy Protection Act**
**VA. CODE ANN. §§ 59.1-513(A), 59.1-514(A)**
**Class Claim against Twilio**

347.    Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

Page 65 of 80

348. Mr. Lowrey brings this Count against Defendant Twilio on behalf of members of the VTPPA Stop Contact Class.

349. Defendant Twilio sent or caused to be sent telemarketing texts to Mr. Lowrey after he informed Defendant Twilio, unequivocally, to stop contacting him on his residential phone. Twilio similarly sent such texts to members of the Twilio TCPA Stop Contact Class after such individuals had already told Twilio to stop sending such texts to them.

350. Such texts were telephone solicitations calls under the VTPPA. VA. CODE ANN. § 59.1-510.

351. Such texts were in violation of the VTPPA's prohibition on initiating or causing to be initiated telephone solicitation calls to telephone numbers where a person at said number has previously stated he does not wish to receive further solicitations. VA. CODE ANN. § 59.1-514(A).

352. Such texts were further in violation of the VTPPA as the number such texts were transmitted on did not permit an individual to make a request to not receive such further communications. VA. CODE. ANN. § 59.1-513(A).

353. In sending or causing to send such texts, Defendant Twilio willfully violated the VTPPA.

354. As a result of repeated unwanted telemarketing calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him. Members of the Twilio VTPPA Stop Contact Class suffered similar damages.

355.    As a result, Mr. Lowrey and members of the Twilio VTPPA Stop Contact Class are each entitled to recover $5,000 in statutory damages for each communication in violation of the VTPPA, as well as reasonable attorney's fees and costs. VA. CODE ANN. § 59.1-515.

356.    In the alternative, if such violations are found to not be willful, Mr. Lowrey and members of the Twilio VTPPA Stop Contact Class are each entitled to recover $500 for the first violation, $1,000 for the second violation and $5,000 for each subsequent violation.

357.    Mr. Lowrey and members of the Twilio VTPPA Stop Contact Class are also entitled to reasonable attorney fees and court costs. VA. CODE ANN. § 59.1-515(C).

358.    Defendants are jointly and severally liable for violations of the VTPPA in making and/or initiating the aforementioned texts to be sent to Mr. Lowrey's phone. VA. CODE ANN. § 59.1-514.1(A).

359.    Mr. Lowrey, on behalf of himself and members of the aforementioned class(es) in this Count, also seeks an injunction against Defendant Twilio to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future.

**COUNT FIVE:**
**Misleading Caller Identification Information in Texts**
**in Violation of Virginia Telephone Privacy Protection Act**
**VA. CODE ANN. § 59.1-513(B)**
**Class Claim against Twilio**

360.    Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

361.    Mr. Lowrey brings this Count against Defendant Twilio on behalf of members of the Twilio VTPPA Misleading Number Class.

362.    Defendant Twilio sent or caused to be sent telemarketing texts to Mr. Lowrey where it used a number not officially listed as belonging to Twilio. Twilio similarly sent such texts to members of the Twilio VTPPA Misleading Number Class.

363.    Such texts were telephone solicitations calls under the VTPPA. VA. CODE ANN. § 59.1-510.

364.    The use of a telephone number that is not officially listed with Twilio caused confusion to Mr. Lowrey as well as members of the Twilio VTPPA Misleading Number Class as they did not know who was contacting them.

365.    Further, without knowing the identity of who was sending such messages, Mr. Lowrey and members of the Twilio VTPPA Misleading Number Class were unable to take steps to stop such unwanted communications from occurring.

366.    Such texts were thus in violation of the VTPPA's prohibitions against (1) taking any intentional action to prevent the transmission of the telephone solicitor's name or telephone number in sending telephone solicitations and (2) any conduct that results in the display of false or misleading called identification information in sending telephone solicitations.

367.    In sending or causing to send such texts, Defendant Twilio willfully violated the VTPPA.

368.    As a result of these misleading telemarketing texts, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, confusion, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try determining who was contacting him. Members of the Twilio VTPPA Misleading Number Class suffered similar damages.

369.     As a result, Mr. Lowrey and members of the Twilio VTPPA Misleading Number Class are each entitled to recover $5,000 in statutory damages for each communication in violation of the VTPPA, as well as reasonable attorney's fees and costs. VA. CODE ANN. § 59.1-515.

370.     In the alternative, if such violations are found to not be willful, Mr. Lowrey and members of the Twilio VTPPA Misleading Number Class are each entitled to recover $500 for the first violation, $1,000 for the second violation and $5,000 for each subsequent violation.

371.     Mr. Lowrey and members of the Twilio VTPPA Misleading Number Class are also entitled to reasonable attorney fees and court costs. VA. CODE ANN. § 59.1-515(C).

