**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division**

| | |
|---|---|
| WILLIAM LOWREY,<br><br>Plaintiff,<br><br>v.<br><br>TWILIO INC., OPENAI, L.L.C., and FRESH START GROUP LLC,<br><br>Defendants. | Civil Action No. 6:25-cv-116-MFU |

**BRIEF IN SUPPORT OF OAI INTERNATIONAL, INC.'S (F/K/A OPENAI, LLC)
MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 3

A. OpenAI Offers A Generative-AI Application Programming Interface To The Public. ..... 3

B. Third Parties Can Use OpenAI's Realtime API To Generate Audio, But The Realtime API Does Not Make Phone Calls. ..... 5

C. Lowrey Alleges Fresh Start Group Ran A Robocalling Campaign. ..... 8

D. Lowrey Brings This Suit. ..... 9

STANDARD OF REVIEW ..... 10

ARGUMENT ..... 10

I. Plaintiff Does Not Plausibly Allege OpenAI Violated The TCPA. ..... 10

A. Counts One, Nine, And Ten Against OpenAI Must Be Dismissed Because Plaintiff Does Not Plausibly Allege OpenAI "Made" Or "Initiated" Any Calls. ..... 11

B. Count One Against OpenAI Must Be Dismissed Because Plaintiff Does Not Plausibly Allege That He Is A "Residential Telephone Subscriber." ..... 30

C. Counts Nine And Ten Against OpenAI Must Be Dismissed Because Plaintiff Lacks A Cause Of Action. ..... 36

D. Counts One And Ten Against OpenAI Must Be Dismissed Because Plaintiff Does Not Plausibly Allege A "Telephone Solicitation" or "Telemarketing." ..... 37

II. Plaintiff Does Not Plausibly Allege OpenAI Violated The VTPPA. ..... 39

A. The Court Should Decline Supplemental Jurisdiction Over Plaintiff's State-Law Claims. ..... 40

B. Plaintiff Does Not Plausibly Allege OpenAI "Made," "Initiated," Or "Caused To Be Initiated" Any Calls. ..... 40

C. Plaintiff Does Not Plausibly Allege A "Telephone Solicitation." ..... 42

D. Plaintiff's Failure-To-Identify Claim Fails Because He Does Not Allege OpenAI "Made Contact" With Him. ..... 42

III. Plaintiff's Do-Not-Call TCPA Claim And His VTPPA Claims Must Be Dismissed Because OpenAI's Terms Of Service Prevent Unlawful Solicitations. ..... 44

CONCLUSION ..... 46

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA International v. FCC*,
885 F.3d 687 (D.C. Cir. 2018)....18

*Aderhold v. car2go N.A. LLC*,
668 F. App'x 795 (9th Cir. 2016)....38

*Advocate Christ Medical Center v. Kennedy*,
605 U.S. 1 (2025)....33

*Alvarez Ronquillo v. Bondi*,
151 F.4th 522 (4th Cir. 2025)....11, 12, 30

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004)....44

*Andersen v. Nexa Mortgage, LLC*,
2024 WL 3762098 (C.D. Cal. Aug. 12, 2024)....38

*Bank of America Corp. v. City of Miami*,
581 U.S. 189 (2017)....17

*Bank v. Vivint Solar, Inc.*,
2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019)....25

*Barr v. American Ass'n of Political Consultants, Inc.*,
591 U.S. 610 (2020)....32

*Bell v. Hawx Services, LLC*,
2025 WL 2533371 (E.D. Cal. Sept. 3, 2025)....39

*Bondi v. VanDerStok*,
604 U.S. 458 (2025)....11

*Bryant v. Byron Udell & Associates Inc.*,
2023 WL 5180351 (E.D. Va. Aug. 11, 2023)....22, 23, 41

*Callier v. GreenSky, Inc.*,
2021 WL 2688622 (W.D. Tex. May 10, 2021)....33

*Cancian v. Hannabass & Rowe, Ltd.*,
2018 WL 6515148 (W.D. Va. Dec. 11, 2018)....43

*Cavey v. MarketPro Homebuyers, LLC*,
542 F. Supp. 3d 418 (E.D. Va. 2021) ....................42

*Cellcontrol, Inc. v. Mill Mountain Capital, LLC*,
2022 WL 598752 (W.D. Va. Feb. 28, 2022) ....................43

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....................25

*Chennette v. Porch.com, Inc.*,
50 F.4th 1217 (9th Cir. 2022) ....................31, 32, 35

*Clemens v. Consumer Solution Center*,
2025 WL 2427685 (E.D. Va. Aug. 22, 2025)....................41

*Cousart v. OpenAI LP*,
2024 WL 3282522 (N.D. Cal. May 24, 2024) ....................5

*Cox Communications, Inc. v. Sony Music Entertainment*,
607 U.S. ___, 146 S. Ct. 959 (2026)....................26, 27, 28, 29

*Cunningham v. McDonald*,
2018 WL 6737418 (M.D. Tenn. Nov. 5, 2018) ....................34

*Cunningham v. Politi*,
2019 WL 2519702 (E.D. Tex. Apr. 26, 2019)....................34

*Cunningham v. Rapid Cap. Funding, LLC/RCF*,
2017 WL 3574451 (M.D. Tenn. July 27, 2017) ....................34

*Cunningham v. Rapid Response Monitoring Services, Inc.*,
251 F. Supp. 3d 1187 (M.D. Tenn. 2017)....................33

*Cunningham v. Sunshine Consulting Group, LLC*,
2018 WL 3496538 (M.D. Tenn. July 20, 2018) ....................33

*Dahdah v. Rocket Mortgage, LLC*,
2023 WL 5941730 (E.D. Mich. Sept. 12, 2023)....................39

*Duell v. Heidenrich*,
39 F.3d 1176 (4th Cir. 1994) ....................17

*Escano v. RCI LLC*,
2022 WL 17251273 (D.N.M. Nov. 28, 2022) ....................37

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021)....................33

*Gaker v. Q3M Insurance Solutions*,
2023 WL 2472649 (W.D.N.C. Feb. 8, 2023) ....................30, 33

*Garnett v. Remedi Seniorcare of Virginia, LLC*,
892 F.3d 140 (4th Cir. 2018) ....................25

*Godon v. North Carolina Crime Control*,
141 F.3d 1158 (4th Cir. 1998) ....................22

*Google LLC v. Oracle America, Inc.*,
593 U.S. 1 (2021)....................4

*Henderson v. Harmon*,
102 F.4th 242 (4th Cir. 2024) ....................40

*Hicks v. Alarm.com Inc.*,
2020 WL 9261758 (E.D. Va. Aug. 6, 2020)....................22, 41

*Hodgin v. UTC Fire & Security Americas Corp.*,
885 F.3d 243 (4th Cir. 2018) ....................25

*Horton v. Molina Healthcare of Texas, Inc.*,
2026 WL 490216 (N.D. Tex. Feb. 6, 2026)....................38

*Howard v. RNC*,
164 F.4th 1119 (9th Cir. 2026) ....................12

*Hulce v. Zipongo Inc.*,
132 F.4th 493 (7th Cir. 2025) ....................38

*Hurley v. Messer*,
2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018) ....................15, 16, 19

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ....................3, 10

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021)....................4

*Kisor v. Wilkie*,
588 U.S. 558 (2019)....................11

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) ....................12

*Laccinole v. Cova Home Realty LLC*,
2026 WL 617312 (E.D. Va. Feb. 11, 2026)....................43

*Lee v. Loandepot.com, LLC*,
2016 WL 4382786 (D. Kan. Aug. 17, 2016) ....................34

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................17

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....................11, 32

*Matthews v. Senior Life Insurance Co.*,
2025 WL 1181789 (E.D. Va. Apr. 22, 2025) ....................21, 23

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*,
606 U.S. 146 (2025)....................32, 33

*Megaro v. McCollum*,
66 F.4th 151 (4th Cir. 2023) ....................45

*Melito v. American Eagle Outfitters, Inc.*,
2015 WL 7736547 (S.D.N.Y. Nov. 30, 2015)....................21

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*,
130 F.4th 91 (4th Cir. 2025) ....................21

*Murphy v. DCI Biologicals Orlando, LLC*,
2013 WL 6865772 (M.D. Fla. Dec. 31, 2013)....................38

*Nickson v. Advanced Marketing & Processing, Inc.*,
2023 WL 4932879 (D. Md. Aug. 2, 2023) ....................39

*Payne v. Sieva Networks, Inc.*,
347 F.R.D. 224 (N.D. Cal. 2024)....................34

*Perrong v. CMI Marketing Research Inc.*,
2023 WL 6277299 (E.D. Pa. Sept. 26, 2023) ....................39

*Santos-Zacaria v. Garland*,
598 U.S. 411 (2023)....................17

*Schmitendorf v. Juicy's Vapor Lounge, Inc.*,
2025 WL 2966205 (D. Kan. Oct. 21, 2025) ....................35

*Schulz v. Infogroup, Inc.*,
2020 WL 4201636 (N.D. Tex. July 21, 2020)....................39

*Scruggs v. CHW Group*,
2020 WL 9348208 (E.D. Va. Nov. 12, 2020)....................23, 40

*Shelton v. Fast Advance Funding, LLC*,
378 F. Supp. 3d 356 (E.D. Pa. 2019) ....................................................................33

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)..........................................................................................18

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025).....................................................................26, 27, 28, 29

*Stevens-Bratton v. TruGreen, Inc.*,
437 F. Supp. 3d 648 (W.D. Tenn. 2020).................................................34, 35

*Strange v. ABC Co.*,
2021 WL 798870 (W.D. La. Mar. 1, 2021) ..........................................33, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................6

*Turizo v. Subway Franchisee Advertising Fund Trust Ltd.*,
603 F. Supp. 3d 1334 (S.D. Fla. 2022) ..............................................................32

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023).............................................................17, 26, 27, 28, 29, 30

*United States v. Boyle*,
469 U.S. 241 (1985)..........................................................................................36

*United States v. Dish Network, LLC*,
75 F. Supp. 3d 942 (C.D. Ill. 2014) ....................................................................34

*United States v. Miller*,
604 U.S. 518 (2025)..........................................................................................17

*United Therapeutics Corp. v. Commissioner of Internal Revenue*,
105 F.4th 183 (4th Cir. 2024) ............................................................................37

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)..........................................................................................33

*Van Buren v. United States*,
593 U.S. 374 (2021)..........................................................................................17

*West v. Koskinen*,
141 F. Supp. 3d 498 (E.D. Va. 2015) ................................................................35

*Worsham v. Discount Power, Inc.*,
2021 WL 3212589 (D. Md. July 29, 2021).........................................................37

*Zhu v. DISH Network, LLC*,
808 F. Supp. 2d 815 (E.D. Va. 2011) ....................41, 44, 45

**Statutes**

47 U.S.C. § 227....................2, 3, 11, 12, 16, 29, 30, 32, 33, 36, 37, 38, 44

Pub. L. No. 102-243, 105 Stat. 2394 (1991)....................1, 33

Va. Code § 59.1-510 ....................3, 40, 42

Va. Code § 59.1-512 ....................40, 41, 42, 43

Va. Code § 59.1-514 ....................3, 40, 41, 42, 44

**Regulatory Materials**

47 C.F.R. § 64.1200....................3, 11, 16, 29, 34, 37, 38

*Joint Petition Filed by Dish Network, LLC, et al.*,
28 FCC Rcd. 6574 (2013)....................18

Remarks of FCC Commissioner Michael O'Rielly,
2019 WL 2184624 (May 16, 2019) ....................29

*Rules & Regulations Implementing the TCPA*,
30 FCC Rcd. 7961 (2015)....................15, 18, 19

*Rules & Regulations Implementing the TCPA*,
18 FCC Rcd. 14014 (2003)....................32, 33

*Rules & Regulations Implementing the TCPA*,
27 FCC Rcd. 1830 (2012)....................36

*Rules & Regulations Implementing the TCPA*,
7 FCC Rcd. 8752 (1992)....................36

**Other Authorities**

*Cellphone*, Collins English Dictionary and Thesaurus (1993) ....................31

*Cellular*, Merriam Webster's Collegiate Dictionary (10th ed. 1994)....................31

*Cellular phone*, The American Century Dictionary (1995)....................31

*Computerized Telephone Sales Calls and 900 Service: Hearings Before the Senate Comm. on Commerce, Science, and Transp.*, 102nd Cong. 67 (1991) ....................31

*Initiate*, American Heritage Dictionary (2d College ed. 1991) ....................12

*Initiate*, Merriam-Webster (Ninth New Collegiate 1990)....12

Laurie Harris, Cong. Rsch. Serv., IF12426, *Generative Artificial Intelligence: Overview, Issues, and Considerations for Congress* (2025), https://tinyurl.com/54cm2fhe....3, 4

*Make*, American Heritage College Dictionary (3d ed. 2000)....12

*Make contact with someone/something*, Cambridge Dictionary, https://tinyurl.com/m3rxj5vh....43

*Make*, Merriam-Webster's Collegiate Dictionary (10th ed. 1999)....12

*Residence*, Black's Law Dictionary (6th ed. 1990)....30

*Residence*, Collins English Dictionary and Thesaurus (1993)....31

*Residence*, Merriam Webster's Collegiate Dictionary (10th ed. 1994)....30

S. Rep. No. 102-178 (1991)....31

## INTRODUCTION

Facing motions to dismiss his original complaint, Plaintiff William Lowrey now brings this Amended Complaint under the Telephone Consumer Protection Act ("TCPA") and the Virginia Telephone Privacy Protection Act ("VTPPA")—laws which protect consumers from "nuisance calls to their homes." Pub. L. No. 102-243, § 2(6), 105 Stat. 2394 (1991). But Lowrey's amendments do not—and cannot—change the fact that OpenAI does not belong in this case because OpenAI does not make telemarketing calls *at all*. That dispositive fact is apparent from the face of the Amended Complaint and the materials upon which it relies. And it requires dismissal with prejudice of Lowrey's claims against OpenAI.

