**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

**WILLIAM LOWREY,** ***individually and on behalf of similarly situated individuals,***

**Plaintiff,**

**v.** **CIVIL ACTION NO. 6:25-cv-116-MFU**

**TWILIO INC., OPENAI, L.L.C., and FRESH START GROUP LLC,**

**Defendants.**

**PLAINTIFF'S OPPOSITION TO OPENAI'S MOTION TO DISMISS**

# TABLE OF CONTENTS

OVERVIEW ....................1

STATEMENT OF FACTS ....................2

I. Plaintiff and His Residential, Do-Not-Call-Registered Cellular Telephone. ....................2

II. OpenAI's Generative-AI Models and Their Autonomous, Conversational Capabilities. ....................2

III. OpenAI's Realtime API and Its Phone-Calling Capability. ....................2

IV. OpenAI's Technology Marketed and Demonstrated to Make Autonomous Outbound Calls. ....................3

V. The Four Artificial-Voice Calls to Plaintiff, and OpenAI as Their Source. ....................4

VI. OpenAI's Knowledge of Unlawful Use, and the Safeguards It Has but Declines to Apply to Spam Calls. ....................4

VII. The Failures to Identify and to Provide a Meaningful Opt-Out. ....................5

VIII. The Resulting Harm. ....................6

IX. OpenAI's Misleading Citations to Websites. ....................6

A. OpenAI Starts the Conversation on the Phone Call. ....................7

B. OpenAI is Responsible for What Is Said on the Call. ....................8

C. OpenAI Retains Control Over What It Says on the Call Even If Given Optional High-Level Instructions. ....................9

LEGAL FRAMEWORK ....................11

I. Statutory Provisions. ....................11

A. The Federal Telephone Consumer Protection Act, 47 U.S.C. § 227. ....................11

B. The Virginia Telephone Privacy Protection Act, Va. Code Ann. §§ 59.1-510 to -515. ....................14

II. The Applicable Dismissal and Pleading Standards. ....................17

ARGUMENT ....................18

I. Plaintiff Has Plausibly Pleaded That OpenAI Made or Initiated Calls. ....................18

A. Plaintiff Has Plausibly Alleged That OpenAI Made or Initiated the Calls He Received. ....................20

1. OpenAI's overly narrow interpretation of "make" and "initiate" is not aligned with the TCPA or supporting caselaw. ....................20

2. The structure and purpose of TCPA regulatory scheme covers OpenAI's conduct. ....................30

3. The OpenAI demo is indicative of OpenAI's capabilities. ....................33

B. Plaintiff Has More Than Plausibly Pleaded OpenAI Made and/or Initiated the At-Issue Calls. ....................34

C. OpenAI, by Its Very Nature, Was Actively Involved in the Calls to Plaintiff. ....................40

II. The TCPA Covers Plaintiff's Cellular Telephone, and He Is a "Residential Telephone Subscriber." ....................42

III. Plaintiff Has a Cause of Action for Counts Nine and Ten. ....................45

IV. Plaintiff Plausibly Alleges the Calls Are "Telephone Solicitations" and "Telemarketing." ....................46

V. Plaintiff Plausibly Alleges OpenAI Violated the VTPPA. ....................49

A. The Court Should Retain Supplemental Jurisdiction Because the Federal Claims Survive. ....................49

B. OpenAI "Made, Initiated, or Caused to Be Initiated" the Calls. ....................50

C. The Calls Are "Telephone Solicitations" Under the VTPPA. ....................52

D. The Failure-to-Identify Claim Is Adequately Pleaded Because OpenAI "Made Contact." ....................53

VI. OpenAI Did Make Contact With Plaintiff for Plaintiff's Failure-to-ID Claim. ....................56

VII. OpenAI's Terms of Service Provide No Grounds for Dismissal. ....................57

CONCLUSION ....................58

## TABLE OF AUTHORITIES

**Cases**

*Abboud v. Circle K Stores Inc.*,
No. CV-23-01683-PHX-DWL, 2025 WL 307039 (D. Ariz. Jan. 27, 2025) ..........................48

*ACA Int'l v. FCC*,
885 F.3d 687 (D.C. Cir. 2018) ..........................32

*Alvarez Ronquillo v. Bondi*,
151 F.4th 522 (4th Cir. 2025) ..........................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................17

*Bank of America Corp. v. City of Miami*,
581 U.S. 189 (2017) ..........................32

*Barnes v. West, Inc.*,
249 F. Supp. 2d 737 (E.D. Va. 2003) ..........................49

*Beard v. John Hiester Chevrolet, LLC*,
640 F. Supp. 3d 420 (E.D.N.C. 2022) ..........................38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................17

*Bennett v. Fastenal Co.*,
184 F. Supp. 3d 304 (W.D. Va. 2016) ..........................49

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) ..........................22

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
681 F.3d 1323 (Fed. Cir. 2012) ..........................18

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) ..........................24

*Bradford v. Sovereign Pest Control of TX, Inc.*,
744 F. Supp. 3d 754 (S.D. Tex. 2024) ..........................45

*Bryant v. Byron Udell & Assocs. Inc.*,
No. 1:23-cv-00414-AJT-LRV, 2023 WL 5180351 (E.D. Va. Aug. 11, 2023) ..........................39

*Cacho v. McCarthy & Kelly LLP*,
739 F. Supp. 3d 195 (S.D.N.Y. 2024) ..........................43

*Callier v. Freedom Forever Texas*,
No. EP-23-CV-364-FM, 2024 WL 1451135 (W.D. Tex. Apr. 2, 2024) ..........................19, 25

*Calvin v. Humana Inc.*,
No. 22-80804-CIV, 2022 WL 18956206 (S.D. Fla. Aug. 18, 2022) ....................................48

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016)..........................................................................................................51

*Camunas v. Nat'l Republican Senatorial Comm.*,
570 F. Supp. 3d 288 (E.D. Pa. 2021) ..................................................................................12

*Cancian v. Hannabass & Rowe, Ltd.*,
No. 7:18-cv-00342, 2018 WL 6515148 (W.D. Va. Dec. 11, 2018) .....................................57

*Cavey v. MarketPro Homebuyers, LLC*,
542 F. Supp. 3d 418 (E.D. Va. 2021) ..........................................................14, 15, 16, 53, 54

*Cellcontrol, Inc. v. Mill Mountain Cap., LLC*,
No. 7:21-CV-246, 2022 WL 598752 (W.D. Va. Feb. 28, 2022) .....................................18, 57

*Champion v. Sethi*,
No. CV-22-01355-PHX-DGC, 2023 WL 2708576 (D. Ariz. Mar. 30, 2023).........................45

*Chennette v. Porch.com, Inc.*,
50 F.4th 1217 (9th Cir. 2022) ..............................................................................................43

*Chesbro v. Best Buy Stores, L.P.*,
705 F.3d 913 (9th Cir. 2012) ...............................................................................................46

*Clemens v. Consumer Sol. Ctr.*,
No. 1:21-cv-1002 (RDA/LRV), 2025 WL 2604494 (E.D. Va. July 14, 2025), report & recommendation adopted, 2025 WL 2427685 (E.D. Va. Aug. 22, 2025) ..................16, 55, 56

*Coleman v. Rite Aid of Ga., Inc.*,
284 F. Supp. 3d 1343 (N.D. Ga. 2018).................................................................................13

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*,
No. 25-cv-03491 (TSC), 2026 WL 1480903 (D.D.C. May 27, 2026).........................22, 35, 37

*Cox Communications, Inc. v. Sony Music Entertainment*,
607 U.S. ___, 146 S. Ct. 959 (2026)..............................................................................41, 42

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
888 F.3d 640 (4th Cir. 2018) ...............................................................................................13

*Deegan v. Moore*,
No. 7:16-cv-00260, 2017 WL 1194718 (W.D. Va. Mar. 30, 2017) ................................22, 37

*Dobronski v. Tobias & Assocs., Inc.*,
769 F. Supp. 3d 681 (E.D. Mich. 2025).................................................................................26

*Dolemba v. Ill. Farmers Ins. Co.*,
No. 15 C 463, 2015 WL 4727331 (N.D. Ill. Aug. 10, 2015) .................................................46

*Duell v. Heidenrich*,
39 F.3d 1176, 1994 WL 609464 (4th Cir. 1994) ....................32

*Eagle v. GVG Capital, LLC*,
No. 22-cv-00638-SRB, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023)....................47, 53

*Erickson v. Pardus*,
551 U.S. 89 (2007)....................17

*Fridline v. Millennia Tax Relief, LLC*,
727 F. Supp. 3d 517 (M.D. Pa. 2024)....................45

*Garnett v. Remedi Seniorcare of Va., LLC*,
892 F.3d 140 (4th Cir. 2018) ....................38

*Godon v. N.C. Crime Control*,
141 F.3d 1158, 1998 WL 193109 (4th Cir. 1998) ....................38

*Gonzalez v. Homefix Custom Remodeling, Corp.*,
670 F. Supp. 3d 337 (E.D. Va. 2023) ....................12, 15

*Goodman v. Praxair, Inc.*,
494 F.3d 458 (4th Cir. 2007) ....................57

*Hall v. DIRECTV, LLC*,
846 F.3d 757 (4th Cir. 2017) ....................18, 22, 25, 34

*Hand v. Beach Ent. KC, LLC*,
456 F. Supp. 3d 1099 (W.D. Mo. 2020) ....................43

*Harrison v. Humana, Inc.*,
No. 3:24-cv-00262-GNS, 2024 WL 4828737 (W.D. Ky. Nov. 19, 2024) ....................23, 25

*Hatteberg v. Cap. One Bank (USA), N.A.*,
No. SACV191425DOCKES, 2019 WL 8888087 (C.D. Cal. Nov. 20, 2019) .................... passim

*Hicks v. Alarm.com Inc.*,
No. 1:20-cv-532, 2020 WL 9261758 (E.D. Va. Aug. 6, 2020) ....................39

*Hodgin v. Parker Waichman LLP*,
No. 3:14-cv-733-DJH, 2015 WL 13022289 (W.D. Ky. Sept. 30, 2015)....................44

*Hodgin v. UTC Fire & Sec. Ams. Corp.*,
885 F.3d 243 (4th Cir. 2018) ....................40

*Houck v. Substitute Tr. Servs., Inc.*,
791 F.3d 473 (4th Cir. 2015) ....................17

*Hunt v. Branch Banking & Tr. Co.*,
480 F. App'x 730 (4th Cir. 2012)....................49

*Hurley v. Messer*,
No. CV 3:16-9949, 2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018) ................................29, 33

*IntraComm, Inc. v. Bajaj*,
492 F.3d 285 (4th Cir. 2007) ..........................................................................................49

*Va. ex rel. Jagdmann v. Real Time Int'l, Inc.*,
No. 4:04-cv-125, 2005 WL 1162937 (E.D. Va. Apr. 26, 2005) ............................................54

*Julian v. Kirkendall Dwyer II, LLP*,
No. 2:25-CV-02510-HLT-GEB, 2026 WL 696528 (D. Kan. Mar. 12, 2026).........................21

*Klassen v. Solid Quote LLC*,
702 F. Supp. 3d 1052 (D. Colo. 2023)..............................................................................43

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) ...........................................................................12, 24, 51

*Kuriloff v. InnerScope Hearing Techs.*,
No. 2:23-cv-270, 2024 WL 2031828 (E.D. Va. Mar. 30, 2024)............................................55

*Laccinole v. Cova Home Realty LLC*,
No. 2:21-cv-507, 2026 WL 617312 (E.D. Va. Feb. 11, 2026), report & recommendation adopted, 2026 WL 615862 (E.D. Va. Mar. 4, 2026) ..................................................50, 54, 57

*League of Women Voters of N.H. v. Kramer*,
No. 24-cv-73-SM-TSM, 2025 WL 919897 (D.N.H. Mar. 26, 2025) ...............................20, 26

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..........................................................................................................32

*Maryland v. Universal Elections, Inc.*,
729 F.3d 370 (4th Cir. 2013) ....................................................................................51, 54

*Matthews v. Senior Life Ins. Co.*,
No. 1:24-cv-1550-MSN-LRV, 2025 WL 1181789 (E.D. Va. Apr. 22, 2025), denying second dismissal, 2025 WL 1899984 (E.D. Va. July 9, 2025) ..........................................................39

*Megaro v. McCollum*,
66 F.4th 151 (4th Cir. 2023) ............................................................................................58

*Melito v. Am. Eagle Outfitters, Inc.*,
No. 14-cv-02440 (VEC), 2015 WL 7736547 (S.D.N.Y. Nov. 30, 2015)...............................38

*Mey v. All Access Telecom, Inc.*,
No. 5:19-CV-00237-JPB, 2021 WL 8892199 (N.D.W. Va. Apr. 23, 2021) ...............20, 26, 27

*United States v. Miller*,
604 U.S. 518 (2025)..........................................................................................................32

*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012)....................................................................................................30

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*,
130 F.4th 91 (4th Cir. 2025), cert. denied sub nom., 146 S. Ct. 821 (2025) ...........................38

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
55 F.4th 340 (1st Cir. 2022).........................................................................................43

*Novia v. Mobiz, Inc.*,
No. 25-CV-11036-AK, 2026 WL 752181 (D. Mass. Mar. 17, 2026) ....................................26

*New York Times Co. v. Microsoft Corp.*,
777 F. Supp. 3d 283 (S.D.N.Y. 2025) ..............................................................................41

*Payton v. Kale Realty, LLC*,
164 F. Supp. 3d 1050 (N.D. Ill. 2016) .............................................................................46

*Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*,
No. CV PWG-17-1791, 2020 WL 5946574 (D. Md. Oct. 7, 2020) ......................................22

*Pepper v. GVG Capital, LLC*,
No. H-22-2912, 2023 WL 3914291 (S.D. Tex. June 9, 2023).........................................47, 53

*Persichetti v. T-Mobile USA, Inc.*,
479 F. Supp. 3d 1333 (N.D. Ga. 2020) ............................................................................13

*Phillips v. Mozes, Inc.*,
No. 2:12-cv-04033-JEO, 2014 WL 12589671 (N.D. Ala. Sept. 3, 2014), report & recommendation adopted in relevant part, 2015 WL 12806594 (Jan. 26, 2015).....................44

*Radvansky v. Kendo Holdings, Inc.*,
744 F. Supp. 3d 1314 (N.D. Ga. 2024) ............................................................................43

*Ray v. Roane*,
93 F.4th 651 (4th Cir.), cert. denied, 145 S. Ct. 164 (2024) ...................................................17

*Robertson v. Sea Pines Real Est. Cos., Inc.*,
679 F.3d 278 (4th Cir. 2012) ..................................................................17, 23, 25, 36

*Salim v. Dahlberg*,
170 F. Supp. 3d 897 (E.D. Va. 2016) ..............................................................................49

*Santos-Zacaria v. Garland*,
598 U.S. 411 (2023)....................................................................................................32

*Scruggs v. CHW Grp.*,
No. 2:20-cv-145, 2020 WL 9348208 (E.D. Va. Nov. 12, 2020) ............................................39

*Shanaghan v. Cahill*,
58 F.3d 106 (4th Cir. 1995) ...........................................................................................49

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................................................................................................32

*Off. of the Att'y Gen. v. Smartbiz Telecom LLC*,
688 F. Supp. 3d 1230 (S.D. Fla. 2023) ..........................................................................29

*Off. of Att'y Gen. v. Smartbiz Telecom LLC*,
No. 22-23945-CIV, 2024 WL 4251895 (S.D. Fla. Sept. 19, 2024).......................................26

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025)..............................................................................................41, 42

*Snyder v. iCard Gift Card, LLC*,
No. 0:15-cv-61718-WPD, 2017 WL 10379591 (S.D. Fla. Apr. 28, 2017)............................40

*Stevens-Bratton v. TruGreen, Inc.*,
437 F. Supp. 3d 648 (W.D. Tenn. 2020)..........................................................................44

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)..............................................................................................32, 41

*Van Baalen v. Mut. of Omaha Ins. Co.*,
729 F. Supp. 3d 1239 (D.N.M. 2024) ..............................................................................43

*Van Buren v. United States*,
593 U.S. 374 (2021)....................................................................................................32

*In re Volkswagen "Clean Diesel" Litig.*,
94 Va. Cir. 189, 2016 WL 10880209 (Fairfax Cir. Ct. Aug. 30, 2016).................................50

*Wesley v. Snap Fin. LLC*,
339 F.R.D. 277 (D. Utah 2021) ......................................................................................13

