CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
10/1/2026
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

| | |
|---|---|
| WILLIAM LOWREY, *Plaintiff*, v. TWILIO, INC., ET AL., *Defendants*. | CASE NO. 6:25-CV-00116 JUDGE NORMAN K. MOON |

**MEMORANDUM OPINION & ORDER**

Plaintiff William Lowrey—who is the executor of his father's estate—filed this putative class action on behalf of himself and other executors/administrators against Twilio, Inc. ("Twilio"), OpenAI, LLC ("OpenAI"), and Fresh Start Group, LLC ("FSG"). Across eleven counts, he alleges these entities violated the Telephone Communication Privacy Act ("TCPA") and the Virginia Telephone Privacy Protection Act ("VTPPA") by texting and calling his cellular telephone to advertise probate services. Twilio and OpenAI each move to dismiss Lowrey's claims. Dkts. 50, 51. Open AI also moves to strike Lowrey's class allegations. Dkt. 53. And finally, FSG seeks summary judgment on a single ground—it claims to be the wrong party. Dkts. 56, 95. Lowrey opposes all four motions. Dkts. 62–65, 96. For the reasons that follow, FSG's motion for summary judgment will be denied; Twilio's and OpenAI's motions to dismiss will be granted in part and denied in part; and OpenAI's motion to strike class allegations will be denied.

## I. BACKGROUND

Lowrey's father passed away in November 2024, and he was appointed executor of his father's estate in December 2024. *See* Am. Compl., Dkt. 45 ¶ 212. On March 18, 2025, he received a text message on his cellular phone, which marketed services associated with Virginia's probate process. *Id.* ¶¶ 206–210, 214. Through March and April 2025, Lowrey received dozens of unsolicited text messages. *Id.* ¶¶ 214–232. On August 14, 2025, Lowrey received a telephone call. *Id.* ¶ 233. He did not answer but listened to a voicemail where the caller identified herself as "Emma;" he noticed, however, that the voice sounded artificial. *Id.* ¶ 233. "Emma" asked Lowrey to call her back at 423-900-2274 because she had "noticed [he was] representing an estate." *Id.* The 423-900-2274 number was listed on a website for a company called Probate Cures, *id.* ¶ 234; however, Lowrey's caller identification showed the call came from 804-636-1337, *id.* ¶ 235. Lowrey received three more calls from that number in October and November 2025. *Id.* ¶¶ 237–238, 242–243. He called the number back and heard an artificial voice say, "this is Nadine with FSG," which then explained that FSG helps individuals with properties going through probate. *Id.* ¶ 239. When Lowrey asked to speak to a representative to request that the calls and texts stop, he heard an automated message: "all three attempts failed. 429: you've exceeded your current quota. Please check your plan and billing detail. For more information on this error, read the docs at: https://platform.openai.com." *Id.*

According to Lowrey, FSG is the company that marketed its services through the text messages and phone calls that were sent to him. *Id.* ¶¶ 239, 241, 251, 257. FSG is owned by Cathy Mathews and her son. Dkt. 95-1 at 2. Lowrey claims FSG paid Twilio to use its telephone numbers to make the telephone calls, and paid OpenAI to generate the messages and automate the voice calls.Am. Compl., Dkt. 45. ¶¶ 252, 254, 257, 261, 267, 269.However, OpenAI and Twilio

confirmed that two other entities owned by the Mathews family—BeTeachable and Fresh Start Affordable Housing—actually paid for their services, not FSG. Dkts. 86–87.