372.     Defendants are jointly and severally liable for violations of the VTPPA in making and/or initiating the aforementioned texts to be sent to Mr. Lowrey's phone. VA. CODE ANN. § 59.1-514.1(A).

373.     Mr. Lowrey, on behalf of himself and members of the aforementioned class(es) in this Count, also seeks an injunction against Defendant Twilio to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future.

### COUNT SIX:
### Misleading Caller Identification Information in Calls
### in Violation of Virginia Telephone Privacy Protection Act
### VA. CODE ANN. § 59.1-512
### Class Claim against OpenAI and Twilio

374.     Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

375.     Mr. Lowrey brings this Count against Defendants OpenAI and Twilio on behalf of members of the OpenAI VTPPA Misleading Name Class.

376.     Defendants OpenAI  and Twilio sent or caused to be sent telemarketing calls to Mr. Lowrey where they failed to identify themselves. On these calls, the call failed to identify with a

first name and last name and the name of the person on whose behalf the call was made. Open AI and Twilio similarly sent such calls to members of the OpenAI VTPPA Misleading Name Class.

377.    These calls caused confusion to Mr. Lowrey as well as members of the OpenAI VTPPA Misleading Name Class as they did not know who was contacting them.

378.    Further, without knowing the identity of who was making such calls, Mr. Lowrey and members of the OpenAI VTPPA Misleading Name Class were unable to take steps to stop such unwanted communications from occurring.

379.    Such calls were thus in violation of the VTPPA's requirement that a telephone solicitor who makes a telephone solicitation call shall identify himself by his first and last names.

380.    In making or causing such calls to be made, Defendant OpenAI and Twilio willfully violated the VTPPA.

381.    As a result of these misleading telemarketing calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, confusion, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try determining who was contacting him. Members of the OpenAI VTPPA Misleading Name Class suffered similar damages.

382.    As a result, Mr. Lowrey and members of the OpenAI VTPPA Misleading Name Class are each entitled to recover $5,000 in statutory damages for each communication in violation of the VTPPA, as well as reasonable attorney's fees and costs. VA. CODE ANN. § 59.1-515.

383.    In the alternative, if such violations are found to not be willful, Mr. Lowrey and members of the OpenAI VTPPA Misleading Name Class are each entitled to recover $500 for the first violation, $1,000 for the second violation and $5,000 for each subsequent violation.

384.    Mr. Lowrey and members of the OpenAI VTPPA Misleading Name Class are also entitled to reasonable attorney fees and court costs. VA. CODE ANN. § 59.1-515(C).

385.    Defendants are jointly and severally liable for violations of the VTPPA in making and/or initiating the aforementioned calls to be sent to Mr. Lowrey's phone. VA. CODE ANN. § 59.1-514.1(A).

386.    Mr. Lowrey, on behalf of himself and members of the aforementioned class(es) in this Count, also seeks an injunction against Defendants OpenAI and Twilio to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future.

**COUNT SEVEN:**
**Repeated Unwanted Telemarketing Communications**
**in Violation of the Telephone Consumer Protection Act**
**47 U.S.C. § 227**
**Individual Claim Against Defendant Fresh Start**

387.    Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

388.    Defendant Fresh Start initiated repeated telemarketing texts and calls to Mr. Lowrey's residential phone despite Mr. Lowrey having registered the number on the National Do Not Call List.

389.    Defendant Fresh Start further repeatedly made telemarketing texts to Mr. Lowrey after he informed Defendant Fresh Start, unequivocally, to stop contacting him on his residential phone.

390.    Defendant Fresh Start initiated these repeated texts without instituting procedures to maintain a do not call list in violation of 47 C.F.R. § 64.1200(d).

391. These repeated texts were made without Mr. Lowrey's authorization and disregarded Mr. Lowrey's designation of the Phone Number on the National Do Not Call List and were thus a violation of 47 C.F.R. § 64.1200(c)(2).

392. The violations of these regulations also constituted violations of the TCPA. 47 U.S.C. § 227(c)(5).

393. Defendant Fresh Start willfully and/or knowingly violated these regulations.

394. As a result of repeated unwanted telemarketing calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him.

395. As a result, Mr. Lowrey is entitled to recover $1,500 in statutory damages for each communication in violation of the TCPA or three times his actual damages, whichever is greater. 47 U.S.C. § 227(c)(5).

396. In the alternative, if such violations are found to not be willful, Mr. Lowrey is entitled to recover $500 in statutory damages for each communication in violation of the TCPA or his actual damages, whichever is greater. 47 U.S.C. § 227(c)(5).