As in his original complaint, Lowrey claims that he was the recipient of several unwanted telemarketing calls allegedly involving Defendants Fresh Start (a purported telemarketer) and Twilio (a dialing platform). But Lowrey's second attempt to drag OpenAI into his lawsuit is no better than his first. Like before, he once again fails to plausibly connect OpenAI to any of the calls at issue. To the contrary, Lowrey's only OpenAI-specific allegation is that the alleged telemarketer could not access OpenAI's services—confirming that OpenAI *was not even involved* in the very calls for which Lowrey seeks to impose liability. And OpenAI certainly did not *make* those calls, as required for liability under the statutes.

Indeed, OpenAI is not a telemarketing company. Instead, it provides generative artificial intelligence ("AI") services to hundreds of millions of users across the United States and beyond. OpenAI's AI models can be accessed through its well-known consumer-facing platform, ChatGPT, and through an "application programming interface," or API, which allows many thousands of companies to integrate OpenAI's models into their own products. But OpenAI's generative-AI models and API do not make phone calls, and they are not calling platforms. To get around the fundamental mismatch between what OpenAI's services do and what the TCPA

and VTPPA prohibit, Lowrey offers an unprecedented—and ultimately, baseless—theory of liability. He claims that OpenAI violated the statutes because Fresh Start tried (unsuccessfully) to use OpenAI's generative-AI technology to generate audio on a phone call.

That theory misunderstands the statutes and has no limit. Generative AI is a general-purpose technology that creates text, sounds, and other content at the prompting of users. It can be used any time people need to create new content or ideas. It can mark up documents. It can create short stories. It can have "conversations" by generating text or audio content. While these use cases are generally beneficial, they can of course be put to misuse. The document being marked up may be fraudulent. The short story might be in poor taste. The conversation may be held on an illegally placed call. But the same could be said of any general-purpose service—from word processors and Internet service providers to banks and retailers. And nobody could seriously argue that the providers of these general-purpose services are somehow liable any time their services are put to unlawful ends.

The TCPA and VTPPA are no different. They limit liability to those who "initiate" or "make" calls. And again, Lowrey does not—and could not—plausibly allege that OpenAI itself makes any calls. Even if some users allegedly employ OpenAI's technology to generate content *after* a call has been initiated, OpenAI did not "make" or "initiate" any unlawful calls and thus cannot be held liable under the TCPA or the VTPPA. And Lowrey's attempt to hold OpenAI liable for a *user's* misconduct relies on a legal theory that has been repeatedly rejected by the Supreme Court.

Other deficiencies permeate the Amended Complaint and independently compel dismissal of the claims against OpenAI. For instance, Lowrey alleges he received calls to his *cell phone*, but (again) invokes a cause of action limited to "*residential* telephone subscribers." 47 U.S.C.

§ 227(c)(1), (5) (emphasis added). Lowrey claims to have received "telephone solicitations" and "telemarketing" calls but (again) fails to allege any facts to show that the calls were made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); *see* 47 C.F.R. § 64.1200(f)(13); Va. Code § 59.1-510. Lowrey alleges violations of regulations that he lacks a cause of action to enforce. *See* 47 C.F.R. § 64.1200(b). And Lowrey incorporates by reference OpenAI contracts that prohibit customers like Fresh Start from using its services to violate the law—a "reasonable practice[ ] and procedure[ ]" that entitles OpenAI to "an affirmative defense" that compels dismissal. 47 U.S.C. § 227(c)(5); Va. Code § 59.1-514(C). Lowrey's prior complaint suffered from many of these same deficiencies.

For each of these reasons, and given Lowrey's inability to remedy the same failings that OpenAI identified in its prior motion to dismiss, the Court should dismiss with prejudice all claims against OpenAI.

## BACKGROUND[1]

### A. OpenAI Offers A Generative-AI Application Programming Interface To The Public.

OpenAI is an artificial intelligence research and deployment company.[2] It creates and offers to the public generative-AI services, *see* Am. Compl. (ECF No. 45), ¶¶ 75–80, used by hundreds of millions of people, *see id.* ¶ 79. Generative AI "refers to AI models, in particular those that use machine learning (ML) and are trained on large volumes of data, that are able to generate new content … when prompted (often by a user inputting text)." Laurie Harris, Cong.

---

[1] OpenAI does not concede the truth of any allegations in the Complaint but merely treats the plausible allegations "as true" for purposes of this motion, as it must on a motion to dismiss. *See Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024).

[2] The named defendant, OpenAI, L.L.C., converted effective December 31, 2025 from a limited liability company to a corporation named OAI International, Inc.

Rsch. Serv., IF12426, *Generative Artificial Intelligence: Overview, Issues, and Considerations for Congress* 1 (2025) ("*Generative-AI CRS Report*"), https://tinyurl.com/54cm2fhe;[3] *see also* Am. Compl. ¶ 80. But OpenAI's generative-AI models do not place calls, nor are they calling platforms. Instead, OpenAI's users can employ generative AI in a variety of different "application areas, such as natural language processing" or "arithmetic and computer programming tasks"—essentially anything that uses context and reasoning to generate "outputs, including text, images, videos, computer code, or music." *Generative-AI CRS Report* at 1; Am. Compl. ¶ 80.

At issue here, Lowrey alleges that Defendant Fresh Start Group LLC ("Fresh Start") tried unsuccessfully to use OpenAI's generative-AI services through its Realtime API. *See* Am. Compl. ¶¶ 239–40 (referencing webpages specific to OpenAI's API). An API is an "application programming interface"—a "tool that allows programmers to use prewritten code to build certain functions into their own programs." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 9 (2021) (quotation marks omitted; alterations accepted). OpenAI's Realtime API thus allows third-party developers (e.g., the operator of a food-delivery application) to integrate generative-AI technology into their own products or applications (e.g., a customer-support chat).

The Amended Complaint is also packed with irrelevant assertions about other OpenAI products and general grievances about AI. Indeed, Lowrey does not allege that the calls to him were placed using "ChatGPT," Am. Compl. ¶¶ 77–80, "Project Strawberry," *id.* ¶¶ 81–82, 101 "Operator," *id.* ¶¶ 83–86, 101, 107, an (unreleased demo) application called "Wanderlust," *id.* ¶¶ 87–96, or "Project Giraffe," *id.* ¶ 97. And the alleged calls in this case have nothing to do with

---

[3] This Court can "take judicial notice of facts" that "are generally known and can be readily determined from reliable sources, such as the Congressional Research Service." *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

"how society works," *id.* ¶ 73, "copyright[ ]," *id.* ¶ 97, "resignations" by OpenAI "researchers," *id.* ¶ 102, claims "that AI will destroy … humanity," *id.* ¶¶ 103–04 (capitalization altered), "psychosis," *id.* ¶ 106, "murder," *ibid.*, or "suicide," *ibid.* These "unnecessary and distracting allegations" only highlight that "dismissal … is appropriate." *Cf. Cousart v. OpenAI LP*, 2024 WL 3282522, at *1 (N.D. Cal. May 24, 2024) ("plaintiffs need to understand that they are in a court of law, not a town hall meeting.").

### B. Third Parties Can Use OpenAI's Realtime API To Generate Audio, But The Realtime API Does Not Make Phone Calls.

Because OpenAI's Realtime API is a general-purpose technology, it can be used for a wide variety of tasks. That includes "customer support," "personal assistance," "education," "searching for a home," interpreting "images, photos, and screenshots," translating "between languages"—and more. *Introducing gpt-realtime and Realtime API updates for production voice agents*, OpenAI (Aug. 28, 2025) ("*Introducing GPT-RealTime Page*"), https://openai.com/index/introducing-gpt-realtime/; *accord* Am. Compl. ¶ 138 (citing this page). "[T]housands of developers have built [applications] with the API[.]" *Ibid.*

As relevant to this case, the Realtime API can be used to generate audio content in real time during "phone call[s]." *Ibid.* However, the Realtime API cannot *make* phone calls. The Amended Complaint candidly acknowledges that a third-party caller must "dial [the] phone number" to make the "call[ ]." Am. Compl. ¶ 144. Only "*after* a user picks up," the Amended Complaint explains, can the third party "trigger the OpenAI Realtime API to have the AI talk." *Ibid.* (emphasis added).

The Complaint's allegations about the relationship between the Realtime API and Defendant Twilio Inc's ("Twilio") product further demonstrate this limitation. Lowrey alleges that the calls at issue in this case involved OpenAI and Twilio. *Id.* ¶ 264 ("actually made by Twilio

and OpenAI"). The Amended Complaint then cites a litany of documents to purportedly support its core legal theory that OpenAI's services are required for a user "to successfully make a call." *Id.* ¶ 145. But those incorporated documents instead explain that a third-party caller must use Twilio's tools to *place* calls and may use the Realtime API to generate audio content *during* calls[4]:

- Twilio Outgoing Calls Page: Paragraphs 72, 139–41, and 146 cite a Twilio webpage that explains how to "implement the functionality to make an outbound call using the Twilio API," and then activate "the OpenAI Realtime API" *after* someone "answers the phone." *See* Paul Kamp, *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python*, Twilio (Aug. 28, 2025) ("*Twilio Outgoing Calls Page*"), https://www.twilio.com/en-us/blog/outbound-calls-python-openai-realtime-api-voice; *see also ibid.* (explaining "OpenAI's Realtime API talk[s]" only "after a user picks up the call.").

- Twilio Node.js Page: Paragraphs 142–44 cite a Twilio webpage that instructs third parties how to use a "Twilio number with Voice capabilities to make an outbound call" and to "trigger the OpenAI Realtime API" "*after a user picks up*." Paul Kamp, *How to Make Outgoing Calls with Twilio Voice and the OpenAI Realtime API and Node.js*, Twilio (Aug. 28, 2025) (emphasis added) ("*Twilio Node.js Page*"), https://www.twilio.com/en-us/blog/outbound-calls-node-openai-realtime-api-voice.

- GitHub Quickstart Page: Paragraph 146 cites a webpage from GitHub—a platform where developers share code—explaining how to build a program that uses Twilio's services to place a call and how to "forward messages between the [already-initiated] call and the [OpenAI] Realtime API." *See OpenAI Realtime API with Twilio Quickstart*, GitHub, https://github.com/openai/openai-realtime-twilio-demo (last visited June 3, 2026) ("*GitHub Quickstart Page*"). The user must rely on "Twilio … to specify how to handle [the] phone call" itself. *Ibid.*

- Twilio ConversationRelay Page: Paragraph 146 cites a Twilio webpage that offers a tutorial showing how to "establish a connection from your phone call to Twilio" and then "connect" to an AI via API *after* "a call is connected." Amanda Lange, *Integrate OpenAI with Twilio Voice Using Conversation Relay* (Mar. 20, 2025) ("*Twilio ConversationRelay Page*"), https://www.twilio.com/en-us/blog/developers/tutorials/product/integrate-openai-twilio-voice-using-conversationrelay.

- Twilio Website Voice Page: Paragraph 147 cites a Twilio webpage on how to program a tool to handle *inbound* calls from a website. Dan Bartlett et al., *Add Voice AI to your website with the Twilio Voice JavaScript SDK and ConversationRelay* (July 14, 2025)

---

[4] "[W]hen ruling on Rule 12(b)(6) motions to dismiss," courts "must consider the complaint in its entirety," which includes, "in particular, documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citing Wright & Miller).