*Whittaker v. Freeway Ins. Servs. Am., LLC*,
No. 22-cv-8042, 2023 WL 167040 (D. Ariz. Jan. 12, 2023) ..............................................47

*Wilcox v. MarketPro S., Inc.*,
No. CV SAG-23-2364, 2023 WL 8806696 (D. Md. Dec. 20, 2023)...............................47, 53

*Wilson v. Better Mortgage Corp.*,
811 F. Supp. 3d 631 (S.D.N.Y. 2025) .....................................................................47, 48

*Wilson v. Hard Eight Nutrition LLC*,
804 F. Supp. 3d 1141 (D. Or. 2025) ..............................................................................43

*Wilson v. Skopos Fin., LLC*,
No. 6:25-cv-00376-MC, 2025 WL 2029274 (D. Or. July 21, 2025).....................................48

*Woods v. City of Greensboro*,
855 F.3d 639 (4th Cir. 2017) ........................................................................................18

*Ybarra v. Dish Network, L.L.C.*,
807 F.3d 635 (5th Cir. 2015) ....................13

*Zhu v. DISH Network, LLC*,
808 F. Supp. 2d 815 (E.D. Va. 2011) ....................52, 56, 57, 58

**Statutes**

28 U.S.C. § 1367 ....................49

47 U.S.C. § 227(a) ....................46

47 U.S.C. § 227(b) ....................11, 13, 14, 38, 45, 46

47 U.S.C. § 227(c) ....................12, 13, 43

Va. Code Ann. § 59.1-510 ....................14, 50, 53

Va. Code Ann. § 59.1-512 ....................16, 53, 54

Va. Code Ann. § 59.1-513 ....................15, 16, 55

Va. Code Ann. § 59.1-513.1 ....................54

Va. Code Ann. § 59.1-514 ....................15, 16

Va. Code Ann. § 59.1-514.1 ....................15, 51, 55

Va. Code Ann. § 59.1-515 ....................15

**Rules**

Fed. R. Civ. P. 8(a)(2) ....................18

Fed. R. Civ. P. 12(b)(6) ....................17, 22, 44, 45, 57

**Regulations**

47 C.F.R. § 64.1200 .................... passim

**Other Authorities**

*In re Implications of A.I. Techs. on Protecting Consumers from Unwanted Robocalls & Robotexts*,
39 FCC Rcd. 1783 (2024) ....................27, 52

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
18 FCC Rcd. 14014 (2003) ....................43, 48

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
30 FCC Rcd. 7961 (2015) .................... passim

COMES NOW the plaintiff William Lowrey ("Plaintiff"), by counsel, who submits the following in Opposition to Defendant OAI International, Inc.'s ("OpenAI") Motion to Dismiss (ECF No. 51). For the reasons discussed below, the Court should deny the Motion.

## Overview

Plaintiff William Lowrey brings this action under the Telephone Consumer Protection Act and the Virginia Telephone Privacy Protection Act after receiving four artificial- or prerecorded-voice telemarketing calls generated through Defendant OpenAI's voice technology. OpenAI moves to dismiss, contending that it merely supplies artificial-intelligence tools, that it did not "make" or "initiate" the calls, and that its terms of service insulate it from liability. Those are fact-bound defenses that cannot be resolved on a motion to dismiss. At this stage Plaintiff need only plausibly allege his claims, and he has done so. The Motion should be denied.

Plaintiff plausibly alleges that OpenAI "made" and "initiated" the calls under the plain meaning of the TCPA, the statute's structure and purpose, and F.C.C. guidance. OpenAI's generative-AI models and its Realtime API have a phone-calling capability, the artificial voice that spoke on the calls to Plaintiff was OpenAI's, and OpenAI controls both the content and the timing of what is said. Plaintiff alleges that OpenAI was so directly connected to, and so involved in placing, the calls as to be deemed to have initiated them, and OpenAI's own public demonstrations confirm that capability. OpenAI's narrow reading of "make" and "initiate" cannot be squared with the statute, and at the pleading stage Plaintiff need not detail the precise technical mechanics of how the calls were placed.

Plaintiff also adequately pleads his failure-to-identify and opt-out claims, because OpenAI made contact with him—its voice spoke to him on voicemail messages and on a live call—and OpenAI's cited cases are distinguishable. OpenAI's reliance on its terms of service and purported

compliance safeguards raises an affirmative defense that OpenAI bears the burden to prove and that cannot be resolved on the pleadings, particularly where Plaintiff alleges that OpenAI could have deployed the same automated monitoring and enforcement it uses to block other harmful content. For these reasons, and those set forth below, the Court should deny OpenAI's Motion to Dismiss.

## STATEMENT OF FACTS

### I. Plaintiff and His Residential, Do-Not-Call-Registered Cellular Telephone.

William Lowrey is a Virginia resident, a cellular-telephone subscriber, and a consumer. (ECF 45 ¶ 164.) On or around December 11, 2004, he registered his cellular telephone number ending in 4102 on the National Do-Not-Call Registry, and he has never changed, removed, or relinquished it. (*Id.* ¶ 206.) He uses the number for residential purposes, his home has no landline, and it is his only telephone number, serving as his residential telephone line. (*Id.* ¶¶ 208–211.) He never consented to receive communications from any Defendant. (*Id.* ¶ 215.)

### II. OpenAI's Generative-AI Models and Their Autonomous, Conversational Capabilities.

OpenAI's flagship product, ChatGPT, is powered by a GPT model whose defining feature is its ability to perform its own reasoning. (*Id.* ¶¶ 73, 75.) OpenAI bills ChatGPT as "a model . . . which interacts in a conversational way." (*Id.* ¶ 78.) OpenAI has pursued initiatives to "extend the capabilities of conversational models" and to "enable reasoning capable of problem-solving and planning, surpassing merely responding to text." (*Id.* ¶ 81.) Through its "Operator" initiative, OpenAI markets "agents . . . capable of doing work for you independently—you give it a task and it will execute it," touting higher "rates of conversion." (*Id.* ¶¶ 83, 85.)

### III. OpenAI's Realtime API and Its Phone-Calling Capability.

OpenAI provides "Voice agents" to its developers and offers a "speech-to-speech" capability in which the model handles live audio input and output directly. (*Id.* ¶ 132.) Its Realtime API has voice activity detection enabled, so the API "will determine when the user has started or stopped speaking and respond automatically." (*Id.* ¶ 137.) OpenAI has marketed the Realtime API's capabilities for "phone calling" through Session Initiation Protocol. (*Id.* ¶ 138.) Through the Realtime API, OpenAI created an interface that allows other platforms to it so that OpenAI can engage in real-time conversations through those platforms. (*Id.* ¶ 150.) Within that interface, OpenAI has specific commands for how to accept, hang up, refer, or reject phone calls. (*Id.* ¶ 151.) OpenAI and Twilio market and publish guides for integrating their two platforms to make outbound calls, and such calls require both. (*Id.* ¶¶ 139, 144, 149, 152.) On those calls, OpenAI initiates the conversation, determines what to say, and interacts with the person who answers—with no involvement from the customer on the call—while Twilio handles the telephony and OpenAI serves as the active caller participant necessary for a conversation to occur. (*Id.* ¶¶ 144, 146–47.) In describing such calls involving OpenAI, Twilio even refers to these as "call[s] made by AI." (*Id.* ¶ 72.)

## IV. OpenAI's Technology Marketed and Demonstrated to Make Autonomous Outbound Calls.

At OpenAI's own developer conference, OpenAI demonstrated its Realtime API placing a phone call and autonomously conversing with the person who answered, with no human on the caller's side of the call. (*Id.* ¶¶ 87–96.) Commentators who saw the demonstration described it as the "OpenAI Realtime API mak[ing] a call," as the "Realtime API … placing an order," and as an "agent that autonomously called … and had a conversation with a human." (*Id.* ¶¶ 89, 95.) OpenAI allowed a developer to publish, on OpenAI's own community site, instructions for fully automating cold calls with OpenAI, in a post titled "How I automated cold calls with AI." (ECF

45 ¶ 133; ECF 45, Ex. E.) Other public tutorials—one with over 60,000 views—demonstrate how to build an AI voice agent that cold-calls leads using OpenAI, and Twilio publishes its own guides for making outbound calls with OpenAI's Realtime API. (ECF 45 ¶¶ 134–136, 139, 144.)

**V. The Four Artificial-Voice Calls to Plaintiff, and OpenAI as Their Source.**

From August through November 2025, Plaintiff received four telemarketing calls bearing nearly identical messages, each in an artificial or pre-recorded voice. (*Id.* ¶¶ 233, 237, 242, 243, 268.) Because the calls were nearly identical, they came from the same source. (*Id.* ¶ 268.) Although a caller identified herself by name, no actual person was on the calls, and there is no actual person named "Nadine" or "Emma" associated with the calls. (*Id.* ¶¶ 248, 266, 271.)

When Plaintiff answered one call, and when he returned a call on another occasion, he was directed to a webpage maintained by OpenAI, hearing a message recite "429: you've exceeded your current quota . . . https://platform.openai.com/docs/guides/error-codes/api-errors." (*Id.* ¶¶ 239, 242, 269.) That OpenAI webpage explains the error code to OpenAI customers who have run out of credits or hit their maximum monthly spend. (*Id.* ¶ 240.) The voices Plaintiff heard were artificially created and were generated by a combination of Twilio and OpenAI. (*Id.* ¶¶ 266, 270.) OpenAI determined the content of the calls, including what to say in the voicemail messages and what to say when Plaintiff answered his phone. (*Id.* ¶ 273.) These calls could not have been made without OpenAI's involvement; without it, there would have been only silence. (*Id.* ¶ 274.)

The calls came from numbers associated with Twilio's platform and were initiated by Fresh Start and actually made by Twilio and OpenAI. (*Id.* ¶¶ 254, 264–265.) Twilio lacks the ability to carry on a conversation and instead relies on third parties like OpenAI to handle the actual interaction on a call, and no person from Fresh Start was on any of the calls. (*Id.* ¶¶ 267, 271.)

**VI. OpenAI's Knowledge of Unlawful Use, and the Safeguards It Has but Declines to Apply to Spam Calls.**

OpenAI knows that "bad actors may try to misuse" its technology. (*Id.* ¶ 107.) It commends itself on its model's ability to moderate generated content and maintains a moderation system "trained to detect a broad set of categories of undesired content." (*Id.* ¶ 109.) It generates and retains usage logs and "leverage[s] automated and human review to monitor for potential abuse and take appropriate action." (*Id.* ¶¶ 112, 115.) It has "developed its own internal reasoning models to determine when usage violates its policy," deploys "monitoring and enforcement technology" against other illegal content such as child sexual abuse material, invests in teams to identify "sophisticated threat actors," and blocks users who engage in suspicious or illicit activity. (*Id.* ¶¶ 116, 126, 128, 130.)

OpenAI also maintains "Root" and "System" rules that automatically prohibit its model from generating specified content—for example, a precise recipe for synthesizing methamphetamine—and it has the ability to create such a rule to prohibit its model from making spam telemarketing calls. (*Id.* ¶¶ 119–23.) On information and belief, OpenAI has adopted no Root or System rule to prevent telemarketing spam calls and has not implemented its monitoring, enforcement, or blocking measures to prevent illegal spam calls, despite having the ability to do so. (*Id.* ¶¶ 125, 127, 129, 131.) Instead, OpenAI leaves it to developers whether to use its moderation features and allows customers to pay more to be excluded from its abuse monitoring. (*Id.* ¶¶ 110, 118.) OpenAI's choice to prioritize profit over safety has prompted a wave of resignations from its safety team. (*Id.* ¶¶ 102–05.) Discovery is expected to show that OpenAI's logs reflect the misconduct at issue here and that OpenAI allowed it to continue. (*Id.* ¶ 114.)

## VII. The Failures to Identify and to Provide a Meaningful Opt-Out.

For each call, Defendants failed to clearly identify who initiated the call and failed to state the name under which the entity is registered with the Virginia State Corporation Commission, leaving Plaintiff confused about who was calling him. (*Id.* ¶¶ 244–46.) For each call, Defendants

also failed to provide a meaningful way for Plaintiff to opt out, as shown by his attempts to reach a person, which yielded only an error message. (*Id.* ¶ 247.)

## VIII. The Resulting Harm.

In total, Plaintiff received approximately forty unwanted texts and at least four unwanted telemarketing calls. (*Id.* ¶ 249.) The repeated contacts caused him anxiety and emotional distress and required him to expend considerable time and energy—including online research and multiple calls—to determine their source and make them stop. (*Id.* ¶¶ 278–281.)

## IX. OpenAI's Misleading Citations to Websites.

Plaintiff disputes OpenAI's attempt to distort websites cited in the Amended Ccomplaint to fit its counterfactual and addresses these mischaracterizations here. First, OpenAI cherry picks quotes from various websites regarding technical details of its involvement in calls:

- Twilio Outgoing Calls Page: Paul Kamp, *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python*, Twilio (Aug. 28, 2025), https://www.twilio.com/en-us/blog/outbound-calls-python-openai-realtime-api-voice ("Twilio Outgoing Calls Page");
- Twilio Node.js Page: Paul Kamp, *How to Make Outgoing Calls with Twilio Voice and the OpenAI Realtime API and Node.js*, Twilio (Aug. 28, 2025), https://www.twilio.com/enus/blog/outbound-calls-node-openai-realtime-api-voice ("Twilio Node.js Page");
- GitHub Quickstart Page: *OpenAI Realtime API with Twilio Quickstart*, GitHub, https://github.com/openai/openai-realtime-twilio-demo (last visited June 23, 2026) ("GitHub Quickstart Page");
- Twilio ConversationRelay Page: Amanda Lange, *Integrate OpenAI with Twilio Voice Using Conversation Relay*, Twilio (Mar. 20, 2025), https://www.twilio.com/en-us/blog/developers/tutorials/product/integrate-openaitwilio-voice-using-conversationrelay ("Twilio ConversationRelay Page");
- Twilio Website Voice Page: Dan Bartlett et al., *Add Voice AI to your website with the Twilio Voice JavaScript SDK and ConversationRelay*, Twilio (July 14, 2025), https://www.twilio.com/en-us/blog/developers/tutorials/product/voice-ai-conversationrelay-twilio-voice-sdk ("Twilio Website Voice Page");
- Twilio Voice Assistant Page: Kelley Robinson et al., *Build an AI Voice Assistant with Twilio Voice, the OpenAI Realtime Agents SDK, and Node.js*, Twilio (Aug. 28, 2025) https://www.twilio.com/enus/blog/developers/tutorials/product/speech-assistant-realtime-agents-sdk-node ("Twilio Voice Assistant Page");

- YouTube AI Cold Call Video: Alex Leischow, *How to Build an AI Voice Agent That Cold Calls Leads for You (2025)*, YouTube (May 14, 2025), youtube.com/watch?v=yKn0qKakUOk ("Cold Calls Tutorial Video")
- Introducing GPT-RealTime Page: *Introducing gpt-realtime and Realtime API updates for production voice agents*, OpenAI (Aug. 28, 2025), https://openai.com/index/introducing-gpt-realtime/ ("Introducing GPT-RealTime Page").

(ECF 52 at 6.)[1] This cited material shows that it is OpenAI who initiates the conversation as the first speaker, that OpenAI is responsible for the actual conversation, and that any instructions provided to OpenAI are high-level, optional, and OpenAI still determines what to say. Just as Plaintiff has plausibly alleged and against which OpenAI may not offer factual counters on a motion to dismiss.

**A. OpenAI Starts the Conversation on the Phone Call.**

As evident from webpages Plaintiff cites in the Amended Complaint, OpenAI initiates the conversation by talking first. (*Twilio Node.js Page*, *supra* (describing "after a user picks up, we'll trigger the OpenAI Realtime API *to have the AI talk first*" and "AI talks first") (emphasis added); *Twilio Outgoing Calls Page*, *supra* (describing "AI talks first," "Since we're *dialing* a number, we want the AI to talk when the call is picked up," "[t]his causes the OpenAI Realtime API to 'go first' in this conversation," and "we initialize the session with OpenAI to configure our phone interaction, and send a conversation item to get the AI to talk first"). The fact that Twilio is involved with the technical connection of the call does not obviate this. (*See, e.g.,* ECF 52 at 5, 6, 12, 14 (repeatedly stating OpenAI's involvement "after a user picks up" and "after a call is connected").) Indeed, there is nothing earth-shattering in the fact that OpenAI is triggered after the recipient picks up; this is how normal calls work—the caller does not start speaking until the recipient picks up the phone.