Lowrey claims that all three entities—FSG, Twilio, and OpenAI—violated the TCPA and VTPPA by texting and calling him. In Count 1, he alleges that Twilio and OpenAI violated the TCPA and its regulations by texting and calling phone numbers on the national do-not-call list. Dkt. 45 ¶¶ 307–322. In Count 2, he claims Twilio further violated the TCPA and its regulations by continuing to call numbers on the do-not-call list after being notified to stop. *Id.* ¶¶ 324–332. In Count 3, Lowrey claims Twilio and OpenAI violated § 59.1-514(B) of the VTPPA by texting and calling phone numbers on the national do-not-call list. *Id.* ¶¶ 334–346. In Count 4, he claims Twilio violated §§ 59.1-513(A) and 514(A) of the VTPPA by continuing to call numbers on the do-not-call list after being notified to stop. *Id.* ¶¶ 348–359. In Count 5, he claims Twilio violated § 59.1-513(B) of the VTPPA by providing misleading caller identification information in text messages. *Id.* ¶¶ 360–373. In Count 6, he claims OpenAI and Twilio violated § 59.1-512 of the VTPPA by failing to identify the caller. *Id.* ¶¶ 374–386. In Count 7, Lowrey asserts that FSG violated the TCPA by initiating unwanted texts and calls. *Id.* ¶¶ 387–397. In Count 8, he argues FSG violated § 59.1-514 of the VTPPA by initiating texts and calls to someone on the national do-not-call list and for failing to stop doing so after being notified to stop. *Id.* ¶¶ 398–407. In Count 9, he claims OpenAI and Twilio violated 47 U.S.C. § 227(b)(1)(A)(iii) and accompanying regulations by making unauthorized artificial voice calls to cellphones. *Id.* ¶¶ 409–419. In Count 10, he alleges OpenAI and Twilio violated 47 C.F.R. § 64.1200(b)(3) by calling cellphones using artificial voice without providing an opt-out option. *Id.* ¶¶ 421–432. And finally, in Count 11, he claims FSG also violated 47 U.S.C. § 227(b) and accompanying regulations by making

unauthorized artificial voice calls to his cellphone and by not providing an opt-out mechanism. *Id.* ¶¶ 433–442.

Twilio and OpenAI challenge all the counts against them pursuant to Fed. R. Civ. P. 12(b)(6), Dkts. 50, 51, and FSG relies upon Fed. R. Civ. P. 56 to assert it is the wrong party. Dkts. 55, 95.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether a plaintiff has stated a claim such that the court can grant relief. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint "does not need detailed factual allegations" to survive a 12(b)(6) motion; however, a plaintiff must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Plaintiff's allegations must be taken as true, and all reasonable inferences must be drawn in the plaintiff's favor during 12(b)(6) motions to dismiss. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

### B. Motion for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The nonmoving party may avoid summary judgment by demonstrating a dispute of material fact that would allow a reasonable jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## III. ANALYSIS

Because it is the simplest of the three substantive motions, the Court will begin with FSG's motion for summary judgment and will then turn to Twilio's and OpenAI's motions to dismiss. The Court will not discuss OpenAI's motion to strike in depth because it is well-accepted that such motions are both disfavored and premature. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

### A. FSG's summary judgment motion must be denied.

Throughout this litigation, FSG has "maintained that it is not a proper defendant in this case." Dkt. 95 at 1. To test this assertion, the parties deposed FSG's corporate representative—Cathy Mathews. *Id.* FSG relies on Mathews's deposition to support its motion for summary judgment, and Lowrey points to portions of that deposition to oppose summary judgment.

Ms. Mathews, along with her son, own FSG. *Id.* at 2; Dkt. 95-1 at 2. According to Ms. Mathews, FSG—along with several other companies she either owns or co-owns—specializes in property management and renovating and selling real estate. Dkt. 95-1 at 2. Ms. Mathews testified that FSG's sole purpose is to own and lease an office building located at 15430 Pouncey Tract

Road in Rockville, Virginia. *Id.* at 7–8. However, she admits that her credit card—which is used for all of her businesses—paid Twilio to send texts and calls to Lowrey and others. *Id.* at 13–14. She also concedes that her family owns a website that represents that FSG, Fresh Start Realty, BeTeachable, Fresh Start Holdings, Fresh Start Living, and Fresh Start Team are part of the Fresh Start "portfolio." Dkt. 96 at 9. And she further admits that there is a Facebook page for the Fresh Start entities, and that her son and husband appear in pictures and videos promoting probate services. *Id.* That Facebook page also includes a link to a website for ProbateCURES, *id.* at 15, and states that the Fresh Start entities are "[c]ertified probate expert[s]" that have the "goal [of] assist[ing] families through the probate process from the beginning all the way through to close of probate and beyond as much or as little as needed," *id.*