397. Each of the Defendants is jointly and severally liable to Mr. Lowrey for the above damages.

**COUNT EIGHT:**
**Repeated Unwanted Telephone Solicitation Calls**
**in Violation of Virginia Telephone Privacy Protection Act**
**VA. CODE ANN. § 59.1-514**
**Individual Claim against Fresh Start**

398. Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

399.    Defendant Fresh Start repeatedly made telephone solicitation texts to Mr. Lowrey after he informed Defendant Fresh Start to stop contacting him.

400.    Defendant Fresh Start also repeatedly made telephone solicitation texts to Mr. Lowrey's residential phone after he registered it on the National Do Not Call List.

401.    This repeated unwanted telephone solicitation calls were violations of the VTPPA. VA. CODE ANN. § 59.1-514(A), (B).

402.    In causing such texts to be sent, Defendant Fresh Start willfully violated the VTPPA.

403.    Defendants are jointly and severally liable for violations of the VTPPA in making and/or initiating the aforementioned texts to be sent to Mr. Lowrey's phone. VA. CODE ANN. § 59.1-514.1(A).

404.    As a result of these unwanted telephone solicitation calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him.

405.    As a result, Mr. Lowrey is entitled to recover $5,000 in statutory damages for each communication in violation of the VTPPA, as well as reasonable attorney's fees and costs. VA. CODE ANN. § 59.1-515.

406.    In the alternative, if such violations are found to not be willful, Mr. Lowrey is entitled to recover $500 for the first violation, $1,000 for the second violation and $5,000 for each subsequent violation.

407.    Mr. Lowrey is also entitled to reasonable attorney fees and court costs. VA. CODE ANN. § 59.1-515(C).

**COUNT NINE:**

**Unsolicited Artificial Voice Calls to Cell Phones**
**in Violation of the Telephone Consumer Protection Act**
**47 U.S.C. § 227(b)(1)(A)(iii)**
**Class Claim Against Defendant Open AI and Twilio**

408.    Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

409.    Mr. Lowrey brings this Count against Defendants OpenAI and Twilio on behalf of members of the OpenAI TCPA Artificial Voice Cell Phone Class.

410.    In the alternative to pleadings above, the aforementioned calls to Mr. Lowrey's cell phone were made using an artificial voice.

411.    Defendants OpenAI and Twilio made or caused to be made repeated calls using an artificial voice to Mr. Lowrey's cell phone and the phone numbers of members of the OpenAI TCPA Artificial Voice Cell Phone Class.

412.    Neither OpenAI nor Twilio received any authorization or consent to make these calls.

413.    Such calls were thus in violation of the TCPA. 42 USC § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1)(iii).

414.    OpenAI and Twilio also did not properly identify the business that was responsible for making these calls, further violating the TCPA. 47 C.F.R. § 64.1200(b)(1).

415.    Defendants OpenAI and Twilio willfully and/or knowingly violated the TCPA and its regulations.

416.    As a result of the repeated unwanted artificial voice calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to

stop Defendants from contacting him. Members of the OpenAI TCPA Artificial Voice Cell Phone Class suffered similar damages.

417.     As a result, Mr. Lowrey and members of the OpenAI TCPA Artificial Voice Cell Phone Class are entitled to recover $1,500 in statutory damages for each communication in violation of the TCPA or three times their actual damages, whichever is greater. 47 U.S.C. § 227(b)(3).

418.     In the alternative, if such violations are found to not be willful, Mr. Lowrey and members of the OpenAI TCPA Artificial Voice Cell Phone Class are entitled to recover $500 in statutory damages for each communication in violation of the TCPA or their actual damages, whichever is greater. 47 U.S.C. § 227(b)(3).

419.     Mr. Lowrey, on behalf of himself and members of the aforementioned class in this Count, also seeks an injunction against OpenAI and Twilio to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future. 47 U.S.C. § 227(b)(3)(A).

**COUNT TEN:**
**Artificial Voice Calls Without Opt-Out Mechanism to Cell Phones**
**in Violation of the Telephone Consumer Protection Act**
**47 U.S.C. § 227(b)(3)**
**Class Claim Against Defendants Open AI and Twilio**

420.     Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

421.     Mr. Lowrey brings this Count against Defendants OpenAI and Twilio on behalf of members of the OpenAI TCPA Artificial Voice No Opt-Out Cell Phone Class.

422.     In the alternative to pleadings above, the aforementioned calls to Mr. Lowrey's cell phone were made using an artificial voice.

423. Defendants OpenAI and Twilio made or caused to be made repeated telemarketing calls using an artificial voice to Mr. Lowrey's cell phone and the phone numbers of members of the OpenAI TCPA Artificial Voice No Opt-Out Cell Phone Class.