(“*Twilio Website Voice Page*”), https://www.twilio.com/en-us/blog/developers/tutorials/product/voice-ai-conversationrelay-twilio-voice-sdk. While largely irrelevant to the alleged *outbound* calls here, the page makes clear that “[t]he TwiML App”—a Twilio tool—“directs calls placed from [the Twilio user’s] client application” *after* the end user “[g]ive[s] the phone number a call.” *Ibid.*

- Twilio Voice Assistant Page: Paragraph 148 cites a Twilio webpage about how to connect to the Realtime API *after* the end user “call[s] your Twilio number.” Kelley Robinson et al., *Build an AI Voice Assistant with Twilio Voice, the OpenAI Realtime Agents SDK, and Node.js* (Aug. 28, 2025) (“*Twilio Voice Assistant Page*”) https://www.twilio.com/en-us/blog/developers/tutorials/product/speech-assistant-realtime-agents-sdk-node.

In sum, OpenAI’s Realtime API does not place calls. Rather, a third party can proxy in AI-generated audio through the Realtime API only *after* he initiates a call himself.

The Realtime API acts at the direction of such third-party users. The user has to code in “instructions” to “control[ ] the AI’s behavior during the phone call” and “control[ ] how the AI will sound.” *Twilio Outgoing Calls Page.*; *see also Introducing GPT-RealTime Page* (“When building a speech-to-speech application, developers give a set of instructions to the model on how to behave, including how to speak, what to say in a certain situation, and what to do or not do.”); *Twilio Node.js Page* (explaining that user must provide “system prompt which controls the overall tenor of the conversation”); *Twilio ConversationRelay Page* (explaining need to “add[ ] the system prompt that will sculpt out the personality for our AI”); *Twilio Voice Assistant Page* (“Next, you’ll update the application to be more tailored for a Veterinary office by adding a new greeting, instructions, and appointment scheduling capabilities.”). In doing so, the user “give[s]” the AI “a prompt … [to] give it its mission, … give it its purpose, give it its persona, and … give it … a conversation flow, like … ‘hey, here’s how I kind of want the conversation to go’ … etcetera, etcetera.” Alex Leischow, *How to Build an AI Voice Agent That Cold Calls Leads for You (2025)*, at 2:35–40, 3:53–4:10, YouTube (May 14, 2025), youtube.com/watch?v=yKn0qKakUOk (“*Cold Calls Tutorial Video*”); *accord* Am. Compl. ¶¶ 135–36 (citing this video).

### C. Lowrey Alleges Fresh Start Group Ran A Robocalling Campaign.

Lowrey's Complaint alleges he received unwanted robocalls and texts advertising Fresh Start's services via its brand, "Probate CURES." Am. Compl. ¶¶ 157, 159–60, 214–38, 241–43, 249, 257, 264. Lowrey says he received 40 text messages "market[ing] services to assist with the probate process in Virginia." *Id.* ¶¶ 214–29, 232, 249, 251, 257. And he alleges four phone calls that left messages "directing [Lowrey] to call … back at [two different numbers] and stating 'I'm reaching out because I noticed you're representing an estate.'" *Id.* ¶¶ 233, 237, 242, 243, 249.

Lowrey blames OpenAI and Twilio for the unwanted phone calls. Although he claims the calls were "initiated by Fresh Start," he says they were "actually made by Twilio and OpenAI." *Id.* ¶ 264; *see also* ¶ 158; *but see id.* ¶ 272 (alleging he does not know "who actually dialed his number to make these calls."). Lowrey does not allege that anyone affiliated with OpenAI called him. Instead, he claims that "[t]he calls originated from Twilio's platform as they came from numbers associated with Twilio." *Id.* ¶ 265. And he claims to have received "voicemail[s]," *id.* ¶¶ 233, 237, 243 and, upon answering one call, a standalone "message," *id.* ¶ 242. Despite allegations about the Realtime API's ability to "engage in conversations in real-time through [third-party] platforms," ¶ 150, Lowrey does not claim to have ever held a live conversation involving the Realtime API or any other OpenAI service.

Instead, Lowrey alleges one fact that purports to link OpenAI to the calls he received. After he called back one of the numbers that left him a prerecorded message about Fresh Start's services—and upon answering one of the calls—he claims to have heard an error code that referenced a "webpage maintained by OpenAI." *Id.* ¶¶ 239–40, 242, 269. That error page explained that the caller had failed to pay its bill and thus could *not* use OpenAI's Realtime API. *Id.* ¶ 240.

### D. Lowrey Brings This Suit.

Lowrey first filed suit against OpenAI, Twilio, and Fresh Start in December 2025. All three defendants filed motions to dismiss, with OpenAI's motion focusing on Lowrey's complete failure to demonstrate that OpenAI had any role in "initiating" or "making" the alleged calls. Indeed, given this failure—and Lowrey's citations to sources showing that OpenAI does not place calls—OpenAI sent Lowrey a letter in April 2026 with materials showing that OpenAI's Realtime API was incapable of placing calls. Unfortunately, that did not deter Lowrey, who in his Amended Complaint, has doubled down on citing sources that expressly demonstrate that OpenAI does not initiate or make calls, *see supra* Section B, and added paragraphs of unrelated allegations about the purported evils of AI generally, *see supra* Section A.

As relevant to this motion, Lowrey alleges that OpenAI violated the TCPA and its implementing regulations in three counts. In Count One, he alleges that OpenAI "initiated … telephone solicitation[s]" in violation of 47 C.F.R. § 64.1200(c)(2) and 47 U.S.C. § 227(c)(5). Am. Compl. ¶¶ 313–17. In Count Nine, he alleges that OpenAI "ma[de] … call[s] … using … an artificial or prerecorded voice" in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)(iii), Am. Compl. ¶¶ 411–13, and that those calls did not "state clearly the identity of the business, individual, or other entity that is responsible for initiating the call" in violation of 47 C.F.R. § 64.1200(b)(1). Am. Compl. ¶ 414. In Count Ten, he alleges that OpenAI "made" calls without an "opt-out mechanism" in violation of 47 C.F.R. § 64.1200(b)(3). Am. Compl. ¶¶ 423–27.

Lowrey also alleges that OpenAI violated two provisions of the VTPPA. In Count Three, he alleges that OpenAI "initiate[d], or cause[d] to be initiated, a telephone solicitation" in violation of Va. Code § 59.1-514(B). Am. Compl. ¶¶ 338–40. In Count Six, he alleges that OpenAI

"ma[d]e[ ] a telephone solicitation via telephone call" and, after "making contact," did not "identify" itself in violation of Va. Code § 59.1-512. Am. Compl. ¶¶ 376, 379.[5]

## STANDARD OF REVIEW

The Court should dismiss all claims against OpenAI for failure to state a claim. Under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (alterations accepted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But a court "need not accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Ibid.* And a court "may consider 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Ibid.*

## ARGUMENT

### I. PLAINTIFF DOES NOT PLAUSIBLY ALLEGE OPENAI VIOLATED THE TCPA.

Lowrey's TCPA claims fail for four independent reasons. *First*, all of Lowrey's TCPA claims fail because OpenAI did not "make" or "initiate" any calls. *Second*, Lowrey's do-not-call claim (Count One) fails because he is not a "residential telephone subscriber," and the allegations otherwise are implausible. *Third*, Lowrey has no cause of action to pursue claims premised on violations of 47 C.F.R. § 64.1200(b) (Counts Nine and Ten). *Fourth*, Lowrey's do-not-call claim (Count One) and his opt-out claim (Count Ten) also fail because the alleged calls were not "telephone solicitations" or "telemarketing."

---

[5] Lowrey briefly mentions that he thinks "discovery will show that OpenAI played a role in initiating or making [alleged text] messages as well." Am. Compl. ¶ 260. But he offers no support for this rank conjecture, he alleges no factual content suggesting OpenAI had anything to do with the text messages, and his substantive counts do not seek relief against OpenAI for sending text messages.

**A. Counts One, Nine, And Ten Against OpenAI Must Be Dismissed Because Plaintiff Does Not Plausibly Allege OpenAI "Made" Or "Initiated" Any Calls.**

To succeed on any of his TCPA claims, Lowrey must show that OpenAI "made" or "initiated" calls. *See* 47 U.S.C. § 227(b)(1)(A) ("make any call") (Count Nine); 47 C.F.R. § 64.1200(a)(1) ("initiate any telephone call") (Count Nine); 47 C.F.R. § 64.1200(b)(3) ("made … to a residential telephone line or" other enumerated lines) (Count Ten); 47 C.F.R. § 64.1200(c)(2) ("initiate any telephone solicitation") (Count One). Lowrey has failed to plausibly allege that OpenAI made or initiated calls for three independent reasons. *First*, OpenAI does not make or initiate calls at all. *Second*, Lowrey has not pled any factual content that links OpenAI to the calls alleged in this case. *Third*, Lowrey cannot hold OpenAI liable for merely failing to stop an alleged TCPA violator from using its platform.

1. The Complaint Does Not Plausibly Allege That OpenAI Makes Or Initiates Calls.

Lowrey does not—and cannot—plausibly allege that OpenAI "makes" or "initiates" calls for a simple reason: OpenAI does not place any calls at all. Lowrey's attempt to hold *OpenAI* liable for calls initiated by *third parties* contradicts the statutory text and would make a mess of Congress's scheme.

a. *OpenAI Does Not "Make" Or "Initiate" Calls Because Its Technology Is Used Only After Call Initiation.*

Start with the meaning of "initiate." The TCPA and its implementing regulations do not define "initiate." *See* 47 U.S.C. § 227(a); 47 C.F.R. § 64.1200(f). Thus, that term must be given its "plain meaning," *Alvarez Ronquillo v. Bondi*, 151 F.4th 522, 526 (4th Cir. 2025) (quotation omitted), and the Court should construe the term as it is used by "an ordinary speaker," *Bondi v. VanDerStok*, 604 U.S. 458, 471 (2025); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *Kisor v. Wilkie*, 588 U.S. 558, 574–75 (2019). "Initiate" means "[t]o cause to begin,"

*see Initiate*, American Heritage Dictionary 662 (2d College ed. 1991), or "set going," *Initiate*, Merriam-Webster 622 (Ninth New Collegiate 1990); *see Alvarez Ronquillo*, 151 F.4th at 527 (consulting "dictionaries published close in time to when [the statute] was enacted"). Similarly, as the Fourth Circuit has explained, a call is made "by … [an] entity," 47 U.S.C. § 227(c)(5), when it "directly" "place[s]" the call, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659 (4th Cir. 2019).[6] So, in plain terms, one initiates a call when they dial a number and, if necessary, press "call."

"Make" is undefined and—in context, where it is used in conjunction with "call"—carries the same meaning. *See Make*, Merriam-Webster's Collegiate Dictionary 702 (10th ed. 1999) ("to cause to exist, occur, or appear"); *Make*, American Heritage College Dictionary 818 (3d ed. 2000) ("To cause to exist or happen; bring about; create"); *Howard v. RNC*, 164 F.4th 1119, 1125 (9th Cir. 2026) ("Construed in accordance with their ordinary meaning, the words 'make' or 'initiate,' when used with reference to a 'call,' refer to the manner in which a call to a telephone is *begun*." (emphasis in original)); *see also Krakauer*, 925 F.3d at 659 (referring to "calls made" by a company as being "placed by the company directly").

OpenAI does not "make" or "initiate" any calls because the Realtime API's role, if any, comes *after* call initiation. Indeed, the Amended Complaint alleges that a third-party caller can "trigger the OpenAI Realtime API" only "*after a user picks up*." Am. Compl. ¶ 144 (emphasis added); *see also id.* ¶ 150 (alleging "RealTime API" engages only after "other platforms …

[6] The TCPA's private right of action also reaches calls made "on behalf of" an entity, 47 U.S.C. § 227(c)(5), which "contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly," *Krakauer*, 925 F.3d at 659. Lowrey does not allege anyone made calls on behalf of OpenAI and so must show that OpenAI placed calls "directly."

connect to it"). Lowrey further alleges that the Realtime API can hold a "conversation *on the call*" and thus, by definition, after the call has been initiated. *Id.* ¶ 144 (emphasis added).

Lowrey confirms this limitation by alleging that "OpenAI *and Twilio* made" the calls here, *id.* ¶ 158 (emphasis added), because the slew of Twilio documents he incorporates by reference repeatedly explain that the Realtime API can be used only *after* a call is already initiated. Take the webpage referenced in paragraphs 72, 139–41, and 146 of the Amended Complaint. It explains that a "[p]rerequisite[ ]" for a user to initiate calls is the possession of a "Twilio account" and a "Twilio number with Voice capabilities to make an outbound call." *Twilio Outgoing Calls Page*. It then explains how "to make an outbound call *using the Twilio API*." *Ibid.* (emphasis added). It offers instructions to "initialize … the *Twilio client we'll be using to make our outbound call*." *Ibid.* (emphasis added). It makes clear that a caller must "implement the functionality to make an outbound call *using the Twilio API*." *Ibid.* (emphasis added). And it provides code for a "make_call function [that] initiates an outbound call to the specified phone number *using Twilio's Python Helper Library*." *Ibid.* (emphasis added).