[1] For ease of reference, Plaintiff will use these same references. Plaintiff also includes the last two webpages which are referenced by OpenAI but not included in its bulleted list.

### B. OpenAI is Responsible for What Is Said on the Call.

OpenAI makes repeated references to the involvement of other entities on calls it makes, such as Twilio and unidentified "third-party developers."[2] (*See, e.g.,* ECF 52 at 4, 5, 7, 13, 14.) Yet neither Twilio nor such developers actually speak on these calls; OpenAI itself determines what to say. The cited webpages in the Amended Complaint illustrate this.[3] *Twilio ConversationRelay Page*, *supra* (noting "connection will open up the line for you to have a conversation with OpenAI," "allows you to call a Twilio phone number and get into a conversation with an LLM," "lets your AI know this conversation will be spoken aloud"); *Twilio Outgoing Calls Page*, *supra* (noting "AI talks"); Twilio Node.js Page, *supra* (same); *Twilio Website Voice Page*, *supra* ("AI-driven conversations" and "connect to AI-backed voice applications"); *Twilio Voice Assistant Page*, *supra* ("The kind folks at OpenAI have made this even easier . . . powering not only the voice interaction"). OpenAI admits as much in its brief when it concedes its "Realtime API . . . generate[s] audio content *during* calls." (ECF 52 at 6 (emphasis in original.))

Further, the cited webpages make clear that OpenAI's involvement is required in order for these calls to be successful, even if Twilio or other parties are also involved. *See GitHub Quickstart Page*, *supra* (noting "*combine OpenAI's Realtime API* and Twilio's phone calling capability to build an AI calling assistant" and "[t]his repo implements a phone calling assistant with the *Realtime API* and Twilio") (emphasis added); *Twilio ConversationRelay Page*, *supra* ("I am a

---

[2] OpenAI also misquotes the Amended Complaint by saying "Lowrey alleges that OpenAI leaves the choice up to third-party developers on how to use the Realtime API" (ECF 52 at 28.) What Plaintiff actually alleges is that OpenAI leaves the choice *whether to flag and block content* up to developers. (ECF 45 ¶ 110.)

[3] OpenAI's citation to one webpage is further misleading as it is taken out of context. (*Contrast* ECF 52 at 6 ("The user must rely on Twilio … to specify how to handle the phone call itself") *with GitHub Quickstart Page*, *supra* ("Twilio uses TwiML (a form of XML) to specify how to handle a phone call. When a call comes in we tell Twilio to start a bi-directional stream to our backend, where we forward messages between the call and the Realtime API.").) As is evident from the full quote, OpenAI determines the content for what to say on the call.

voice assistant powered by Twilio and Open A I"); *Twilio Voice Assistant Page*, *supra* (same); *Twilio Outgoing Calls Page*, *supra* ("maintains a live connection for continuous data exchange between Twilio and OpenAI"); *Twilio Node.js Page*, *supra* ("dial a phone number using Twilio Voice and Media Streams, and the OpenAI Realtime"); *see also* ECF 34-1 ("I combined Twilio for the phone calls, Open AI for the speech to speech AI"). In short, these websites show that both Twilio and OpenAI are required for the calls to be made successfully.

Plaintiff's cited YouTube video is instructive on OpenAI's deep involvement in the calls. *See Cold Calls Tutorial Video*, *supra* at 0:03–0:08 ("Today I'm going to show you how to build a fully automated AI outbound voice agent that is going to cold call all your leads for you"). The video instructs watchers to set up their voice agent through OpenAI. *Id.* 2:32–2:41 (". . .you can basically just prompt one together in OpenAI . . . you basically give it a prompt good enough to basically give it a personality, give it its mission, and then it can kind of handle the conversation with the client automatically"). The video later advises "[W]e're going to use OpenAI because I think it's just the easiest and the best" to power the voice agent." *Id.* 5:36–5:39. As is evident later in this video, while other tools (like Vapi and Make.com) are used for making the calls, the calls need the AI voice agent in order to be made. *Id.* 18:58–19:08 (showing need to specify ID for OpenAI-powered voice agent into Make.com platform). In sum, while the tutorial may involve other tools, OpenAI plays an essential role in a successful call by handling the conversation.

### C. OpenAI Retains Control Over What It Says on the Call Even If Given Optional High-Level Instructions.

OpenAI then references the fact that instructions and system prompts can be relayed to it that bear on "how to behave, including how to speak, what to say in a certain situation, and what to not do." (ECF 52 at 7 (quoting *Introducing GPT-RealTime Page*, *supra*; *Twilio Outgoing Calls Page*, *supra*; *Twilio Node.js Page*, *supra*; *Twilio ConversationRelay Page*, *supra*).) What OpenAI

leaves out though is that these instructions are not specific call scripts but more general guidance for how the AI should behave. An example of such a prompt on one of the cited webpages is instructive:

> You are a helpful and bubbly AI assistant who loves to chat about anything the user is interested in and is prepared to offer them facts. You have a penchant for dad jokes, owl jokes, and rickrolling – subtly. Always stay positive, but work in a joke when appropriate.

*Twilio Node.js Page*, *supra*. Accordingly, OpenAI still determines what it will say in a phone call and indeed, this autonomous ability of OpenAI is what makes it so appealing.

A closer look at what these "instructions" actually entail also shows how OpenAI maintains autonomy and thus control over what it says on a call. OpenAI cites to a webpage to claim "[t]he user has to code in instructions to control the AI's behavior during the phone call and control how the AI will sound." (ECF 52 at 7 (citing *Twilio Outgoing Calls Page*, *supra*).) The actual language from the webpage says "SYSTEM_MESSAGE is instructions we send to OpenAI, basically controlling the AI's behavior during the phone call, TEMPERATURE controls the randomness of the AI responses, while VOICE controls how the AI will sound" and cites to OpenAI's Realtime API Reference for more information. *Twilio Outgoing Calls Page*, *supra* (citing *Realtime | OpenAI API Reference*, OpenAI, https://developers.openai.com/api/reference/resources/realtime (last visited June 24, 2026) (also cited at ECF 45 ¶ 151)). On that reference page, there is no "SYSTEM_MESSAGE" but there is a parameter called "RealtimeConversationItemSystemMessage." *Realtime | OpenAI API Reference*, *supra*. OpenAI defines this parameter as:

> A system message in a Realtime conversation can be used to provide additional context or instructions to the model. This is similar but distinct from the instruction prompt provided at the start of a conversation, as system messages can be added at any point in the conversation. For major changes to the conversation's behavior, use instructions, but for smaller updates (e.g. "the user is now asking about a different topic"), use system messages.

*Id.*[4] Another parameter on this page is "instructions" which is specified as an "optional string" and OpenAI gives the following description:

> The default system instructions (i.e. system message) prepended to model calls. This field allows the client to guide the model on desired responses. The model can be instructed on response content and format, (e.g. "be extremely succinct", "act friendly", "here are examples of good responses") and on audio behavior (e.g. "talk quickly", "inject emotion into your voice", "laugh frequently"). The instructions are not guaranteed to be followed by the model, but they provide guidance to the model on the desired behavior. Note that the server sets default instructions which will be used if this field is not set and are visible in the session.created event at the start of the session.

*Id.* The clear takeaway, and reasonable inference, from the cited webpages is that while users may give OpenAI prompts and instructions, such guidance is merely high-level, "are not guaranteed to be followed by the model" and are in fact optional. Accordingly, OpenAI is still ultimately in charge of what it says on a phone call.

## LEGAL FRAMEWORK

### I. Statutory Provisions.

#### A. The Federal Telephone Consumer Protection Act, 47 U.S.C. § 227.

The TCPA contains two operative prohibitions Plaintiff invokes. Subsection 227(b) restricts the use of automated telephone equipment, including the making of calls using an artificial or prerecorded voice. The private right of action for subsection (b) violations is codified at 47 U.S.C. § 227(b)(3), which permits a person to recover the greater of actual monetary loss or "$500 in damages for each such violation," and authorizes the court, in its discretion, to treble the award to as much as $1,500 per violation where "the defendant willfully or knowingly violated" the statute or regulations.

---

[4] The "voice" parameter merely determines the actual sound of the voice the AI uses to respond. *Realtime | OpenAI API Reference*, *supra*. Again, this does not dictate what OpenAI actually says on phone calls.

Subsection 227(c), through the regulations the Federal Communications Commission ("F.C.C.") promulgated under it, protects subscriber privacy by restricting telephone solicitations to numbers on the National Do-Not-Call Registry and by requiring callers to maintain internal do-not-call procedures. Each subsection carries its own private right of action.

The private right of action for the do-not-call regulations is codified at 47 U.S.C. § 227(c)(5), which provides:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may . . . [bring an action] to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater . . . . If the court finds that the defendant willfully or knowingly violated the regulations . . . the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under [the damages provision].

The Fourth Circuit has confirmed that the § 227(c)(5) cause of action runs to any "person" who received the offending calls and "is not limited to telephone subscribers." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019).

To establish a National Do-Not-Call Registry claim, a plaintiff must "initially show two things: a number on the Do-Not-Call registry, and two calls made to that number in a year." *Krakauer*, 925 F.3d at 656. Synthesizing the statutory and regulatory text, courts articulate three elements: the plaintiff (a) received more than one telephone solicitation within a 12-month period, (b) by or on behalf of the same entity, (c) on a residential telephone number registered on the National Do-Not-Call Registry. *Camunas v. Nat'l Republican Senatorial Comm.*, 570 F. Supp. 3d 288, 297 (E.D. Pa. 2021); *see also Gonzalez v. Homefix Custom Remodeling, Corp.*, 670 F. Supp. 3d 337, 341 (E.D. Va. 2023) (the VTPPA and TCPA both incorporate the federally maintained National Do-Not-Call Registry).

The regulations relating to Section 227(c)(5) prohibit initiating "any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls." 47 C.F.R. § 64.1200(d). The minimum procedures include a written do-not-call policy available on demand, training of personnel, recording and honoring opt-out requests within a reasonable time not exceeding ten business days, identification of the caller and the entity on whose behalf the call is made, and retention of records. *Id.* § 64.1200(d)(1)–(6). Because § 64.1200(d) was promulgated under § 227(c)—the subscriber-privacy provision—rather than under the technical and procedural standards of § 227(d), violations are privately enforceable through § 227(c)(5). *Persichetti v. T-Mobile USA, Inc.*, 479 F. Supp. 3d 1333, 1339 (N.D. Ga. 2020).

Another portion of the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii); *accord* 47 C.F.R. § 64.1200(a)(1)(iii). A plaintiff must prove that "(1) the defendant called plaintiff's cellular telephone (2) using . . . an artificial or prerecorded voice (3) without the plaintiff's prior express consent." *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 297 (D. Utah 2021); *accord Coleman v. Rite Aid of Ga., Inc.*, 284 F. Supp. 3d 1343, 1345–46 (N.D. Ga. 2018). The artificial or prerecorded voice must "actually play" during the call. *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635, 641 (5th Cir. 2015). The Fourth Circuit has applied this provision to a defendant that itself placed autodialed, prerecorded calls. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 644–45 (4th Cir. 2018). Prior express consent is an affirmative defense, and for calls that constitute

telemarketing the consent must be prior express *written* consent. 47 C.F.R. § 64.1200(a)(2), (f)(8)–(9).

Section 227(b)(2) directs the F.C.C. to prescribe implementing regulations. Pursuant to that authority, 47 C.F.R. § 64.1200(b) imposes three affirmative requirements on artificial or prerecorded voice messages: (1) the message must state, at the outset, the identity of the entity responsible for initiating the call, *id.* § 64.1200(b)(1); (2) it must state that entity's telephone number, *id.* § 64.1200(b)(2); and (3) where the message constitutes telemarketing, the caller must "provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request . . . within two (2) seconds of providing the identification information," which must automatically add the number to the caller's do-not-call list and terminate the call; when left on voicemail, the message must provide a toll-free number connecting the called party to that opt-out mechanism, *id.* § 64.1200(b)(3). These requirements are enforceable through the private right of action in 47 U.S.C. § 227(b)(3).

### B. The Virginia Telephone Privacy Protection Act, VA. CODE ANN. §§ 59.1-510 to -515.

The VTPPA is Virginia's analogue to the TCPA. It regulates the conduct of a "telephone solicitor," defined as "any person who makes or initiates, or causes another person to make or initiate, a telephone solicitation on its own behalf or for its own benefit or on behalf of or for the benefit of a seller." VA. CODE ANN. § 59.1-510. A "telephone solicitation" expressly includes not only calls but also "any text message sent to any wireless telephone with a Virginia area code or to a wireless telephone registered to any natural person who is a resident of the Commonwealth" made "for the purpose of offering or advertising any property, goods, or services for sale, lease, license, or investment." *Id.*; *see Cavey v. MarketPro Homebuyers, LLC*, 542 F. Supp. 3d 418, 427 (E.D. Va. 2021).

Both the telephone solicitor and the seller on whose behalf the solicitation is made are jointly and severally liable, and any call advertising a seller's goods or services is rebuttably presumed to be made on the seller's behalf. Va. Code Ann. § 59.1-514.1(A).

Any aggrieved natural person may recover statutory damages of "$500 for a first violation, $1,000 for a second violation, and $5,000 for each subsequent violation," plus injunctive relief; upon a finding of a willful violation, the court may, in its discretion, increase the award for a first or second violation to an amount not exceeding $5,000. Va. Code Ann. § 59.1-515(A), (B). A prevailing plaintiff "may be awarded . . . reasonable attorney fees and court costs." *Id.* § 59.1-515(C).

Section 59.1-514(B) provides that "[n]o telephone solicitor shall initiate, or cause to be initiated, a telephone solicitation call to a telephone number on the National Do-Not-Call Registry maintained by the federal government." The VTPPA does not maintain a separate state registry; it incorporates the federal one. *Gonzalez*, 670 F. Supp. 3d at 341. To state a claim under this subsection, the plaintiff must show that (1) the defendant is a telephone solicitor, (2) it initiated, or caused to be initiated, a telephone solicitation (call or covered text message), and (3) the number called was listed on the National Do-Not-Call Registry. *Cavey*, 542 F. Supp. 3d at 427.

Section 59.1-514(A) prohibits initiating a telephone solicitation "to a telephone number when a person at such telephone number previously has stated that he does not wish to receive a telephone solicitation call made by or on behalf of the person on whose behalf the telephone solicitation call is being made." Section 59.1-513(A) separately requires the solicitor to transmit a telephone number that permits the recipient to make a do-not-call request—satisfied, for text solicitations, by a number that accepts a reply opt-out such as "STOP" or "UNSUBSCRIBE." To establish a § 59.1-514(A) violation, the plaintiff must show that (1) the defendant is a telephone

solicitor, (2) a person at the called number previously stated that he did not wish to receive solicitations, and (3) the defendant nonetheless initiated, or caused to be initiated, a further solicitation to that number. *Clemens v. Consumer Sol. Ctr.*, No. 1:21-cv-1002 (RDA/LRV), 2025 WL 2604494, at *10 (E.D. Va. July 14, 2025) (finding a § 59.1-514(A) violation where the defendant placed additional calls after the plaintiff's stop request, which also terminated any established-business-relationship defense), *report & recommendation adopted*, 2025 WL 2427685 (E.D. Va. Aug. 22, 2025).

Section 59.1-513(B) prohibits a telephone solicitor from "tak[ing] any intentional action to prevent the transmission of the telephone solicitor's name or telephone number" and from "engag[ing] in any conduct that results in the display of false or misleading caller identification information on the called person's telephone." The plaintiff must show that (1) the defendant is a telephone solicitor making a telephone solicitation, and (2) the defendant either took intentional action to prevent transmission of its name or number, or engaged in conduct resulting in the display of false or misleading caller-identification information. *Clemens*, 2025 WL 2604494, at *11. The use of "spoof" numbers is cognizable under the provision. *Id.*

Section 59.1-512 requires that "[a] telephone solicitor who makes a telephone solicitation call shall identify himself by his first and last names and the name of the person on whose behalf the telephone solicitation call is being made promptly upon making contact with the called person." A successful plaintiff must show that (1) the defendant is a telephone solicitor, (2) it made a telephone solicitation call, and (3) it failed promptly upon contact to identify itself by first and last name and by the name of the person on whose behalf the call was made. *Cavey*, 542 F. Supp. 3d at 427; *Clemens*, 2025 WL 2604494, at *11. Providing only a first name, or only the business name, does not satisfy the statute.