These facts suggest that Ms. Mathews, her husband, her son, and/or the web of companies they own are responsible for texting and calling Lowrey and others. However, that does not necessarily mean that FSG—which is the only Fresh Start entity Lowrey is suing—is legally responsible for the acts of the Mathews or any other Fresh Start entity. For FSG to be liable, Lowrey must come forward with some facts showing either: (1) that FSG directed the telemarketing call, or (2) that a corporate insider—*i.e.*, the Mathews or other Fresh Start entities—used FSG as their alter ego. *See C.F. Tr., Inc. v. First Flight L.P.*, 266 Va. 3, 10 (Va. 2003) ("In a reverse piercing action, the claimant seeks to reach the assets of a corporation or some other business entity, as in this instance the assets of a limited partnership, to satisfy claims or a judgment obtained against a corporate insider."). Here, Lowrey has not come forward with sufficient facts to show that FSG directed that the telemarketing calls and texts be sent (and in fact, the only evidence shows that FSG did not directly hire Twilio and OpenAI to send the texts and calls). However, there is sufficient evidence for a jury to conclude that the Mathews family—who are

behind the efforts to market probate services—used the Fresh Start portfolio of companies to shield themselves and their assets from liability.

Virginia law recognizes "reverse veil piercing in limited circumstances where a corporate insider abuses the corporate form to evade personal obligations or perpetrate injustice." *Al Baz v. Saleh*, 2026 WL 873367, at *5 (Va. Ct. App. Mar. 31, 2026). "In a reverse piercing action, . . . the claimant seeks to reach the assets of a . . . business entity . . . to satisfy claims or a judgment obtained against a corporate insider." *Id.* (quoting *C.F. Tr., Inc.*, 266 Va. at 10). "When determining whether reverse piercing of a limited partnership is appropriate, a court must consider the same factors" that it "considers when determining whether traditional veil piercing should be permitted." *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 338 F.3d 316, 317 (4th Cir. 2003) (quoting *C.F. Tr., Inc.*, 266 Va. at 12). While "no single rule or criterion is dispositive, the litigant who seeks to disregard a limited partnership entity must show that the partnership sought to be pierced has been controlled or used by the debtor to evade a personal obligation, to perpetrate a fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Id.* Further, the piercing of the corporate veil "is justified when the unity of interest and ownership is such that the separate personalities of the corporation and/or limited partnership and the individual no longer exist, and adherence to that separateness would create an injustice." *Id.*

Based on this limited factual record, a jury could conclude Ms. Mathews and/or her family used FSG and their other corporate entities as alter egos—*i.e.*, they created corporate forms to avoid personal liability for their actions. For example, Ms. Mathews concedes that she ignores the various corporate forms of the Fresh Start entities by using her *personal* credit card to pay the business expenses of all the Fresh Start companies, including FSG. Dkt. 95-1 at 7–8. There is also a single website and Facebook page advertising all the Fresh Start businesses that prominently

feature pictures and videos of Ms. Mathews's husband and son. Dkt. 96 at 9–16. These facts suggest a lack of corporate separateness and that there may be little daylight between the personalities of the corporations and the Mathews themselves.

Accordingly, Fresh Start's motion for summary judgment must be denied based on the current record before the Court.

**B. TCPA Claims**

Twilio and OpenAI challenge the TCPA claims against them, raising six legal arguments: (1) they did not "make" or "initiate" a call within the meaning of the TCPA; (2) § 227(c)(5) does not apply to text messages; (3) § 227(c)(5) only applies to "residential lines," not cellphones; (4) 47 C.F.R. § 64.1200(b)(1) and (b)(3) do not provide a private cause of action; (5) the calls Lowrey received were not "telephone solicitations" or "telemarketing" within the meaning of the TCPA; and (6) OpenAI's and Twilio's terms of service constitute affirmative defenses to Lowrey's "do not call list" claims. The Court will address each in turn.

**1. Twilio and OpenAI did "make" and/or "initiate" calls under the TCPA.**

Subsection 227(b)(1)(A)(iii) imposes direct liability on a party who "make[s]" a call to a "cellular telephone" using an "artificial or prerecorded voice,"while § 227(b)(1)(B) prohibits anyone from "initiat[ing]" a call to a "residential telephone line" using an artificial or prerecorded voice "without the prior express consent of the called party." *See also Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1123 (9th Cir. 2026) (citing 47 U.S.C. § 227(b)(1)). The TCPA does not define "make" or "initiate." Because the parties dispute what it means to "make" or "initiate" a call, the Court begins, as it must, with the plain meaning of those terms. *See United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006), *aff'd*, 496 F.3d 344 (4th Cir. 2007) ("It is axiomatic that the task of statutory construction begins with the statute's language and ends there

if the plain meaning of the statute is dispositive of the question presented.") (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)).