424. On these calls, there was no automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request.

425. Further, no instructions were provided on these calls for how use such a mechanism.

426. Further, when such calls resulted in a voicemail message, such messages did not include a toll free number that enabled the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism.

427. Consequently, such calls violated the TCPA. 47 C.F.R. § 64.1200(b)(3); 47 U.S.C. § 227(b)(2).

428. Defendants OpenAI and Twilio willfully and/or knowingly violated the TCPA and its regulations.

429. As a result of the repeated unwanted artificial voice calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him. Members of the OpenAI TCPA Artificial Voice No Opt-Out Cell Phone Class suffered similar damages.

430. As a result, Mr. Lowrey and members of the OpenAI TCPA Artificial Voice No Opt-Out Cell Phone Class are entitled to recover $1,500 in statutory damages for each communication in violation of the TCPA or three times their actual damages, whichever is greater. 47 U.S.C. § 227(b)(3).

431.      In the alternative, if such violations are found to not be willful, Mr. Lowrey, members of the OpenAI TCPA Artificial Voice No Opt-Out Cell Phone Class are entitled to recover $500 in statutory damages for each communication in violation of the TCPA or their actual damages, whichever is greater. 47 U.S.C. § 227(b)(3).

432.      Mr. Lowrey, on behalf of himself and members of the aforementioned class in this Count, also seeks an injunction against OpenAI and Twilio to establish additional policies and procedures to prevent the aforementioned violations in this Count from occurring in the future. 47 U.S.C. § 227(b)(3)(A).

## COUNT ELEVEN:
### Unsolicited Artificial Voice Calls to Cell Phone
### in Violation of the Telephone Consumer Protection Act
### 47 U.S.C. § 227(b)
### Individual Claim Against Defendant Fresh Start

433.      Mr. Lowrey realleges and incorporates all other factual allegations set forth in this Complaint.

434.      Defendant Fresh Start initiated repeated telemarketing calls using an artificial voice to Mr. Lowrey's cell phone.

435.      Mr. Lowrey never provided any authorization or consent for these calls to be made to him.

436.      These calls also lacked the required opt-out mechanism and the voicemails left by some of these calls also lacked the required toll-free number to use the aforementioned opt-out mechanism.

437.      Accordingly, these calls violated the TCPA. 42 USC § 227(b)(1)(A)(iii),(b)(2); 47 C.F.R. § 64.1200(a)(1)(iii),(b)3).

438.      Defendant Fresh Start willfully and/or knowingly violated these regulations.

439.     As a result of repeated unwanted telemarketing calls, Mr. Lowrey suffered actual damages including frustration, anger, stress, invasion of privacy, annoyance, loss of time, and other emotional and mental distress. He was also forced to spend time and resources to try to stop Defendants from contacting him.

440.     As a result, Mr. Lowrey is entitled to recover $1,500 in statutory damages for each communication in violation of the TCPA or three times his actual damages, whichever is greater. 47 U.S.C. § 227(b)(3).

441.     In the alternative, if such violations are found to not be willful, Mr. Lowrey is entitled to recover $500 in statutory damages for each communication in violation of the TCPA or his actual damages, whichever is greater. 47 U.S.C. § 227(b)(3).

442.     Each of the Defendants is jointly and severally liable to Mr. Lowrey for the above damages.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes respectfully prays that this Court:

443.     Certify each of the Classes under Rule 23 of the Federal Rules of Civil Procedure;

444.     Find Defendants jointly and severally liable for violations of the VTPPA and TCPA;

445.     Award actual and statutory damages as pled;

446.     Award attorneys' fees and costs under the VTPPA as pled;

447.     Award pre-judgment and post-judgment interest to Mr. Lowrey and members of the Classes;

448.     Issue injunctions against Defendants Twilio and OpenAI as pled; and

449.     Award such other relief, including equitable relief, as the Court deems just and appropriate.

**TRIAL BY JURY IS DEMANDED**

Respectfully Submitted,

**WILLIAM LOWREY,**

By:  /s/ *Kevin Dillon*

Kevin A. Dillon (VSB # 93475)
VOICE FOR JUSTICE LAW, PLLC
626 E. Broad Street, Suite 300
Richmond, VA 23219
Telephone: 804-277-9441
Facsimile: 804-494-4985
Email: kevin@clalegal.com

Craig C. Marchiando (VSB # 89736)
CONSUMER LITIGATION ASSOCIATES, PC
763 J. Clyde Morris Blvd, #1a
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: craig@clalegal.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on April 22, 2026, a true and correct copy of the foregoing was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

*/s/ Kevin Dillon*
Kevin Dillon (VSB # 93475)