The document further explains that *OpenAI*'s API comes into play only *after* someone else has initiated a call. It explains that the system uses "the AI to talk *when the call is picked up*." *Ibid.* (emphasis added). It uses "the OpenAI Realtime API" only *after* someone "*answers the phone*." *Ibid.* (emphasis added). Only "[o]n connect"—i.e., after contact with the recipient—does the program "start proxying audio between OpenAI and Twilio." *Ibid.* There are no instructions on how to use the OpenAI API to place calls. Instead, there are instructions on how to "control[ ] the AI's behavior during the phone call," *ibid.* (emphasis added), and "to get the AI to talk first," *ibid.*—actions that happen only after the call is answered.

Other materials incorporated into the Amended Complaint reinforce that OpenAI is not involved in any call until after it is initiated. Paragraph 133 references a webpage explaining that outbound-call automation requires using "Twilio for the phone calls" and "OpenAI for the speech to speech AI." HenryObj, *How I automated cold calls with AI*, OpenAI Developer Community (Dec. 23, 2024).[7] Paragraphs 135 and 136 reference an instructional video that similarly explains that, when it comes to "actually … calling phone numbers," the outbound-calling system must use a dialing platform—in the video, the platform used is called "make.com." *Cold Calls Tutorial Video* at 17:39–52. Paragraphs 142–44 cite a Twilio page that explains that a user can "trigger the OpenAI Realtime API" only "*after a user picks up*." *Twilio Node.js Page* (emphasis added). Paragraph 146 cites a page that explains that the user must rely on "Twilio … to handle [the] phone call" and may "forward messages between the [already-initiated] call and the [OpenAI] Realtime API." *GitHub Quickstart Page*. The same paragraph cites a page explaining how to "establish a connection from your phone call to Twilio" and then "connect" to an AI API *after* "a call is connected." *Twilio ConversationRelay Page*.

Further, OpenAI does not even choose to engage the Realtime API during an already-initiated call. A third-party developer does. Again, the Amended Complaint alleges that a third-party developer must "trigger the OpenAI Realtime API" "after a user picks up." Am. Compl. ¶ 144; *Twilio Node.js Page* ("[A]fter a user picks up, [*the user*] *trigger[s]* the OpenAI Realtime API."). The third-party developer must create "code" to get "the AI to talk when the call is picked up." *Twilio Outgoing Calls Page*. That "code" is doing "the heavy lifting" by "pass[ing] messages" to and from the Realtime API. *Twilio ConversationRelay Page*. In other words, the

[7] This webpage is no longer publicly available. OpenAI has thus placed on the docket an archived copy from the "Wayback Machine." *See* ECF No. 34-1.

Realtime API generates content, but it does *not* put that content on a phone call. Rather, the call initiator must take that action.

Thus, according to the factual allegations and documents incorporated in the Amended Complaint, the technology works like this: (i) a caller (here, allegedly Fresh Start) chooses to initiate calls, (ii) a calling platform (here, allegedly Twilio) provides the tools to place the calls at the entity's direction, and (iii) in some cases, the caller triggers an AI tool like OpenAI's Realtime API to generate audio content *after* the call is initiated.[8]

The bottom line is that OpenAI did not "make" or "initiate" any call in violation of the TCPA. Indeed, courts facing analogous circumstances have reached the same conclusion. In *Hurley v. Messer*, 2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018), a plaintiff sued an individual caller, calling platforms, and a technology intermediary called Fiverr. *Id.* at *1. Fiverr allegedly connected the individual caller to "voice actors" who "read [a] prepared script" for prerecorded calls that violated the TCPA. *Id.* at *3. Although the court found it plausible that the individual and/or the platforms initiated the calls, it dismissed the claims against Fiverr. It reasoned that there were "no facts suggesting that Defendant Fiverr physically placed the telephone calls at issue." *Ibid.* And it rejected the contention that the provision of voice actors for unlawful calls meant Fiverr "could be deemed to have initiated them." *Ibid.* "[P]roviding an actor to read the content of an illegal message," the court explained, "is not the equivalent of being 'so involved in *the*

---

[8] None of this is to suggest that calling platforms initiate any calls or texts. To the contrary, the FCC has found that a dialing platform that merely "allows its users to send" communications "does not make or initiate a call." *See Rules & Reguls. Implementing the TCPA*, Declaratory Ruling and Order, 30 FCC Rcd. 7961, ¶¶ 31–32 (2015). But OpenAI is even further removed than even non-initiator dialing platforms because it is not involved in placing calls *at all*.

*placing* of a specific telephone call as to be deemed *to have initiated it*.'" *Id.* at *4 (emphasis in original).

The same reasoning applies here. The Amended Complaint shows that OpenAI did not "physically place[ ] the telephone calls." *Id.* at *3. And the allegation that a third-party caller can use the Realtime API to "interact[ ] with individuals who answer … calls," Am. Compl. ¶ 144–48, 150, shows that here, OpenAI simply offered the AI version of Fiverr's provision of voice actors. "[P]roviding an [API]" that third parties use to generate "the content of an illegal message is not the equivalent of being 'so involved in *the placing* of a specific telephone call as to be deemed *to have initiated it*.'" *Hurley*, 2018 WL 4854082, at *4 (emphasis in original).

b. *The Structure And Purpose Of The TCPA's Regulatory Scheme Reinforce That OpenAI Does Not "Make" Or "Initiate" Calls.*

Reading "make" and "initiate" to reach OpenAI's provision of a generative-AI API would not only flout the plain meaning of those terms, but it would also make a mess of the TCPA's regulatory scheme.

Start with the structural implications. Lowrey's theory would render OpenAI liable based on which number is called, *see* 47 C.F.R. § 64.1200(a)(1)(i)–(iv), (3), (c)(2); 47 U.S.C. § 227(b)(1)(A)(i)–(iii), (B), the relationship between the calling party and recipient, *see* 47 C.F.R. § 64.1200(c)(2)(ii)–(iii); 47 U.S.C. § 227(b)(2)(A), the purpose for the call, *see* 47 U.S.C. § 227(a)(4), (b)(2)(B); 47 C.F.R. § 64.1200(a)(1), (a)(3)(i)–(v), and whether the call provides the identity, contact info, and opt-out mechanism of the person making the call, 47 C.F.R. § 64.1200(b)(1)–(3). But OpenAI is neither a telemarketer nor a dialing platform. Thus, it does not choose which number to call, it has no way of knowing the caller's relationship with the recipient, it does not decide the purpose for the call, and it is not in charge of who places the call

or how to contact them or to opt out of their future calls. Thus, Lowrey's reading would hold OpenAI liable for decisions completely outside of its control.

That reading is nonsensical. It would "render the statutory scheme incoherent" by imposing on a non-caller "obligation[s] … incompatible with the rest of the statute's design." *Santos-Zacaria v. Garland*, 598 U.S. 411, 428 (2023). That "flouts a fundamental canon of statutory construction … that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Miller*, 604 U.S. 518, 533 (2025) (quotations omitted). And by eschewing any need for "some direct relation between the injury asserted and the injurious conduct alleged," *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 202–03 (2017), that reading is inconsistent with principles of "proximate causation," presumptively incorporated into "statutory cause[s] of action," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). Worse still, it would raise serious constitutional questions by holding a party liable for choices it did not make. *See, e.g.*, *Duell v. Heidenrich*, 39 F.3d 1176 (4th Cir. 1994) (unpublished) ("As a matter of due process, one [defendant] should not be held liable for another [person]'s [actions]."); *accord Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023) ("our legal system generally does not impose liability" absent "[s]ome level of blameworthiness" to avoid "sweep[ing] in … tangential assistance" or an "attenuated … relationship with [a] wrongdoer").

The "breathtaking" scope of Lowrey's reading further "underscores the implausibility of [his] interpretation." *Van Buren v. United States*, 593 U.S. 374, 393–94 (2021). If offering a lawful, general-purpose service is sufficient to render a company liable under the TCPA when its users employ that service in furtherance of allegedly unlawful calls, there would be no end to the statute's reach. Proofreading and related features in word-processing software such as Apple

Pages commonly suggest spelling, grammar, and other changes to documents. If the document happens to be a cold-calling script, does that render the software company liable for calls made using that script? Similarly, telemarketers and others commonly store telephone numbers in spreadsheet programs such as Google Sheets. If employees place calls using the spreadsheet program, *see, e.g.*, *Cold Calls Tutorial Video* at 21:18–21:40, is the distributor of the spreadsheet software liable? What about the manufacturers and retailers of computers and smartphones? These are general-purpose devices that allow users to automate calls and program complex tools to facilitate those calls. Does that render liable the companies that sell these devices to the public? Of course not. Reading "initiate" to reach providers of general-purpose technology—in particular, technology not inherently bound up with telemarketing—would give the statute "an eye-popping sweep" that would render countless companies "TCPA-violator[s]-in-waiting" for conduct entirely beyond their control. *ACA Int'l v. FCC*, 885 F.3d 687, 697–98 (D.C. Cir. 2018) (rejecting expansive reading of the TCPA that would reach every smartphone).

These issues are exactly why the FCC has rejected a reading of "initiate" that would sweep in "a host of activities which have only a tenuous connection with the making of a telephone call." *Joint Petition Filed by Dish Network, LLC, et al.*, Declaratory Ruling, 28 FCC Rcd. 6574, ¶ 26 (2013) ("*2013 FCC Ruling*"); *accord Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The agency has "conclude[d] that a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities … that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." *2013 FCC Ruling* ¶ 26. Thus, a company "does not make or initiate a call" when it offers a service that is "reactive in nature" and "allows its users to" make communications. *Rules & Reguls. Implementing the TCPA*, Declaratory Ruling and Order, 30 FCC Rcd. 7961,

¶¶ 31–32 (2015) ("*2015 FCC Ruling*"). And even that guidance is specifically about the liability of dialing platforms that "facilitate[ ] calling, or host[ ] a calling service"—entities that, unlike OpenAI, are at least "involved in the placing of … telephone call[s]." *Id.* ¶¶ 28, 30, 31 (analyzing "YouMail" app offering "service to send an automatic text" message), 35 (analyzing app that "sends invitational texts"), 36 (analyzing "TextMe app and service" that "provides access to text message and voice call services"). The agency has *never* suggested that general-purpose technology platforms like OpenAI—that are not involved in placing calls at all—can somehow be deemed call initiators.

Lowrey's allegations that the Realtime API "engage[s] in conversations," Am. Compl. ¶ 150; *see id.* ¶¶ 144–48, and "determines the content in [a] call," *id.* ¶ 273, do not change this outcome. For one, as Lowrey's incorporated materials repeatedly explain, the Realtime API generates content at the direction of *users*. *See, e.g.*, *Twilio Outgoing Calls Page* (explaining user must code in "instructions" to "control[ ] the AI's behavior during the phone call"); *Cold Calls Tutorial Video* at 3:53–4:10 (similar); *Introducing GPT-RealTime Page* ("developers give a set of instructions to the model on how to behave, including how to speak, what to say in a certain situation, and what to do or not do."); *Twilio Node.js Page* ("system prompt which controls the overall tenor of the conversation"); *Twilio ConversationRelay Page* (similar); *Twilio Voice Assistant Page* ("Next, you'll update the application to be more tailored for a Veterinary office by adding a new greeting, instructions, and appointment scheduling capabilities."). And it is those *users* that ultimately choose to put the audio output of the Realtime API on a phone call. *See supra* Section I.A.1.a. Again, generating "the content of an illegal message is not the equivalent of being … involved in *the placing* of a" call. *Hurley*, 2018 WL 4854082, at *4 (quoting *2015 FCC Ruling* ¶ 30) (emphasis in original).

For these reasons, Lowrey has failed to plausibly allege that OpenAI "initiated" any calls—much less the calls to his phone number.

c. *The Complaint's Allegations About A Staged Demonstration Are A Red Herring.*

Paragraphs 87–96 of the Amended Complaint purport to address deficiencies in the original complaint by discussing a video that allegedly shows the "Realtime API making a phone call." Am. Compl. ¶¶ 87–96. But the opposite is true. The video—which Lowrey apparently did not watch (or watch closely)—confirms that the Realtime API *does not* make phone calls.

*First*, the allegations describe a video showing an OpenAI technical demonstration with actors—not a real-world use of the Realtime API. *See* Am. Compl. ¶¶ 88 (describing call to "a seller … *played by a researcher*" (emphasis added)), 91 ("This video shows a demonstration"), 95 (describing video as a "demonstration" and a "demo"); *see also* Eze Vidra, *The new Realtime API from OpenAI uses AI voice to call store*, at 3:35–5:44, YouTube (Oct. 1, 2024) (showing "call" to fictional strawberry shop that is made to researcher standing on stage with the presenter) ("*Demo Video*"), https://www.youtube.com/watch?v=vXu2MZ7fp-I; *accord* Am. Compl. ¶ 95 (citing this video). Of course, the Amended Complaint does not allege that Lowrey was called during a staged tech demo. It alleges that Fresh Start made "[t]he calls … from Twilio's platform." Am. Compl. ¶¶ 264–65.