## II. The Applicable Dismissal and Pleading Standards.

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). In analyzing such a motion, the Court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in the Plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). While detailed factual allegations are not required, the Plaintiff's obligation to "provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). On a motion to dismiss, the court is to consider the "sufficiency of the complaint, not its veracity." *Ray v. Roane*, 93 F.4th 651, 654 (4th Cir.), *cert. denied*, 145 S. Ct. 164, 220 L. Ed. 2d 25 (2024). "The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset. A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim." *Robertson v. Sea Pines Real Est. Companies, Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) (emphasis in original) (quotations omitted). The Fourth Circuit has explained that "a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim across the line from conceivable to plausible." *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).

Federal Rule of Civil Procedure 8 governs pleadings. It requires that a plaintiff's complaint provide just "a short and plain statement of the claim showing that the pleader is entitled to relief."

FED. R. CIV. P. 8(a)(2). In other words, as this Court has recognized, "a plaintiff does not have to 'prove its case at the pleading stage.'" *Cellcontrol, Inc. v. Mill Mountain Cap., LLC*, No. 7:21-CV-246, 2022 WL 598752, at *2 (W.D. Va. Feb. 28, 2022) (Urbanski, J.) (quoting *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012) (superseded on other grounds)); *see also Woods v. City of Greensboro*, 855 F.3d 639, 652–53 (4th Cir. 2017) ("the question before us is not whether the defendant will ultimately prevail but whether the complaint was sufficient to cross the federal court's threshold") (cleaned up). "If a complaint is well-pleaded, it may proceed even if a judge thinks actual proof of the facts is improbable and recovery is 'remote and unlikely.'" *Cellcontrol, Inc.*, 2022 WL 598752, at *4 (quoting *In re Bill of Lading*, 681 F.3d at 1339). The Fourth Circuit has emphasized that "a complaint is to be construed liberally so as to do substantial justice." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

## ARGUMENT

### I. Plaintiff Has Plausibly Pleaded That OpenAI Made or Initiated Calls.

Throughout its brief, OpenAI seeks to weave its own counterfactual of what happened, flagrantly ignoring the well-pleaded allegations of the Amended Complaint and misreading liability under the TCPA and VTPPA.[5] The Court should not indulge such diversion. In considering, and ultimately denying, a motion to dismiss in a TCPA case, another court has provided a well-reasoned analysis on the pleading standard in such cases and the inherent challenges plaintiffs face:

> A careless application of *Twombly* and *Iqbal*, however, would transform an otherwise adequate factual assertion . . . into an insufficient conclusory

[5] As but one example, OpenAI claims "Lowrey does not claim to have ever held a live conversation involving" OpenAI. (ECF 52 at 8). Not only is a "live conversation" not prerequisite to Plaintiff's claims, but he has in fact pled such a conversation. (*See* ECF 45 ¶¶ 242, 266, 270, 273–74.)

> allegation, merely because the statute directly incorporates a factual matter into the elements of a cause of action . . . .
>
> Worse yet, taken to its logical end, Defendant's argument would essentially "disqualify," for pleading purposes, any factual matter encompassed by a cause of action, thereby heightening a plaintiff's burden to survive a motion to dismiss. (And, perversely, the more factual description or definition provided by a statute, the heavier the plaintiff's burden would become, as more and more factual detail was reduced to "mere recitation" of the statute.) This argument threatens to turn Twombly and Iqbal into a one-way ratchet, requiring plaintiffs to plead ever more specific and detailed factual allegations whenever a cause of action includes at least one matter of fact as an element. And in cases like the one at hand—in which Plaintiff, without discovery, has no meaningful access to Defendant's inner workings and operations, and thus only a limited ability to assert specific facts about Defendant's conduct—this heightened pleading standard could well render insurmountable the information asymmetries faced by plaintiffs, thereby closing the federal courts to potentially meritorious claims with an impossibly demanding pleading standard.

*Hatteberg v. Cap. One Bank (USA), N.A.*, No. SACV191425DOCKES, 2019 WL 8888087, at *3–*4 (C.D. Cal. Nov. 20, 2019) (denying in part motion to dismiss on TCPA ATDS claim and noting "[a]dvances in technology, including artificial intelligence and natural language processing," impact on pleading such claims); *see also Callier v. Freedom Forever Texas*, No. EP-23-CV-364-FM, 2024 WL 1451135, at *3 (W.D. Tex. Apr. 2, 2024) ("If anything, with today's increasingly rapid advances in technology and artificial intelligence, together with the incorporated Kixie link, such a conclusion seems premature at this stage without the benefit of discovery. And as the referring court has also explained, it is impracticable to expect plaintiffs to plead specific facts about a defendant's technology in a TCPA case before discovery.") Through its Motion to Dismiss, OpenAI improperly seeks to insert its own set of facts and disregards the federal pleading standard of plausibility, instead seeking to impose much higher evidentiary standard on Plaintiff's well-pleaded complaint. Yet OpenAI is the only party currently with the facts of how its platform actually works and "it is impracticable to expect plaintiffs to plead specific facts about a defendant's technology in a TCPA case before discovery." *See Callier*, 2024 WL 1451135, at *3.

The Federal Rules do not countenance such a one-sided analysis. At this early juncture in the case, Plaintiff has plausibly pleaded his claims against OpenAI and its motion to dismiss should be denied.

### A. Plaintiff Has Plausibly Alleged That OpenAI Made or Initiated the Calls He Received.

#### 1. OpenAI's overly narrow interpretation of "make" and "initiate" is not aligned with the TCPA or supporting caselaw.

OpenAI seeks to lead this Court into an overly constrained definition of what is covered by the TCPA, contorting the statute's words outside their plain meaning and in a way that is both inconsistent with the F.C.C.'s guidance and out of touch with current reality.[6] The Court should reject this misguided attempt. As noted by the F.C.C. and other courts, the TCPA imposes liability for those involved with either making or initiating calls. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980 ¶ 30 (2015) (the "2015 F.C.C. Order"); *Mey v. All Access Telecom, Inc.*, No. 5:19-cv-00237-JPB, 2021 WL 8892199, at *5 (N.D.W. Va. Apr. 23, 2021); *League of Women Voters of N.H. v. Kramer*, No. 24-cv-73-SM-TSM, 2025 WL 919897, at *12 (D.N.H. Mar. 26, 2025). Under both the plain meaning analysis and a totality of circumstances, OpenAI made and/or initiated the calls Plaintiff received and is thus liable under the TCPA.

##### *a. Under the plain meaning of the words, OpenAI "initiated" and "made" the calls at issue.*

[6] A main crux of OpenAI's argument presumes that there is simply one entity who places and conducts a phone call. Yet today's fully automated spam calls, as alleged in the amended complaint, occur when multiple platforms are work together and such calls are made without any human on the line. For plaintiffs in Plaintiff's situation, (likely to become ever more common given advances in technology), OpenAI's position would "mak[e] it impossible for a TCPA suit to survive a motion to dismiss—and allow[] [telephone spammers] to violate the TCPA with utter impunity." *See Hatteberg*, 2019 WL 8888087, at *3.

Start with the Plaintiff's well-pleaded facts. He received four calls containing nearly identical messages to one another. (ECF 45 ¶¶ 233, 237, 239, 242, 243, 268.) Each of these calls involved an artificial or pre-recorded voice. (*Id.*) While the voice provided a name, no actual person was on the call. (ECF 45 ¶¶ 243, 266.) On one of the calls, when Plaintiff picked up, he first heard a voice and then a message played that directed him to a page on OpenAI's website.[7] (ECF 45 ¶ 242, 269.) Plaintiff was also directed to the same page on OpenAI's website when he called the phone number back. (ECF 45 ¶ 237.) On these allegations, taken as true, it is reasonable to infer that these four calls were made by the same entity. *See Julian v. Kirkendall Dwyer II, LLP*, No. 2:25-CV-02510-HLT-GEB, 2026 WL 696528, at *3 (D. Kan. Mar. 12, 2026) (noting that calls "all followed a similar format" and that there were "sufficient facts to make it plausible that . . . [the] calls . . . were made by or on behalf of [defendant]."). The OpenAI webpage that Plaintiff was directed to explained that the error code he heard is intended for OpenAI customers who have reached their monthly usage limit or consumed all their credits. (ECF 45 ¶ 240; *see also Error Codes*, OpenAI, https://platform.openai.com/docs/guides/error-codes/api-errors (last visited June 12, 2026).) OpenAI further elaborates this can be due to "several reasons," such as:

- You are using a high-volume or complex service that consumes a lot of credits or tokens.
- Your monthly budget is set too low for your organization's usage.
- Your monthly budget is set too low for your project's usage."

*Error Codes*, *supra*. The reasonable inference here is that there was an OpenAI account used to make these calls and then such account for one of "several reasons" hit the quota limit.[8]

---

[7] Contrary to Defendant's mischaracterization, this call was a "live conversation." (*See* ECF 52 at 8 ("Lowrey does not claim to have ever held a live conversation involving the Realtime API or any other OpenAI service").) Plaintiff answered his phone and heard a voice talking, this is what a live conversation is. (*See* ECF 45 ¶ 269.)

[8] OpenAI seeks to twist this error code to say Fresh Start "could not use," "could not access," or was "unable to use" "OpenAI's services." (*See* ECF 52 at 8, 22, 23, 35.) This contradicts Plaintiff's well-pleaded facts, as the reasonable inference is that Plaintiff would only have only heard

OpenAI, FSG, and Twilio were all involved in the making of these calls, as one call mentioned FSG and the calls came from a phone number associated with Twilio. (ECF 45 ¶¶ 239, 254, 264.) Yet, Twilio lacks the ability to have a conversation with a call recipient on its own. (ECF 45 ¶¶ 145–48, 267.) And there was not any actual person from FSG on any of these calls (ECF 45 ¶ 271.) In fact, there's no "Nadine" or "Emma" who worked for FSG during the time these calls were made. (ECF 45 ¶¶ 248, 266; *see also* FSG Aff. ¶ 7, ECF No. 56-1.) This leaves OpenAI as the only source of these voices, which is the reasonable inference to be drawn here. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 588 (7th Cir. 2021) (noting allegations of minute details of the parties' business relationship are not required to allege a plausible agency claim" and reversing district court's granting of 12(b)(6) motion on TCPA claim). The Fourth Circuit has been clear that Plaintiff need only provide so much detail, and he is not expected to plead facts that are simply not in his control at the pleading stage. S*ee Hall*, 846 F.3d at 765, 771 (reversing motion to dismiss on claim involving joint employer liability and noting "at the pleading stage, . . . plaintiffs have had no opportunity for discovery" to certain relevant information and are "not required to . . .

---

OpenAI's error message if its services were in fact being used. One plausible explanation for the error code is that the actual interaction with a live person could be a more akin to a "high-volume or complex service that consumes a lot of credits or tokens" than simply starting a call, thus one could hit a limit performing the former while not hitting the limit for the latter. Another plausible explanation is that FSG had sufficient tokens at the time the calls were made, which were then consumed by the time the error message was encountered. What actually happened with FSG's OpenAI account is a matter for discovery and is not ripe for deciding a motion to dismiss, where all facts are taken as true and reasonable inferences are to be drawn in Plaintiff's favor. *See Deegan v. Moore*, No. 7:16-cv-00260, 2017 WL 1194718, at *6 (W.D. Va. Mar. 30, 2017) ("Defendants simply ask the court to accept their version of events, which the court may not do at this stage."); *see also Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. CV PWG-17-1791, 2020 WL 5946574, at *3 (D. Md. Oct. 7, 2020) ("[T]he time to sort out the conflicting evidentiary facts that [defendant] raises is not on a motion to dismiss, but after discovery has taken place and the competing facts can be evaluated to determine if there is a genuine issue of material fact."); *Council for Opportunity in Educ., v. U.S. Dep't of Educ.*, No. 25-cv-03491 (TSC), 2026 WL 1480903, at *4 (D.D.C. May 27, 2026) ("Defendant's counterfactual is insufficient grounds to dismiss [plaintiff]'s . . . claim").

describe in detail the employer's corporate structure" and the district court had "misapplied the plausibility standard set forth in *Twombly* and *Iqbal* by subjecting Plaintiffs to evidentiary burdens inapplicable at the pleading stage"); *Robertson*, 679 F.3d at 291 (affirming denial of motion to dismiss and ruling "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset. A complaint need not make a case against a defendant or forecast evidence sufficient to prove an element of the claim. It need only allege facts sufficient to state elements of the claim.").

Indeed, OpenAI even admits in its briefing that it can "have conversations." (ECF 52 at 2; *see also* ECF 45 ¶¶ 132, 137; *Realtime conversations*, OpenAI Developers, https://developers.openai.com/api/docs/guides/realtime-conversations#voiceactivity-detection (last visited June 12, 2026) ("Realtime sessions have voice activity detection (VAD) enabled, which means the API will determine when the user has started or stopped speaking and respond automatically").) Further, there are multiple demonstrations of OpenAI being used to make phone calls. (*See* ECF 45 ¶¶ 87–96, 133–37.) In fact, at OpenAI's own conference, developers demonstrated how to use OpenAI to place a call without any human involved on the call for the caller.[9] (ECF 45 ¶¶ 87–96.)

OpenAI fits cleanly within the plain meaning of who initiated and made these calls.[10] *See Harrison v. Humana, Inc.*, No. 3:24-cv-00262-GNS, 2024 WL 4828737, at *5 (W.D. Ky. Nov. 19, 2024) (finding defendant "directly initiated" calls that "began with prerecorded voice and then

---

[9] Defendant's attempt to mischaracterize this demonstration as a "red herring" is addressed further below.

[10] Tellingly, in describing calls made on its platform with OpenAI, Twilio even refers to such calls as the "call is *made* by AI." (ECF 45 ¶ 72 (citing *How to Make Outgoing Calls with Twilio Voice, the OpenAI Realtime API, and Python*, *supra*).)

transferred to a person who identified . . . with [defendant]"). OpenAI was the only party "speaking" on these calls (aside from Plaintiff in the one call he answered); an "ordinary speaker" would treat such a person as the one who made or initiated the call.[11] (*See* ECF 52 at 11; *Bondi v. VanDerStok*, 604 U.S. 458, 471 (2025).)

Another of Defendant's cited cases also shows how OpenAI made these calls. *See Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1126 (9th Cir. 2026) (finding to "make" and "initiate" equate to "*begin* a call") (emphasis in the original). The *Howard* court then further elaborated:

> The line drawn by this plain-language reading also coheres with the declared purpose of the statute, which is to prevent the intrusion upon seclusion associated with answering a "call" only to be subjected to the nuisance of hearing an artificial or prerecorded voice rather than the voice of a live person. A call that is begun with an artificial or prerecorded voice directly implicates that privacy interest, because the person called, upon being reached, is immediately and involuntarily subjected to the nuisance of listening to an artificial or prerecorded voice. Likewise, a voicemail message that consists of a prerecorded robocall, rather than a recording of a live speaker contemporaneously leaving a message, intrudes on the recipient's privacy as soon as he or she plays back the message and is subjected to listening to an entirely prerecorded voicemail message.

*Id.* Here, the calls *began* with OpenAI's voice; neither FSG nor Twilio were on these calls. As pointed out in *Howard*, Plaintiff suffered the nuisance and invasion of his privacy by voicemails left on his own phone by OpenAI, similar to when he answered his phone only to be confronted with the artificial voice from OpenAI.

---

[11] OpenAI's reliance on *Krakauer.* is misplaced as it cobbles together different phrases of the opinion. *See* 925 F.3d at 659. The full portion of the opinion states "By its plain language, the TCPA's private right of action contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly." *Id.* This opinion merely states one of the ways in which a company may be found liable under the TCPA, not the only way as OpenAI appears to insinuate. Indeed, this opinion does not address the fact that "make" or "initiate" are undefined terms in the TCPA and does not engage in statutory interpretation of these terms.

This Court should refuse at this juncture, prior to any discovery, OpenAI's attempt to delve into the fact-intensive inquiry of technical details regarding how these calls were made.[12] *See Hatteberg*, 2019 WL 8888087, at *3; *Callier,* 2024 WL 1451135, at *3. The Fourth Circuit has repeatedly rejected such fact-finding, particularly as here when the plaintiff does not have access to all the facts. *See Robertson*, 679 F.3d at 291, *Hall*, 846 F.3d at 765, 771. In fact, OpenAI's position would lead to absurd results. Given OpenAI's capabilities, telemarketing spam calls can be made without the involvement of any person on the actual call. (*See* ECF 45 ¶¶ 134–35.) If plaintiffs were required to plead detailed allegations regarding the inner workings of such calls, many consumers would be shut out of the courts as call recipients have no idea regarding the technical details of what steps are made in such a call. *See Hatteberg*, 2019 WL 8888087, at *3. Rather the specific technical roles that various actors played in how these calls were made is an issue for discovery, not grounds for a motion to dismiss. *See Harrison*, 2024 WL 4828737, at *5 (denying motion to dismiss and finding direct liability adequately pleaded where call involved a transfer from a prerecorded voice to a person).