The dictionary defines "make" as "to cause to exist, occur, or appear; bring to pass; create; cause." *Howard*, 164 F.4th at 1125–26 (quoting *Make*, Webster's Third New International Dictionary 1363 (1981 ed.)). Likewise, it defines "initiate" as "to begin or set going; make a beginning of; perform or facilitate the first actions, steps, or stages of"). *Id.* (quoting Webster's Third, *supra*, at 1164). Applying the plain meaning of "make" and "initiate," courts around the country have held that *direct* TCPA liability "generally does not extend to sellers who do not personally make the phone calls at issue but only includes the telemarketers acting on behalf of those sellers." *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 960 (8th Cir. 2019).[1] Those same courts, however, have held that sellers may be *vicariously* liable for TCPA violations based on common law agency theories. *Id.*

Here, Lowrey argues that FSG is the "seller" and that Twilio and OpenAI are "telemarketers." Dkt. 45 ¶¶ 157, 159 ("[T]ext messages [and calls] were made on behalf of Defendant Fresh Start, and were marketing messages designed to convince Plaintiff to engage the services of Fresh Start's alter ego, Probate Cures."); *id.* ¶¶ 156, 158 ("Open AI and Twilio caused to be initiated multiple telemarketing calls to Plaintiff within the meaning of the TCPA and the VTPPA"); *id.* ¶¶ 252, 254 (Twilio numbers were used to make the calls to Lowrey); Dkt. 65 at 32 (arguing that based on the allegations in the Amended Complaint one can reasonably infer that

---

1 *See also Barry v. Firstsource Sols. USA, LLC*, 2025 WL 1762289, at *2 (W.D. Ky. June 25, 2025); *League of Women Voters of N.H. v. Kramer*, 2025 WL 919897, at *13 (D.N.H. Mar. 26, 2025); *Smith v. Truman Rd. Dev., LLC*, 2020 WL 2044730, at *17 (W.D. Mo. Apr. 28, 2020); *Cunningham v. Montes*, 378 F. Supp. 3d 741, 748 (W.D. Wis. 2019); *Lucas v. Telemarketer Calling From (407) 476-5670 & Other Tel. Numbers*, 2014 WL 1119594, at *7 (S.D. Ohio Mar. 20, 2014); *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 774 (N.D. Ill. 2014).

OpenAI supplied the artificial voice for the calls). Both Twilio and OpenAI dispute they are "telemarketers" and that they made or initiated calls within the meaning of the TCPA.

Twilio argues it did not make or initiate the calls because it had no control over the content of the messages or when and to whom messages were sent. Dkt. 50-1 at 9. On the other side of that coin, OpenAI argues that it did not make or initiate the calls because its artificial voice technology did not engage until after the call was answered. Dkt. 51 at 30. Essentially, Twilio and OpenAI argue that because they divided the traditional functions of a "telemarketer" or "robo-caller" between them, neither should face TCPA liability.

Not so. As Lowrey alleges, Twilio's and OpenAI's platforms work *together* to place the calls and to provide the artificial voice that engages with the consumer. Dkt. 45 ¶ 152 ("Twilio has published multiple guides on how to integrate its platform with OpenAI to make phone calls . . . [and] [f]or such calls to work, both Twilio and OpenAI must be used."); *see also id.* ¶ 144. Therefore, they are telemarketers—albeit the 21stcentury version of them.

Twilio's own marketing materials concede as much, admitting that Twilio's platform can be used to make telemarketing calls. *See* Dkt. 50-1 at 35–36; *see also* https://www.twilio.com/en-us/legal/service-country-specific-terms/voice-sip ("If you use the Twilio Voice Services to place telemarketing or advertising voice calls, you must do the following . . . ."). Twilio's website also admits that it that it "makes" calls for its customers. *See* https://www.twilio.com/en-us. And while the statutory hook is arguably stronger for Twilio because it provides the telephone numbers and dials the unsuspecting consumers,[2] *see Wick v. Twilio Inc.*, 2017 WL 2964855, at *4 (W.D. Wash. July

---

[2] A party makes or initiates a call if "it takes the steps necessary to physically place a telephone call." *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 519 (N.D.W. Va. 2016), *aff'd sub nom. Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243 (4th Cir. 2018).