*Second*, the video referenced in the Amended Complaint does not show the Realtime API making a phone call. The presenter explains that he "dropped some code to integrate the Realtime API into Wanderlust"—an unreleased application created solely for the demo—to provide "a voice." *Demo Video* at 0:05–0:12. Then, just before the phone-call demonstration, the presenter says he also "add[ed] *Twilio's phone-calling capabilities onto Wanderlust by using the Twilio API*." *Id.* at 3:23–3:30 (emphasis added). And then right after the call, the presenter says, "*we*

*place[d] the call with Twilio*." *Id.* at 6:02–05. In other words, like the allegations in the Amended Complaint and the documents cited throughout it, this staged demo call shows that OpenAI's Realtime API does not make phone calls. Instead, a third-party caller (here, the presenter, demonstrating what a user might do) uses a third-party application (here, Wanderlust in tandem with the Twilio API) to place a call—and only *after* that call is answered is the Realtime API engaged to generate audio content on the call. Thus, the video does not plausibly show the Realtime API "making a phone call," *contra* Am. Compl. ¶ 87, but instead only reinforces that it does *not* make phone calls.

2. <u>Plaintiff Has Not Plausibly Alleged Any Facts Showing That OpenAI Made Or Initiated The At-Issue Calls.</u>

Even if the Court were to find that OpenAI's API "initiates" some telemarketing calls (it does not), Lowrey's TCPA claim still fails for an independent reason: he fails to plausibly allege that OpenAI initiated the telemarketing calls at issue in this case.

Lowrey conclusorily alleges that "OpenAI and Twilio made, initiated, and/or caused to be initiated multiple telemarketing calls to Plaintiff within the meaning of the TCPA and the VTPPA." Am. Compl. ¶¶ 158, 264, 272. That undifferentiated and disjunctive allegation, standing alone, is a textbook failure to state a claim. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to survive a motion to dismiss." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 112 (4th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied sub nom.*, 146 S. Ct. 821 (2025).

Indeed, courts regularly reject as "a legal conclusion devoid of further factual enhancement" plaintiffs' "conclusory assertions that [a defendant] sent or caused … to be sent" communications in violation of the TCPA. *Melito v. Am. Eagle Outfitters, Inc.*, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015); *Matthews v. Senior Life Ins. Co.*, 2025 WL 1181789, at

*3 (E.D. Va. Apr. 22, 2025) (rejecting plaintiff's conclusory assertion that defendant initiated calls without "plead[ing] any facts to substantiate that claim"); *Bryant v. Byron Udell & Assocs. Inc.*, 2023 WL 5180351, at *5 (E.D. Va. Aug. 11, 2023) (rejecting "broad, conclusory and ambiguous allegations about [defendant's] involvement" in calls); *Hicks v. Alarm.com Inc.*, 2020 WL 9261758, at *4 (E.D. Va. Aug. 6, 2020) (dismissing complaint where "connection between the[ ] communications and the named Defendant is factually flimsy"). Yet here, Lowrey alleges virtually no factual matter about OpenAI's supposed involvement with the alleged calls.

Indeed, his primary factual assertion *belies* any such involvement. Lowrey claims that he received a "call from Defendants in which they left a voicemail" with a "callback number," and that when he "called th[e] number back," he heard message purporting to be from Fresh Start, followed by another message that said: "All three attempts failed. 429: you've exceeded your current quota. Please check your plan and billing detail. For more information on this error, read the docs. https://platform.openai.com/docs/guides/error-codes/api-errors." Am. Compl. ¶¶ 233, 237, 239–40, 242–43; *see also id.* ¶ 269 ("When Mr. Lowrey answered one of these calls and tried to speak with someone, he instead heard a message that gave an error code"). "The link provided in this message is to an actual webpage maintained by OpenAI," which provides that the "OpenAI customer[ ] … ha[s] run out of credits or hit their maximum 'monthly spend.'" *Id.* ¶ 240. In other words, Lowrey alleges that Fresh Start could *not* use OpenAI's services because it had not paid its bill. *See ibid.*; *accord Error Codes*, OpenAI, https://tinyurl.com/3ek7kvxh (explaining that "[s]olution" to error is to "[b]uy more credits or learn how to increase your limits").

Accepting as true that Fresh Start was unable to use OpenAI's services "does not support—and indeed undermines—[Lowrey's] claim," *Godon v. N. Carolina Crime Control*, 141 F.3d 1158, at *3 (4th Cir. 1998) (per curiam), that the calls were made or initiated by OpenAI. Put simply, if

Fresh Start had not paid its bill to use OpenAI's services, then it could not have used OpenAI's services for *any* purpose, much less to "make" the alleged calls (functionality that OpenAI's API does not even support, *see supra* Section I.A.1). And, of course, the mere fact that an error message mentioned OpenAI when Lowrey "called th[e] number back," Am. Compl ¶ 239, does not plausibly suggest that OpenAI had anything to do with initiating a call to Lowrey. That theory is akin to conflating the existence of a telephone answering machine with actually placing a telephone call.

But even if the Court were to credit that an error code mentioned OpenAI—disregarding the context of that mention—that factual allegation would still be insufficient to support an inference that OpenAI initiated the calls. That is because even if a plaintiff alleges "the caller identified himself as associated with" the defendant, that "solitary fact" does not clear the plausibility bar for initiation. *Scruggs v. CHW Grp.*, 2020 WL 9348208, at *6–7, *9–10 (E.D. Va. Nov. 12, 2020); *id.* at *10 ("That lone link to the defendant is insufficient under the *Iqbal* pleading standards."); *Bryant*, 2023 WL 5180351, at *4 ("In *Scruggs*, the unwanted telemarketer actually identified himself as associated with the defendant. Nevertheless, the court still dismissed the case after determining that there was no factual basis to trace the calls to the defendant and that 'the alleged conduct could have been attributed to an unrelated third party.'" (citations omitted)); *Matthews*, 2025 WL 1181789, at *3 (holding that receiving "questions regarding" the defendant's service on the call "is not sufficient to identify [defendant] as the caller").

Lowrey also alleges that "OpenAI … determin[ed] what to say in the voicemail messages as well as when Mr. Lowrey answered his phone." Am. Compl. ¶ 273; *see also id.* ¶ 270. Even assuming this post-call-initiation conduct is relevant, *but see supra* Section I.A.1, it is independently implausible. That is because there is no allegation that OpenAI chose to generate

audio *on calls* to Lowrey. In other words, even if OpenAI generated audio content—e.g., the Realtime API error code—there are no plausible factual allegations that OpenAI made the choice to use that content "*in the voicemail messages*" or "*when Mr. Lowrey answered his phone*." Am. Compl. ¶ 273 (emphasis added); *accord supra* Section I.A.1.a (citing allegations in the Amended Complaint explaining that third-party users must "trigger" the Realtime API on phone calls). That matters because it does not violate the TCPA to generate audio. For example, nobody could say with a straight face that OpenAI violated the TCPA by generating a generic error code that plays when someone tries to use the Realtime API without paying their bill. Instead, what violates the TCPA is *making a phone call* that uses certain audio. Lowrey pleads nothing that would plausibly give rise to an inference that OpenAI chose to use any output from the Realtime API *on the alleged calls* to Lowrey.[9]

Lowrey's other allegations further undermine his claims. Lowrey alleges "[t]he calls originated from Twilio's platform," Am. Compl. ¶ 265, and came from "Twilio numbers that were used through Twilio," *id.* ¶ 252 (alterations accepted; quotations omitted). Those allegations are inconsistent with the (facially implausible) claim that OpenAI placed the call. Lowrey alleges that "OpenAI … handle[s] the actual interaction on the call," *id.* ¶ 267, but concedes that, here, there was no interaction and that "he instead heard a message that gave an error code," *id.* ¶ 269. Thus, the *one role* Lowrey says OpenAI plays—holding a real-time conversation—did not happen, presumably because the caller did not pay its bill. Lowrey speculates that "[t]hese calls could not have been made without OpenAI's involvement," *id.* ¶ 274, but fatally undermines that allegation

[9] Or, to consider another example that demonstrates this faulty logic, a radio station does not violate the TCPA by broadcasting audio to the public just because some unrelated third party might play that broadcast over a phone call. The culpable act *is the phone call*.

by conceding that he "received" the "phone call[s]" even though the caller had not paid its bill to use OpenAI's services, *id.* ¶¶ 233, 236–37, 239–40, 242–43. Finally, Lowrey's concession that he "does not" know "who actually dialed his number," *id.* ¶ 272, and his repeated speculation about what he "expects discovery to show" about OpenAI, *id.* ¶¶ 114, 129, 260, lays bare that this case is nothing more than a fishing expedition.

At bottom, Lowrey does not plead "a scintilla of factual support" that would plausibly "connect" OpenAI to the calls, and thus his "complaint fails the basic test … that 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Garnett v. Remedi Seniorcare of Virginia, LLC*, 892 F.3d 140, 146 (4th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679); *accord Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 253 (4th Cir. 2018) (rejecting argument that party was responsible for calls where only purported "connection between [defendant's actions] and the purported TCPA violations [wa]s so attenuated" that it "amount[ed] to mere speculation"). That alone dooms Lowrey's TCPA claim against OpenAI.

3. Plaintiff Does Not Plausibly Allege Any Facts That Would Support Holding OpenAI Liable For Its Users' Alleged Misdeeds.

Finally, even if the Court finds plausible that OpenAI "makes" or "initiates" calls at all (it does not) and was in some abstract way connected to the initiation of the calls alleged in the Complaint (it was not), Lowrey still cannot show that OpenAI made the at-issue calls for a third independent reason: he has articulated no facts that would support holding OpenAI liable for its users' actions.

Lowrey, at bottom, seeks to hold OpenAI liable for aiding and abetting Fresh Start's alleged calls. But the TCPA does not authorize aiding-and-abetting liability. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (explaining civil statutes do not provide for secondary liability absent express language); *accord Bank v. Vivint*

*Solar, Inc.*, 2019 WL 1306064, at *5 n.4 (E.D.N.Y. Mar. 22, 2019) ("no court has found that the TCPA provides for aiding and abetting liability"). And a trio of recent Supreme Court cases shows that Lowrey would not be able to satisfy even that more relaxed liability standard—only crystallizing that he falls far short of plausibly alleging the *direct* liability required by the TCPA.

First, in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court unanimously declined to hold social-media companies liable where a terrorist group allegedly used the companies' online "platforms to recruit new terrorists and to raise funds for terrorism." *Id.* at 478. To impose liability for assisting in another's wrong, the Court explained, a plaintiff must allege "conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493. The plaintiffs fell short in *Twitter* because the defendants' "mere creation of" social-media "platforms … [wa]s not culpable" simply because "bad actors … [we]re able to use [such] platforms … for illegal … ends." *Id.* at 499.

Second, in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), the Supreme Court unanimously refused to hold gun manufacturers liable for allegedly "supply[ing] firearms to retail dealers whom they know illegally sell to Mexican gun traffickers." *Id.* at 288. Again, the Court recognized that "routine and general activity that happens on occasion to assist a [wrong]—in essence, incidentally—is unlikely to count as aiding and abetting." *Id.* at 292 (quotations omitted).

Third, just a few weeks ago in *Cox Communications, Inc. v. Sony Music Entertainment*, 607 U.S. ___, 146 S. Ct. 959 (2026), the Supreme Court unanimously held that an Internet service provider did not "infringe" a copyright when it provided internet service to "known [copyright] infringers." *Id.* at 966. The Court found that the Internet service provider was not liable for its subscribers' infringement because it "did not 'induce' or 'encourage' its subscribers to infringe,"

*id.* at 968, and it offered a general-purpose service "used for many purposes other than copyright infringement." *Ibid.*

The principles in these unanimously-decided cases are plainly instructive: two were decided on motions to dismiss (*Twitter* and *Smith & Wesson*), and all three rejected attempts to hold a defendant company liable because customers allegedly used the company's services to commit a wrong. The Supreme Court declined to find liability even though the statutes at issue in each case were far easier to satisfy than the TCPA because they each authorize aiding-and-abetting liability. *See Twitter*, 598 U.S. at 478 ("any person who aids and abets, by knowingly providing substantial assistance"); *Smith & Wesson*, 605 U.S. at 286 (similar); *Cox*, 146 S. Ct. at 967 (recognizing "contributory liability" and "induce[ment]" liability).[10] If there was no liability under statutes that authorized aiding-and-abetting liability, *a fortiori* there can be no direct liability here.