*b. Plaintiff has plausibly pleaded OpenAI's direct connection to the calls he received.*

Given these terms are not defined in the statute or implementing regulations, the F.C.C. has provided well-reasoned guidance on who is considered to "initiate" or "make" covered TCPA communications: "a direct connection between a person or entity and the making of the call" which includes "taking the steps necessary to physically place a telephone call. It also can include being so involved in the placing of a specific telephone call to be deemed to have initiated it." 2015

[12] Plaintiff disputes OpenAI's repeated mischaracterizations of material cited in the Amended Complaint. He addresses those mischaracterizations in his Statement of Facts above.

F.C.C. Order, 30 FCC Rcd. at 7980 ¶ 30; *Kramer*, 2025 WL 919897, at *12.[13] Such analysis looks at the totality of the circumstances when considering who has made or initiated a call. 2015 F.C.C. Order, 30 FCC Rcd. at 7980 ¶ 30; *Mey*, 2021 WL 8892199, at *5. Courts have continued to cite to this analysis even amidst their duty to exercise independent judgment in statutory analysis post-*Loper Bright*. *See Novia v. Mobiz, Inc.*, No. 25-cv-11036-AK, 2026 WL 752181, at *3 (D. Mass. Mar. 17, 2026); *Dobronski v. Tobias & Assocs., Inc.*, 769 F. Supp. 3d 681, 698 (E.D. Mich. 2025) (noting Sixth Circuit's use of F.C.C.'s "totality of circumstances" test when determining TCPA liability for platform providers), *Off. of Att'y Gen. v. Smartbiz Telecom LLC*, No. 22-23945-CIV, 2024 WL 4251895, at *5 (S.D. Fla. Sept. 19, 2024); *Kramer,* 2025 WL 919897, at *12. This framework has become even more important given rapidly changing technology on the telemarketing space, as the advent of AI has added ambiguity to the idea of who "makes" or "initiates" calls. *See Alvarez Ronquillo v. Bondi*, 151 F.4th 522, 526 (4th Cir. 2025) (noting a "plain meaning" statutory analysis is appropriate in "absen[ce] of ambiguity"); 2015 F.C.C. Order, 30 FCC Rcd. at 7980 ¶ 29 ("In issuing the guidance that we provide today, we account for changes in calling technology.").

Courts have thus articulated a number of factors to consider under this totality of the circumstances analysis to determine who should be deemed to have initiated a call:

(1) The extent to which the defendant controls the call's message;

(2) The extent to which the defendant controls the timing or initiation of the call;

(3) The extent to which the defendant controls who receives the call;

(4) Whether the service is "reactive in nature," meaning that it places calls in a manner that is arranged by the customer rather than the defendant;

[13] OpenAI cites to this order in section I.A.1.b of its brief but neglects to state the actual totality of the circumstances that the F.C.C. articulated in considering whether a platform can be liable under the TCPA. (ECF 52 at 18–19.)

> (5) The extent to which the defendant "willfully enables fraudulent spoofing of telephone numbers" by offering that functionality to clients;
>
> (6) The extent to which the defendant "assists telemarketers in blocking Caller ID" by offering that functionality to clients; and
>
> (7) Whether a defendant "who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes."

*Mey*, 2021 WL 8892199, at *4. Here, a number of factors favor finding that OpenAI was so directly involved that it should be considered to have made the calls in question.[14] Chief among these factors is OpenAI's permissiveness in allowing unlawful use on its platform.

*i. OpenAI's knowledge of unlawful use on its platform and permissiveness to TCPA violations.*

OpenAI is fully aware that "bad actors" seek to use its platform for unlawful means. (ECF 45 ¶¶ 107-09.) Indeed, the company has implemented a wide-ranging array of tools to prevent unlawful conduct, but only of certain sorts of conduct. (*See* ECF 45 ¶ 109 ("Our moderation system is trained to detect a broad set of categories of undesired content, including sexual content, hateful content, violence, self-harm, and harassment.").) It maintains usage logs to monitor for abuse. (ECF 45 ¶¶ 112–13.) Such logs contain details of the unlawful calls that Plaintiff received. (ECF 45 ¶ 114.) It "leverages automated and human review to monitor for potential abuse and take

[14] While these factors have traditionally been applied to traditional calling platforms, OpenAI has presented yet another "change[] in calling technology" since the F.C.C.'s 2015 ruling and such factors are applicable here too. *See* 2015 F.C.C. Order, 30 FCC Rcd. at 7980 ¶ 29; *see also In the Matter of Implications of A.I. Techs. on Protecting Consumers from Unwanted Robocalls & Robotexts*, 39 FCC Rcd. 1783 (2024) (affirming "calls that use" "current AI technologies that generate human voice" "fall under the TCPA and the . . . implementing rules"). Further, OpenAI's own marketed capabilities illustrate that it represents a new technological evolution on what should be considered a calling platform. (*See* ECF 45 ¶¶ 137 (describing "voice activity detection . . which means the API will determine when the user has started or stopped speaking and respond automatically"), 138 (marketing OpenAI RealTime API as "now supports . . . phone calling"), 151 (specific commands within RealTime API for handling phone calls, such as "hang up"); *see also Realtime | OpenAI API Reference*, *supra* (describing RealTime parameter as "useful for situations . . . such as a phone call").)

appropriate action." (ECF 45 ¶ 115.) It "deploy[s] monitoring and enforcement technology to detect and prevent bad actors from attempting to use our tools" in certain contexts, such as child sex abuse. (ECF 45 ¶ 126.) It has "developed its own internal reasoning models to determine when usage violates its policy." (ECF 45 ¶ 116.) It "invests in technology and teams to identify sophisticated threat actors' activities," which includes multiple teams such as "Intelligence and Investigations, Safety, Security, and Integrity." (ECF 45 ¶ 128.) It blocks users from accessing its platform when it detects suspicious or illicit activity. (ECF 45 ¶ 130.)

And yet OpenAI fails to implement any of the aforementioned safeguards to prevent its platform from being used for illegal spam calls. (*See* ECF 45 ¶¶ 117, 127, 129, 131.) Indeed, OpenAI has the ability, and does, to implement specific and targeted system rules to prevent certain content from being created on its platform. (ECF 45 ¶¶ 120-22 (giving example of rule that prohibits AI model from providing precise recipe for synthesizing methamphetamines), 124.) While OpenAI has the ability to create such a rule to prohibit its model from making spam telemarketing calls, it has chosen not to create any such rules. (ECF 45 ¶¶ 123, 125.)

OpenAI has failed to block such unlawful conduct despite clear knowledge that such conduct is occurring. OpenAI's own website at one point included on how to use OpenAI to make such spam telemarketing calls. (ECF 45 ¶¶ 133–34.) At OpenAI's own conference, there was a demonstration showing OpenAI's ability to make outbound calls.[15] (ECF 45 ¶¶ 87–96.) There are public online video tutorials showing how to make telemarketing spam calls using OpenAI and at least one of these videos has over 60,000 views. (ECF 45 ¶ 135–36.) There are other online tutorials as well showing how to use OpenAI to make outbound calls. (*See* ECF 45 ¶¶ 139, 142, 144, 146.)

---

[15] Plaintiff addresses OpenAI's contentions regarding this demonstration in a subsequent section in this brief.

Despite OpenAI's clear notice of bad actors trying to use its platform and numerous examples of telemarketer spammers demonstrating how to use OpenAI, Defendant still provides its users ways to avoid scrutiny. For example, OpenAI allows its customers to pay more money to be excluded from its abuse monitoring. (ECF 45 ¶ 118.) It also directs its developers that it is up to them whether or not to use OpenAI's moderation features. (ECF 45 ¶ 110.) OpenAI's decision to put profits over safety has led to a wave of departures amongst its safety team. (ECF 45 ¶¶ 102–05.)

Plaintiff has thus pleaded detailed allegations showing OpenAI's knowledge of unlawful conduct on its platform and failure to take appropriate steps to stop unlawful telemarketing calls. Plaintiff has thus plausibly pleaded facts for his TCPA claim against OpenAI and its motion to dismiss should be denied.

Another of OpenAI's cited case also supports Plaintiff's claims. *See Hurley v. Messer,* 2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018). While the court dismissed the one defendant who merely provided voice actors who then read prepared scripts for prerecorded messages, the court refused to dismiss claims against the two calling platform defendants. *Id.* at *3, *4. Despite these defendants claiming they "were just a conduit," the court found that the plaintiff had plausibly pleaded his claim in part because they "knowingly allowed its client(s) to use that platform for unlawful purpose." *Id.* at *4; *see also Off. of the Att'y Gen. v. Smartbiz Telecom LLC*, 688 F. Supp. 3d 1230, 1237 (S.D. Fla. 2023) (denying motion to dismiss TCPA claim against calling platform where it had notice of fraudulent calls and refused to implement checks to prevent such calls).

*ii. OpenAI is in control of the call's content and not "reactive in nature."*

As detailed above, OpenAI determines what to say on a call. This has been demonstrated both through the demonstration at OpenAI's conference as well as online tutorial videos. (*See* ECF

45 ¶¶ 87–98, 133–35.) Once these calls start, there is no human involvement. This behavior comports with how OpenAI describes its platform: "use[s] chain-of-thought (CoT) reasoning," "interacts in a conversation way," "enable reasoning capable of problem-solving and planning, surpassing merely responding to text," and "capable of doing work for you independently." (ECF 45 ¶¶ 75, 78, 81.) Accordingly, OpenAI does not simply react to what its user says, rather it operates in real-time and makes its own determinations of what to say on a call. As OpenAI controls what it says on call, both factors of content control and reactive nature also demonstrate OpenAI's high involvement in the call.

*iii. OpenAI is in control of the timing of content on a call.*

Related to its influence over the content of the call, OpenAI also controls the timing of how it responds on a call. This is shown through OpenAI's voice activity detection (VAD) feature, which allows it to "determine when the [call recipient] has started or stopped speaking and respond automatically." (ECF 45 ¶ 137.) As OpenAI is able to determine on its own the timing of its responses, this factor also shows OpenAI's high degree of involvement on calls.

**2. The structure and purpose of TCPA regulatory scheme covers OpenAI's conduct.**

The TCPA's purpose is to combat the "proliferation of intrusive, nuisance telemarketing calls to [consumers'] homes" which are "rightly regarded by recipients as an invasion of privacy." *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). OpenAI's platform, which it markets as "now support[ing] . . . phone calls" and even demonstrates such capabilities, supercharges the proliferation of these nuisance calls. (*See* ECF 45 ¶¶ 87–96, 137–38.) Indeed, online videos demonstrating how to make such spam calls using OpenAI have racked up tens of thousands of views. (*See* ECF 45 ¶¶ 135–36.) Against this backdrop, OpenAI decries any responsibility on its part, raising arguments on grounds as far afield as proximate causation and

constitutionality. (*See* ECF 52 at 17.) Contrary to OpenAI's assertion, Plaintiff's claims do not "hold OpenAI liable for decision completely outside of its control," as OpenAI purposefully has developed and marketed its platform to be used in making autonomous calls and as detailed above, OpenAI has failed to put in place the necessary safeguards despite clearly having the capabilities to do so. (*See* ECF 52 at 17.)

OpenAI then raises the specter of a parade-of-horribles if it is found liable, seeking to downplay its revolutionary capabilities as nothing more than a "general-purpose service." (*See* ECF 52 at 18.) OpenAI's protests are unavailing for the simple reason that it is nothing like the "general-purpose service" examples it gives, such as "word-processing software," "spreadsheet programs," and "computers and smartphones." (ECF 52 at 18.) As Plaintiff has pleaded, OpenAI's platform "use[s] chain-of-thought (CoT) reasoning" and it has marketed the platform as "soon you will be able to have helpful assistants that talk to you . . . . Later you can have something that goes off and does tasks for you." (ECF 45 ¶¶ 75–77.) It boasts its "model which interacts in a conversational way." (ECF 45 ¶ 78.) OpenAI continues to "extend the capabilities of conversational models and enable reasoning capable of problem-solving and planning, surpassing merely responding to text." (ECF 45 ¶ 81.) It further claims that its platform "will streamline tasks for users and bring the benefits of agents to companies that . . . desire higher rates of conversion" and that its "agents . . . are AIs capable of doing work for you independently—you give it a task and it will execute it." (ECF 45 ¶¶ 83, 85.) As detailed above, not only does OpenAI market its platform as supporting phone calls, it has even hosted a demonstration of this at its conference. OpenAI even admits in its briefing that its platform "can have 'conversations' by generating text or audio content" and that it "can be—and is—used for . . . . phone calls." (ECF 52 at 2, 27.) These impressive capabilities set OpenAI's platform worlds apart from word processors and

spreadsheets, which are not "capable of problem-solving and planning" and certainly cannot hold a conversation. Yet while OpenAI's capabilities are formidable, it has taken a disturbingly lackadaisical approach to appropriate guardrails, resulting in resignations from its safety team, lawsuits from harmed users, and the unlawful calls that Plaintiff received here.[16] (*See* ECF 45 ¶¶ 100–06, 111.)

OpenAI's cited caselaw does not provide any compelling support for its argument. In its slew of cited cases, nearly all do not even make mention of the TCPA and are thus readily distinguishable.[17] Out of the two cases that do involve the TCPA, one is distinguishable as it focused on whether smartphones automatically qualify as automatic telephone dialing systems. *See ACA Int'l v. FCC*, 885 F.3d 687, 697–98 (D.C. Cir. 2018). As the court reasoned in that case, such a reading of the TCPA would lead to "every smartphone user violates federal law whenever she makes a call or sends a text without advance consent" and noting "nothing in the TCPA countenances concluding that Congress could have contemplated" such expansive breadth. *Id.* 697,

---

[16] In addition to the lawsuits cited in the amended complaint, OpenAI is now facing a lawsuit based on allegations of unauthorized practice of law. *See* Complaint, *Nippon Life Ins. Am. v. OpenAI Foundation et al.,* No. 1:26-cv-02448 (N.D. Ill. Mar. 4, 2026).

[17] *See Santos-Zacaria v. Garland*, 598 U.S. 411, 413–14 (2023) (involving exhaustion requirements for non-citizen to judicially challenge removal order); *United States v. Miller*, 604 U.S. 518, 522 (2025) (involving scope of federal government's sovereign immunity waiver in regard to bankruptcy trustee's avoidance powers); *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 194 (2017) (determining who is considered an "aggrieved person" under Fair Housing Act and what is required to establish proximate cause under FHA); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 124 (2014) (deciding appropriate analytical framework for determining party's standing to maintain an action for false advertising under the Lanham Act); *Duell v. Heidenrich*, 39 F.3d 1176, 1994 WL 609464 at *1 (4th Cir. 1994) (unpublished) (involving collusion in post-judgement settlement that nullified creditor's ability to sue limited partner in dissolved partnership); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 478 (2023) (involving question of civil liability for social media companies arising from posts from terrorist organizations); *Van Buren v. United States*, 593 U.S. 374, 378 (2021) (involving scope of Computer Fraud and Abuse Act in context of former police offer who improperly ran license plate search); *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944) (involving question of whether waiting time can be considered working time under the Fair Labor Standards Act).

699. Here, Plaintiff's claims would not have anywhere near this effect. Rather, his claims focus on TCPA liability for a single AI-company that has marketed its platform as capable of making calls, which it in fact did to Plaintiff. There simply are not the same concerns regarding regulatory overreach that would impact most Americans as what was present in *ACA International*. And as described above, Defendant's last case actually supports Plaintiff's claims against OpenAI. *See Hurley*, 2018 WL 4854082, at *4.

**3. The OpenAI demo is indicative of OpenAI's capabilities.**

OpenAI unconvincingly seeks to distance itself from a demo of its platform making a call. (*See* ECF 52 at 20; ECF 45 ¶¶ 87–96.) While OpenAI admonishes Plaintiff for not "watch[ing] closely" the video of the demo, it is OpenAI's flimsy defenses that do not withstand scrutiny. (*See* ECF 52 at 20.)