12, 2017), there is also an adequate statutory basis to hold OpenAI liable for lending its technology to telemarketing calls. After all, OpenAI "facilitate[s] the first actions, steps, or stages of" the call by providing the artificial voice and responding to the consumers who answer the calls. *Howard*, 164 F.4th at 1125–26 (quoting Webster's Third, *supra*, at 1164). Twilio's act of dialing the number would prove fruitless without OpenAI's technology that engages with the consumer on the other end of the call.

In sum, the Amended Complaint alleges sufficient facts to find that Twilio and OpenAI—working in concert—"made" and "initiated" calls to Lowrey within the meaning of the TCPA.

**2. Text messages are not governed by the "do not call" provisions of the TCPA.**[3]

As their second line of defense, Twilio and OpenAI argue that Lowrey's § 227(c)(5) claims (colloquially referred to as "do not call" claims) do not apply to text messages. *E.g.*, Dkt. 50-1 at 22–26. This argument fares better. While neither the Supreme Court nor the Fourth Circuit have addressed this question, the Seventh Circuit has directly and persuasively held that § 227(c)(5) does not apply to text messages.[4] *See Steidinger v. Blackstone Med. Servs.*, 182 F.4th 532, 539 (7th Cir. 2026).

Section 227(c)(5) creates a private right of action for an individual "who has received more than one *telephone call* within any 12-month period by or on behalf of the same entity in violation

---

[3] Twilio does not argue that § 227(b)(1)(B) only applies to call, not texts. *See generally* Dkt. 50-1 at 22–23. Accordingly, the Court will not address whether § 227(b)(1)(B) applies to text messages.

[4] The Seventh Circuit is not alone. Numerous district courts have also held that § 227(c)(5)'s private right of action only applies to telephone calls, not text messages. *E.g.*, *Stockdale v. Skymount Prop. Grp.*, 2026 WL 591842, at *2–4 (N.D. Ohio Mar. 3, 2026); *Radvansky v. 1-800-FLOWERS.COM, INC.*, 2026 WL 456919, at *5 (N.D. Ga. Feb. 17, 2026); *James v. Smarter Contact, Inc.*, 2026 WL 879244, at *2–4 (M.D. Fla. Mar. 31, 2026); *Irvin v. Sonic Indus. Servs., LLC*, 2026 WL 1098403, at *5 (N.D. Ga. Apr. 20, 2026).

of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). The TCPA does not define "telephone call," *see Steidinger*, 182 F.4th at 535; however, the dictionary defines a telephone as "[a]n instrument for reproducing sounds at a distance," *see Telephone*, Webster's Ninth New Collegiate Dictionary 1214 (1991), and a call as "get[ting] or try[ing] to get into communication by telephone." *Call*, *id.* Unlike a text message, a telephone call anticipates sound—*i.e.*, voices communicating with one another. *Steidinger*, 182 F.4th at 536 ("Text messages do not reproduce sounds, suggesting that they do not qualify as a new application of telephone call within the meaning of that term."). Moreover, it is undoubtable that in "today's parlance, 'telephone call' means something entirely different from 'text message.'" *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 899 (C.D. Ill. 2025). If someone says, "I'm going to text you," the listener would not expect a telephone call. Likewise, if someone says, "I'm going to call you," the listener would not expect a text. Therefore, the plain meaning of "telephone call" excludes text messages.

This conclusion is further supported by other provisions of the TCPA. For example, the TCPA defines a "telephone solicitation" as "the initiation of a *telephone call or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4) (emphasis added). Section 227(a)(4) clearly differentiates between a telephone call and a message. Moreover, § 227(e)(8) explicitly excludes from the definition of "text message" a "real-time, two-way voice or video communication." *Id.* § 227(e)(8). Section 227(e)(8) shows that Congress—like the average American on the street—appreciates the difference between a text message and a voice call.

Because a text message is different from a telephone call and because § 227(c)(5) only applies to "telephone calls," Lowrey's § 227(c)(5) claims relying on text messages must be

dismissed. Accordingly, Count 1 must be dismissed to the extent it relies on text messages Lowrey received, and Count 2 must be dismissed in its entirety. For the sake of efficiency, the Court will also dismiss Count 7 (to the extent it relies upon text messages Lowrey received).

**3. Section 227(c) does not apply to cellphones, only residential lines.**

Twilio and OpenAI also argue that § 227(c) only applies to residential landlines, not cellphones. Dkt. 50-1 at 36; Dkt. 52 at 30. They are right about this as well.