And indeed, Lowrey fails even the more forgiving aiding-and-abetting standard. Just like the Defendants in the trio of Supreme Court cases, OpenAI offers a service to the public: a general-purpose, generative-AI API that can engage in real-time voice and text generation. By its very nature, this service can be—and is—used for many different activities. That includes phone calls. But it also includes "customer support," "personal assistance," "education," "searching for a home," interpreting "images, photos, and screenshots," translating "between languages"—and more. *Introducing GPT-RealTime Page*.

---

[10] The Copyright Act does not expressly provide for secondary liability, but the Supreme Court has "recognized specific forms of secondary copyright liability that predated the Copyright Act." *Cox*, 146 S. Ct. at 967. *Cox* thus reinforces that, without copyright's historical pedigree, the TCPA is subject to the "[o]rdinar[y]" rule that Congress must "impose secondary liability … expressly." *Ibid.* (citing *Central Bank of Denver*, 511 U.S. at 176–177); *see ibid.* ("we are loath to expand such liability beyond those [copyright] precedents").

So, at most, Lowrey alleges that OpenAI offers a general "service[ ] to the public writ large" and "fail[ed] to stop" a TCPA violator "from using [OpenAI's] platform[ ]." *Twitter*, 598 U.S. at 499–500. Just like in these cases, OpenAI allegedly engaged in "routine and general activity that happen[ed] on occasion to assist in a" TCPA violation, *Smith & Wesson*, 605 U.S. at 292, even while "[c]ountless people use" the same service for "legal activities," *Cox*, 146 S. Ct. at 964. And just like in those cases, such allegations, without more, fail to establish liability for "mere passive nonfeasance." *Twitter*, 598 U.S. at 500; *Smith & Wesson*, 605 U.S. at 292, 297.

By that same token, "[n]one of [Lowrey's] allegations suggest that" OpenAI "culpably associated [itself] with" Fresh Start's alleged TCPA violation, "participated in it as something [OpenAI] wished to bring about," or sought "to make it succeed." *Twitter*, 599 U.S. at 498 (cleaned up). There is no allegation OpenAI gave Fresh Start "any special treatment or words of encouragement." *Ibid.* Indeed, in serving "millions … of people" with "vast quantities of information on a daily basis," there "are no allegations that [OpenAI] treated [Fresh Start Group] any differently from anyone else." *Id.* at 500. Lowrey has not offered any "reason to think that [OpenAI] w[as] consciously trying to help or otherwise participate in" Fresh Start's alleged TCPA violation. *Id.* at 498 (quotations omitted).

Indeed, consider what the Amended Complaint says about OpenAI. Lowrey alleges that OpenAI "leaves the choice up to [third-party] developers" on how to use the Realtime API, Am. Compl. ¶¶ 110, 133–36, 139, 144, 150, that OpenAI has taken "a laissez-faire approach" to third-party users, *id.* ¶¶ 111, 96, that OpenAI does not effectively "prevent illegal telemarketing calls to be made [by third parties] with its platform," *id.* ¶¶ 117, 125, 127, 131, and that, here, "Defendant Fresh Start" used the Realtime API to "initiate repeated telemarketing calls … to Mr. Lowrey's cell phone." *Id.* ¶ 434. In other words, Lowrey does not allege that OpenAI *did* anything. He

instead alleges that OpenAI *did not* stop a third party from misusing its service. Thus, just like in the trio of Supreme Court cases, Lowrey alleges that once the Realtime API was "up and running, [OpenAI] at most allegedly stood back and watched; [it was] not alleged to have taken any further action with respect to" Fresh Start. *Twitter*, 598 U.S. at 499. Such "failures, omissions, or inactions … rarely support aiding-and-abetting liability," much less *direct* liability. *Smith & Wesson*, 605 U.S. at 292 (cleaned up); *see also Cox*, 146 S. Ct. at 968 (explaining that courts will not find liability "merely based on a failure to take affirmative steps to prevent" wrongdoing).

Lowrey also alleges that OpenAI knows that its technology is used to generate audio on third parties' telemarketing calls. *See* Am. Compl. ¶¶ 132–36, 144, 149. But all agree that telemarketing calls are lawful as a general matter; indeed, nobody disputes that there are "legal robocalls." Remarks of FCC Comm'r Michael O'Rielly, 2019 WL 2184624, at *3 (May 16, 2019). For example, it is legal to make calls with an artificial voice if the caller has "prior express consent," 47 U.S.C. § 227(b)(1)(A), and it is legal to make telephone solicitations during businesses hours to subscribers who are not on the do-not-call list, 47 C.F.R. § 64.1200(c)(1)–(2). Thus, even in the calling context, the Realtime API is "clearly capable of substantial or commercially significant … uses" that do not violate the TCPA. *Cox*, 146 S. Ct. at 968 (quotations omitted). And even if OpenAI "kn[ew] that in some fraction of cases misuse will occur," it would still not "become liable" for any "misuse of" its service by customers. *Smith & Wesson*, 605 U.S. at 292 (cleaned); *Cox*, 146 S. Ct. at 968 ("This Court has repeatedly made clear that mere knowledge that a service will be used [for wrongdoing] is insufficient").

At bottom, even under aiding-and-abetting liability, a plaintiff cannot hold a service provider "liable for any sort of wrongdoing merely for knowing that [some] wrongdoers [a]re"

potentially "using its services and failing to stop them." *Twitter*, 598 U.S. at 503. Plainly then, Lowrey cannot prevail on that same theory under a *direct*-liability regime.

**B. Count One Against OpenAI Must Be Dismissed Because Plaintiff Does Not Plausibly Allege That He Is A "Residential Telephone Subscriber."**

Lowrey's Do-Not-Call TCPA claim (Count One) fails for additional, independent reasons. Lowrey alleges he received unwanted telephone calls to "his cellular phone number ending in 4102" after registering it "on the National Do Not Call Registry." Am. Compl. ¶ 206. That allegation fails to state a claim as a matter of law because the TCPA authorizes do-not-call suits only by *residential* telephone subscribers, not *cellular* telephone subscribers. Even if the Court disagrees, Lowrey has not alleged sufficient factual content to show that his cellular telephone was a residential telephone.

1. <u>Cellular Telephones Are Not Residential Telephones.</u>

Lowrey invokes the TCPA private right codified at 47 U.S.C. § 227(c)(5). Am. Compl. ¶ 317. That right authorizes suits for telephone calls made "in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). "[T]his subsection" refers to subsection 227(c), which authorizes the FCC to issue do-not-call regulations "to protect *residential* telephone subscribers' privacy rights." 47 U.S.C. § 227(c)(1) (emphasis added).

"The Fourth Circuit has not addressed whether cell phone owners are considered 'residential telephone subscribers.'" *Gaker v. Q3M Ins. Sols.*, 2023 WL 2472649, at *2 (W.D.N.C. Feb. 8, 2023). The statute's "plain meaning" shows they are not. *See Alvarez Ronquillo*, 151 F.4th at 526. When Congress enacted the TCPA, a "residence" was "a building used as a home." *Residence*, Merriam Webster's Collegiate Dictionary 996 (10th ed. 1994). The term "residential" meant "relating to [a] residence or residences." *Ibid.*; *see also*; *Residence*, Black's Law Dictionary (6th ed. 1990) (a "residence" is a "[p]lace where one actually lives or has his home; a person's

dwelling place or place of habitation; an abode"); *Residence*, Collins English Dictionary and Thesaurus 981 (1993) ("the place in which one resides; abode or home"). The term "residential telephone," therefore, meant a traditional landline telephone connected to a residence. The term could not refer to a cellular telephone because a cellular telephone was necessarily a wireless telephone unconnected with any particular residence. *See Cellular*, Merriam Webster's Collegiate Dictionary 184 (10th ed. 1994) ("a radiotelephone system in which a geographical area (as a city) is divided into small sections each served by a transmitter of limited range"); *Cellphone*, Collins English Dictionary and Thesaurus 175 (1993) ("a portable telephone operated by cellular radio"); *Cellular phone*, The American Century Dictionary 93 (1995) ("mobile radio-telephone that can operate over a wide region via a network of local transmitters, each serving a local area (cell)").

Common usage from that time agrees with the dictionary definitions. For example, statements "made in connection with Congress's consideration of the TCPA" differentiated "calls to the home" from "calls to … cellular telephones." *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1234 (9th Cir. 2022) (Ikuta, J., dissenting) (collecting examples).[11] An analysis from the Congressional Budget Office similarly distinguished "cellular" and "residential" subscribers, S. Rep. No. 102-178, at 7 (1991) (reprinting CBO letter), as did a legislative summary prepared by the relevant U.S Senate Committee, *see Computerized Telephone Sales Calls and 900 Service: Hearings Before the Senate Comm. on Commerce, Science, and Transp.*, 102nd Cong. 67 (1991) (appendix summary distinguishing TCPA provisions relating to cellular phones from those relating to home phones). Outside of Congress, telephone equipment "[i]nstallation guides at the time

[11] The *Chennette* majority expressed no disagreement with Judge Ikuta's statutory analysis but, in that *Chevron*-era decision, considered itself bound by "the FCC's" conclusion "that a cell phone is presumptively residential." 50 F.4th at 1225.

assumed residential telephones were wired telephones." *Chennette*, 50 F.4th at 1233 n.1 (Ikuta, J.) (collecting examples).

The TCPA's structure reinforces its clear text. Subsection 227(c) addresses "residential telephones" but says nothing about "cellular telephones." Subsection 227(b), by contrast, contains separate prohibitions for robocalls to a "cellular telephone," § 227(b)(1)(A)(iii), and robocalls to a "residential telephone," § 227(b)(1)(B). The Supreme Court has held these terms in subsection 227(b) are not interchangeable. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 617, 617 n.3 (2020) (explaining "residential telephone" in subsection 227(b) means "home phones" not "cellular phones"). "Considering Congress knew of cellular telephones—and in fact referenced cellular telephones as distinct from residential telephones throughout the TCPA—a proper interpretation of the statute would conclude that Congress intentionally omitted any reference to cellular telephones in section 227(c)." *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1340 (S.D. Fla. 2022).

2. The FCC's Contrary Interpretation Fails.

Resisting the plain meaning of the text Congress actually enacted, the FCC in 2003 announced a "presumption" that "wireless subscribers who ask to be put on the national do-not-call list [are] 'residential subscribers.'" *Rules & Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14039 (2003) ("*2003 FCC Order*"). But that mistaken agency "interpretation" cannot bind this Court and should not persuade it either.

The Supreme Court's teaching is clear: "courts decide legal questions by applying their own judgment." *Loper Bright*, 603 U.S. at 392. Accordingly, a district court "is not bound by the FCC's interpretation of the TCPA" but "must independently determine for itself whether the agency's interpretation of [the] statute is correct." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155, 168 (2025).

The FCC's interpretation is wrong. It relied not on the text but instead on what it perceived as "the overall intent of the TCPA." *2003 FCC Order*, 18 FCC Rcd. at 14039. But "no statute pursues a single policy at all costs," *Advoc. Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 19 (2025) (cleaned up), and the FCC cannot "rewrite" the TCPA "to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also McLaughlin*, 606 U.S. at 166; *Facebook, Inc. v. Duguid*, 592 U.S. 395, 409 (2021). The FCC's analysis of purpose was also mistaken. Congress identified the TCPA's purpose as "the need to protect *residential* telephone subscribers." 47 U.S.C. § 227(c)(1) (emphasis added). And the TCPA likewise focuses on "[t]he use of the telephone to market goods and services *to the home* and other businesses"—not cellular phones. Pub. L. No. 102-243, § 2(1), 105 Stat. 2394, 2394 (codified at 47 U.S.C. § 227 note) (emphasis added); *see id.* §§ 2(6), 2(12).

Because subsection 227(c) authorizes suits only by *residential* telephone subscribers, and Lowrey concedes that he is a *cellular* telephone subscriber, the Court should dismiss Count One. *Gaker*, 2023 WL 2472649, at *4 (dismissing on this ground).[12]

3. Lowrey Has Not Plausibly Alleged His Cell Phone Was "Residential."

Courts that have wrongly indulged the FCC's mistaken presumption have still required the plaintiff to plausibly allege that his or her particular "cellular number is used for residential purposes." *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1201 (M.D. Tenn. 2017).[13]

---

[12] *See, e.g.*, *Callier v. GreenSky, Inc.*, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021) ("Plaintiff does not cite—and the Court is not aware of—any authority that has found § 64.1200(d)(1) applicable to cellphones."); *Cunningham v. Sunshine Consulting Grp., LLC*, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018) (similar), *report and recommendation adopted*, 2018 WL 5728534 (M.D. Tenn. Aug. 7, 2018); *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 363 n.7 (E.D. Pa. 2019) (similar).