OpenAI first seeks to mince words by labeling the demonstration as a "technical demonstration with actors—not a real-world use of the Realtime API." (ECF 52 at 20.) Plaintiff is clear in his Amended Complaint that this was a demonstration, yet it showed OpenAI's capabilities to make a phone call and have a conversation with a human on the on the other line. (ECF 45 ¶¶ 91–93.) Various commentators who have seen this video describe it as "OpenAI Realtime API makes a call," "[t]he new Realtime API from OpenAI uses AI voice to call store," "very cool video . . . of the new Realtime API placing an order" and "Realtime API demo showed off an agent that autonomously called . . . and had a conversation with a human." (ECF 45 ¶¶ 89, 95.) This demonstration is a clear example of OpenAI's capabilities to make phone calls, and Plaintiff has framed it as such in the Amended Complaint.

OpenAI then tries to hide behind the fact that other tools were involved in the demonstration, yet this flies in the face of how commentators have opined on the demo. (*Contrast*

ECF 52 at 20–22 *with* ECF 45 ¶¶ 89, 95.) The cited commentary in the Amended Complaint was not that some "unreleased demo[] application called 'Wanderlust'" made calls or that Twilio made calls, it is that OpenAI and its Realtime API made the calls. While other tools were present, the fact remains that it was OpenAI who conducted the call and "determin[ed] what words to say in the conversation." (ECF 45 ¶ 94.) That was what made this demonstration so noteworthy; that OpenAI had created something that could make autonomous calls without human intervention.

**B. Plaintiff Has More Than Plausibly Pleaded OpenAI Made and/or Initiated the At-Issue Calls.**

OpenAI next argues that Plaintiff's pleading implicating multiple defendants somehow "is a textbook failure to state a claim." (ECF 52 at 21.) While OpenAI seeks to focus on Plaintiff's allegations concerning Twilio's and FSG's involvement in the calls, (*see, e.g.*, ECF 52 at 1, 5, 20, 24,) its specious argument conveniently glosses over the fact that only Defendants know the specific, granular details of each of their involvement in the calls. At this early pleading stage, Plaintiff is not required to plead such detail since he has not had an opportunity to conduct discovery on each Defendant's role. *See Hatteberg*, 2019 WL 8888087, at *3 ("And in cases like the one at hand—in which Plaintiff, without discovery, has no meaningful access to Defendant's inner workings and operations, and thus only a limited ability to assert specific facts about Defendant's conduct—this heightened pleading standard could well render insurmountable the information asymmetries faced by plaintiffs, thereby closing the federal courts to potentially meritorious claims with an impossibly demanding pleading standard"); *Hall,* 846 F.3d at 771 (reversing dismissal and noting "plaintiffs have had no opportunity for discovery" to gather information regarding joint employer theory). The specifics of how each entity operated in these calls is only known to Defendants and will come out in discovery. Similar to the plaintiffs in *Hall*, Plaintiff should not be penalized for information that he has no access to right now. Rather,

Plaintiff has plausibly pleaded his claims against OpenAI by pleading he received calls in which no human was involved and the calls directed him to and implicated OpenAI. (ECF 45 ¶¶ 266, 269–71.)

The Court should not entertain OpenAI's counterfactual that somehow FSG "could not have used OpenAI's services for *any* purpose, much less to 'make' the alleged calls" based on speculation that "Fresh Start had not paid its bill to use OpenAI's services." (ECF 52 at 23, 24.) Plaintiff has clearly pleaded that the only entities he is aware of in making these calls were FSG, Twilio, and OpenAI, that FSG was not actually on the call, and that Twilio lacks the capability to hold a conversation on a call. Yet, there was still an artificial voice on these calls which left the voicemails on Plaintiff's phone as well as what he heard when he answered one of the calls. The clear implication and reasonable inference are that this voice came from OpenAI. This inference is further underscored by the fact that on the call Plaintiff answered, he was directed to OpenAI's website, as well as when he called the number back after receiving one of the offending voicemails. Yet there are no facts before the Court that FSG failed to pay its bill and thus was barred from using OpenAI's services and the Court should reject OpenAI's counterfactual claiming such. *See Council for Opportunity in Educ.*, 2026 WL 1480903, at *4 ("Defendant's counterfactual is insufficient grounds to [plaintiff]'s . . . claim"). While the error message Plaintiff heard would indicate that FSG had hit some sort of limit, this limit was apparently reached by the time Plaintiff interacted on the call, not necessarily before. Another equally plausible explanation is that the response to Plaintiff was more credit-intensive than the initial message OpenAI made, and this more credit-intensive request is what exceeded FSG's credit limit. *See Managing costs | OpenAI API*, OpenAI, https://developers.openai.com/api/docs/guides/realtime-costs (last visited June 18, 2026) (describing how later responses in conversation "will be more expensive").

Another plausible explanation was that FSG had sufficient credits when OpenAI initially made the call but then ran out of credits during the call. *Id.* ("Realtime API costs are accrued when a Response is created, and is charged based on the numbers of input and output tokens."). There may be other reasons why this error code was given. However, the clear implication of Plaintiff's well-pleaded facts is that OpenAI was responsible for making the audio in these calls. The federal pleading standard does not require Plaintiff to specify the innerworkings of OpenAI's billing relationship with FSG at this stage, rather he simply needs to plead plausible facts. *See Hatteberg*, 2019 WL 8888087, at *3; *Robertson*, 679 F.3d at 291. What is not plausible is that OpenAI was in no way involved in the offending calls yet Plaintiff was twice directed to its website through messages connected to these calls.[18]

This is not a case where simply the "caller identified himself as associated with" OpenAI. (*See* ECF 52 at 23.) As explained above, there was no actual human on these calls. FSG was not on the call. Twilio cannot speak on calls. Plaintiff was directed from these calls to OpenAI's website. Thus, Open AI was who left messages and conversed on the call with Plaintiff, and is thus liable under the TCPA. Defendant's cited cases do not call for any different result.

OpenAI next claims that "there is no allegation that OpenAI chose to generate audio *on calls* to Plaintiff." (ECF 52 at 23–24.) Yet, Plaintiff has specifically pleaded this: "OpenAI determines the content in the call, such as determining what to say in the voicemail messages as well as when Plaintiff answers his phone" and that "[t]hese calls could not have been made without OpenAI's involvement" as there "would only be mere silence." (ECF 45 ¶¶ 273–74.) Plaintiff has also provided detailed allegations showing why it could be only OpenAI, and none of the other

---

[18] OpenAI's reference to various cases for the assertion that it was merely "associated" with the calls does not save its argument. (ECF 52 at 23.)

defendants, who created the voice that Plaintiff heard. (*See* ECF 45 ¶¶ 145–47, 248, 267, 274, 270–71.) And of course "OpenAI made the choice to use that content" in the calls that Plaintiff received, OpenAI's contention otherwise is nonsensical. (*See* ECF 52 at 24.) Indeed, OpenAI itself explains it "will determine when the [called recipient] has started or stopped speaking and respond automatically." (ECF 45 ¶ 137.) OpenAI has developed its platform and markets it in a way for it to be used for phone calls. As part of this, OpenAI chooses what to say when someone answers a call, just like Plaintiff, just like the demonstration and OpenAI's conference, and just like the myriad of online demonstrations showing how to make such calls using OpenAI.[19] (*See* ECF 45 ¶¶ 87–96, 134–36, 273–74.)

OpenAI then further mischaracterizes the Amended Complaint, claiming that Twilio's involvement in the calls somehow signify OpenAI is not responsible. (ECF 52 at 24.) However, Plaintiff has plausibly pleaded that Twilio and OpenAI were jointly involved and responsible for the making of the calls to his phone. (*See* ECF 45 ¶¶ 264–67, 270, 273–74.) Plaintiff's claim is not that "OpenAI placed the call," indeed Plaintiff does not have information on who actually dialed his phone number. (ECF 52 at 24; ECF 45 ¶ 272.) OpenAI's attempt to artificially narrow Plaintiff's claim to such both misstates the allegations in the Amended Complaint and misunderstands liability under the TCPA.[20] Plaintiff has pleaded detailed allegations establishing

[19] OpenAI's insinuates that there is some unknown third-party who somehow controls these calls but has not even identified such an entity. (*See* ECF 52 at 14, 28 (mentioning "third-party developer").) Such speculation should not be entertained on a motion to dismiss and runs contrary to Plaintiff's well-pleaded facts. *See Deegan*, 2017 WL 1194718, at *6; *Council for Opportunity in Educ.*, 2026 WL 1480903, at *4. Whether or not another entity was involved is a matter for discovery, during which OpenAI can produce evidence regarding the level of involvement and role of such supposed third-parties in the calls Plaintiff received.

[20] OpenAI's misunderstanding of the TCPA is further underscored by its commentary regarding "legal robocalls" and "telemarketing calls are lawful as a general matter." (ECF 52 at 29.) It is not legal to make such calls to someone on the do-not-call list nor make calls involving an artificial voice *unless and until* the recipient provides consent for such calls. 47 U.S.C. §

OpenAI's direct involvement in the initiation and making of the calls he received; Twilio's joint involvement does not change this analysis.

OpenAI is also wrong to claim there was "no interaction" on the calls Plaintiff received. (*See* ECF 52 at 24.) An interaction took place when OpenAI left voicemail messages on Plaintiff's phone: the call was connected to his phone, his voicemail recording played, and then the message was left on his phone.[21] This is how voicemail messages work: a call is rerouted to the voicemail recording and then the caller is prompted to leave a voicemail message. And courts have been clear that voicemail messages are covered under the TCPA. *See Beard v. John Hiester Chevrolet, LLC*, 640 F. Supp. 3d 420, 425 (E.D.N.C. 2022); *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1126 (9th Cir. 2026). Another clear interaction occurred when Plaintiff actually answered one of the calls, heard a voice, then tried to speak to someone, and was then directed to OpenAI's website. (*See* ECF 45 ¶¶ 242, 269.)

Defendant's cited TCPA cases are readily distinguishable from the case at hand as they contain much sparser allegations than what Plaintiff has pleaded and thus do not warrant dismissal of his claims.[22] In *Melito v. American Eagle Outfitters, Inc*., the court dismissed claims against Experian who was alleged to have simply "caused texts to be sent on behalf of" another defendant

---

227(b)(1)(A)(iii),(c)(5); 47 C.F.R. § 64.1200(a)(1)(iii),(c)(2). Indeed, this forms the basis for much of Plaintiff's claims in this suit.

[21] While Plaintiff has not specifically pleaded the technical details of how his voicemail plays, this is a reasonable inference to be made in his favor. Plaintiff is also prepared to amend his Complaint to incorporate such facts as well.

[22] OpenAI cites to other cases that do not mention the TCPA and thus carry little weight in this analysis. *See MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 98–99 (4th Cir. 2025), *cert. denied sub nom.*, 146 S. Ct. 821 (2025) (involving claims regarding price fixing in violation of RICO and state laws); *Godon v. N.C. Crime Control*, 141 F.3d 1158, 1998 WL 193109, at *1 (4th Cir. 1998) (per curiam) (involving discrimination claims based on wrongful discharge); *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 141–42 (4th Cir. 2018) (involving defamation suit against employer for statements made by co-worker).

and plaintiff actually indicated there was another entity who operated the texting platform. *See* No. 14-cv-02440 (VEC), 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015). In another case, the court initially dismissed claims against a defendant where the only allegations connecting the defendant to the call were the caller offered to sell products of defendant and unsubstantiated allegation that one of the callers was an employee of defendant. *See Matthews v. Senior Life Ins. Co.*, *See* No. 1:24-cv-1550-MSN-LRV, 2025 WL 1181789 (E.D. Va. Apr. 22, 2025), *denying second dismissal*, 2025 WL 1899984, at *2–*3 (E.D. Va. July 9, 2025) (finding "sufficient allegations to . . . sufficiently state a claim"). Another case involved dismissal of a claim based on a single call where the only facts linking the defendant were a general allegation that such defendant was used for third-party telemarketing and unspecified discovery that allegedly "revealed the [defendant], or a vendor they retained, made the offending call. *See Bryant v. Byron Udell & Assocs. Inc.*, No. 1:23-cv-00414-AJT-LRV, 2023 WL 5180351, at *1, *5 (E.D. Va. Aug. 11, 2023). Yet another involved a dismissal based on the only allegation was that a "caller identified himself as *associated with*" the defendant. *See Scruggs v. CHW Grp.*, 2020 WL 9348208, at *10 (E.D. Va. Nov. 12, 2020) (emphasis added). In another case, the court dismissed claims where the plaintiff "le[ft] open the possibility . . . of a third party acting on [d]efendant's behalf" and relies on statements made on third-party websites. *See Hicks v. Alarm.com Inc.*, No. 1:20-cv-532, 2020 WL 9261758, at *1, *2, *4 (E.D. Va. Aug. 6, 2020).

Here, Plaintiff has pleaded much more direct involvement from OpenAI. As detailed above, his Amended Complaint alleges that OpenAI made the artificial voice in the calls he received, no other Defendant was involved with these artificial voices, and that he was directed to OpenAI's website through these calls. These allegations are far different from any case to which OpenAI directs the Court.

Defendant's other cited case also does not warrant dismissal here. *See Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243 (4th Cir. 2018). There, the court upheld summary judgment against two defendants where vicarious liability had been alleged based on calls made by downstream retailers. *Id.* at 246–48. Important in the court's decision was the fact that plaintiffs failed to take a single deposition during a three-month window. *Id.* at 250. Further, the plaintiffs there failed to rebut evidence demonstrating the defendants had repudiated the alleged TCPA violations. *Id.* at 252. Here, Plaintiff has not even had a chance to conduct any discovery regarding OpenAI's role in the calls. *See Hatteberg*, 2019 WL 8888087, at *3.

As detailed above, Plaintiff has provided detailed factual allegations that more than meet his pleading burden to plausibly state a claim against OpenAI. These allegations go well beyond the "scintilla of factual support that would plausibly connect OpenAI to the calls." (*See* ECF 52 at 25.) Accordingly, OpenAI's motion to dismiss should be denied.

### C. OpenAI, by Its Very Nature, Was Actively Involved in the Calls to Plaintiff.

OpenAI next seeks to defeat Plaintiff's claims by arguing he has "articulated no facts that would support holding OpenAI liable for its users' actions" and that "at bottom, [he] seeks to hold OpenAI liable for aiding and abetting Fresh Start's alleged calls." (ECF 52 at 25.) These assertions miss the mark as Plaintiff has not pleaded any "aiding and abetting" theory in his Amended Complaint. Instead, he asserts that OpenAI was directly involved in these calls and thus liable. *See Snyder v. iCard Gift Card, LLC*, No. 0:15-cv-61718-WPD, 2017 WL 10379591, at *2 (S.D. Fla. Apr. 28, 2017) (noting the defendant's "argument that Plaintiff fails to state a claim . . . because there is no recognized cause of action for aiding and abetting under the TCPA is a red herring. [The c]omplaint does not allege an aiding and abetting claim against [defendant] under the TCPA" and denying motion to dismiss against defendant who sent texts on behalf of another company.") In making its argument, OpenAI goes far afield to try to escape liability, citing to cases involving

terrorism posts on social media, gun manufacturers and weapon sales to foreign drug cartels, and internet service providers and copyright infringement.[23] *See Taamneh*, 598 U.S. 471; *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025); *Cox Communications, Inc. v. Sony Music Entertainment*, 607 U.S. ___, 146 S. Ct. 959 (2026). In discussing these cases, OpenAI seeks to bill itself as a "general-purpose service" and "general service" and its actions as "mere passive nonfeasance," "at most allegedly stood back and watched," and "mere "failures, omissions, or inactions." (*See* ECF 52 at 27–29.) These labels are gross mischaracterizations of OpenAI's active participation in the calls as plausibly alleged in the Amended Complaint.

Here, Plaintiff has clearly pleaded OpenAI was directly involved in the calls. It determined what to say and was responsible for handling the conversation on these calls. Indeed, OpenAI markets its platform as having the ability to act autonomously without the need for human involvement. (*See* ECF 45 ¶¶ 83, 85–87.) This clear and direct involvement is more than enough to plausibly establish direct liability on OpenAI and readily distinguishes this matter from the "passive nonfeasance" cited in OpenAI's cases. *See Taamneh*, 598 U.S. at 481, 498–99 (involving claims where third-party wrongdoer "was able to upload content to the platforms and connect with third parties," "claim is based on defendants' provision of the infrastructure" to do so, and "plaintiffs never allege ISIS used defendants' platform to plan or coordinate the . . . attack [and] "do not allege [attacker] ever used [platforms]")[24]; *Smith & Wesson*, 605 U.S. at 295 (only selling guns to wholesale distributors which resulted in downstream sales to bad actors); *Cox*

[23] Notably, OpenAI failed last year in its attempt to dismiss a copyright infringement lawsuit filed against it. *See New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 328–29 (S.D.N.Y. 2025).