Section 227(c) "protect[s] *residential telephone subscribers'* privacy rights." 47 U.S.C. § 227(c)(1) & (3) (emphasis added). Although the TCPA provides no statutory definition of the term "residential telephone subscriber," and the "Fourth Circuit has not addressed whether cell phone owners are considered 'residential telephone subscribers,'" *Gaker v. Q3M Ins. Sols.*, 2023 WL 2472649, at *2 (W.D.N.C. Feb. 8, 2023), the statute's "plain meaning" and its structure show that cellphones are different from residential lines. *See Anthony v. Brian Mktg. Grp.*, 2026 WL 2685650, at *8 (S.D. Fla. Sept. 11, 2026); *Cunningham v. Britereal Mgmt., Inc.*, 2020 WL 7391693, at *7 (E.D. Tex. Nov. 20, 2020), report and recommendation adopted, 2020 WL 7388415 (E.D. Tex. Dec. 16, 2020).

A "residence" is "a building used as a home." *Residence*, Merriam Webster's Collegiate Dictionary 996 (10th ed. 1994); *see also Residence*, Black's Law Dictionary (6th ed. 1990) (a "residence" is a "[p]lace where one actually lives or has his home; a person's dwelling place or place of habitation; an abode"). The term "residential" relates to "[a] residence or residences," and therefore, a residential telephone is uniquely tied to a person's dwelling. Merriam Websters, *supra*, at 996. By contrast, a cellphone is a portable device that can be used anywhere by connecting to a

mobile network.[5] Based on the readily apparent distinction between "residential" and "cellular," Congress clearly intended to refer to a customer who paid for a residential landline when it used the term "residential telephone subscriber" in the TCPA.

The TCPA's structure reinforces the plain meaning of the text. Congress appreciated the difference between a residential and cellular number because it prohibited telemarketing calls with artificial voices to both cellphones, *see* 47 U.S.C. § 227(b)(1)(A)(iii), and "residential lines," *see id.* § 227(b)(1)(B).[6] The Supreme Court has also confirmed that the terms "residential telephone line" and "cellular telephone service" are not interchangeable. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 617, 617 n.3 (2020). "Considering Congress knew of cellular telephones—and in fact referenced cellular telephones as distinct from residential telephones throughout the TCPA—a proper interpretation of the statute would conclude that Congress intentionally" used those terms and did not do so synonymously. *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1340 (S.D. Fla. 2022). To hold otherwise would either render § 227(b)(1)(A)(iii) or § 227(b)(1)(B) superfluous because only one of those provisions would be necessary if the terms "residential telephone line" and "cellular telephone service" were interchangeable. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be

---

[5] *Cellphone*, Merriam Webster's, *supra*, at 184 ("a radiotelephone system in which a geographical area (as a city) is divided into small sections each served by a transmitter of limited range"); *Cellphone*, Collins English Dictionary and Thesaurus 175 (1993) ("a portable telephone operated by cellular radio"); *Cellular phone*, The American Century Dictionary 93 (1995) ("mobile radio-telephone that can operate over a wide region via a network of local transmitters, each serving a local area (cell)").

[6] Section 227(b)(1)(B) makes it unlawful to "initiate any telephone call to any *residential telephone line* using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B).

prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Because the text and structure of the statute support the conclusion that § 227(c) only applies to residential landlines,[7] the Court will dismiss the rest of Counts One and Seven because they rely on calls to Lowrey's cellphone. This reasoning is also an alternative ground for dismissing Count Two.

**4. 47 C.F.R. §§ 64.1200(b)(1) and (b)(3) do not provide private causes of action.**

Counts 9, 10, and 11 are based, at least in part, on alleged violations of two regulations:47 C.F.R. §§ 64.1200(b)(1) and (b)(3). 47 C.F.R. § 64.1200(b)(1) requires a telemarketer to identify who is responsible for making a call, and 47 C.F.R. § 64.1200(b)(3) requires that the consumer be provided with an "opt-out" mechanism. OpenAI argues that Counts 9 and 10 must be dismissed because neither (b)(1) nor (b)(3) provide a private right of action. Dkt. 52 at 36.[8] OpenAI is correct.