[13] *See also, e.g.*, *Strange v. ABC Co.*, 2021 WL 798870, at *4 (W.D. La. Mar. 1, 2021) ("Plaintiff's

Here, as in the prior complaint, Lowrey has not pled facts creating a plausible inference that his cellular telephone is "residential." The Amended Complaint principally alleges that Lowrey "registered his cellular phone number … on the National Do Not Call Registry." Am. Compl. ¶ 317. That allegation alone clearly cannot satisfy the pleading requirement: the FCC regulation Lowrey seeks to enforce makes clear that the complainant must "register[ ] his or her telephone number on the national do-not-call registry" *and* must be a "residential telephone subscriber." 47 C.F.R. § 64.1200(c). "If establishing the National Do-Not-Call Registry element necessarily established the residential-telephone-subscriber element, the regulatory language requiring the latter would be superfluous." *Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 658 n.4 (W.D. Tenn. 2020). "Allowing proof of registration on the National Do-Not-Call Registry to satisfy the 'residential telephone subscriber' element would violate the interpretive canon against surplusage." *Ibid.*; *Strange v. ABC Co.*, 2021 WL 798870, at *4 (W.D. La. Mar. 1, 2021) ("plaintiffs, like Strange, who register their cell phones with do-not-call registries are presumed to be residential subscribers. However, the Court finds that Strange is still required to put forth evidence supporting this presumption, as he is seeking enforcement"); *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1024 (C.D. Ill. 2014) (similar), *vacated in part on other grounds*, 80 F. Supp. 3d 917 (C.D. Ill. 2015).

---

pleadings allege only that calls were made to his cellular phone and he has pled no facts or offered evidence sufficient for the court to draw the conclusion that he has stated a cause of action under subsection (c)(5)"); *Cunningham v. McDonald*, 2018 WL 6737418, at *2 (M.D. Tenn. Nov. 5, 2018) (same); *Cunningham v. Rapid Cap. Funding, LLC/RCF*, 2017 WL 3574451, at *3 (M.D. Tenn. July 27, 2017) (similar), *report and recommendation adopted* 2017 WL 3776165 (M.D. Tenn. Aug. 31, 2017); *Cunningham v. Politi*, 2019 WL 2519702, at *4 (E.D. Tex. Apr. 26, 2019) (recommending dismissal on similar grounds), *report and recommendation adopted*, 2019 WL 2526536 (E.D. Tex. June 19, 2019); *cf. Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 228 (N.D. Cal. 2024) ("the burden to show the residential status is on [the plaintiff]"); *Lee v. Loandepot.com, LLC*, 2016 WL 4382786, at *6 (D. Kan. Aug. 17, 2016) (similar).

Lowrey's other allegations also fail to clear the plausibility bar. He says he uses the phone "for his personal use," Am. Compl. ¶ 207, and "for residential purposes" *id.* ¶ 208, that his cell-phone number is his "only phone number," *id.* ¶ 209, and that he "has no landline telephone," *id.* ¶ 208. Those vague and conclusory assertions—devoid of any factual allegations—are simply not enough. *See, e.g.*, *Stevens-Bratton*, 437 F. Supp. 3d at 656 ("In her declaration, she states: 'I affirm that I have used my cellular phone, (501) 802-XXXX, as both my residential line and mobile line since May 2005. I have not [had] a dedicated landline since May 2005.' That is not enough to establish that she uses her telephone for residential purposes." (citation omitted)).

Lowrey has also failed to allege any facts showing he uses his cellphone exclusively for residential purposes. In *Schmitendorf v. Juicy's Vapor Lounge, Inc.*, 2025 WL 2966205 (D. Kan. Oct. 21, 2025), a plaintiff survived judgment on the pleadings because he alleged that personal use was exclusive—i.e., "he alleged that he used his cell phone *only* in personal contexts." *Id.* at *8 (emphasis added). But that same plaintiff lost at summary judgment because discovery showed he "also uses his cell phone for business purposes," including "to apply for jobs, communicate with his boss, and swap shifts with his co-workers." *Ibid.*; *see also Chennette*, 50 F.4th at 1225 (majority opinion) (explaining courts consider "factors bearing on how a reasonable observer would view the phone line"). Here, absent factual allegations to show that Lowrey's cellular telephone use was exclusively personal, his barebones allegations cannot plausibly suggest that his cellular telephone is "residential."

Furthermore, Lowrey's other allegations suggest a business purpose. Lowrey says he received telephone calls about "services to assist with the probate process in Virginia." Am. Compl. ¶ 214; *see also id.* ¶¶ 216, 233, 237, 243. But serving as an executor is typically regarded as a business function. *See, e.g.*, *West v. Koskinen*, 141 F. Supp. 3d 498, 499, 503 (E.D. Va. 2015)

("executors of [an] estate" must "exercise[e] ordinary business care and prudence"); *United States v. Boyle*, 469 U.S. 241, 251–52 (1985) (an executor is "a person experienced in business matters"). Beyond alleging that he returned calls about probate services, *see* Am. Compl. ¶¶ 236, 239, Lowrey alleges no non-conclusory facts about how he uses his cellular telephone. This likewise prevents an inference that Lowrey's cellular telephone is "residential."

### C. Counts Nine And Ten Against OpenAI Must Be Dismissed Because Plaintiff Lacks A Cause Of Action.

Count Nine alleges, *inter alia*, that OpenAI "did not properly identify the business that was responsible for making th[e] calls" in violation of 47 C.F.R. § 64.1200(b)(1). *See* Am. Compl. ¶ 414. Count Ten alleges that the calls failed to include a proper "opt-out mechanism" in violation of 47 C.F.R. § 64.1200(b)(3). *See* Am. Compl. ¶¶ 424–27. These claims must be dismissed because Lowrey lacks a cause of action to pursue them.

The reason stems from the statutory origin of the regulations Lowrey seeks to enforce. Section 227(d)(3) of the TCPA instructs the FCC to "prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone." 47 U.S.C. § 227(d)(3). Section 64.1200(b)(1) and (3) of the FCC's rules were prescribed under Section 227(d)(3). *See Rules & Reguls. Implementing the TCPA*, Report and Order, 7 FCC Rcd. 8752, ¶ 53 (1992) (prescribing 47 C.F.R. § 64.1200(b)(1) under Section 227(d)(3)); *Rules & Reguls. Implementing the TCPA*, Report and Order, 27 FCC Rcd. 1830, ¶¶ 11, 47 & nn.28, 134 (2012) (prescribing 47 C.F.R. § 64.1200(b)(3) under Section 227(d)(3)).

There is no cause of action to enforce regulations prescribed under Section 227(d)(3). Rather, Congress provided a cause of action to enforce only regulations prescribed under Section 227(b), *see* 47 U.S.C. § 227(b)(3)(A), and Section 227(c), *see id.* § 227(c)(5)(A). It did not include a similar provision in Section 227(d). Such disparate "inclusion and exclusion [is] intentional."

*United Therapeutics Corp. v. Comm'r of Internal Revenue*, 105 F.4th 183, 189 (4th Cir. 2024). Thus, "virtually every federal court to have considered this issue agrees that subsection (d) [of the TCPA] does not confer a private right of action." *Escano v. RCI LLC*, 2022 WL 17251273, at *5–6 & n.7 (D.N.M. Nov. 28, 2022) (cleaned up) (collecting cases), *report and recommendation adopted*, 2023 WL 34525 (D.N.M. Jan. 4, 2023); *see also, e.g.*, *Worsham v. Disc. Power, Inc.*, 2021 WL 3212589, at *5 (D. Md. July 29, 2021) ("dismiss[ing] with prejudice" claims that "improperly allege causes of action based on alleged violations of 47 C.F.R. § 64.1200(b)"), *aff'd*, 2023 WL 2570961 (4th Cir. Mar. 20, 2023). Although Lowrey purports to enforce 47 C.F.R. § 64.1200(b) through Section 227(b)(3)'s cause of action, Am. Compl. ¶¶ 417–18, 427, 430–31, his effort fails because that cause of action is limited to "violation[s] of … regulations *prescribed under this subsection*"—i.e., subsection 227(b), *not* subsection 227(d), *see* 47 U.S.C. § 227(b)(3) (emphasis added).

Thus, Lowrey lacks a cause of action against OpenAI for alleged violations of 47 C.F.R. § 64.1200(b) of the Commission's rules in Counts Nine and Ten.

### D. Counts One And Ten Against OpenAI Must Be Dismissed Because Plaintiff Does Not Plausibly Allege A "Telephone Solicitation" or "Telemarketing."

Counts One and Ten independently fail because Lowrey does not plausibly allege that the calls he received were "telephone solicitation[s]," 47 C.F.R. § 64.1200(c) (Count One), or "telemarketing," *id.* § 64.1200(b)(3) (Count Ten).[14] A "telephone solicitation" is a call "for the

[14] 47 C.F.R. § 64.1200(b)(3) requires an opt-out mechanism for calls that meet one of three conditions: (i) it qualifies for an exemption from the prohibition on making calls with an artificial or prerecorded voice, (ii) it "introduces an advertisement," or (iii) it "constitutes telemarketing." Lowrey alleges that the call was not exempt from the general prohibition, *see* Am. Compl. ¶ 413, and he does not allege that the call offered "any material advertising the commercial availability or quality of any property, goods, or services," 47 C.F.R. § 64.1200(f)(1) (defining "advertisement"). Instead, he alleges that the at-issue calls were "telemarketing calls." Am. Compl. ¶ 423.

purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4). "Telemarketing" is defined identically. *See* 47 C.F.R. § 64.1200(f)(13).

"A plaintiff's characterization of a call as a 'solicitation' does not make it so." *Andersen v. Nexa Mortg., LLC*, 2024 WL 3762098, at *3 (C.D. Cal. Aug. 12, 2024). To satisfy these definitions, a call must do more than "relat[e] to commerce" or be "profit-seeking." *Hulce v. Zipongo Inc.*, 132 F.4th 493, 499 (7th Cir. 2025). Rather, the call must have been made "for the purpose of persuading or urging someone to pay for a service." *Ibid.*

Lowrey does not allege that anyone encouraged him to purchase, rent, or invest in anything. He instead alleges he received "voicemail[s] with a pre-recorded message … directing Mr. Lowrey to call them back at [a callback number] and stating 'I'm reaching out because I noticed you're representing an estate.'" Am. Compl. ¶¶ 233, 237, 242, 243. Lowrey alleges that when he called back the first time, he heard a "pre-recorded" message that said, "'That number is not associated with an inbound agent' followed by three rapid beeps and then the call was disconnected." *Id.* ¶ 236. And he alleges when he called back the second time, he heard another message purporting to be someone "with FSG"—but, when he "asked to speak to a representative," he heard an error code and was not able to speak to anyone. *See id.* ¶¶ 239–40, 269.

Those allegations do not create a plausible inference of a telephone solicitation or telemarketing. For one, the calls themselves—the most probative information to assess purpose—did not "encourage[ ] [Lowrey] to purchase, rent, or invest in anything." *Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013) (granting motion to dismiss), *aff'd*, 797 F.3d 1302 (11th Cir. 2015); *see also Aderhold v. car2go N.A. LLC*, 668 F. App'x 795, 796 (9th Cir. 2016) (affirming dismissal where defendant's "message contain[ed] no content encouraging purchase of [its] services"); *Horton v. Molina Healthcare of Texas, Inc.*, 2026

WL 490216, at *9–10 (N.D. Tex. Feb. 6, 2026) (granting motion to dismiss where there was "no allegation that the[ ] calls requested [plaintiff] to purchase anything at all"); *Perrong v. CMI Mktg. Rsch. Inc.*, 2023 WL 6277299, at *4 (E.D. Pa. Sept. 26, 2023) ("speculat[ion]" that call lacking marketing content was "pretext for solicitation" was "the sort of thing that could be true, but" lacked "enough plausible facts to get over the Rule 12(b)(6) hurdle").

Further, "when [Lowrey] affirmatively contacted" the callback number, he could not reach anyone and thus obtained no further "context for [the] calls." *Schulz v. Infogroup, Inc.*, 2020 WL 4201636, at *2–3 (N.D. Tex. July 21, 2020) (granting motion to dismiss); *see also Dahdah v. Rocket Mortg., LLC*, 2023 WL 5941730, at *3 (E.D. Mich. Sept. 12, 2023) ("if no one was on [the] other end [of the call], no inference can be drawn that the calls were made for a solicitation or marketing purpose");[15] *Nickson v. Advanced Mktg. & Processing, Inc.*, 2023 WL 4932879, at *7 (D. Md. Aug. 2, 2023) (dismissing where "[plaintiff] called the number back," and nobody "encouraged the purchase or rental of, or investment in, property, goods, or services" (alterations accepted)).

Because Lowrey has not alleged facts that would give rise to a plausible inference that he received calls made for the purpose of encouraging a purchase, rental, or investment, he "has not sufficiently pled that he received a telephone solicitation within the meaning of the TCPA." *Bell v. Hawx Servs., LLC*, 2025 WL 2533371, at *4 (E.D. Cal. Sept. 3, 2025).