[24] *Taamneh* is further distinguishable as in that case "there [was] not any reason to think defendants carefully screened any content" whereas here, Plaintiff has provided detailed allegations regarding OpenAI's thorough and rigorous screening of usage of its platform. *See* 598 U.S. at 498–99.

*Communications, Inc.*, 146 S. Ct. at 964 (involving copyright infringement claims against defendant "because it continued to provide known infringers with Internet access" yet noting such "Internet service providers . . . have limited knowledge about how their internet services are used and who uses them . . . . [a]nd more generally. . . also cannot directly control how their Internet services are used."). This is not a case simply in which "OpenAI knew that in some fraction of cases misuse will occur." (ECF 52 at 29 (citing *Smith & Wesson*, 605 U.S. at 292.) As pleaded above and in addition to its active involvement on the calls, OpenAI exercises extensive control and monitoring over usage on its platform, to the extent that it can block usage based on precise parameters (ex. making methamphetamine). Yet, OpenAI has chosen not to implement such controls to block spam calls despite its ability to do, demonstrated by its control measures in other areas. Instead, OpenAI has marketed both on its website and at its conference the ability to make such spam calls.

## II. The TCPA Covers Plaintiff's Cellular Telephone, and He Is a "Residential Telephone Subscriber."

OpenAI argues that a cellular telephone categorically cannot be a "residential telephone subscriber," that the F.C.C.'s contrary interpretation fails after *Loper Bright* and *McLaughlin*, and that Plaintiff pleaded only registration and the absence of a landline. (ECF 52 at 30–36.) Each premise is wrong, and the residential-use question is at minimum a fact question that cannot be resolved against Plaintiff on the pleadings.

The F.C.C. extended the do-not-call protections to wireless subscribers, and its regulation remains binding. 47 C.F.R. § 64.1200(e) applies the subsection (c) and (d) rules to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." In its 2003 Order, the Commission found it more consistent with the TCPA's purpose to allow wireless

subscribers "to benefit from the full range of TCPA protections," and adopted a presumption that resolves OpenAI's categorical argument:

> [W]e will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14038–39 (2003). The Ninth Circuit applied that presumption in *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1224–25 (9th Cir. 2022), holding that cell phones registered on the Registry are presumptively "residential" under § 227(c)—even when used for both personal and business purposes—and that the defendant bears the burden of rebutting the presumption with facts developed in discovery. The First Circuit is in accord, *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 348 (1st Cir. 2022). *McLaughlin* did not invalidate § 64.1200(e); it remains binding law that, by its terms, extends the do-not-call protections to wireless numbers.

District courts uniformly hold that materially similar—and weaker—allegations survive dismissal, and that the inquiry can often be fact-intensive. *Wilson v. Hard Eight Nutrition LLC*, 804 F. Supp. 3d 1141, 1150–51 (D. Or. 2025) (noting *Loper Bright*'s grant of "deferential review" to agency's interpretation of a statutory term and agreeing a cell phone is presumptively residential because § 227(c) denotes a private use, not a transmission technology); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 208 (S.D.N.Y. 2024) (pleading no landline for fifteen years plus personal use sufficient); *Van Baalen v. Mut. of Omaha Ins. Co.*, 729 F. Supp. 3d 1239, 1251 (D.N.M. 2024) (pleading of "personal, household and residential needs" sufficient even without further detail); *Radvansky v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314, 1319 (N.D. Ga. 2024) (finding registration on DNC registry and allegations of personal use sufficient); *Klassen v. Solid Quote LLC*, 702 F. Supp. 3d 1052, 1057–58 (D. Colo. 2023) (concluding statement of residential use sufficient.); *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1119–20 (W.D. Mo. 2020)

(finding cell-phone user can qualify; faulting defendant's reliance on cases ignoring § 64.1200(e) and the 2003 Order).

On the whole, the inquiry is fact-intensive and premature on a motion to dismiss—as even the summary-judgment decision in *Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648 (W.D. Tenn. 2020), confirms. Considering summary-judgment briefing and evidence—not a Rule 12(b)(6) motion—that court agreed that "the FCC made clear that 'residential subscriber' can include 'wireless subscribers' because 'it is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones.'" *Id.* at 655. The court explained that evidence (not pleadings) can establish residential status, and ruled against the plaintiff there only because he failed to carry that summary-judgment burden. *Id.* at 656–57. It further recognized two decisions holding that, at the pleading stage, a plaintiff who alleges registration on the National Do-Not-Call Registry raises a reasonable inference of "residential telephone subscriber" status sufficient to survive dismissal. *Id.* at 658 (discussing *Hodgin v. Parker Waichman LLP*, No. 3:14-cv-733-DJH, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015), and *Phillips v. Mozes, Inc.*, No. 2:12-cv-04033-JEO, 2014 WL 12589671, at *6 (N.D. Ala. Sept. 3, 2014), *report & recommendation adopted in relevant part*, 2015 WL 12806594 (Jan. 26, 2015)); *see Hudson v. Palm Beach Tan, Inc.*, No. 1:23-cv-486(WO)(JEP), 2024 WL 4190513, at *3 (M.D.N.C. Aug. 12, 2024), *report & recommendation adopted*, No. 1:23-cv-486, 2024 WL 4188310 (M.D.N.C. Sept. 13, 2024) (collecting multiple cases holding allegations of residential use survive Rule 12(b)(6) scrutiny).

Plaintiff pleads more than registration and the absence of a landline: he registered his cell number on the Registry in 2004 and has used it for personal purposes for over twenty years (ECF 45 ¶¶ 206–07); he uses it for residential purposes and has no landline (*id.* ¶ 208); it is his only

telephone number and the only number he uses for residential purposes (*id.* ¶¶ 209–10); and it is "his residential telephone line" (*id.* ¶ 211). Taken as true, those allegations establish—or at least support a reasonable inference of—residential-subscriber status. OpenAI's demand for allegations of "exclusively" personal use and its inference that serving as an executor shows "business" use (ECF 52 at 35–36) invert the Rule 12(b)(6) standard. Under *Chennette*, how a number is held out and used is a multi-factor question on which the defendant bears the burden after discovery. Count One should therefore not be dismissed on this ground.

**III. Plaintiff Has a Cause of Action for Counts Nine and Ten.**

OpenAI argues that Counts Nine and Ten must be dismissed for lack of any private cause of action because they rest on 47 C.F.R. § 64.1200(b)(1) (identification) and § 64.1200(b)(3) (opt-out), which OpenAI says were prescribed under 47 U.S.C. § 227(d)(3)—a subsection with no private right of action. (ECF 52 at 36–37.) The argument for complete dismissal of these Counts fails.

Counts Nine and Ten are not as restricted as OpenAI suggests. They are predicated on the TCPA's central prohibition: making "any call" to a cellular telephone "using an artificial or prerecorded voice" without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii). (ECF 45 ¶¶ 410–13, 421–23.) That prohibition is directly and privately enforceable through § 227(b)(3), and a plaintiff states a claim by alleging that the defendant (1) called a cellular number, (2) using an artificial or prerecorded voice (or an ATDS), (3) without prior express consent of the call recipient. *Fridline v. Millennia Tax Relief, LLC*, 727 F. Supp. 3d 517, 523–24 (M.D. Pa. 2024); *Bradford v. Sovereign Pest Control of TX, Inc.*, 744 F. Supp. 3d 754, 758–59 (S.D. Tex. 2024). Even where a court doubts a private right of action for a particular § 64.1200 subpart, the core claim survives. In *Champion v. Sethi*, the court held that even assuming no private action lies under the identification regulation, the plaintiff's claims under the core

prohibitions remained actionable through § 227(b)(3). No. CV-22-01355-PHX-DGC, 2023 WL 2708576, at *5 n.11 (D. Ariz. Mar. 30, 2023). The Court should reach the same result here.

The Amended Complaint alleges that OpenAI's artificial/prerecorded voice called Plaintiff's cellular telephone without his consent (ECF 45 ¶¶ 233, 237, 239, 242–43, 270, 273–74; *see also* ¶¶ 413, 423), which states a § 227(b)(1)(A)(iii) claim. And while a number of federal courts have held that Section 227(b) cannot be used to privately enforce Section 64.1200(b) Regulations, OpenAI's argument, at most, would pare back the identification and opt-out theories; it would not warrant dismissing Counts Nine and Ten in their entirety.

## IV. Plaintiff Plausibly Alleges the Calls Are "Telephone Solicitations" and "Telemarketing."

OpenAI further claims that Counts One and Ten fail because the calls were neither "telephone solicitations" (Count One) nor "telemarketing" (Count Ten), and that Plaintiff reached no one when he called back. (ECF 52 at 37–39.) That misapplies the governing definition and the F.C.C.'s dual-purpose rule, while asking the Court to resolve a fact question on the pleadings.

A "telephone solicitation," and "telemarketing," turn on the purpose of encouraging a purchase, not on whether the message states a price. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(13). No explicit offer is required where the implication is clear from context, applying "a measure of common sense"; informational content does not "inoculate" a communication that also serves a marketing purpose. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012); *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1062–63 (N.D. Ill. 2016) (the inquiry "focus[es] on the purpose of the call, rather than its content") (citing *Dolemba v. Ill. Farmers Ins. Co.*, No. 15 C 463, 2015 WL 4727331, at *2 (N.D. Ill. Aug. 10, 2015)).

OpenAI's argument also flounders on Plaintiff's allegations. Fresh Start markets multiple services to consumers, including business-advisory, real-estate, lending, and home-buying-and-

selling services (ECF 45 ¶¶ 183–84); it is connected to several home-buying businesses registered in Virginia (*id.* ¶¶ 189–91); and it engages in probate-related business advertised on an associated Facebook page and on YouTube, with videos bearing Fresh Start branding that tout its probate-related services (*id.* ¶¶ 192–97), including posts noting that Fresh Start—through an affiliated entity, Probate Cures—will take inherited property off an individual's hands (*id.* ¶ 197). That dovetails with the answered call, on which a voice stated "This is Nadine with FSG" and explained that the company helps individuals with properties going through probate (*id.* ¶ 239), and with the prerecorded voicemails stating the sender was "reaching out because [it] noticed you're representing an estate" (*id.* ¶¶ 212, 216). Courts sustain solicitation and telemarketing claims on materially similar facts. *Wilcox v. MarketPro S., Inc.*, No. CV SAG-23-2364, 2023 WL 8806696, at *3 (D. Md. Dec. 20, 2023) (alleging purpose was to "encourage a surreptitious sale of its various real estate-related services"); *Eagle v. GVG Capital, LLC*, No. 22-cv-00638-SRB, 2023 WL 1415615, at *1, *3 (W.D. Mo. Jan. 31, 2023) (finding that a text "presenting a fabulous proposition for your house" was pled to be offering "home selling services" to the plaintiff and thus stated a viable claim); *Pepper v. GVG Capital, LLC*, No. H-22-2912, 2023 WL 3914291, at *2 (S.D. Tex. June 9, 2023) (holding, in a case involving text offers to buy a home, that "allegations that [a defendant] provides the necessary services associated with a real estate transaction, and that the seller effectively pays for those services through [defendant's] payment of a discounted purchase price, are sufficient to state a claim").

Courts likewise sustain solicitation and telemarketing claims where a message references the recipient's circumstances and invites a callback, supporting the inference of a pretextual marketing purpose. *Wilson v. Better Mortgage Corp.*, 811 F. Supp. 3d 631, 643–44 (S.D.N.Y. 2025); *Whittaker v. Freeway Ins. Servs. Am., LLC*, No. 22-cv-8042, 2023 WL 167040, at *2 (D.

Ariz. Jan. 12, 2023); *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-00376-MC, 2025 WL 2029274, at *3 (D. Or. July 21, 2025). Here, the prerecorded voicemails identified "Emma, from ProbateCURES," stated the sender was "reaching out because I noticed you're representing an estate," and supplied a callback number (*id.* ¶¶ 233, 237, 242–43); the answered call stated "This is Nadine with FSG" and offered help with probate properties (*id.* ¶ 239); ProbateCURES is alleged to be Fresh Start's alter ego, marketing probate/estate services (*id.* ¶¶ 160, 170–205, 234); and Plaintiff alleges the calls were made to "advertise and market Fresh Start's services in handling probate matters" (*id.* ¶ 251) and were "telemarketing calls" (*id.* ¶ 423). The natural inference is a sell-side solicitation and telemarketing.

OpenAI's contention that Plaintiff reached no live agent when he called back (ECF 52 at 38–39) misidentifies the operative communications: the actionable solicitations are Defendants' inbound prerecorded voicemails and the answered call, which under the dual-purpose rule are themselves advertisements; a message that supplies a callback number to generate future business is an advertisement. *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14098 ¶ 142 (2003); *see Wilson v. Skopos Fin., LLC*, 2026 WL 810636, at *3–4 (declining summary judgment to the calling defendant because, although a message may be "informational on [its] face," the TCPA guards against more than "an explicit mention of a good, product or service"); *Wilson v. Better Mortgage Corp.*, 811 F. Supp. 3d at 644–45 (finding allegations of pretextual messages sufficient to plead a claim). Contrary to OpenAI's position, whether the calls were solicitations or telemarketing is a fact question unsuitable for resolution on a motion to dismiss. *Calvin v. Humana Inc.*, No. 22-80804-CIV, 2022 WL 18956206, at *4 (S.D. Fla. Aug. 18, 2022); *see also Abboud v. Circle K Stores Inc.*, No. CV-23-01683-PHX-DWL, 2025

WL 307039, at *5 (D. Ariz. Jan. 27, 2025) (agreeing courts should weigh a call's potential dual purposes in assessing liability). Counts One and Ten should not be dismissed on this ground.

## V. Plaintiff Plausibly Alleges OpenAI Violated the VTPPA.

### A. The Court Should Retain Supplemental Jurisdiction Because the Federal Claims Survive.

OpenAI's request to decline supplemental jurisdiction (ECF 52 at 40) is expressly contingent on dismissal of all federal claims against OpenAI. Because those claims survive for the reasons above (*supra* §§ I–III), the premise fails. Under 28 U.S.C. § 1367(a), the Court "shall have supplemental jurisdiction" over state-law claims that form part of the same case or controversy, which exists wherever the claims "derive from a common nucleus of operative fact"; only "a loose factual connection" is required. *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995); *Bennett v. Fastenal Co.*, 184 F. Supp. 3d 304, 311 (W.D. Va. 2016); *Barnes v. West, Inc.*, 249 F. Supp. 2d 737, 740 (E.D. Va. 2003). The VTPPA and TCPA claims arise from the same calls and texts, so retention is proper. *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 n.1 (4th Cir. 2007). The discretion to decline under § 1367(c)(3)—the only basis OpenAI invokes—arises only after a court "has dismissed all claims over which it had original jurisdiction." *Hunt v. Branch Banking & Tr. Co.*, 480 F. App'x 730, 731–32 (4th Cir. 2012); *see Salim v. Dahlberg*, 170 F. Supp. 3d 897, 903 (E.D. Va. 2016).

Even then, however, the decision to retain jurisdiction is left to the Court's discretion. In making that decision, the Court should consider things like "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110. OpenAI engages in no such analysis, arguing simply that if the Court dismisses the federal claims, there is no reason to keep the state claims.

(ECF 52 at 40.) Since OpenAI has not engaged in that analysis, the Court should consider those arguments waived.

In addition to those factors that OpenAI did not address, Plaintiff believes the Court should consider the posture here. Plaintiff brings his claims on behalf of classes of consumers, but in Virginia state courts there is no class-action mechanism. *In re Volkswagen "Clean Diesel" Litig*., 2016 WL 10880209, at *12, 94 Va. Cir. 189 (Fairfax Cir. Ct. Aug. 30, 2016). Thus, if the Court were to dismiss any state court claims that remain following the dismissal of all federal claims, those consumers would be unable to pursue their rights as the case is currently pleaded, and would instead have to file thousands of individual lawsuits. That volume would easily overwhelm the Virginia state court system, leading to a waste of resources and a meaningful loss of judicial economy.

### B. OpenAI "Made, Initiated, or Caused to Be Initiated" the Calls.

OpenAI argues it cannot be a "maker" or "initiator" because its service operates only "after" another party begins a call. (ECF 52 at 40–41.) That ignores the statute's breadth and controlling authority, as well as Plaintiff's allegations, and asks the Court to accept OpenAI's characterization of its processes over Plaintiff's allegations. OpenAI's arguments fail for all these reasons.