47 C.F.R. §§ 64.1200(b)(1) and (b)(3) were authorized under § 227(d), not §§ 227(b) or (c).[9] Unlike §§ 227(b) and (c), which both provide for private rights of action, § 227(d) does not allow private individuals to sue for violations of that statutory provision or its associated regulations. *See Connor v. Honeywell Int'l Inc.*, 2012 WL 6135193, at *2 (D.S.C. Nov. 13, 2012);

---

[7] The Court is required to independently interpret the meaning of a statute and has no obligation to defer to an alternative construction by an executive agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024) ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").

[8] Count 11 is against FSG, which did not make any arguments for dismissal other than it is the incorrect party. Nonetheless, Count 11 is similar to Count 9, so the Court will also address Count 11.

[9] *See Rules & Reguls. Implementing the TCPA*, Report and Order, 7 FCC Rcd. 8752, ¶ 53 (1992) (prescribing 47 C.F.R. § 64.1200(b)(1) under Section 227(d)(3)); *Rules & Reguls. Implementing the TCPA*, Report and Order, 27 FCC Rcd. 1830, ¶¶ 11, 47 & n.28, 134 (2012) (prescribing 47 C.F.R. § 64.1200(b)(3) under Section 227(d)(3)).

*Dr. Stuart T. Zaller, LLC v. Pharmawest Pharmacy, Ltd.*, 2011 WL 5508912, at *2 (D. Md. Nov. 8, 2011); *Adler v. Vision Lab Telec., Inc.*, 393 F.Supp.2d 35, 38 (D.D.C. 2005). Therefore, to the extent Counts 9, 10, and 11 rely on 47 C.F.R. §§ 64.1200(b)(1) and (b)(3), they must be dismissed.[10]

**5. Lowrey received "telephone solicitations" or "telemarketing" calls within the meaning of the TCPA.**

Twilio and OpenAI also argue that Counts One and Ten should be dismissed because Lowrey did not allege that a "telephone solicitation" or a "telemarketing" call occurred. Dkt. 50-1 at 31–32; Dkt. 52 at 37–38. Under the TCPA, a "telephone solicitation" is a call made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4). A telemarketing call is defined identically. *See* 47 C.F.R. § 64.1200(f)(13).

Twilio and OpenAI argue that Lowrey does not allege that anyone encouraged him to purchase goods or services. *E.g.*, Dkt. 50-1 at 32. Rather, the messages he received merely noted that he was representing an estate and suggested he should call a number for more information. The Court disagrees with Twilio's and OpenAI's limited view of what a "telephone solicitation" is. The purpose of the calls to Lowrey was to connect him with ProbateCURES and to ultimately sell him its services. Telemarketers cannot insulate themselves from TCPA liability by dividing a solicitation into a two-step process. One of the primary purposes of the Act is to protect individuals from the annoyance of telemarketing calls. *See, e.g.*, *Katz v. Allied First Bank*, 2026 WL 636723, at *7 (N.D. Ill. Mar. 6, 2026) ("Congress intended for the TCPA to protect individuals from the

---

[10] Counts 9 and 11 appear to rely on violations of both 47 C.F.R. § 64.1200(b)(1) and 47 U.S.C. § 227(b)(1)(A)(iii). Dkt. 45 ¶¶ 408–409. Therefore, Counts 9 and 11 are only dismissed in part as they relate to the regulatory claim. *E.g.*, *id.* ¶ 414. By contrast, Count 10 appears to rely exclusively on a violation of 47 C.F.R. § 64.1200(b)(3) and must be dismissed in its entirety. *Id.* ¶¶ 410–432.

annoyance and cost of receiving certain types of telemarketing calls without their prior consent."). The purpose of the Act would be defeated if telemarketers could side-step enforcement by saying "we hear you're looking for [insert good or service], please call this number for more information." Interpreting "telephone solicitation" this narrowly would undermine, not encourage, the TCPA's prophylactic purpose. *See Clodfelter v. Republic of Sudan*, 720 F.3d 199, 211 (4th Cir. 2013) ("[R]emedial statutes should be liberally construed.").

**6. Twilio's and OpenAI's affirmative defenses regarding their terms of service are not facially apparent.**

Under the TCPA, it is "an affirmative defense . . . that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of" the respective statutes. 47 U.S.C. § 227(c)(5). Both Twilio and OpenAI argue that their terms and conditions establish reasonable practices and procedures that should prevent solicitations in violation of the TCPA. Dkt. 50-1 at 35–37; Dkt. 52 at 44–45. But these affirmative defenses are not "obvious from the face of the complaint," and therefore it is premature to consider them at the motion to dismiss stage. *See Hudson v. Ralph Lauren Corp.*, 385 F. Supp. 3d 639, 642 (N.D. Ill. 2019). Twilio and OpenAI are free to raise this issue again at summary judgment.