## II. PLAINTIFF DOES NOT PLAUSIBLY ALLEGE OPENAI VIOLATED THE VTPPA.

The Court should also dismiss Lowrey's VTPPA claims against OpenAI for four independent reasons. *First*, after dismissing the federal TCPA claims against OpenAI, the Court

[15] *Opinion vacated on reconsideration on other grounds*, 2023 WL 11944898 (E.D. Mich. Nov. 17, 2023), *rev'd and remanded on other grounds*, 166 F.4th 556 (6th Cir. 2026).

should decline supplemental jurisdiction over the parallel state-law claims against OpenAI. *Second*, Lowrey has failed to plausibly allege that OpenAI "made," "initiated," or "caused to be initiated" calls. *Third*, Lowrey has failed to plausibly allege that he received "telephone solicitations." *Fourth*, Lowrey's VTPPA failure-to-identify claim fails because he does not allege that a telephone solicitor "made contact" with him.

### A. The Court Should Decline Supplemental Jurisdiction Over Plaintiff's State-Law Claims.

Lowrey urges the Court to take supplemental jurisdiction over his VTTPA claims against OpenAI based on his federal TCPA claims against OpenAI. Am. Compl. ¶ 162 (citing 28 U.S.C. § 1367). For all the reasons explained, *see supra* Section I, the federal TCPA claims against OpenAI must be dismissed. Accordingly, the Court should decline to take supplemental jurisdiction over the VTPPA claims against OpenAI. *See, e.g.*, *Scruggs*, 2020 WL 9348208, at *11–12 (explaining that court should decline "supplemental jurisdiction" over "VTPPA claim" after dismissing TCPA claim); *accord Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) ("generally, when a district court dismisses all federal claims in the early stages of litigation … it should decline to exercise jurisdiction over any remaining pendent state law claims" (alterations accepted)).

### B. Plaintiff Does Not Plausibly Allege OpenAI "Made," "Initiated," Or "Caused To Be Initiated" Any Calls.

To the extent the Court reaches Lowrey's VTPPA claims, they must be dismissed on the merits.

Foremost, Lowrey fails to plausibly allege that OpenAI "ma[d]e[ ]," Va. Code § 59.1-512, "initiated," or "caused to be initiated," *id.* § 59.1-514(B), calls in violation of the VTPPA. *See also id.* § 59.1-510 (defining "telephone solicitor" as one who "initiates, or causes another person to make or initiate" calls). "Initiate" in the VTPPA carries a similar meaning to the TCPA.

Looking "to the common dictionary meaning of 'initiate,'" courts have construed the term to mean "to begin or to set going … originate." *Zhu v. DISH Network, LLC*, 808 F. Supp. 2d 815, 819 (E.D. Va. 2011) (citing Webster's Third New International Dictionary of the English Language, Unabridged 1164 (1986)); *accord supra* Section I.A.1. And "make"—as in "make a call"—is synonymous with "initiate." *See Bryant*, 2023 WL 5180351, at *5 (dismissing claims under both Va. Code § 59.1-512 and Va. Code § 59.1-514(A) absent showing "that the defendant actually, physically initiated the telephone call at issue"); *accord supra* Section I.A.1. Thus, as with the TCPA, a defendant is not liable if it did not place "the offending calls." *Zhu*, 808 F. Supp. 2d at 819.

Applied here, "[t]he VTPPA claim[s] must fail at this stage for similar reasons as the parallel TCPA claim." *Hicks*, 2020 WL 9261758, at *5. *First*, Lowrey fails to plausibly allege that OpenAI makes, initiates, or causes to be initiated any calls because OpenAI's involvement (if any) begins *after* a different party makes or initiates a call. *See supra* Section I.A.1; *Clemens v. Consumer Sol. Ctr.*, 2025 WL 2427685, at *4 (E.D. Va. Aug. 22, 2025) (dismissing VTPPA claim where calls were placed by third party, rather than defendants). *Second*, Lowrey fails to allege any facts that would give rise to a plausible inference that OpenAI placed the calls at issue in the Complaint. *See supra* Section I.A.2; *Bryant*, 2023 WL 5180351, at *4–*5 (dismissing VTPPA claim where "Plaintiff … adduced no facts to suggest that [defendant] initiated the telephone call outside of conclusory allegations"); *Hicks*, 2020 WL 9261758, at *5 (similar); *Clemens*, 2025 WL 2427685, at *4 (similar). *Third*, Lowrey fails to allege any culpable conduct that would render OpenAI liable for its users' wrongs under even aiding-and-abetting liability—much less *direct* liability. *See supra* Section I.A.3; *accord Zhu*, 808 F. Supp. 2d at 818–19 (rejecting construction of VTPPA that would render defendants liable for calls placed by third parties).

### C. Plaintiff Does Not Plausibly Allege A "Telephone Solicitation."

Lowrey's VTPPA claims against OpenAI must also be dismissed for the independent reason that he has failed to plausibly allege receipt of a "telephone solicitation." Va. Code §§ 59.1-514(B), 512.

Similar to the TCPA, the VTPPA defines "telephone solicitation" to reach calls made "for the purpose of offering or advertising any property, goods, or services for sale, lease, license, or investment, including offering or advertising an extension of credit or for the purpose of fraudulent activity." Va. Code § 59.1-510. Under the VTPPA, "the purpose of [a call] is determined from the contents of the [call] relative to its recipient." *Cavey v. MarketPro Homebuyers, LLC*, 542 F. Supp. 3d 418, 428 (E.D. Va. 2021) (quotations omitted).

"Based on that interpretation, Plaintiff has not alleged facts from which to reasonably infer that Defendant violated the VTPPA." *Ibid.* As explained above, *see supra* Section I.C, the calls at issue "did not offer or advertise any property, goods or services for sale, lease, license or investment." *Ibid*. "Similarly [the calls] made no mention of any ancillary services that were being offered for sale," and when Lowrey called the number back, he "does not allege" that anyone "attempt[ed] to sell any such service." *Ibid.* Lowrey cannot bridge this gap with a generic allegation "of a larger commercial effort," as, if sufficient, that "construction of the VTPPA would effectively expand its coverage to all [calls]" from companies, rather than the "*sales* calls" Virginia sought to regulate. *Ibid.* (emphasis in original). Thus, Lowrey's VTPPA claims fail.

### D. Plaintiff's Failure-To-Identify Claim Fails Because He Does Not Allege OpenAI "Made Contact" With Him.

For Lowrey to succeed on his failure-to-identify claim, *see* Compl. ¶¶ 376, 379 (Count Six), he must show that OpenAI "ma[d]e a telephone solicitation via telephone call" and failed to "identify [itself] … promptly upon *making contact with the recipient* of such solicitation." Va.

Code § 59.1-512 (emphasis added). "Make contact" means "to *succeed* in communicating with someone or something, especially by speaking or writing to them." *Make contact with someone/something*, Cambridge Dictionary, https://tinyurl.com/m3rxj5vh (emphasis added).

Here, as an initial matter, Lowrey actually alleges that the callers *did* identify themselves—as "Nadine" and as "Emma" "from FSG." *See* Am. Compl. ¶¶ 233, 237, 242, 243. Citing only "information and belief," *id.* ¶ 248, Lowrey purports to doubt whether any such persons exist. But, as this Court has rightly recognized, "allegations, supported … only by vague 'information and belief,' are insufficient to allow the court to discern a plausible claim" in most cases. *Cellcontrol, Inc. v. Mill Mountain Cap., LLC*, 2022 WL 598752, at *5 (W.D. Va. Feb. 28, 2022) (Urbanski, J.); *see also Cancian v. Hannabass & Rowe, Ltd.*, 2018 WL 6515148, at *3 (W.D. Va. Dec. 11, 2018) (Urbanski, J.) ("pleadings based upon information and belief … are considered 'tenuous at best'").

Furthermore, the factual matter Lowrey does allege shows that whomever these persons may have been, they have nothing to do with OpenAI—because Lowrey alleges OpenAI never succeeded in communicating with him in the course of a telephone solicitation. He claims to have missed three of the four calls alleged in the Amended Complaint, receiving voicemails with "message[s]" purporting to be from Fresh Start. Am. Compl. ¶¶ 233, 237, 243. And the one call he says he answered again purported to be from Fresh Start, *id.* ¶ 242, and then played an error code explaining that connection to OpenAI API "failed," *id.* ¶¶ 242, 239–40. Because OpenAI never "ma[d]e[ ] contact with" Lowrey, his failure-to-identify claim under Va. Code § 59.1-512 must be dismissed. *See Laccinole v. Cova Home Realty LLC*, 2026 WL 617312, at *14 (E.D. Va. Feb. 11, 2026) (finding "plaintiff … failed to state a claim" under § 59.1-512 because "plaintiff alleges that he did not speak with" alleged caller), *report and recommendation adopted*, 2026 WL 615862 (E.D. Va. Mar. 4, 2026).

## III. PLAINTIFF'S DO-NOT-CALL TCPA CLAIM AND HIS VTPPA CLAIMS MUST BE DISMISSED BECAUSE OPENAI'S TERMS OF SERVICE PREVENT UNLAWFUL SOLICITATIONS.

Under both the TCPA and the VTPPA, it is "an affirmative defense … that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of" the respective statutes. 47 U.S.C. § 227(c)(5); Va. Code § 59.1-514(C). To the extent OpenAI's provision of a generative-AI service to the general public constitutes having "initiated" or "made" calls (it does not), the pleadings show that OpenAI satisfies this statutory affirmative defense.

OpenAI contractually prohibits its customers from using its API to violate the TCPA. Its Services Agreement—which governs "use of OpenAI's APIs"—provides that users cannot use the API "in a way that violates applicable laws." OpenAI Services Agreement, § 3.3 (May 1, 2025), *available at* https://tinyurl.com/2c7zdeku.[16] And because the Complaint incorporates by reference OpenAI's "standard policies and procedures," Am. Compl. ¶¶ 276–77, 301, the Court can consider the OpenAI Services Agreement "at the 12(b)(6) stage of the litigation," *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

OpenAI's contractual provision is a reasonable practice and procedure that satisfies the TCPA and VTPPA's affirmative-defense requirement. A decision from a sister court in this Circuit, *Zhu v. DISH Network, LLC*, 808 F. Supp. 2d 815 (E.D. Va. 2011), is instructive. In *Zhu*, the plaintiff received calls from retailers claiming to advertise for DISH Network. *Id.* at 817. The district court held that DISH was entitled to the affirmative defense under the VTPPA because DISH utilized an "independent contractor agreement, which specifically places a du[t]y on

---

[16] Plaintiff alleges unlawful calls between August and November 2025. *See* Compl. ¶¶ 233, 237, 242, 243. The cited Services Agreement was in effect from May 1, 2025 to January 1, 2026, i.e., at all times during the relevant period.

independent contractors to comply with telemarketing laws." *Id.* at 820. "The independent contractor agreement," the court explained, "constitute[d] a reasonable practice and procedure to effectively prevent telephone solicitation calls." *Ibid.* (quotations omitted) (alterations accepted).

This Court should reach the same conclusion here. OpenAI imposes a duty on its API users to comply with "applicable laws," including the TCPA. OpenAI Services Agreement, § 3.3. Indeed, because OpenAI does not itself physically place telephone calls or choose the numbers to be called—like DISH in *Zhu*—it is hard to imagine what more OpenAI could do to facilitate TCPA compliance. Thus, just like in *Zhu*, OpenAI has "properly invoked" the "affirmative defense" present in both the VTPPA and the TCPA by virtue of its "du[t]y on [users] to comply with telemarketing laws." *Zhu*, 808 F. Supp. 2d at 819–20.

Finally, it makes no difference that *Zhu* was decided on summary judgment. "[A]ffirmative defenses can be considered in resolving Rule 12(b)(6) motions when the facts surrounding the defense are clear from the complaint." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023). In *Zhu*, the court held that the contractual duty to comply with telemarketing laws was sufficient to satisfy the affirmative defense. Here, because the relevant contract is referenced by the Amended Complaint—and thus properly considered at this stage of the litigation—the Court can rule for OpenAI without any additional factual development.

## CONCLUSION

For the foregoing reasons, OpenAI respectfully requests that the Court dismiss with prejudice all claims against it.

Dated: June 3, 2026

Respectfully submitted,

*/s/Stephen J. Obermeier*
Stephen J. Obermeier (VSB # 89849)
Michael E. Toner (VSB # 34548)*
Krystal B. Swendsboe (VSB # 89614)
Jeremy J. Broggi (DC Bar # 1029427)*
Boyd Garriott (DC Bar # 1617468)*
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-7000
Fax: (202) 719-7049
sobermeier@wiley.law
mtoner@wiley.law
kswendsboe@wiley.law
jbroggi@wiley.law
bgarriott@wiley.law

*Counsel for OAI International, Inc.*

* *Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on June 3, 2026, a true and correct copy of the foregoing was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

*/s/Stephen J. Obermeier*
Stephen J. Obermeier (VSB # 89849)