The VTPPA defines a "telephone solicitor" as:

> [A]ny person who makes or initiates, or causes another person to make or initiate, a telephone solicitation *on its own behalf or for its own benefit or on behalf of or for the benefit of a seller*.

VA. CODE ANN. § 59.1-510 (emphasis added). The "causes another person to make or initiate" prong reaches entities that direct or benefit from calls others place. *Laccinole v. Cova Home Realty LLC*, No. 2:21-cv-507, 2026 WL 617312, at *16, n.16 (E.D. Va. Feb. 11, 2026), *report & recommendation adopted*, 2026 WL 615862 (E.D. Va. Mar. 4, 2026). The Fourth Circuit applies

the same principle under the TCPA: "the TCPA's private right of action contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly," *Krakauer*, 925 F.3d at 659, and a party that "directs" prerecorded calls is liable even though another entity physically places them, *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 378–79 (4th Cir. 2013); *accord Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) (holding common-law agency governs).

The VTPPA also supplies a presumption and a vicarious-liability standard lower than the TCPA's. Sellers and solicitors are jointly and severally liable, VA. CODE ANN. § 59.1-514.1(A), and a solicitation advertising a seller's goods or services is statutorily presumed to be made on the seller's behalf:

> A telephone solicitation offering or advertising a seller's property, goods, or services shall be presumed to have been made or initiated on behalf of or for the benefit of the seller, whether or not any agency relationship exists between the telephone solicitor and the seller, whether or not the seller supervised or directed the conduct of the telephone solicitor, and whether or not the telephone solicitor is shown to have acted at the seller's direction and request . . . .

VA. CODE ANN. § 59.1-514.1(B); *see also id.* (noting presumption rebuttable only by clear and convincing evidence).

The F.C.C. has made the point directly for a defendant whose technology supplies the content of a call:

> [W]here a caller provides the called party's phone number to a [service] provider and controls the content of the call, he is the maker of the call rather than the [service] provider who connects the call.

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, ¶ 26 (2015). And in 2024 the F.C.C. confirmed that AI-generated voices that simulate human speech are "artificial" voices subject to the TCPA and that the presence of an intermediary or live agent "does not negate" the prohibition. *In re Implications of A.I. Techs. on Protecting Consumers from*

*Unwanted Robocalls & Robotexts*, 39 FCC Rcd. at 1784–86, ¶¶ 5, 8–9. The First Amended Complaint places OpenAI at the center of making these calls, not merely "after" them as it claims: OpenAI "initiates the conversation on the call, determines what to say, and interacts with" recipients (ECF 45 ¶ 144); the calls "require both Twilio and OpenAI" and "could not have been made without OpenAI's involvement," yielding only "mere silence" otherwise (*id.* ¶¶ 145–46, 274); OpenAI "determines the content in the call" (*id.* ¶ 273); the calls were "actually made by Twilio and OpenAI" (*id.* ¶ 264); and OpenAI is alleged to be a "Telephone Solicitor" (*id.* ¶¶ 158, 166).

All told, whether OpenAI "made," "initiated," or "caused" the calls is a factual inquiry in need of a developed record, not the pleadings. The point is illustrated by the very kind of authority OpenAI invokes: in *Zhu v. DISH Network, LLC*, 808 F. Supp. 2d 815, 817, 819–22 (E.D. Va. 2011), the court reached the "cause to be initiated" question at summary judgment, observed that no controlling authority resolved it, and ruled for the defendant only because the evidence showed no nexus between DISH and the entity that placed the calls. Here, by contrast, the Amended Complaint pleads a direct nexus between OpenAI and the calls (*id.* ¶¶ 144–46, 264, 270–74), so the question cannot be resolved on the pleadings.

**C. The Calls Are "Telephone Solicitations" Under the VTPPA.**

OpenAI also argues that the VTPPA claims fail because Plaintiff does not plausibly allege a "telephone solicitation," contending the calls did not offer or advertise any property, goods, or services for sale and that a generic allegation of a "larger commercial effort" cannot suffice. (ECF 52 at 42.) The argument fails for the same reasons as its TCPA counterpart (supra § III) and because the calls advertised services for sale on their face. The VTPPA defines "telephone solicitation" broadly to include:

> [A]ny telephone call made or initiated to any natural person's residence in the Commonwealth, to any landline or wireless telephone with a Virginia area code . . . for the purpose of offering or advertising any property, goods, or services for sale, lease, license, or investment . . . .

VA. CODE ANN. § 59.1-510. As under the TCPA, the purpose "is determined from the contents of the [call] relative to its recipient." *Cavey*, 542 F. Supp. 3d at 428. That test favors Plaintiff, and OpenAI's reliance on *Cavey* (ECF 52 at 42) is misplaced: *Cavey* found no solicitation because the defendant there "offered only to *buy*" the plaintiff's property, "without mentioning ancillary services." *Id.* Here the calls did the opposite. A probate-services business—ProbateCURES, alleged to be the alter ego, d/b/a, or affiliate of Fresh Start (ECF 45 ¶¶ 160, 170–205, 234)—contacted the representative of an estate, stated it was "reaching out because I noticed you're representing an estate," and, on the answered call, identified itself as "FSG" and offered help with probate properties (*id.* ¶¶ 233, 237, 239, 242–43); Plaintiff alleges the calls were made to "advertise and market Fresh Start's services in handling probate matters" (*id.* ¶ 251); and Fresh Start markets those probate- and estate-related property services across multiple channels (*id.* ¶¶ 183–84, 189–97). Those are sell-side advertisements of services to a targeted recipient—the paradigm "telephone solicitation" under § 59.1-510—not a mere "generic allegation of a larger commercial effort." *See Wilcox*, 2023 WL 8806696, at *3; *Eagle*, 2023 WL 1415615, at *3; *Pepper*, 2023 WL 3914291, at *2. At a minimum, the question requires factual development and therefore cannot be resolved on the pleadings.

### D. The Failure-to-Identify Claim Is Adequately Pleaded Because OpenAI "Made Contact."

OpenAI argues that it never "made contact" because Plaintiff missed three calls and received prerecorded voicemails, and the one answered call ended in an error. (ECF 52 at 42–43.) That misreads the statute and the allegations. Section 59.1-512 requires a telephone solicitor to identify himself by first and last name and the seller's name "promptly upon making contact with

the recipient." VA. CODE ANN. § 59.1-512. A failure or refusal to provide that identification is itself an actionable violation. *Va. ex rel. Jagdmann v. Real Time Int'l, Inc.*, No. 4:04-cv-125, 2005 WL 1162937, at *2–3 (E.D. Va. Apr. 26, 2005); *Cavey*, 542 F. Supp. 3d at 424 (finding allegations of failure to identify worked Article III injury). The duty does not depend on the recipient personally answering: § 59.1-513.1 addresses the situation where no live representative is available and requires that the solicitor "play a prerecorded identification message that states the name and telephone number of the person on whose behalf the telephone solicitation was being made." VA. CODE ANN. § 59.1-513.1. That provision confirms that a prerecorded message left for a recipient is itself contact carrying identification obligations.

The parallel federal rules are to the same effect: all artificial or prerecorded-voice messages must identify the entity responsible for the call and provide a contact number, 47 C.F.R. § 64.1200(b)(1)–(2); telemarketing calls must provide the caller's name, the entity on whose behalf the call is made, and a contact number, *id.* § 64.1200(d)(4); *accord* 47 U.S.C. § 227(d). The Fourth Circuit has held these requirements apply to prerecorded robocalls regardless of whether the recipient personally answered, and that the entity directing the calls is liable for their omissions. *Universal Elections, Inc.*, 729 F.3d at 376–77, 380–81 (rejecting constitutional challenges to these provisions, and others, of the TCPA).

Nevertheless, Plaintiff alleges actual contact. He answered one call and heard OpenAI's artificial voice state "This is Nadine with FSG" and offer help with probate properties (ECF 45 ¶ 239), and he received prerecorded voicemails from the same operation (*id.* ¶¶ 233, 237, 243). None identified the individual caller's first and last name or the registered Virginia entity responsible, and none provided a compliant opt-out (*id.* ¶¶ 244–247, 275). OpenAI's reliance on *Laccinole*, 2026 WL 617312, at *14 (ECF 52 at 42), is misplaced: there the plaintiff "did not speak with" the

caller at all, whereas Plaintiff alleges he both received the prerecorded messages and spoke with the AI's voice on the answered call. That decision therefore lends no assistance to the Court's analysis.

OpenAI's attempts to twist the content of the messages into something this is compliant also fail. While it claims that "Lowrey actually alleges that the callers *did* identify themselves—as 'Nadine' and 'Emma' 'from FSG," (ECF 52 at 43 (emphasis in original)), those snippets of information fail to meet the statute's obligations that callers provide first and last name of the person on the call, as well as the seller's name (for VTPPA), and the caller's name, the entity on whose behalf the call is made, and a contact number (TCPA). Even with OpenAI's attempted embellishments, the messages still fail to meet the statutory mandates.

Further, because OpenAI is itself a "telephone solicitor" (supra § IV.B) and therefore jointly and severally liable under § 59.1-514.1(A), it cannot escape the identification duty by pointing to another participant in the call; § 59.1-513(B) independently forbids "any intentional action to prevent the transmission of the telephone solicitor's name or telephone number." VA. CODE ANN. § 59.1-513(B). That more than one party may be responsible for a noncompliant call confirms the claim is adequately pleaded. *See Clemens*, 2025 WL 2604494, at *10 (allowing for joint and several liability under § 59.1-514.1(A)). And OpenAI's "information and belief" objection to whether "Nadine" or "Emma" exist is beside the point—the violation is the failure to provide the information the statute requires, which the pleaded facts establish. At best, OpenAI's fact-based contest of its role cannot be resolved on the pleadings. *Kuriloff v. InnerScope Hearing Techs.*, No. 2:23-cv-270, 2024 WL 2031828, at *14 (E.D. Va. Mar. 30, 2024) ("At this stage, the Court does not resolve disputed issues of fact or adjudicate the merits of the case."). Plaintiff's VTPPA claims should not be dismissed on these grounds.

## VI. OpenAI Did Make Contact With Plaintiff for Plaintiff's Failure-to-ID Claim.

As already detailed above, Plaintiff has plausibly pled that OpenAI made and/or initiated the offending call he received. None of Defendant's cited cases call for any different result.[25] In *Zhu*, the court ruled on summary judgment that the moving defendant was not liable where the plaintiff "did not dispute that [defendant] did not place the telephone calls itself, nor did the telemarketing companies [defendant] directly hired make the calls on its behalf." 808 F. Supp. 2d at 816, 817. In fact, there was "no evidence . . . [to] suggest[] any nexus between the [entity with whom calling numbers were registered] and the Defendant." *Id.* at 817. In contrast to this case, Plaintiff has pleaded detailed allegations regarding how Twilio and OpenAI work together to make such outbound calls and that OpenAI was responsible for the artificial voice that Plaintiff heard on the calls. The *Zhu* case is further distinguishable as it was decided on summary judgment, whereas here, the parties have not been afforded any opportunity to conduct discovery.[26]

Plaintiff has also plausibly pleaded his failure-to-identify claim against Open AI as it was OpenAI who made contact with him. As clearly pleaded in the amended complaint, it was OpenAI who was responsible for the voice on the calls that Plaintiff received. The contact was made when he listened to the voicemail messages and when he answered the call. This fits with OpenAI's cited definition, as Plaintiff heard a voice on his voicemail messages and on the call he answered; thus OpenAI "succeed[ed] in communicating" to him, "especially by speaking . . . to" him. (ECF 52 at

---

[25] Plaintiff has already addressed *Bryant v. Byron Udell & Assocs. Inc.* and *Hicks v. Alarm.com Inc.* above.

[26] Defendant's other cited case is also readily distinguishable on this point. *See Clemens,* 2025 WL 2427685, at *4 (E.D. Va. Aug. 22, 2025) (involving VTPPA claims by pro se litigant who had prior existing business relationship with defendant and involving a call made by "individual . . . who is not one of the Defaulting Defendants" nor did plaintiff "allege [caller] was calling on behalf of any of the Defaulting Defendants, or, relatedly, than any of the Defaulting Defendants caused the [call] to be initiated.")

43.) Also as clearly pleaded in his complaint, neither FSG nor Twilio provided the voice on these calls.[27]

Defendant's cited cases are distinguishable and do not warrant dismissal. Two of the cases do not even involve telemarketing calls. *See Cellcontrol, Inc.*, 2022 WL 598752, at *1 (patent infringement); *Cancian v. Hannabass & Rowe, Ltd.,* 2018 WL 6515148, at *1 (W.D. Va. Dec. 11, 2018) (copyright infringement). OpenAI's other case does not include any indication that voicemails were left, only that the plaintiff "did not speak with" the caller when called. *See Laccinole*, 2026 WL 617312, at *14 (no mention of voicemails in the opinion). Further, Plaintiff did speak with the caller on the call he did pick up. Thus *Laccinole* is distinguishable from here, where OpenAI did in fact make contact with him, both through voicemails and on an actual call.

**VII. OpenAI's Terms of Service Provide No Grounds for Dismissal.**

While OpenAI may raise an affirmative defense that it had "reasonable practices and procedures" in place that "effectively prevent unlawful solicitations," OpenAI has the burden of proving such a defense. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) ("[A] motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense . . ."). OpenAI's own cited case in support of its argument involved a motion for summary judgment, not a motion to dismiss. *See Zhu*, 808 F. Supp. 2d at 816 (finding "[t]he matter is appropriate for summary judgment because there are not material facts in dispute"). In contrast to *Zhu* and as detailed above, there are a number of well-pleaded allegations here regarding OpenAI's failure to adopt

[27] Plaintiff's assertion that the identified individuals on these calls, "Nadine" and "Emma" are not real people is more than just "allegations . . . supported only by vague information and belief." (*See* ECF 52 at 43.) As the calls are described in the complaint, they were made using an artificial voice, not an actual human speaking. Further, FSG has submitted its own declaration that it does not employ any individual named either Nadine or Emma. (*See* ECF No. 56-1 at ¶ 7.)

appropriate measures to prevent illegal spam calls from occurring. Contrary to OpenAI's assertion that "it is hard to imagine what more OpenAI could do to facilitate TCPA compliance," the amended complaint provides a myriad of examples of what OpenAI could do to ensure compliance. (*Contrast* ECF 52 at 45 *with* ECF 45 ¶¶ 107–31.) Rather than only including in its terms of service that users "cannot use the API in a way the violates applicable laws," OpenAI could implement the automated monitoring and enforcement mechanisms that it employs to block and prevent other harmful content on its platform. Yet it has failed to do so. These detailed allegations call into question whether OpenAI's practices were reasonable and effective. OpenAI may present its affirmative defense of its policies and procedures, however, Plaintiff is also entitled to discovery on such a defense, including if they were reasonable. Accordingly, the mere existence of such policies and procedures is not grounds for dismissal of Plaintiff's complaint.[28]

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court deny OpenAI's Motion to Dismiss (ECF No. 51) and grant such other and further relief as justice may require.

Dated: June 24, 2026

Respectfully Submitted,

**WILLIAM LOWREY,**

[28] Defendant's cited cases do not call for any different result. As OpenAI admits, *Zhu* was decided on summary judgment, in which the plaintiff was afforded an opportunity at discovery. *See* 808 F. Supp. 2d at 815, 817 (noting "evidence produced during discovery"). OpenAI's other cited case even acknowledges "it is not appropriate for the court to convert a motion to dismiss into a motion for summary judgment when the parties have not had an opportunity to conduct reasonable discovery." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023). There, the court took judicial notice of a state bar disciplinary hearing decision in a matter involving a fee dispute between attorneys and former clients. *Id.* at 154. Here, there are no state bar proceedings nor anything similar. Rather, OpenAI simply asserts it has reasonable procedures in place. Plaintiff is entitled to discovery on this affirmative defense of OpenAI.

By: /s/ *Kevin Dillon*

Kevin A. Dillon (VSB # 93475)
VOICE FOR JUSTICE LAW, PLLC
626 E. Broad Street, Suite 300
Richmond, VA 23219
Telephone: 804-277-9441
Facsimile: 804-494-4985
Email: kevin@voiceforjustice.law

Craig C. Marchiando (VSB # 89736)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., #1a
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: craig@clalegal.com

*Counsel for Plaintiff*