**C. VTPPA claims**

OpenAI's and Twilio's arguments for dismissal of Lowrey's VTPPA claims largely track their arguments for dismissal of his TCPA claims. For example, they argue they are not "telephone solicitors"; they did not initiate or make any calls; Lowrey did not receive a "telephone solicitation"; and their terms of service preclude relief. The Court already rejected these arguments regarding the TCPA and will also reject them for the VTPPA. There is one argument, however, that

is unique to the VTPPA—*i.e.*, that Lowrey's failure-to-identify claim fails because he does not allege OpenAI or Twilio "made contact" with him. *See* Dkt. 50-1 at 30–31; Dkt. 52 at 42–43.

To succeed on his failure-to-identify claim under the VTPPA (Count 6), Lowrey must show that OpenAI and Twilio "ma[d]e a telephone solicitation via telephone call" and failed to "identify [themselves] . . . promptly upon making contact with the recipient of such solicitation." Va. Code § 59.1-512. Lowrey's own allegations show that when he received a call or text someone identified themselves (even if they were artificial) and the company they were with. For example, he alleges that a person named "Emma, from ProbateCURES" reached out "because [she] noticed [he was] representing an estate." Dkt. 45 ¶¶ 216, 233, 237, 243. He also alleges that when he called back the numbers a voice stated, "this is Nadine with FSG," and explained that the company helps individuals with properties going through probate. *Id.* ¶ 239. Simply put, the calls and texts provided sufficient identification for Lowrey to figure out that ProbateCURES and FSG—related companies controlled by the Mathews family—were the ones contacting him. After all, we likely wouldn't be here if there had been no identifying information in the calls and texts.

Although very few cases have interpreted § 59.1-512, the calls and texts here appear to comply with the statute's requirements. To the extent Lowrey argues that the calls needed to identify FSG as the company advertising its services, Twilio as the company making the call, and OpenAI as the company providing the artificial voice technology, that is a bridge too far. Accordingly, Count 6 must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, FSG's motion for summary judgment (Dkts. 55, 95) is **DENIED**.

Additionally, Twilio and OpenAI's motions to dismiss (Dkts. 51, 52) are **GRANTED IN PART AND DENIED IN PART**. Specifically, Counts 1, 2, 6, 7, and 10 are **DISMISSED** in their entirety[11] and Counts 9 and 11 are **DISMISSED** in part.[12] All other claims remain.

Within twenty-one (21) days of this Order, Plaintiff should file an amended complaint that reflects the Court's rulings.[13] Thirty (30) days after that, Defendants should file their responsive pleadings.

The Court also **DENIES** OpenAI's motion to strike the class allegations (Dkt. 53) as premature. Such motions are disfavored and defeat the purpose of the separate class certification proceedings.[14]

The Clerk of Court shall send this Memorandum Opinion & Order to all parties of record.

Entered this 1st day of October, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

11 To the extent Plaintiff's counsel can find a new class representative who, for example, received calls to their residential phone line, some of these dismissed counts may be revived.

12 As noted above, Counts 9 and 11 are only dismissed to the extent it relies upon a violation of 47 C.F.R. § 64.1200(b)(1). To the extent Counts 9 and 11 also plead violations of 47 U.S.C. § 227(b)(1)(A)(iii), those claims remain.

13 Should Plaintiff add additional parties to his amended complaint, he should serve those parties within seven (7) days of filing the amended complaint.

14 *See, e.g.*, *Hubble v. loanDepot.com, LLC*, 826 F. Supp. 3d 892, 896 (E.D. Mich. 2025); *Francis v. Mead Johnson & Co.*, 2010 WL 3733023, at *1 (D. Colo. Sept. 16, 2010); *In re Jamster Mktg. Litig.*, 2009 WL 1456632, at *11 (S.D. Cal. May 22, 2009); *Paikai v. Gen. Motors Corp.*, 2009 WL 275761, at * 11 (E.D. Cal. Feb. 5, 2009); *In re Wal–Mart Stores, Inc. Wage and Hour Litig.*, 505 F.Supp.2d 609, 616 (N.D. Cal. 2007).